1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

    LARRY LONDON,

4

              Plaintiff,

5                              CIVIL ACTION FILE
    vs.

6                              NO.: 1:16-CV-00353-ODE,

7    KROGER CORPORATION,

8              Defendant.

9

10

11              VIDEOTAPED DEPOSITION OF

12                 LARRY L. LONDON

13                 June 20, 2016

14                   9:20 a.m.

15          Peachtree Center - Harris Tower

16                   Suite 1245

17                 Atlanta, Georgia

18

19        Carolyn M. Carboni, RPR, RMR, CCR-B-878

20

21

22

23

24

25

                                        Page 1

```
 1              INDEX TO EXHIBITS

 2    EXHIBIT          DESCRIPTION              PAGE

 3    For the Defendant:

 4    Exhibit 1   Employment application         21

 5    Exhibit 2   Store Rules and Regulations,

 6                effective March 2004, Bates

 7                22                             40

 8    Exhibit 3   Store Rules and Regulations,

 9                effective March 2004, Bates

10                70                             41

11    Exhibit 4   The "411" on the Kroger Scene,

12                Spend It Where You Earn It     44

13    Exhibit 5   Kroger Associate Purchase Policy  49

14    Exhibit 6   Document entitled To All Employee

15                Who Work Between 1 a.m. to 6 a.m.  54

16    Exhibit 7   Letter To Whom It May Concern

17                from Mr. London, Bates 112-113  59

18    Exhibit 8   Kroger records, Bates 107-100   59

19    Exhibit 9   Shrink and Inventory Control,

20                Bates 0028                     77

21    Exhibit 10  Constructive Advice Record,

22                Bates 0007                     85

23    Exhibit 11  2/14/14 letter to Mr. London

24                from R. Clark                  88

25    Exhibit 12  Grievance Form, Bates 116-118  92


                                         Page 2
```

```
 1              INDEX TO EXHIBITS (Continued)

 2     EXHIBIT              DESCRIPTION              PAGE

 3     Exhibit 13   3/20/14 handwritten note from

 4                  Mr. London                      94

 5     Exhibit 14   Handwritten notes Bates

 6                  227-253                          108

 7     Exhibit 15   3/19/14 letter to Mr. Lucia

 8                  from Mr. London                  113

 9     Exhibit 16   Complaint for damages           151

10     Exhibit 17   Plaintiff's responses to

11                  interrogatories                  192

12     Exhibit 18   The "411" on the Kroger Scene,

13                  Time and Attendance System       227

14     Exhibit 19   Time and Attendance document,

15                  Bates 194                        227

16     Exhibit 20   Important Information For All

17                  Employees document, Bates 1-2    235

18     Exhibit 21   10/29/07 letter to All Employees,

19                  Bates 3                          237

20     Exhibit 22   Pay records, Bates 216-221       239

21     Exhibit 23   Punch detail history            251

22     Exhibit 24   2013 overtime records           271

23

24

25

                                              Page  3
```

```
1                    INDEX TO EXAMINATION

2     EXAMINATION                                    PAGE

3     By Mr. Barron                                    6

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
800-336-4000

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiff:

 3           MARK D. SPERRY, ESQUIRE

 4           The Molden Law Firm, LLC

 5           Peachtree Center Plaza

 6           Harris Tower

 7           223 Peachtree Street, Suite 1245

 8           Atlanta, Georgia  30303

 9   On behalf of the Defendant:

10           DAVID L. BARRON, ESQUIRE

11           Cozen O'Connor

12           LyondellBasell Tower

13           1221 McKinney, Suite 2900

14           Houston, Texas  77010

15           832.214.3900

16   Also Present:

17           Terry Wetz, Videographer

18           Tony Denney

19

20           (Pursuant to Article 10(B) of the Rules

21   and Regulations of the Georgia Board of Court

22   Reporting, a written disclosure statement was

23   submitted by the court reporter to all counsel

24   present at the proceeding.)

25


                                       Page 5
```

```
 1                 P R O C E E D I N G S

 2            THE VIDEOGRAPHER:  And we are on the

 3    record.  The time is approximately 9:21 a.m.

 4    Today's date is June 20th, 2016.  This is the

 5    beginning of the videotaped deposition of Mr. Larry

 6    London.

 7            Would counsel present please identify

 8    themselves and who they represent for the record.

 9            MR. BARRON:  Go ahead.

10            MR. SPERRY:  Mark Sperry representing

11    Plaintiff Mr. Larry London.

12            MR. BARRON:  David Barron representing the

13    Defendant Kroger.

14            THE VIDEOGRAPHER:  Thank you, counsel.

15    Would the court reporter please swear the witness.

16                      LARRY L. LONDON,

17    being first duly sworn, was examined and deposed as

18    follows:

19                       EXAMINATION

20    BY MR. BARRON:

21       Q    Good morning, Mr. London.  My name is

22    David Barron.  I represent Kroger in this case.

23       A    Yes.

24       Q    Okay.  And you understand we're here

25    because you filed a lawsuit against Kroger?
```

Page 6

1    A    Yes.

2    Q    Have you ever been deposed before?

3    A    No.

4    Q    I'm sure your lawyer has probably gone

5    over some of these rules with you, but I'm going to

6    go over them again just to make sure we have a

7    smooth deposition here today.

8         The way this is going work is, I'm going

9    to ask you questions, and you're going to answer

10   them hopefully.  And I would like for you to wait

11   till I finish my question before you answer.  That

12   way we're not talking over each other.  Can we

13   agree on that?

14   A    Yes.

15   Q    I will try my best to let you finish your

16   answer before I talk again.  If I don't, I

17   apologize, and the court reporter will probably

18   kick me under the table, but again, we'll try to

19   make sure we're not talking over each other.  All

20   right?

21   A    Right.

22   Q    It's also important for you to answer

23   verbally.  You're doing great, but you need to say

24   yes or no as opposed to an uh-huh or an huh-uh or

25   nodding the head or something like that.

Page 7

```
 1        A     Right.
 2        Q     If you need a break for any reason, let me
 3   know.  Happy to let you have a break to go to the
 4   bathroom or get some water or whatever you need.
 5            The only thing I would ask is that if
 6   there's a question on the table, I need you to
 7   answer that before you leave.  Okay?
 8        A     Yes.
 9        Q     If you don't understand my questions for
10   any reason, let me know.  If it's too long, too
11   complicated, I use a word you don't understand,
12   anything like that.  I also tend to talk fast.
13   Again, for any of those reasons, if you don't
14   understand the question, let me know.  And I'll do
15   my best to try to help you understand it.
16            If you answer it, I'm going to assume you
17   understood it.  Okay?
18        A     Yes.
19        Q     You understand that the oath you just took
20   is the same oath that you would take in court and
21   that it's under penalty of perjury, right?
22        A     Yes.
23        Q     Are you taking any medications or anything
24   that would interfere with your ability to testify
25   honestly here today?
```

Page 8

```
 1        A    No.
 2        Q    Did you speak with anybody in preparation
 3   for your deposition other than your lawyer?  I
 4   don't want to know about anything you talked with
 5   your lawyer about.
 6        A    No.
 7        Q    Are you married?
 8        A    No.
 9        Q    Did you review any documents in
10   preparation for your deposition here today?
11        A    No.
12        Q    You didn't review anything?
13        A    No.
14        Q    Your lawsuit, payroll records, nothing?
15        A    No.
16        Q    Did you bring any documents today with
17   you?
18        A    No.
19        Q    What is your full name?
20        A    Larry Lawson London.
21        Q    Have you always gone by that name?
22        A    Yes.
23        Q    Have you gone by any other names?
24        A    No.
25        Q    What is your current address?
```

Page 9

1      A     2920 Winchester Drive, Cumming, Georgia,

2   30041.

3      Q     Does anybody else live with you?

4      A     No.

5      Q     How long have you lived at that address?

6      A     21 years.

7      Q     Is it a house?

8      A     Yes.

9      Q     Do you own it?

10      A     No.

11      Q     Okay.  Are you owning it or --

12      A     I'm renting it.

13      Q     You're renting it, okay.

14      A     Yes.

15      Q     So you've rented it for 21 years?

16      A     Yes.

17      Q     How old are you?

18      A     63.

19      Q     What year were you born?

20      A     1953.

21      Q     You said you're not currently married.

22   Have you been married before?

23      A     Yes.

24      Q     All right.  How many times?

25      A     Twice.

Page 10

```
 1        Q    I guess it's sometimes easier to go in
 2   reverse, so what's the most recent marriage?  How
 3   long ago was that?
 4        A    I want to say 2000.  I'm not positive.
 5        Q    Okay.  How long were you married?
 6        A    Two years.
 7        Q    So 2000 to 2002?
 8        A    Yes.
 9        Q    What was her name?
10        A    Nancy.
11        Q    What's her last name?
12        A    Spear.
13        Q    Can you spell that?
14        A    S-p-e-a-r.
15        Q    All right.  And what was her employment or
16   occupation?
17        A    She worked for Lowe's -- I mean, for
18   Levitz, excuse me, furniture company.
19        Q    Okay.  Do you know if she ever worked for
20   Kroger?
21        A    No, she never did.
22        Q    Any children by that marriage?
23        A    No.
24        Q    Okay.  Previous marriage, your first
25   marriage, when was that?
```

```
 1        A    That was in -- I'm trying to think -- '80.

 2        Q    Okay.  How long were you married?

 3        A    Eight years.

 4        Q    So to about '88 or so?

 5        A    Yes.

 6        Q    What was her name?

 7        A    Doris.

 8        Q    Last name?

 9        A    Denny, D-e-n-n-y.

10        Q    Okay.  What was her occupation?

11        A    She worked for Winn-Dixie.

12        Q    Did you meet her at -- because you worked

13   also at Winn-Dixie, correct?

14        A    Yes.

15        Q    Did you meet her at Winn-Dixie?

16        A    Yes.

17        Q    What did she do for Winn-Dixie?

18        A    She was a drug GM manager.

19        Q    Did she ever work for Kroger, to your

20   knowledge?

21        A    No.

22        Q    Any family members that have ever worked

23   for Kroger, to your knowledge?

24        A    No.

25        Q    Have you ever dated anybody at Kroger?
```

Page 12

```
 1        A     No.

 2        Q     Any children from your first marriage?

 3        A     No.

 4        Q     Any children at all?

 5        A     No.

 6        Q     Do have any brothers or sisters?

 7        A     Yes.

 8        Q     How many?

 9        A     Two brothers, three sisters.

10        Q     Wow.  All right.  All of them still alive?

11        A     Yes.

12        Q     Any of them work at Kroger?

13        A     No.

14        Q     Any family member that's ever worked at

15   Kroger besides you?

16        A     No.

17        Q     Any of them work in the grocery industry?

18        A     No.

19        Q     Where do they live, your brothers and

20   sisters?

21        A     I believe everybody lives in Florida.

22        Q     Okay.  Are you from Florida?

23        A     Originally.

24        Q     Where did you grow up?

25        A     Jacksonville.
```

Page 13

```
 1        Q     Jacksonville, you said?

 2        A     Yes.

 3        Q     Did you go to high school there?

 4        A     I finished high school in Atlanta, but

 5    most of my high school was there.

 6        Q     Okay.  Why did you come to Atlanta?

 7        A     My parents had died, and my oldest sister

 8    had custody, and they chose to move to Atlanta, so

 9    I had no choice.

10        Q     So you moved here with your oldest sister?

11        A     Yes.

12        Q     What happened to your parents?

13        A     They both died of cancer.

14        Q     Around the same time?

15        A     Within -- we buried one, and the other one

16    died the day we buried her.

17        Q     Really?

18        A     Yes.

19        Q     Wow.

20        A     But they also were smokers, I mean...

21        Q     Okay.  So lung cancer?

22        A     Big time.  Well, it originally wasn't

23    diagnosed as that --

24        Q     Yeah.

25        A     -- but that's what it was.  Back then the
```

Page 14

```
 1   way that the local doctors and stuff were, they
 2   just didn't get it.
 3        Q    All right.  Interesting.  You usually
 4   don't see people die at the same time like that.
 5        A    I know, yeah.
 6        Q    That's obviously bad for you as --
 7        A    It was.
 8        Q    -- a child.
 9        A    Because I think I was 13 at the time.
10        Q    Yeah.  Okay.  So you went to high school
11   in Jacksonville and then graduated in Atlanta?
12        A    Yes.
13        Q    Any college education?
14        A    No.
15        Q    Military?
16        A    No.
17        Q    Any certifications, training, anything
18   like that?
19        A    No.
20        Q    Okay.  I want to walk through your
21   employment before Kroger.  And it's usually easier
22   to do it backwards.
23             Do you recall when you started working at
24   Kroger?
25        A    2007.
```

Page 15

1      Q     Where did you work immediately prior to

2    Kroger?

3      A     I was a personal trainer.

4      Q     Okay.  Is that the IBL [sic], Inc. --

5      A     Yes.

6      Q     -- that was on your application?

7      A     Yes.

8      Q     Okay.  Where were you a personal trainer?

9    Is it something you did out of your home or at a

10   gym?

11     A     Both.

12     Q     How long had you done that, from when to

13   when?

14     A     I want to say 2001 up to about 2006.

15     Q     Do you actually have your own company

16   incorporated?

17     A     I did at the time, yes.

18     Q     And it was called LB --

19     A     LBL, Inc.

20     Q     Okay.  Those are your initials, I assume?

21     A     Yes.

22     Q     How many clients did you have at your most

23   successful point?

24     A     25.

25     Q     When would that have been?

1      A      2004, 2005.

2      Q      And which gym were you using to train

3   them?

4      A      They were different gyms.  Gold's Gym was

5   one.

6      Q      Okay.

7      A      Another one was Georgia 400.

8      Q      Okay.  And did you stop doing that when

9   you worked at Kroger?

10      A      Yes.

11      Q      Have you done any personal training since?

12      A      No.

13      Q      Okay.  What else did you do before doing

14   the personal training?

15      A      Worked for Winn-Dixie.

16      Q      Okay.  From when to when?

17      A      I want to say 2000 -- or -- yeah, 2000 --

18   that would be 1973 to 1991.

19      Q      What was your reason for leaving there?

20      A      Tired.  Just wanted to do something

21   different.  I wanted to -- I wanted to start my own

22   landscaping company.

23      Q      Did you do that?

24      A      I did do that.

25      Q      How long did you have your own landscaping

Page 17

```
 1   company?

 2        A     Three years.

 3        Q     From when to when?

 4        A     From '94, '95 to probably '98.

 5        Q     Did you have any employees?

 6        A     No.

 7        Q     Just yourself?

 8        A     Yes.

 9        Q     And what were you doing, mowing yards?

10        A     Just, yeah, basically, maintenance.

11        Q     Why did you stop doing that?

12        A     Wasn't profitable enough, wasn't

13   consistent enough.

14        Q     Any other employment?

15        A     Out of high school, I went to work for a

16   company called Lithonia Lighting.

17        Q     What was that?

18        A     Lithonia Lighting.

19        Q     Lithonia?

20        A     Yes.

21        Q     Okay.  What kind of business is that?

22        A     It was a manufacturer of lighting

23   fixtures.

24        Q     What did you do for them?

25        A     Drove a forklift, worked on an assembly
```

Page 18

1    line, and then became what they would call a

2    checker, which was a person who was a

3    receiving/shipping person.

4        Q    Do you know when you worked, from when to

5    when?

6        A    It was out of high school, so it would be

7    '71 until -- I left there to go to Winn-Dixie.

8        Q    So, like, '73 or so?

9        A    Yes.

10       Q    Did you quit or were you terminated?

11       A    No, I quit.

12       Q    Have you ever been terminated from a job

13   other than Kroger?

14       A    No.

15       Q    During the time you worked at Kroger, did

16   you have any hobbies?

17       A    Played a little golf, went to the gym from

18   time to time.

19       Q    I understand you went to the gym pretty

20   regular when you worked for Kroger.  Is that not

21   true?

22       A    Well, I would go to the gym sometimes on

23   my lunch hour because it was right next door to the

24   Kroger.

25       Q    Yeah.  Which gym did you go to?

Veritext Legal Solutions
800-336-4000

```
 1        A      Anytime Fitness.

 2        Q      Was it open 24 --

 3        A      Yes.

 4        Q      -- hours?

 5        A      Yes.

 6        Q      So you would go sometimes at night in the

 7   middle of your shift or --

 8        A      Yes.

 9        Q      -- on your lunch?

10        A      Yes.

11        Q      For how long?

12        A      45 minutes.

13        Q      Did you also sometimes go before your

14   shift started?

15        A      Yes.

16        Q      Did you do any personal training over at

17   Anytime Fitness?

18        A      No.

19        Q      Was it allowed to do personal training

20   there?

21        A      They had personal trainers, so you had to

22   be on staff to do that.

23        Q      Okay.  So a third party personal trainer

24   could not do that?

25        A      Could not do that, no.
```

Page 20

```
 1        Q     How far away did you live -- I believe you
 2   were at -- was it 473?
 3        A     Yes.
 4        Q     The store?
 5        A     Yes.
 6        Q     Where is 473?
 7        A     It's in Cumming on exit 17.
 8        Q     How far away did you live from 473?
 9        A     3.5 miles.
10        Q     Sounds like you know that route very well.
11        A     I do.
12        Q     Okay.  Did you have any sort of strict
13   routine in terms of when you worked out or did you
14   just work out whenever you could?
15        A     Whenever I could.
16        Q     Any other hobbies?
17        A     No, that's about it.
18        Q     Okay.
19              (Defendant's Exhibit 1 marked.)
20   BY MR. BARRON:
21        Q     Mr. London, I've handed you what's been
22   marked as Exhibit 1 to your deposition.  Do you see
23   that?
24        A     Yes.
25        Q     And I'll represent to you that this is
```

```
 1    your application at Kroger.  Does that look
 2    familiar?
 3         A    This is a application.
 4         Q    Okay.  Did you fill out more than one?
 5         A    No, I'm -- what I'm saying is, I don't see
 6    this as my application.  Or are you saying that
 7    this is my actual application?
 8         Q    Yeah.  If you look, it has your name on
 9    it, Larry London, 2920 Winchester --
10         A    Oh, okay, yes.  Yeah, I see that now.
11    Thank you.  I was looking down here and didn't see
12    anything.  That's why I was --
13         Q    Sorry.  If you look at the second page, it
14    has your employment history on it, it has LBL,
15    Inc. --
16         A    Yes.
17         Q    -- and Winn-Dixie.  Do you see that?
18         A    Yes, yes.
19         Q    Okay.  And it looks like you were making
20    $25 an hour at -- as a personal trainer?
21         A    Yes.
22         Q    Why did you stop doing that and decide to
23    go back to the grocery business?
24         A    The number of clients had diminished over
25    a period of time.
```

Page 22

```
 1        Q     Okay.
 2        A     And of that $25 you're making, you're
 3   still having to pay the gym a certain percentage of
 4   that, so it's not as much as it appeared to be.
 5              And as I was getting older, I needed
 6   something that was more stable, and I needed
 7   insurance.  So that was my reason for wanting to go
 8   back into the grocery business.
 9        Q     Okay.  On your application, it asks you,
10   have you ever been convicted of a crime, and you
11   said no.
12        A     Correct.
13        Q     Is that true?
14        A     True.
15        Q     Have you ever been arrested?
16        A     Yes.
17        Q     What have you been arrested for?
18        A     I was arrested -- once again, I'm guessing
19   at the date, I want to say 2004, 2005, something
20   like that.  It was -- I was accused of having child
21   pornography on a work computer.
22        Q     This is 2004, you said?
23        A     I believe so.
24        Q     At which workplace?
25        A     At the gym that I was working out of,
```

Page 23

1    Gold's Gym.

2        Q    Which Gold's Gym was this?

3        A    It was the one in Cumming.

4        Q    Do you remember the date?

5        A    It was --

6        Q    A month?

7        A    I want to say February the 12th, something

8    like that.

9        Q    Of which year?

10       A    I want to say '5.  It may be '4.

11       Q    So what happened?  I mean, how did you --

12   did you just go up there and you were arrested one

13   day or what happened?

14       A    Computer in my office had broke.  I had

15   asked the person that does the tech work to repair

16   the computer.  And he said he found child

17   pornography on the computer.  Since it was in my

18   office, that's why I was arrested.

19       Q    Were you the only one that had access to

20   that computer?

21       A    No, I was not.

22       Q    This computer did not belong to you?

23       A    It did not.

24       Q    What happened next?

25       A    I was arrested.  I did not have funds, so

1    they appointed me counsel.

2         Q     Okay.

3         A     We went through the whole process of going

4    to court and waiting for the court -- the case to

5    move forward.

6               As it moved forward, very little was going

7    on.  It was just mainly of a be-on-hold thing.  It

8    took, I want to say, a year and a half before we

9    ever actually got a date set to actually go to

10   trial.  And at that point, the district attorney

11   dropped all charges.

12        Q     Had you been looking at child pornography

13   on that computer?

14        A     I had not.

15        Q     Do you know whose it was?

16        A     I do not, but there was -- several people

17   had access to that computer.

18        Q     Were you in jail for some period of time?

19        A     24 hours.

20        Q     How did you get out?

21        A     Bail.

22        Q     Bail?  Who paid for your bail?

23        A     I did.

24        Q     Any other arrests?

25        A     No.

Veritext Legal Solutions
800-336-4000

1      Q     Did you keep any records from that arrest?

2      A     No.

3      Q     Which county was that, do you remember?

4      A     Forsyth.

5      Q     Forsyth?

6      A     Yes.

7      Q     Have you ever filed for bankruptcy?

8      A     Yes.

9      Q     When?

10     A     2007 was the last time.  I had filed

11  earlier, I believe, in 2000 or maybe 1999,

12  something like that.

13     Q     Any particular reason?  Start with 2007.

14     A     I had wages garnished, and there was no

15  way I was going to catch up at that point in time.

16     Q     What were your wages garnished for?

17     A     It was a credit card debt.

18     Q     Okay.  What about 2000, 1999?

19     A     That was a -- when I was -- had my own

20  company, and I had health issues and no insurance.

21  And it wiped me out.

22     Q     It's a medical debt?

23     A     Yes.

24     Q     What were your health issues?

25     A     I have a kidney problem.

Page 26

1      Q    Do you still have kidney problems?

2      A    I do.

3      Q    Do you require dialysis?

4      A    No.

5      Q    What's the problem?

6      A    It --

7      Q    Just generally.  I don't need to know all

8    the details.

9      A    Yeah.  One of the kidneys produces kidney

10   stones on a regular basis, and generally speaking,

11   for the most part, I'm able to pass them.  But

12   whenever they occur and you're not allowed -- not

13   able to pass them, it causes all kind of issues.

14     Q    Any other criminal history that you

15   haven't told me about?

16     A    No.

17     Q    When you applied at Kroger, were you

18   looking for a meat department job?

19     A    No, because I wanted to work overnight.

20     Q    Okay.  You worked at Winn-Dixie as a

21   market manager?

22     A    For 11 years.

23     Q    Meat market?

24     A    Yes.

25     Q    Why did you want to work overnight at

Page 27

```
 1    Kroger?

 2         A    Because I still wanted to have the day

 3    time to do other things.

 4         Q    Personal training?

 5         A    Yes.

 6         Q    So you were doing some personal training

 7    after you started working at Kroger?

 8         A    No, that was the -- the plan was to do

 9    that.  It just never worked out.

10         Q    Now, I want to talk about your employment

11    after Kroger.

12              You were terminated from Kroger in 2014.

13    Does that sound --

14         A    Yes.

15         Q    Have you worked anywhere since 2014?

16         A    I have not.

17         Q    Why not?

18         A    After I was first terminated, I went

19    through the period of being angry.  Then depression

20    set in for a while.  And then I was looking at

21    future as far as what I wanted to do.  I still

22    liked the grocery business.  I was about a year

23    away from I could take early retirement.

24              I talked to several people in different

25    grocery chains, people -- just store level people,
```

Page 28

```
1    and asked them, from a entry-level position, with

2    experience, having been a grocery manager, what

3    would be the pay scale.

4           And I kept getting the same answer, that

5    experience didn't matter, that you would enter --

6    whatever their entry-level pay would be is where

7    you would enter, and then your time of service

8    would determine your income or how much you would

9    make.

10          And as I did the math on it, it didn't

11   make sense to go back to work and start at $10 an

12   hour where my early social security would be about

13   the same, as far as what I would make, but with the

14   social security, there would be no taxes.

15       Q    So you're currently receiving social

16   security?

17       A    Yes.

18       Q    And that would be the retirement social

19   security not disability?

20       A    No, it's retirement.  It's not disability.

21       Q    Okay.

22       A    I had spoke to someone about the

23   possibility of the disability because of the kidney

24   problem --

25       Q    Right.
```

```
 1        A     -- and they told me by the time it got
 2    processed, I would be old enough to get the other,
 3    so it didn't matter.
 4        Q     When did you start receiving your social
 5    security?
 6        A     May of 2015.
 7        Q     Did you receive unemployment?
 8        A     No.
 9        Q     Did you apply?
10        A     No.
11        Q     So what did you do for income between
12    February 2014 and May 2015?
13        A     Savings.
14        Q     You had adequate savings to --
15        A     I did.
16        Q     -- cover you?
17        A     Yes.
18        Q     Okay.  Any other sources of income since
19    your separation from Kroger to the present other
20    than social security?
21        A     No.
22        Q     How much did you have in savings in
23    February 2014?
24        A     41,000.
25        Q     Now, was that accumulated during the time
```

Page 30

1    you worked for Kroger or something you had been

2    saving for quite some time?

3        A    Most of it was from Kroger.  There was a

4    portion of it from a -- hang on.  I need to make a

5    correction.

6        Q    Sure.

7        A    We were talking about my employment, the

8    years that I worked for Winn-Dixie, I also worked

9    for the Atlanta Journal Constitution as a part-time

10   employee, of course.

11       Q    Okay.

12       A    And that in -- I want to say in 2009 or

13   '10, once again, I'm guessing or estimating, when I

14   turned 60 or 61, they contacted me and told me that

15   I had X number of dollars in a pension fund that

16   was now available, and I could take a one-time lump

17   sum payment if I chose to, and I did.

18            And that was -- I want to say it was

19   $18,000.  And that was part of the 40 that I had

20   accumulated.

21       Q    How long did you work for the Atlanta

22   Journal Constitution?

23       A    12 years.

24       Q    What did you do for them?

25       A    I was what they called a branch captain.

Page 31

1      Q     What is that?

2      A     Each -- the paper has branches throughout

3   the city, and this is where you would have your

4   inserts like your Sunday paper, the Dixie Living

5   section, all these things, they are delivered by

6   trucks to the branch.  And then you may have 40

7   carriers at a branch.

8          It was my job to see that each carrier got

9   the designated number of each supplement they were

10  supposed to get.  So it was a job that allowed me

11  to show up whenever I needed to as long as I had it

12  done before the carriers needed to pick up their

13  stuff.

14     Q     Any other jobs that you can recall that

15  you haven't --

16     A     No.

17     Q     -- told me about?

18     A     No.

19     Q     Have you ever filed any lawsuits other

20  than this one?

21     A     No.

22     Q     Any claims?  By that, I mean workers'

23  comp, discrimination, anything like that.

24     A     No.

25     Q     Have you ever testified in a lawsuit

```
 1   before?
 2       A    Yes.  Well, I guess -- let me rephrase
 3   that.  I guess that would be considered giving a
 4   deposition, but it was like a -- I was at a bar,
 5   and there was a fight, and they deposed me.  And it
 6   was like a 15-minute thing that was at the bar,
 7   what-did-you-see kind of thing.
 8       Q    All right.  Was that like immediately
 9   after the fight or --
10       A    No.  This was -- oh, it had to be months
11   later.  And there was -- somebody had sued
12   somebody, and they were trying to gather witnesses
13   and statements and whatever.
14       Q    Was there a lawyer there and --
15       A    It was -- was there a lawyer there?  Well,
16   yeah, I'm assuming that's -- yeah.
17       Q    Okay.  People asked you questions?
18       A    Yeah.  And like I said, it took maybe 15
19   minutes at the most.
20       Q    Any other testimony?
21       A    No.
22       Q    And again, you've never filed a claim for
23   discrimination, harassment, anything like that?
24       A    No.
25       Q    Never been injured on the job?
```

Page 33

1        A        When I worked for Winn-Dixie, there was a

2    workman's -- well, there was a couple of them from

3    getting cut, when you're in the meat department,

4    and stuff like that.  But I guess workman's comp

5    was filed, but I wasn't a claim as in suing

6    somebody.

7        Q        Okay.

8        A        It was just the normal course of when

9    you're injured on the job, you fill out the

10   paperwork kind of thing.

11       Q        Did you ever miss work for any significant

12   amount of time because of an injury?

13       A        I want to say three weeks one time when I

14   had a problem with a back.  That was when I was

15   with Winn-Dixie.

16       Q        Any workers' comp claims at Kroger?

17       A        No.

18       Q        Have you ever filed any complaints

19   regarding your wages or overtime --

20       A        No.

21       Q        -- before this one?

22       A        No.

23       Q        I just want to go back to your post

24   Kroger.  Just to be clear, you haven't applied for

25   work anywhere since your separation from Kroger; is

Veritext Legal Solutions
800-336-4000

```
 1   that true?
 2       A    Correct.
 3       Q    And you haven't been employed anywhere
 4   since your separation from Kroger?
 5       A    Correct.
 6       Q    This may be a dumb question, but what do
 7   you do all day?
 8       A    I started back working out, going to the
 9   gym on a regular basis.  That's pretty much been
10   it.
11           I've had issues with my kidney from time
12   to time.  And whenever you get ambitious and you
13   get started on a program and stuff and then it acts
14   up, it kind of takes all the fun out of trying to
15   be ambitious.
16       Q    When you say "ambitious," you mean working
17   out or --
18       A    Working out --
19       Q    Okay.
20       A    -- or just wanting to proceed to go
21   forward.
22           All the years I've worked for Kroger,
23   never missed a day.  I don't think I was ever late.
24   Trying to go somewhere and work again while I still
25   have this issue with the kidney is a problem
```

Page 35

```
 1    because I don't want to go in and start something

 2    and then immediately have problems because of that.

 3         Q    Do you feel like you're able to -- you

 4    would be able to work in the grocery business right

 5    now with your kidney?

 6         A    I can work fine as long as the kidney

 7    stone is not acting up.

 8         Q    Okay.

 9         A    That is not a problem.

10         Q    How often does that happen?

11         A    It's happening once every six weeks.

12    Sometimes when it's happened, it lasts for two or

13    three weeks.  Sometimes when it happens, it lasts

14    for a day.  And you just -- you never know.

15         Q    Okay.  Let's go back to Kroger.  Why did

16    you choose to apply at Kroger as opposed to

17    somewhere else?

18         A    Convenience.

19         Q    And when you say "convenience," just the

20    location --

21         A    Three and a half miles.

22         Q    -- the location of the store?

23         A    Yes.

24         Q    Did you shop in that store before you

25    applied for --
```

Page 36

1        A    Yes, I did.

2        Q    Let me finish my question.  I know you

3    know what I'm going to ask, but --

4        A    Yeah, okay.

5        Q    Did you shop at that particular store

6    before you applied for work there?

7        A    Yes, I did.

8        Q    Did you know there was any openings there

9    or did you just apply on a whim?

10       A    They had a sign on the front door that

11   said Job Fair.  And I went, okay, well, let's go

12   check it out.

13       Q    Did you talk to anybody in particular at

14   the store about employment?

15       A    At the job fair is the only time I talked

16   to anybody.

17       Q    Was there a hiring manager there or --

18       A    There was a -- the co-manager was the

19   hiring manager, and his name was Mr. Motts.

20       Q    And do you recall what you talked about

21   with Mr. Motts?

22       A    Basically, about my experience with

23   Kroger -- I mean, with Winn-Dixie.

24       Q    You mean Winn-Dixie?

25       A    Yes.  And what I wanted to do, what kind

Page 37

1   of shifts I wanted to work, that kind of thing.

2       Q    What did you tell him?

3       A    I told him that I wanted to work the

4   overnight shift, which would be the stocking crew.

5       Q    Had you ever worked the overnight stocking

6   crew before?

7       A    No.

8       Q    You did not do that job at Winn-Dixie?

9       A    No.

10      Q    Had you ever been a stocker before?

11      A    Just -- not a grocery stocker.  The

12  stocking that you would do when you were in the

13  meat department, lunch meat, that kind of thing.

14      Q    Were you, in fact, hired at store 473?

15      A    Yes.

16      Q    And what was your position when you were

17  hired?

18      A    Stocker.

19      Q    Over the night shift?

20      A    Yes.

21      Q    Do you remember what your hourly rate was?

22      A    It was minimum wage, which was whatever it

23  was at the time, 7.35, 7.40, something like that.

24      Q    And you were hired on an hourly non-exempt

25  basis, correct?

Page 38

```
 1       A     Yes.

 2       Q     You were eligible for overtime?

 3       A     Yes.

 4       Q     Is it fair to say that for the entire time

 5   that you worked for Kroger, you were non-exempt,

 6   eligible for overtime, correct?

 7       A     That is correct.

 8       Q     Do you recall if you were hired on a

 9   part-time or full-time basis?

10       A     Part-time.

11       Q     At some point, did you become full-time?

12       A     Yes.

13       Q     Do you remember when that was?

14       A     I would say it was within a year.

15       Q     Do you recall whether Kroger had a union?

16       A     Yes.

17       Q     Did you become a member of the union?

18       A     No.

19       Q     At no point?

20       A     No point.

21       Q     Why not?

22       A     I'm not a fan of unions.

23       Q     Why?

24       A     I believe that if you do your job

25   correctly, you should be able to deal directly with
```

Page 39

1    management and not have to have a third party go

2    through.

3         Q    When you were hired at Kroger, did you

4    receive a copy of the employee manual?

5         A    I assume I did.

6         Q    Do you remember your start date?

7         A    I want to say it was November of 2007, or

8    maybe October, October, like, 30th, something like

9    that.

10             (Defendant's Exhibit 2 marked.)

11   BY MR. BARRON:

12        Q    Mr. London, I'm handing you what's been

13   marked as Exhibit 2 to your deposition.

14        A    Yes.

15        Q    And I'll represent to you that this is a

16   sign-off sheet, looks to be dated October 29, 2007,

17   for your receipt of the Kroger rules and

18   regulations.  Do you see that?

19        A    Yes.

20        Q    Does this refresh your memory?  Do you

21   remember actually receiving the Kroger rules and

22   regulations?

23        A    Well, this says 2004, and that can't be

24   right because I was not working for Kroger.

25        Q    No.  I'll represent to you that that's

                                        Page 40

```
 1   when the -- that's the date --

 2       A    Oh, that's when the --

 3       Q    -- the rules or --

 4       A    Okay.

 5       Q    -- the 2004 version --

 6       A    Yes.

 7       Q    -- which you signed off in 2007 --

 8       A    Yes.

 9       Q    -- that you got?

10       A    Yes.

11       Q    Okay.  Do you remember when you were hired

12   that Kroger gave you a number of documents and

13   rules and things?

14       A    Yes.

15       Q    Okay.

16            (Defendant's Exhibit 3 marked.)

17   BY MR. BARRON:

18       Q    And the court reporter's handed you what's

19   been marked as Exhibit 3 to your deposition.  And

20   I'll represent to you this is another sign-off

21   sheet dated 2012 for, again, Kroger providing you

22   with another copy of the Kroger's rules and

23   regulations.  Do you see that?

24       A    Yes.

25       Q    Okay.  That's your signature?
```

```
 1        A     Yes.

 2        Q     Just to be clear, that's your signature on

 3   both Exhibit 2 and 3, correct?

 4        A     That is correct.

 5        Q     Have you heard of Kroger's associate

 6   purchase policy?

 7        A     Yes.

 8        Q     What is it?

 9        A     You are to purchase your merchandise prior

10   to consumption.  You are to keep your receipt with

11   your merchandise at all times.  And you are to --

12   any product that you consume on the premises is to

13   be done in the designated area.

14        Q     And how did you come to know those rules?

15        A     Written, spoken, just generally

16   understood.

17        Q     Is it fair to say that those were very

18   well-known rules by employees at Kroger?

19        A     Yes.

20        Q     And is it also fair to say that those were

21   also the rules at Winn-Dixie?

22        A     Yes.

23        Q     Are you aware of something called shrink?

24        A     Yes.

25        Q     What is shrink?
```

Page 42

```
 1        A     Shrink is loss of inventory.
 2        Q     Shrink is important in a grocery store,
 3   isn't it?
 4        A     It's the life blood.
 5        Q     Right.  So theft is something that
 6   obviously grocery stores want to avoid, correct?
 7        A     Yes.
 8        Q     So if an employee is going to be, say,
 9   consuming food or a soft drink --
10        A     Yes.
11        Q     -- it's important for that employee to
12   have a receipt for that product, right?
13        A     That is correct.
14        Q     Because, otherwise, management won't know
15   whether they paid for it or not?
16        A     Correct.
17        Q     During the time you worked for Kroger, you
18   advanced to the position of grocery manager, right?
19        A     Correct.
20        Q     And as -- in your position as grocery
21   manager, it's part of your job to actually enforce
22   the associate purchase policy with --
23        A     That is correct.
24        Q     -- respect -- let me finish my question.
25              -- with respect to other employees,
```

Page 43

1   correct?

2      A    Yes.

3      Q    So it was part of your job to make sure,

4   for example, that someone working on the night

5   crew, if they took a break and was going to eat

6   something, that they paid for it?

7      A    Correct.

8           (Defendant's Exhibit 4 marked.)

9   BY MR. BARRON:

10     Q    The court reporter has handed you what's

11  been marked as Exhibit 4 to your deposition.

12     A    Yes.

13     Q    And I'll represent to you that this is a

14  page of out the Kroger rules and regulations, the

15  page with respect to the associate purchase policy.

16  Do you see that?

17     A    Yes.

18     Q    Have you seen this before?

19     A    Yes.

20     Q    Okay.  How many times have you seen it, do

21  you think?

22     A    It's -- I believe something similar to

23  this is posted in our break room.

24     Q    And I want to direct your attention to a

25  couple of points on here.  There are two paragraphs

                                        Page 44

```
 1    at the top and then there are bullets.  Do you see
 2    that?
 3         A    Yes.
 4         Q    So I want to direct your attention to the
 5    third bullet.  And the last two sentences, it says,
 6    "Full payment must be made at the time of purchase.
 7    Associates must be able to substantiate the
 8    purchase with a register receipt."
 9              Do you see that?
10         A    Yes.
11         Q    Did you understand that to be Kroger's
12    rules?
13         A    Absolutely.
14         Q    If you go down another two bullets, it
15    says, "Associates must retain the register receipt
16    on the merchandise."
17              Do you see that?
18         A    Correct.
19         Q    Isn't it true that that was the practice
20    at Kroger, you would tape it or somehow --
21         A    Yes.
22         Q    -- rubber band it to the product, right?
23         A    Yes.
24         Q    And you did that -- you've done that
25    before, right?
```

Page 45

```
 1        A     All the time, yes.

 2        Q     The next to last bullet says, "Associates

 3   are, under no circumstances to open, use or

 4   otherwise consume any item, merchandise or product

 5   for which they have not paid and for which they do

 6   not have a register receipt."

 7              Do you see that?

 8        A     Yes.

 9        Q     Okay.  I read that correctly?

10        A     Yes.

11        Q     And the very last sentence on this

12   Exhibit 4 says, "Violation of the associate

13   purchase policy may lead to disciplinary action up

14   to and including discharge."  Right?

15        A     Yes.

16        Q     You understood that to be Kroger's policy?

17        A     I did.

18        Q     During the time you worked at Kroger, were

19   you aware of any employees being disciplined or

20   terminated for violations of the associate purchase

21   policy?

22        A     Directly, no.  In hearsay, yes.

23        Q     Okay.  So you didn't have personal

24   knowledge of anybody being, say, fired for stealing

25   a Coca-Cola or a candy or any sort of food item?
```

Page 46

 1      A     Right.

 2            MR. SPERRY:  Object to the form.

 3   BY MR. BARRON:

 4      Q     Okay.  Now, you said you had some hearsay

 5   knowledge.

 6      A     Yes.

 7      Q     What did you hear?

 8      A     Well, I mean, you would hear that, did you

 9   hear that John got fired today for stealing

10   something from the deli, or for consuming something

11   that he shouldn't have, that kind of thing.

12            But I had no direct knowledge that a

13   person did it or I saw anything of that nature.

14      Q     How about employees on the night crew

15   specifically, anybody on the night crew terminated

16   for violating the associate purchase policy during

17   the time you worked for Kroger?

18      A     There was a grocery manager that was

19   fired, I believe his name was Jeff Braggett, and he

20   was the grocery manager, and he was fired for

21   stealing cigarettes.

22      Q     Okay.  During the time that you worked

23   there?

24      A     Yes.

25      Q     And he was at 473?

1       A     Yes.

2       Q     Was that how you got to be grocery

3    manager?

4       A     No, it was later.

5       Q     Okay.  This was after you were grocery

6    manager or before?

7       A     No, it was before I was grocery manager --

8       Q     Okay.

9       A     -- but it was -- there was a couple of

10   grocery managers past that before I became grocery

11   manager.

12      Q     Got it.  Okay.  All right.  So were you

13   working at a -- as a stocker at the time?

14      A     I was the dairy lead at the time.  And

15   when I took that position -- I didn't really want

16   the position, but when they finally convinced me to

17   take the position, I told them I wouldn't take it

18   unless I worked overnight, because the night

19   premium was 60 cents.  The raise for being the

20   dairy lead was 40 cents.

21            If I took the job as it was designed to do

22   in the daytime, I actually lost money.  So I said,

23   no, I'm not going to take a job to have more

24   responsibility and lose money, so I didn't do that.

25      Q     All right.

Veritext Legal Solutions
800-336-4000

```
 1              (Defendant's Exhibit 5 marked.)
 2    BY MR. BARRON:
 3        Q    All right.  Mr. London, the court reporter
 4    has handed you a copy of Exhibit 5, which is
 5    another version of the Kroger associate purchase
 6    policy.  I'll represent to you that's actually in
 7    the booklet twice.
 8        A    Right.
 9        Q    Do you have any reason to dispute that
10    when I tell you that?
11        A    No.
12        Q    All right.  Going through your history at
13    Kroger, you said you were hired as a night stocker,
14    right?
15        A    Correct.
16        Q    How long did you work in that position?
17        A    Two and a half, three years.
18        Q    So to 2010 roughly?
19        A    Yes.
20        Q    And then what was your next job?
21        A    Dairy lead.
22        Q    How long did you work that job?
23        A    Another two years.
24        Q    Okay.  What was your next position?
25        A    Grocery manager.
```

Veritext Legal Solutions
800-336-4000

1     Q     And again, about two years?

2     A     Yes.

3     Q     And you worked the night shift for all

4  three of those positions; is that fair?

5     A     Yes.

6     Q     When you became grocery manager, were you

7  still doing the dairy job or was -- did someone

8  else take that over?

9     A     The way it was supposed to work is when I

10  took over the grocery manager's position, we

11  promoted -- or Ms. Dodson promoted somebody to

12  dairy.

13        It was my job to train them.  So while I

14  was the new grocery manager, I was also the person

15  training the new dairy manager.  That was the way

16  it was supposed to work.

17     Q     Okay.  Did it work that way?

18     A     No.

19     Q     Okay.  What happened?

20     A     The person that we picked couldn't handle

21  the job.  So over the period of about three months

22  or so, that person was forced to step down.

23  Another person was put in that position.  Same

24  thing occurred again.

25        And we went through that the entire time I

Page 50

1    was the dairy manager -- or the grocery manager.

2    We went through three dairy leads.  And at time of

3    my termination, they had just hired another -- or

4    brought a person from another store to be the dairy

5    lead.

6        Q    But during that time, you always worked at

7    night?

8        A    Yes.

9             Can I ask a question?

10       Q    Huh?

11       A    Can I ask a question?

12       Q    Sure, yeah.  I might not answer it, but

13   you can ask it.

14       A    Okay.  When we were going through all the

15   policies about purchase and stuff, there was

16   something that I would like to say about that.

17   Would that be allowed?

18       Q    Sure.

19       A    Okay.  I absolutely knew what the policies

20   were.  At nighttime, there was no cashier.  We had

21   U-Scan computers that were available for us to make

22   purchases.

23            The problem with the U-Scan computer is

24   that if there's anything that varies on items that

25   are scanned, in other words, if you're doing canned

Page 51

1   goods or something, you're always going to -- it's

2   always going to work because that's a label and

3   everything's guaranteed to be correct.

4          But if you're buying anything that is

5   catch weight, meat department, deli, something like

6   that, there's always the possibility that if

7   there's any difference in what the weight says and

8   what the computer is reading on the scan, it shuts

9   the computer down.  You can't make a purchase.  It

10  just freezes, just cannot complete the thing.

11         This happened a number of times while we

12  were working overnight.  I went to Ms. Dodson about

13  it.  I said, "Once this happens, we can't buy

14  anything.  We're shut down for the rest of the

15  night.  What can we do about it?"

16         So one of the options that was presented

17  is that they would have two machines that were

18  open.  So if one shut down, then you had a second

19  option.  Okay.  That was fine.

20         I asked her, I said, if you're in the --

21  "If you are in the process of purchasing something,

22  and the machine shuts down, do you want us to not

23  consume our food, put it back and wait until the

24  shift is over?"

25         She goes, "No, that wouldn't be fair since

```
1   you're trying to buy your break or whatever."

2          So she told me personally that it was

3   okay, on the overnight shift, if the computer shut

4   down, to still consume the product, but needed to

5   leave her a note and then we needed to pay for it

6   in the morning when it -- when the computers were

7   up and there was somebody there, a cashier that was

8   actually there to take care of the situation.

9          Not only did Ms. Dodson have that

10  discussion with me, there were co-managers that

11  knew of the same discussion, Cory Ivy is one of

12  those people, Stacie Robinson is one of those

13  people, Michelle Fresalone is one of those people.

14         And I told all my crew the same thing.  If

15  they had a problem with the computer shutting down

16  on them, they needed to come tell me about it.  We

17  would write a note.  We would leave the note for

18  management to see what happened.  And they need to

19  make sure they paid for it when the store opened in

20  the morning and there was a cashier there.

21     Q    Okay.  I'm going to object to that as

22  being nonresponsive.  But I'm going --

23     A    Oh, okay.

24     Q    -- to get to all of that.

25     A    Oh, okay.
```

Page 53

```
 1         Q    That's fine for you --
 2         A    I didn't know if we were going there
 3    somewhere else or not.
 4         Q    We're going to get there.
 5         A    Okay.
 6         Q    Yeah.  Okay.  Let's do this next and then
 7    we'll get to the chicken incident.
 8         A    Okay.
 9         Q    Which is where you're going, right?
10         A    Right.
11         Q    Yeah.
12              (Defendant's Exhibit 6 marked.)
13    BY MR. BARRON:
14         Q    All right.  Mr. London, I've handed you
15    what's been marked as Exhibit 6 to your deposition.
16    This is a notice that you signed off on, correct?
17         A    Yes.
18         Q    That's your signature on Exhibit 6?
19         A    Yes.
20         Q    And this was a policy directive that was
21    given to you.  Was it also given to the other
22    members of the night crew?
23         A    I assume so, yes.
24         Q    Okay.  Do you remember the date of this?
25         A    No, but I would assume that this was
```

                                                Page 54

```
 1    probably given out more than once.
 2         Q    Okay.  And basically it says that because
 3    the store is closing between 1 a.m. and 6 a.m., all
 4    purchases must be made on robot four, which will be
 5    open, and also any person who consumes items before
 6    purchasing them will be subject to disciplinary
 7    action?
 8         A    Correct.
 9         Q    All right.  Was the store closed at 473 at
10    night?
11         A    Yes.
12         Q    Was it closed in February of 2014?
13         A    Yes.
14         Q    All right.  Was it closed between 1 a.m.
15    and 6 a.m.?
16         A    Correct.
17         Q    Do you know what period of time the store
18    was closed between 1 a.m. and 6 p.m.?  In other
19    words, was it like that when you started working
20    the night crew or did it change at some point?
21         A    When I first started with Kroger in 2007,
22    they actually had a -- we were a 24-hour store --
23         Q    Right.
24         A    -- and we had a cashier.
25         Q    Right.
```

Page 55

1    A    So somewhere within about a two-year

2    period, they decided it would just be more

3    cost-effective to close at 1 and reopen at 6.

4    Q    And it stayed that way all the way to

5    2014?

6    A    Yes.

7    Q    Okay.  So you were advised in writing by

8    the company that obviously you needed to make your

9    purchases on one of the U-Scans and that you

10   shouldn't consume food that you hadn't paid for?

11   A    True.

12   Q    Okay.  So that's the rule, we all agree

13   that's the rule, right?

14   A    Yes.

15   Q    All right.  Now, I understand your

16   testimony to be that at some point, you had a

17   discussion with Ms. Dodson -- and for the record,

18   she was the store manager?

19   A    Correct.

20   Q    -- about this problem that sometimes

21   things wouldn't ring up and how to deal with that.

22   And your testimony is she told you to write that on

23   a note of some sort?

24   A    Yes.

25   Q    And then what would you do with the note?

Page 56

1     A     I would always leave it in her office.

2     Q     Okay.  And then how would you pay for the

3  item?

4     A     If it's 6 or 6:30, whenever a cashier

5  would come in, I would pay for it then.  But I

6  would always make it a point that later that day, I

7  would come back and say, okay, this is me coming

8  back and telling you, I have paid for it, here's

9  the receipt, you've got the note.

10     Q     Okay.  So you'd leave a note?

11     A     Yeah.

12     Q     And then when the early morning cashier

13  would come in, you would pay for it?

14     A     Yes.

15     Q     And get your receipt at that point?

16     A     Yes.

17     Q     And that was a typical practice?  In other

18  words, how often did that happen?

19     A     To me, I think it only happened like four

20  times over that -- over a year.  But for my

21  employees and stuff, it was something that would

22  happen weekly or bi-weekly.

23     Q     And they would follow the same rule with

24  the note?

25     A     They would come to me and then I would

Page 57

```
 1    leave the note for the -- for them.

 2         Q    Okay.  Leave the note where?

 3         A    Under her door.  Her door was locked since

 4    it was overnight, and I would always slide the note

 5    under the door.  And it would just say, early

 6    manager, this is what happened overnight.

 7         Q    Okay.  I mean, what would it say --

 8         A    Well, it would say --

 9         Q    -- Jose wanted to buy some pizza?

10         A    Right.  I said, we had a transaction where

11    the computer failed --

12         Q    Okay.

13         A    -- this is what took place.

14         Q    Okay.  And it would say how much the

15    person owes?

16         A    Yes.

17         Q    Okay.  All right.  And your testimony is

18    that no one ever objected to that practice, right?

19         A    Correct.

20         Q    Now, let's then focus on the day involving

21    the chicken.

22         A    Okay.

23         Q    Which was, I believe, in February of 2014?

24         A    Correct.

25         Q    Sound right?
```

Page 58

1    A     Yes.

2          (Defendant's Exhibit 7 marked.)

3          MR. BARRON:  And while we're at it...

4          (Defendant's Exhibit 8 marked.)

5    BY MR. BARRON:

6    Q     Okay.  Mr. London, the court reporter has

7    handed you what's been marked as Exhibit 7 and 8 to

8    your deposition.  See those documents?

9    A     Yes.

10   Q     Have you seen them before?

11   A     Yes.

12   Q     Both of them?

13   A     Well, no, I've seen the one, of course,

14   that I typed out myself.

15   Q     Which is Exhibit 7, right?

16   A     Yes.

17   Q     All right.  Have you seen the loss

18   prevention report before?

19   A     No.

20   Q     Okay.  Do you know if it was provided to

21   you in the -- or in any of the grievance steps --

22   step meetings?

23   A     I don't believe so.  It may have.

24   Q     Okay.  All right.  I want to direct your

25   attention to Exhibit 8, the very last page.  This

Page 59

1    is the narrative from the investigator, Michael

2    Mabrey.  Do you know that name?

3         A    Yes.

4         Q    Okay.  And it says that "A call was

5    received from store 473 in regards to allegations

6    of a possible theft.  Store management advised that

7    upon reviewing the 31-day box" --

8              Do you know what the 31-day box is?

9         A    I do now.

10        Q    What is it?

11        A    It's a report that generated whenever the

12   computer shut down, and they go back and look and

13   see why the computer shut down.

14        Q    Okay.  And it says, "They observed a deli

15   four-piece chicken cold pack that was voided at

16   2:44 a.m. on the 1st of February.  Upon video

17   review, they observed what they assumed was an

18   associate that had taken and later consumed the

19   voided product."

20              And that was you, correct?

21        A    Yes.

22        Q    At around 2:44 a.m. --

23        A    Yes.

24        Q    -- does that sound right?

25        A    Yes.

 1        Q    You don't dispute that that was you?

 2        A    No.

 3        Q    Okay.  "Video footage was reviewed and

 4   compared to transaction details and confirmed that

 5   grocery manager, Larry London, had consumed the

 6   chicken pack."

 7             Again, you don't dispute that, right?

 8        A    I do not.

 9        Q    Okay.  You attempted to purchase this

10   four-piece chicken cold pack --

11        A    Correct.

12        Q    -- on one of the U-Scan?

13        A    Yes.

14        Q    And your testimony is that the U-Scan

15   locked up?

16        A    Yes.

17        Q    And so you did not pay for the chicken --

18        A    Correct.

19        Q    -- on that day?

20        A    Yes.

21        Q    In fact, on any day, right?

22        A    Correct.

23        Q    You had a -- I think was it a Pepsi or

24   some sort of soda?

25        A    Yes.

Page 61

```
 1        Q    And you went to a different U-Scan --
 2        A    Yes.
 3        Q    -- and paid for the soda?
 4        A    Yes.
 5        Q    Then you took both the soda and the
 6   chicken to the break room?
 7        A    Correct.
 8        Q    And you consumed both --
 9        A    Yes.
10        Q    -- right?
11             But you didn't finish the chicken, I
12   believe?
13        A    Correct.
14        Q    You then placed the remaining chicken in
15   the refrigerator --
16        A    Correct.
17        Q    -- in the break room?
18        A    Yes.
19        Q    And then that morning, you took the
20   chicken from the refrigerator with you when you
21   left?
22        A    No, that is incorrect.
23        Q    All right.  Well, tell me what happened.
24        A    I'll -- and if you'll read Mr. Mabrey's
25   report, I left the chicken on the table in the
```

Page 62

1    break room.  When I came into the break room to get

2    my coat, I picked up the chicken and sat it in the

3    refrigerator.  I never left with the chicken.

4         Q    Okay.  All right.  So you left the chicken

5    in the refrigerator?

6         A    Yes.

7         Q    You never actually took it home?

8         A    No.

9         Q    Do you know what happened to the chicken?

10        A    I'm assuming after they looked at the

11   inventory, they found it.

12        Q    Okay.  All right.  You never left a note

13   for anybody regarding the chicken or the problem

14   with the scanning of the chicken, right?

15        A    I did not.

16        Q    Do you remember how long it was after this

17   incident happened that you were confronted by

18   Mr. Mabrey?

19        A    The incident happened on a Saturday.  I

20   was confronted with Mr. Mabrey on a Thursday.

21        Q    Do you know if it was the immediately

22   following Thursday or --

23        A    Yes.  No, it was the -- it was the 6th.

24        Q    Okay.

25        A    And this happened on the 1st or 2nd.

Page 63

1    Q    Okay.  So approximately four days?

2    A    Yes.

3    Q    So in those four days, you never attempted

4    to pay for the chicken?

5    A    I never -- never thought of it.  I never

6    remembered it.

7    Q    Okay.  And when you met with Mr. Mabrey,

8    you admitted that you had consumed the chicken

9    without paying for it, right?

10   A    Yes, because at that point, I remembered

11   what had happened as soon as he brought it up.

12   Q    Right.  And he showed you video evidence

13   and --

14   A    Right.

15   Q    There was no question that you had done

16   what he said you did, right?

17   A    Right, and there was no denying it.  I had

18   done what he said I had done.

19        When I came up front to pay for the

20   chicken, the first thing you do is U-Scan your

21   employee ID card.

22   Q    Right.

23   A    And so it identifies that Larry London is

24   standing in front of this computer.  And as -- I

25   did my best to explain to him and to Ms. Dodson at

Page 64

1    the time that everything that I did was in front of

2    them.

3           I've been with that store long enough to

4    know where the cameras are and where they're not.

5    I have been in the office before and looked at

6    video as a grocery manager while we were looking at

7    people to see whether or not there was shoplifting

8    going on and whatever, and so I know where blind

9    spots and stuff are.

10          And the whole thing made no sense to me

11   whatsoever that there was any intent to deceive or

12   try to steal something from Kroger.  I would have

13   been the worst thief ever born, because I did

14   everything in the open in front of everybody.

15       Q    So let's take the intent out of it.

16       A    Okay.

17       Q    You agree that you violated Kroger's

18   associate purchase policy, right?

19       A    I agree that I violated Kroger's purchase

20   policy.  I did not violate Lori Dodson's purchase

21   policy until I forgot to come back and pay for it.

22   At that point, yeah, when I left the store and I

23   had not paid for it, then I had violated her trust.

24       Q    Okay.

25       A    But before that point, everything I had

Page 65

```
 1    done had been okayed by her.

 2         Q    When you say it had been okayed by her,

 3    what you're referring to is the fact that you could

 4    leave a note if the machine --

 5         A    Yes.

 6         Q    -- failed to operate --

 7         A    Yes.

 8         Q    -- properly?

 9         A    Yes, yes.

10         Q    But you didn't even do that?

11         A    Because I knew I was going to be there

12    late enough to actually be there when the cashiers

13    came in.

14         Q    Right.

15         A    And Ms. Dodson was going to be there.

16         Q    Right.

17         A    Because this was -- this week was the snow

18    storm week.

19         Q    Correct.

20         A    I had been there 14, 15 hours Wednesday,

21    Thursday, Friday and now Saturday.  And I hate to

22    admit it, I was exhausted, worn out.

23         Q    Right.

24         A    And that is -- that was -- it shouldn't be

25    an excuse, and like I told Mr. Mabrey, I'm the
```

Page 66

```
 1    grocery manager and I should know better, but
 2    that's what happened.  That's why it happened the
 3    way it did.
 4         Q    All right.  So you didn't pay for the
 5    chicken?
 6         A    Correct.
 7         Q    You did not leave a note saying that the
 8    computer -- the U-Scan had not operated properly?
 9         A    Correct.
10         Q    You did not tell the opening cashier that
11    you needed to pay for it?
12         A    Correct.
13         Q    And you did not tell Ms. Dodson that you
14    needed to pay for it?
15         A    Correct.
16         Q    You did none of those things?
17         A    I did none of those things.
18         Q    So even under your testimony about what
19    Ms. Dodson allowed at her store at night if a
20    U-Scan failed to operate properly --
21         A    Right.
22         Q    -- you didn't even follow that procedure,
23    correct?
24         A    I did not complete that procedure, no.
25         Q    Okay.  So there's absolutely no way for
```

Page 67

```
 1    Kroger to see that you had paid for the item or
 2    attempted to pay for the item?
 3         A    Because I had not.  Well, I mean, I had
 4    attempted to pay for the item.
 5         Q    But not actually followed through?
 6         A    Right, that is correct.
 7         Q    I want to go to your statement, which is
 8    Exhibit 7.
 9         A    Okay.
10         Q    Were you asked to draft this statement or
11    did you do it on your own?
12         A    They said, Would you like to.
13         Q    Okay.  This is Mr. Mabrey?
14         A    Yes.
15         Q    Did you draft it that same day, a
16    different --
17         A    Yes.
18         Q    -- day?
19         A    No, the same day.
20         Q    Okay.  You provided it before you left?
21         A    Yes.
22         Q    And I would assume these are -- this is in
23    your own words?
24         A    Yes.
25         Q    No one twisted your arm or told you what
```

Page 68

1    to say?

2        A    No.

3        Q    Did you type this --

4        A    On the computer, yes.

5        Q    On the computer at Kroger?

6        A    Yes.

7        Q    All right.

8            MR. SPERRY:  Excuse me.  Larry, let him

9    finish the question first.

10           THE WITNESS:  Okay.

11           MR. BARRON:  Yeah, it will help the court

12   reporter a lot.

13           THE REPORTER:  And the transcript.

14           MR. BARRON:  And the transcript.

15   BY MR. BARRON:

16       Q    You mention here that you made an --

17   quote, an honest mistake.

18       A    Yes.

19       Q    And that "I did not ring up the chicken,"

20   right?

21       A    Correct.

22       Q    "I had every intention of paying for the

23   chicken in the morning, but I forgot."

24       A    Yes.

25       Q    And that's your testimony here today as

Page 69

1    well?

2        A    Yes.

3        Q    You're not changing your story at all?

4        A    No.

5        Q    I want to talk to you about your meeting

6    with Mr. Mabrey.  Where did that meeting take

7    place?

8        A    In Ms. Dodson's office.

9        Q    How long was it?

10       A    45 minutes to an hour.

11       Q    Had you met Mr. Mabrey before?

12       A    Yes.

13       Q    How many times?

14       A    Two or three.

15       Q    On what occasions?

16       A    Just seeing him in the store, Ms. Dodson

17   telling me who he was, what he represented from

18   Kroger.

19       Q    Were there ever any loss prevention

20   investigations at night that you were involved in?

21       A    No.

22       Q    Were there ever occasions where someone

23   from loss prevention or security would make, like,

24   a visit at night to make sure people were not

25   stealing or doing anything wrong?

Page 70

1       A    There were people that would come around

2    usually while the store was still open but at night

3    just to look at safety issues; were the doors

4    locked, the back doors were locked properly, that

5    kind of thing.

6       Q    But never Mr. Mabrey or loss prevention?

7       A    I don't -- I -- there were people that

8    were co-managers that were associated with -- or

9    they were doing something, a project with loss

10   prevention, and they were the ones that would come

11   by and check on stuff like that.

12      Q    Okay.  What do you recall Mr. Mabrey --

13   tell me about the meeting with Mr. Mabrey.  What

14   happened?

15      A    Came into the office, sat down.  He said

16   the reason we're here.  He goes, "Do you remember

17   this?"

18            And as soon as he said it, I said, "Yes, I

19   do."

20            And the meeting went from there.

21   Ms. Dodson was there.  They brought up another

22   employee as a witness.  We went through the whole

23   thing about, you know, you're not recording this,

24   you're not doing this.

25            And then he went through the whole thing

Page 71

1    about why I did what I did and do I know company

2    policy and that kind of thing.

3              One of the things that really bothered me

4    is he kept saying, "Do you know policy and why this

5    is -- what you did was wrong?"

6              And I kept waiting for Ms. Dodson to say,

7    but I told him it was okay, what he didn't do at

8    the end is what got us in trouble.  But she never

9    spoke up.  She never said a word.

10             And I know this is going to sound strange,

11   but we're here to tell the truth and how things

12   were at the time.  One of the things Ms. Dodson had

13   discussed with me on several different occasions

14   was that, we were a team, me and her, and that we

15   needed to stick together as a team.

16             And when different things would come up,

17   she would say we need to be careful because we're

18   going to wind up getting fired if we do something

19   that is a problem with the company, so be careful.

20             And whether y'all want to believe this or

21   not, it's your choice, when I came into that office

22   and we started having this discussion, I thought

23   Mr. Mabrey was there for Ms. Dodson, because I

24   thought he was going to try to -- I don't know what

25   the word I'm looking for -- to implicate her for

Veritext Legal Solutions
800-336-4000

1  not following company policy because she had

2  allowed the policy to be changed.

3          So during that meeting, at no time did I

4  get mad and go, well, Ms. Dodson, speak up for me

5  because you know what you said.  At no point did I

6  ever say anything about that because I thought it

7  was her -- I thought she would be in more trouble

8  than me if she said, I gave him permission, and

9  that's why he screwed up.

10     Q    And you're talking about the permission to

11  do a note?

12     A    Yes.

13     Q    Instead of -- instead of actually paying

14  for something --

15     A    Of consuming the food before you pay for

16  it.

17     Q    Right.  If the U-Scan failed to operate

18  properly?

19     A    Correct.

20     Q    Okay.  At no time did Mr. Mabrey tell you

21  that Ms. Dodson didn't have the authority to do

22  that or did he?  Was there any discussion about

23  that?

24     A    At that meeting, no.  At the second --

25     Q    It was about you?

Page 73

1     A    At the second meeting, that was brought

2    up.

3     Q    Okay.  I want to talk about the first

4    meeting.

5     A    Okay.

6     Q    We'll get to the second meeting.

7     A    Yes.

8     Q    At the first meeting, the discussion was

9    about you; it was not about Ms. Dodson?

10    A    Correct.

11    Q    And there was not any discussion about

12   whether Ms. Dodson had the authority or didn't have

13   the authority to have that type of policy in the

14   store?

15    A    Correct.

16    Q    Was Mr. Mabrey respectful to you,

17   professional?

18    A    Yes.

19    Q    How about Ms. Dodson?

20    A    She just sat there and didn't say

21   anything.

22    Q    Basically a witness?

23    A    Basically, yes.

24    Q    All right.  Do you know how -- and I know

25   you mentioned the 31-day report, but do you know

1    the mechanics or the time line on how Kroger became

2    aware of this issue with the chicken?

3         A    No.

4         Q    Do you know if, for example, whether

5    Ms. Dodson brought it to the attention of loss

6    prevention or somebody else brought it to the

7    attention of Ms. Dodson?  Do you have any knowledge

8    as to how that happened?

9         A    The way I understood later -- and this was

10   hearsay.

11        Q    Okay.

12        A    This is what people were telling me, is

13   that somebody was looking at the report, saw what

14   they saw, brought it to Dodson, and Dodson's the

15   one who called loss prevention.

16        Q    Okay.  But you don't have personal

17   knowledge of that?

18        A    I do not have personal knowledge of that.

19        Q    All right.  Who did you hear that from?

20        A    Just employees.

21        Q    All right.  And you mentioned another

22   person was at that meeting?

23        A    Yes.

24        Q    Do you know who -- his or her name was?

25        A    It was a cashier, her name's Mary, but I

```
 1    don't know what her last name is.

 2         Q     Okay.  And did she speak at all?

 3         A     No.

 4         Q     Were there any documents reviewed during

 5    that meeting --

 6         A     It was just --

 7         Q     -- or surveillance video?

 8         A     It was just the video, that's -- they

 9    showed me the video.

10         Q     How about the receipt or the voided

11    transaction, did they show you that at all?

12         A     I -- they may have.  I don't remember.

13               MR. BARRON:  Okay.  All right.  We've been

14    going about an hour.  Time for a break.

15               MR. SPERRY:  Sure.

16               THE VIDEOGRAPHER:  And we are off the

17    record.  The time is 10:28.

18               (Recess from 10:28 a.m. to 10:42 a.m.)

19               THE VIDEOGRAPHER:  And we are back on the

20    record.  The time is 10:42.  You may continue.

21    BY MR. BARRON:

22         Q     Mr. London, we're back on the record.  You

23    understand you're still under oath, correct?

24         A     Yes.

25         Q     All right.  When we left off, we were
```

Page 76

1    talking about your meeting with Mr. Mabrey and

2    Ms. Dodson.

3         A    Correct.

4         Q    Okay.  And I believe you said that you, in

5    your mind, believed that the meeting was actually

6    about Ms. Dodson?

7         A    Correct.

8         Q    Okay.  Obviously, it wouldn't have made a

9    lot of sense for Ms. Dodson to call loss prevention

10   if she thought she had done something wrong, right?

11        A    Obviously.

12        Q    She never told you that she was doing

13   anything wrong when she allowed you guys to do the

14   notes when the U-Scan was --

15        A    No.

16        Q    And you don't have any personal knowledge

17   of whether such a policy was permitted by Kroger,

18   do you?

19        A    At that time, no, I did not.

20        Q    And you've never been told by anybody

21   senior to Ms. Dodson that such a policy was not

22   permitted at Kroger, right?

23        A    Correct.

24             (Defendant's Exhibit 9 marked.)

25

                                          Page 77

1    BY MR. BARRON:

2        Q    Mr. London, the court reporter has handed

3    you what's been marked as Exhibit 9 to your

4    deposition.  This is another document that looks

5    like it was signed around the time you were hired.

6    Do you see that?

7        A    Correct, I do.

8        Q    It's on shrink and inventory control?

9        A    Yes.

10       Q    And it -- again it talks about the

11   importance of inventory control and shrink --

12       A    Yes.

13       Q    -- right?

14            Which you, I think, testified earlier

15   was -- you understood was a very important policy

16   at Kroger?

17       A    Yes.

18       Q    And I think your testimony today was that

19   you didn't feel like you had any intent to steal

20   the chicken, right?

21       A    Correct.

22       Q    And you felt that somehow that should have

23   mitigated the discipline that Kroger issued to you,

24   right?

25       A    Yes.

Veritext Legal Solutions
800-336-4000

1    Q    Okay.  Now, you understand that there have

2   been many other circumstances or situations at

3   Kroger where employees have been terminated for

4   theft of items with very small dollar amounts;

5   would you agree with that?

6    A    Yes.

7    Q    Okay.  In fact, would you agree that

8   Kroger's policy doesn't differentiate between

9   whether it's a candy bar or a soda or a $100 piece

10   of meat?

11    A    That is correct.

12    Q    And the reason for that is, again, because

13   of the serious nature of shrink in a grocery store?

14    A    Correct.

15    Q    Because if every employee who just forgot

16   to pay could, if they got caught, say, I forgot to

17   pay, it would be very difficult to administer that

18   type of policy?

19    A    Correct.

20    Q    So for that reason, Kroger, in your

21   experience, takes a very hard line view on the

22   issue of theft and shrink?

23    A    Correct.  But I -- it is not absolute.

24    Q    Okay.  Do you have any personal knowledge

25   of any situations where Kroger took into account

Page 79

1    intent in deciding whether to discipline someone

2    who was caught with something that they hadn't paid

3    for?

4        A    I have seen several occasions where I

5    would be walking the store with a co-manager or

6    with Ms. Dodson, an employee would walk by and

7    would be eating something on the floor, "Do you

8    have a receipt?"

9            "No, I'm on my way to pay for it."

10           They would say, "You know you need to pay

11   for that before you open the pack?"

12           "Yes, I do."

13           "Well, go pay for it."

14           Nobody was fired.  Nobody was -- but they

15   did take care of it right then, and they were --

16       Q    Right.

17       A    But they -- it wasn't the absolute, we've

18   caught you and you're fired.

19           On the other hand, I know of a case where

20   a co-manager was caught consuming a free deli item,

21   which was a sample.  Kroger considered that theft

22   and fired that person for that.

23           So it's not consistent, but it's there if

24   they want to enforce it.

25       Q    Okay.  In the cases that you mentioned

                                                    Page 80

```
 1   involving employees consuming items that you saw
 2   during a walk-through at the store --
 3        A    Yes.
 4        Q    -- how many times would you estimate that
 5   happened?
 6        A    Three or four over a year.
 7        Q    Okay.  And which managers were present
 8   when that happened?
 9        A    A couple of times it was Ms. Dodson.  A
10   couple of other times it was -- I want to say it
11   was Stacie Robinson one time who was a co-manager
12   at the time, and another time Robert Hotchkins, who
13   was a co-manager at the time.
14        Q    Okay.  And do you recall the dates or the
15   names of the employees?
16        A    No.  It was -- like I said, it was casual,
17   because one of the things that happened when I got
18   to work every night or evening, one of the things
19   we would always do was walk the store so they could
20   tell me issues during the day, what they wanted me
21   to take care of at night, that kind of thing.  And
22   as you would walk through the store, you would come
23   across employees doing different things.
24        Q    You'd agree in those situations it was
25   different in that those employees did not leave the
```

Page 81

```
 1   store for their shift without paying for the
 2   merchandise?
 3        A    Correct.
 4        Q    They were still in the store and, in fact,
 5   as far as you know, they actually paid for the
 6   merchandise?
 7        A    Correct.
 8        Q    Are you aware of any situation where an
 9   employee consumed merchandise in the store, left
10   their shift without paying for it, and was not
11   disciplined?
12        A    No.
13        Q    You mentioned in your statement that you
14   gave Mr. Mabrey and also today that you felt you
15   made an honest mistake?
16        A    Correct.
17        Q    What's the difference, in your mind,
18   between an honest mistake and a careless mistake?
19             MR. SPERRY:  Object to the form.
20             You can go ahead and answer.
21             THE WITNESS:  Okay.
22        A    Perfect example would be, after I had left
23   Kroger and I had been terminated for the $4
24   incident, and one of the things that was discussed
25   was the shrink and how important we need to make
```

Page 82

1    sure that we don't do anything that causes the

2    company to lose money, whether it's the intent was

3    there or it was negligence or just mistake,

4    whatever, and a few -- I want to say a few weeks

5    afterwards, maybe even less than that, a employee

6    in our meat department -- or their meat department

7    since I'm no longer with them -- was going to clean

8    their cooler floor.  And he pushed all the meat out

9    on to the sales floor so he could clean it.  And

10   then he forgot to put some of it back into the

11   cooler till it was left off refrigeration.

12            The co-manager that closed did not catch

13   it.  The grocery manager who worked that night did

14   not catch it.  The next morning, the market manager

15   found it.  It sat out for eight hours.  Cost the

16   company over $1,000, from what I understand.

17            And once again, I didn't witness this,

18   I've heard about this by several people.  And the

19   employee made an honest mistake.  Now, he had no

20   intent to leave the meat out.  He had no intent to

21   cost Kroger $1,000 in lost inventory.  He got a

22   note to file and kept his job.

23   BY MR. BARRON:

24       Q    Okay.  Again, you don't have personal

25   knowledge of this situation, right?

Page 83

1     A     I do not.  But I did bring it up in our --

2     in the previous -- I mean, subsequent meeting that

3     we had with different people, and their attitude

4     was, well, we'll check into that, but we don't

5     understand what happened there.

6     Q     And that is different from your situation

7     in that that employee did not get any personal gain

8     or benefit from the meat that was left out, right?

9     A     True.

10    Q     Which is a -- which is a different

11    situation than yours?  There's no way that could be

12    considered theft because that employee did not

13    consume any of the meat himself, right?

14    A     Correct.

15    Q     Whereas in your situation, the chicken at

16    issue was actually consumed by you?

17    A     Correct.

18    Q     All right.  Let's talk about after the

19    meeting with Mr. Mabrey.  You were getting a --

20    what Kroger calls a constructive advice record.  Do

21    you recall that?

22    A     I have no idea what that is.

23    Q     Okay.  Like a writeup.

24    A     Not that I'm aware of.

25    Q     Okay.

Page 84

```
 1              (Defendant's Exhibit 10 marked.)

 2   BY MR. BARRON:

 3       Q    Would you take a look at that document

 4   that's been marked as Exhibit 10, Mr. London.  Have

 5   you seen that before?

 6       A    Well, I signed it, so I assume I have.  I

 7   don't really recall it.

 8       Q    Are you familiar generally with the form,

 9   the constructive advice record?

10       A    I am not.

11       Q    Okay.  I'll represent to you that this is

12   Kroger's form they use for issuing discipline.

13       A    Okay.

14       Q    This is your name on it, right --

15       A    Yes.

16       Q    -- on Exhibit 10?

17            And there's a number of boxes, and one of

18   them that's checked is "Disregard of established

19   rule and regulations."

20            Do you see that?

21       A    Correct.

22       Q    And the narrative is that "On

23   February 1st, 2014, Mr. London violated the

24   associate purchase when he failed to make payment

25   for a four-piece chicken dinner prior to consuming
```

Veritext Legal Solutions
800-336-4000

1    said dinner."

2         That describes the incident that we're

3    talking about?

4         A    Yes.

5         Q    And it says, "The shop steward, Paul

6    Osburn" -- do you know who he is?

7         A    Yes.

8         Q    Okay.  Is he the union shop steward?

9         A    Yes.

10        Q    -- "has been fully informed of the details

11   on 2/7."

12        And it's signed by, it looks like Lori

13   Dodson.  Under employee's statement, it says "See

14   statement" and it's signed by you.  Do you see

15   that?

16        A    Yes, yes.

17        Q    You don't recall getting this on the same

18   day you met Mr. Mabrey?

19        A    I may have.

20        Q    Okay.  All right.  Do you remember any

21   discussions about the constructive advice record at

22   all?

23        A    I do not.

24        Q    Are you familiar with the term suspended

25   pending or suspended pending advisability of

                                         Page 86

 1   termination?

 2        A     I had not until that day.

 3        Q     Okay.  What does that phrase mean, do you

 4   know?

 5        A     Well, I originally thought suspended

 6   pending meant just what it said, that you were

 7   suspended from working for Kroger until there was

 8   an investigation, until the process went through,

 9   and at the end of that process, a determination

10   would be made as to what your status would be.

11             I found out that was not what it meant,

12   because when I left there that day, I was under the

13   assumption there would be other meetings and all

14   this would be discussed, and at that point, which

15   direction we were going to go, that would be how it

16   would work out.

17             What happened was, I want to say five or

18   six days later, I get a notice in the mail that

19   says, you've been terminated.  It didn't say

20   anything about suspended pending or waiting for

21   anything.  It says, you're done, you're gone.

22        Q     All right.  Did anybody explain what

23   suspension pending termination meant at the meeting

24   with Mr. Mabrey?

25        A     No.

Page 87

1      Q     So what you just described was your --

2  just your personal view or thought of what that

3  meant?

4      A     That's what I had always thought that that

5  was what that meant because I had known of other

6  cases where employees were suspended pending and

7  they came back to Kroger.

8             (Defendant's Exhibit 11 marked.)

9  BY MR. BARRON:

10     Q     Is Exhibit 11 -- Exhibit 11 the letter

11  that you just described --

12     A     Yes.

13     Q     -- concerning your employment?

14     A     Yes.

15     Q     This is dated February 14th, 2014?

16     A     Yes.

17     Q     And it's from Rebecca Clark in HR with

18  Kroger?

19     A     Yes.

20     Q     You received this at your home?

21     A     Yes.

22     Q     Did you respond or write any letter in

23  response to Exhibit 11?

24     A     Well, at the time I received this, I

25  called Maria Davenport, who was the union steward,

                                        Page 88

1   and -- because they had given, Mr. Mabrey, I

2   believe, had given me her number.

3       Q    Okay.

4       A    And like I said, I wasn't a union member,

5   but they were still the person that you would

6   contact to represent anything going forward that

7   was in a grievance-type hearing or whatever.

8            And I called her, and she said, "Oh, don't

9   worry about that, that's just a standard letter

10  they send out.  And if the matter is resolved in

11  your favor, all your time with the company and

12  everything will be restored, and it will be like it

13  never took place."

14           And at the time, and being naive and

15  believing things that turned out not to be true, I

16  believed that once the meetings occurred and the

17  situation would be resolved, and I would still be

18  an employee of Kroger.  I did believe that.

19      Q    You did file a grievance, correct?

20      A    That was automatic.  That was done on

21  their behalf.  In fact, the way I understood it,

22  Mr. Mabrey said that since we were there together

23  with Ms. Dodson, and we had gone over the situation

24  and whatever, that that would constitute the first

25  grievance hearing.  And that, therefore, we

                                    Page 89

1    wouldn't have to do that again.  We would go to

2    what they call second level grievance.

3            When I talked to Ms. Davenport, she said

4    Mr. Mabrey didn't have any business doing that,

5    blah, blah, blah, blah, we would do this over

6    again.

7            And I told her, I said, "I don't want this

8    to drag on forever.  If what happened in the first

9    meeting is just going to happen a second time and

10   then we're going to go to the next step, let's not

11   do that, let's go ahead and go to the second

12   meeting."

13           And she said, "Okay, but you're not

14   following what I recommend."

15           I said, "That's fine.  I want this to be

16   dealt with as soon as possible."

17      Q    Okay.  You had never been through the

18   grievance process at Kroger before; is that fair?

19      A    No.

20      Q    Okay.  You understand there's a collective

21   bargaining agreement which is a contract that sets

22   forth the procedure, right?

23      A    I do now.

24      Q    You're not an expert on that, right?

25      A    No.

Page 90

1      Q    And I think you testified that you had to

2    file a grievance, is that what your testimony is?

3    I mean, it was your choice whether to file a

4    grievance or not, right?

5      A    Well, the way Mr. Mabrey put it to me, he

6    said -- and it was one of those things that at the

7    time, it was annoying.

8           But he said, he goes, "Now, if this goes

9    through the way it's set up, and the way things

10   look to me right now," he goes, "you have a

11   choice."  He says, "You can resign, and everything

12   that Kroger owes you will come to you in a timely

13   manner, and there will be nothing on your record to

14   show that there was ever any disciplinary action

15   taken against you."  And he goes, "Would you like

16   to sign that paper?"

17          And I said, "No, I would not."

18          And he says, "Well, okay, then we need

19   to -- this is the procedure that we will go with."

20   And he says, "You need to call Ms. Davenport."

21          And that's where that came in.

22     Q    Okay.  So you were given an opportunity to

23   resign?

24     A    Correct.

25     Q    Which you chose not to do?

```
 1      A    Correct.

 2      Q    Okay.  And you don't know whether that's

 3  customary for Kroger to allow employees the

 4  opportunity to resign if --

 5      A    Right, I had no idea.

 6      Q    You chose not to resign, instead, you

 7  chose to contest the discipline that was given to

 8  you?

 9      A    Correct.

10      Q    Right.  And you chose to contest that

11  through a grievance, right?

12      A    That's how it worked it, yes.

13      Q    I mean, you have that right --

14      A    Yes.

15      Q    -- under Kroger's collective bargaining

16  agreement.

17      A    Okay.

18      Q    And you chose to enforce that right,

19  correct?

20      A    Yes.

21      Q    You were not required to do that?

22      A    Right.

23           (Defendant's Exhibit 12 marked.)

24  BY MR. BARRON:

25      Q    Mr. London, the court reporter has handed
```

Page 92

1    you what's been marked as Exhibit 12 to your

2    deposition.  And I'll represent to you that this is

3    the grievance form that you signed, I believe.

4         A    Yes.

5         Q    And it's actually got several dates on it,

6    but looks like the date of the grievance is

7    March 6th.  The statement of grievance says, "I

8    made a mistake, but I feel the reaction was

9    excessive."

10             Do you see that?

11        A    Yes.

12        Q    It's signed by Maria Davenport and you,

13   right?

14        A    Yes, correct.

15        Q    You mentioned earlier that there are --

16   you understood that there were certain steps --

17        A    Yes.

18        Q    -- that are followed under the Kroger

19   grievance and arbitration procedure?

20        A    Correct.

21        Q    And that the first meeting with Mr. Mabrey

22   was considered step one?

23        A    Yes.

24        Q    There was also a meeting for step two?

25        A    Correct.

```
 1         Q    And step three --

 2         A    Correct.

 3         Q    -- right?

 4              Did you take any notes from any of those

 5    meetings?

 6         A    I did not.

 7         Q    At some point, I believe after the step

 8    two meeting, you had an opportunity to have the

 9    step three, and you waived that right?

10         A    That is correct.

11         Q    Okay.  And you waived that right in

12    writing?

13         A    Yes.

14         Q    Okay.

15              (Defendant's Exhibit 13 marked.)

16    BY MR. BARRON:

17         Q    I've handed you what's been marked as

18    Exhibit 13 to your deposition.  Is this the letter

19    that you wrote waiving your right to the step

20    three?

21         A    Yes.

22         Q    And why did you choose to do that?

23         A    In the step two meeting, it was with Jill

24    Nystrom and Mr. Mabrey, Ms. Davenport, and I don't

25    remember who else was there.
```

Page 94

```
 1            But in that meeting, we went over the
 2    whole thing again, the whole what all had taken
 3    place.  And Ms. Nystrom said, she goes, "I'm here
 4    to hear what happened.  I want to hear it from
 5    you."
 6            She was quite polite about the whole
 7    situation.
 8            I explained in great detail what happened.
 9    I, once again, went into great detail of the intent
10    to steal was never there.  If the machine had
11    worked, obviously, I would have paid for the
12    chicken.  There would have been -- none of this
13    would have ever come up.  The machine failed.  And
14    then things just -- one thing after that went
15    wrong.
16            I felt like we were having -- she -- let
17    me rephrase.
18            At the beginning, she said that she was an
19    impartial observer, that she was there basically as
20    an umpire.  Mr. Mabrey had a belief and a decision
21    that he made, and I was there to present mine.  And
22    I had made it very clear to Ms. Davenport that I
23    did not need her to represent me, per se, but I
24    would represent myself and that she was there on
25    behalf of the company and the union, whatever.  And
```

Page 95

1    so I thought we were having a decent meeting.

2          It was at this meeting where Mr. Mabrey

3    made the comment that Ms. Dodson did not have the

4    power or the authority to change a Kroger rule.

5    Okay.  First I've heard about it, because she's my

6    boss.  And when my boss -- I've always believed

7    that if your boss, the person that is in charge of

8    you, who can hire and fire, and if not fire you, at

9    least make your life a living hell, if they ask you

10   to do something or tell you you can do something,

11   you're solid, because that's your boss.

12         So when he said that, I just thought that

13   was odd that he told me that.  Well, then he

14   proceeded to go on and tell me that she didn't --

15   not only did she not have the authority to tell me

16   that I could break a Kroger rule, that I as an

17   employee had a responsibility to know that I should

18   not listen to a boss who tells you that you can

19   break a rule because you work for Kroger; you don't

20   necessarily work for that boss.

21         And the longer he talked, the more I got

22   the feeling that his attitude was, even if she told

23   you it was okay, even if she gave you written

24   permission, and you had paid for it, you still

25   violated the company policy because you weren't

                                        Page 96

1  following what Kroger wanted you to do, which was

2  pay for something before you consume it.  And

3  therefore, anything that went wrong, it wasn't the

4  company's fault; it was the employee's part.  And I

5  just thought that was absurd.

6           Then Ms. Nystrom looks at me and says the

7  same thing; that as an employee, you determine what

8  is right and wrong, and you have an ethical

9  obligation to do the right thing.  And your bosses

10 can't tell you to do anything that would be -- that

11 anyone could consider unethical or against company

12 policy.

13     Q    All right.  Let me break that down a

14 little bit.

15     A    Okay.

16     Q    We'll get back to that.  You would agree

17 that if your supervisor told you it was okay to

18 steal, that that would be a directive that you

19 shouldn't follow?

20     A    Correct.

21     Q    Okay.  So you agree with Mr. Mabrey on

22 that point, right?

23          MR. SPERRY:  Object to the form.

24     A    It would be the excessive -- common sense

25 would tell you when a boss had crossed the line as

                                          Page 97

1    opposed to giving permission for a company policy.

2         For example, it is Kroger policy that you

3    never take a break unless you're off the clock.

4    You clock out for your breaks.

5    BY MR. BARRON:

6         Q    Right.

7         A    You have designated areas where you can

8    smoke.  That is a company policy.  That policy is

9    never enforced.  Drives me crazy because I'm not a

10   smoker.  So, of course, every time I turn around, I

11   see people smoking in areas where they shouldn't

12   be, and they're not off the clock, it bothered me

13   because, once again, my whole attitude was, if it's

14   a policy, and you're not enforcing it, is it a

15   policy?

16        But then all of a sudden, you see Johnny

17   outside smoking, and Johnny's not a good employee

18   or you got an attitude about Johnny, and then you

19   go write Johnny up for being outside smoking when

20   all these other people do it daily, I have a

21   problem with that.

22        Q    Right.

23        A    That --

24        Q    We're not in this lawsuit talking about

25   smoking, right?

Page 98

```
 1        A    I know.  But once again, we were talking
 2   about policy, company policy.
 3        Q    I understand.  There's a difference
 4   between smoking where you're not supposed to be
 5   smoking and stealing chicken, right; two different
 6   things?
 7        A    One is stealing time, one is stealing
 8   merchandise.
 9        Q    Well, in your opinion.  I mean, they're
10   still working when they're smoking, so they're not
11   necessarily stealing time, but -- right?
12        A    No.  If they're smoking, they're not
13   working.
14        Q    Okay.  All right.  Okay.  Back to the
15   issue at hand --
16        A    Yes.
17        Q    -- with the chicken.
18             I believe I was -- what prompted this
19   discussion was that -- your letter waiving your
20   third step.
21        A    Yes.
22        Q    Okay.  You did that?
23        A    I did that.
24        Q    Okay.  And you were actually talked out of
25   that?  Someone --
```

Page 99

```
 1      A     No.  Well, eventually, I was talked out of

 2   it.

 3      Q     Eventually, you were talked out of that?

 4      A     Yes.

 5      Q     And you ended up having a third step?

 6      A     Yes.

 7      Q     Okay.  Why did you change your mind?

 8      A     I did not realize I had changed my mind.

 9      Q     Okay.

10      A     When -- at the second meeting, when the

11   conversation that I just described came about --

12      Q     Right.

13      A     -- it was my opinion that a third

14   grievance hearing would be no different than what

15   the first one was, because it was -- to me, the

16   entire conversation was basically:  You did it, we

17   think you did it, but we have to go through this

18   process.

19           So it was a waste of time.  It was just

20   something that the company and the negotiations

21   with the union, whatever, had to proceed to be

22   legal.  In other words, they had those steps they

23   had to take.

24           So I didn't see any reason to go forward

25   to a third grievance and just waste another six
```

Page 100

 1   weeks or two months before that hearing was going

 2   to be scheduled just to hear the same thing.

 3           So I told Ms. Davenport, I said, "I'm

 4   going to go talk to legal counsel, and I'm going to

 5   see what rights I actually have, because this whole

 6   thing to me is just absurd.  It's ridiculous."

 7           And she said, "Well, nobody's going to

 8   talk to you.  Kroger's not going to talk to any

 9   lawyers, blah, blah, blah."

10           She tried very hard to discourage me.

11           And I said, "No, I'm going to do what I

12   think is best for me."

13           And so that's why I signed the letter and

14   said that, you know, we'll waive the hearing.

15           So talked to a couple of attorneys just in

16   general about what had taken place.  And I wanted

17   to go forward -- I wanted the matter resolved.  I

18   didn't want to get into a bunch of litigation.  I

19   really did not want to do that.  Nothing personal,

20   I'm not a big fan of attorneys and sitting and

21   doing all this.  But that's just normal.

22           So after I talked to a couple of attorneys

23   briefly, I decided to write a letter to the

24   president of Kroger, Mr. Lucia.  And in that

25   letter, I spelled out all the different things that

                                        Page 101

1   I thought were wrong, and I wanted -- basically,

2   all I asked for him was that I wanted an apology

3   from Kroger accusing me of being a thief and to

4   give me my job back.

5       Q    Let me stop you there.  Kroger never

6   actually accused you of being a thief.  They said

7   that you violated the Kroger associate purchase

8   policy, right?

9       A    Okay.

10      Q    Well, that's true, right?

11      A    That is true.

12      Q    Okay.

13      A    And at the meeting, the third meeting, it

14  was to the point of being absurd how many times

15  Mr. Mabrey looked at me and goes, "We didn't call

16  you a thief.  We're not accusing you of being a

17  thief."

18          You're accusing me of violating a policy,

19  and the policy end result is that I'm a thief.  But

20  it was -- it was almost to the point where it was

21  absurd the way he kept saying, "Nobody called you a

22  thief.  Nobody called you a thief."

23      Q    Well, to be fair, Kroger does not

24  distinguish between someone who doesn't pay for

25  something by mistake and someone who doesn't pay

                                        Page 102

```
 1   for something because they intended to steal it,

 2   right?

 3           MR. SPERRY:  Object to the form.

 4   BY MR. BARRON:

 5       Q    Do you understand what I'm saying?

 6       A    To me, it's the same -- it would be the

 7   same answer.  Okay.  Cashier in charge of her

 8   register.  She knows how much money she starts

 9   with.  It's -- she's an idiot if she doesn't count

10   it to start off with.  Okay.  At the end of the

11   day, she's $5 short.  She has no way of knowing how

12   she's $5 short.  She's $5 short.  That's shrink.

13   She has lost $5.

14       Q    Right.  But she didn't put $5 in her

15   pocket; we all agree on that?

16       A    But, see, that's the point.

17           MR. SPERRY:  Object to the form;

18   argumentative.

19       A    Okay.  Because the point is, that if that

20   cashier's $5 short, she can be fired for that.  If

21   that cashier took that $1,000 and put it in her --

22   $5 and put it in her pocket and is on video doing

23   it, she can be fired for that.  She can be fired

24   for either one of them.

25
```

Page 103

1   BY MR. BARRON:

2       Q    Well, let me back up.  Do you know that if

3   a cashier is $5 short, they can be fired for that?

4       A    Yes.

5       Q    You have personal knowledge of that?

6       A    I have -- I know they've been written up

7   for it --

8       Q    Right.

9       A    -- and if it happens more than once, they

10  can be terminated, yes.

11      Q    Kroger does not typically fire a cashier

12  the first time they're $5 short, right?

13      A    I do not know that for a fact.

14      Q    Okay.  Because you're -- you were never a

15  cashier?

16      A    Right.

17      Q    Okay.

18      A    But I do know cashiers.

19      Q    Okay.  There's a difference between being

20  a cashier and being short, and consuming food

21  product that you didn't pay for; do you agree with

22  me there?  Those are two different things?

23      A    Yes.

24      Q    Okay.  And there is a difference between

25  being called a thief and being accused of violating

Page 104

1    the Kroger associate purchase policy, right?  Those

2    are two different things?

3         A    For sake of argument, yes.

4         Q    All right.  And your -- and I'm asking

5    your opinion.  I mean, in your opinion, theft

6    requires intent, right?

7         A    Yes.

8         Q    Okay.  And you would agree with me that

9    Kroger has no way of knowing what's in your head,

10   right?

11        A    Correct.

12        Q    It wouldn't be the first time that a thief

13   lied and said, well, I didn't mean to steal it.

14   You would imagine that happens all the time, right?

15        A    I would imagine that happens all the time.

16        Q    And it would be very, very difficult for

17   Kroger to try to discern between the people who are

18   telling the truth that they had no intent to steal

19   versus the people who honestly made a mistake and

20   didn't intend to steal, right?

21        A    Yes, with one exception.

22        Q    Okay.

23        A    The video.  It shows that I had every

24   intent to pay for the chicken.  It shows me walking

25   across the floor in front of all the cameras.  I

Page 105

1    used my personal ID number to scan the computer.

2    Everything I did up to that point says Larry was

3    going to pay for the chicken.

4         When the computer failed -- not me, I

5    didn't fail.  I didn't not have enough money to pay

6    for it and I walked away.  The computer would not

7    allow me to go forward with my purchase.

8         Therefore, there is video evidence that I

9    had every intent.  Therefore, it's not a question

10   of questioning what was in my heart or my mind.

11   That's there for it to be seen.

12   Q    Right.  But again, if -- and I'm not

13   accusing you of this.

14   A    Okay.

15   Q    But if one wanted to be, you know,

16   conspiracy theory, they could say that, well,

17   that's a great opportunity to steal because you're

18   on -- you know, you set up a situation where, you

19   know, you can say, oops, I forgot to pay because

20   the machine didn't work.

21        MR. SPERRY:  Object to the form.

22   BY MR. BARRON:

23   Q    I understand that that's another side of

24   the story, correct?

25   A    Okay.  And how would --

Page 106

1          MR. SPERRY:  Object to the form.

2      A    How in the world would I have known that

3  the machine was going to fail so I could do that?

4          MR. SPERRY:  Larry, just answer the

5  question that you're asked.

6          THE WITNESS:  Okay.

7  BY MR. BARRON:

8      Q    My point is, is that we can play this game

9  all day.

10     A    Yes, yes.

11     Q    And, you know, your view of what's

12  suspicious, not suspicious, could easily

13  differentiate between someone else.  And it's very

14  difficult, again, for Kroger to get in your mind,

15  try to figure out what's going on in your mind,

16  right?

17     A    Yes.

18     Q    Would you -- how familiar are you with the

19  union?

20     A    Not at all.

21     Q    Okay.  Do you know that -- I mean, you

22  filed a grievance, so you obviously understand that

23  employees who are disciplined have a right to file

24  a grievance --

25     A    Yes.

1      Q      -- right?

2              And have a right to ultimately take it to

3    arbitration if they wish to?

4      A      Yes.

5      Q      So Kroger has to defend its actions

6    against the union --

7      A      Yes.

8      Q      -- if they choose to contest Kroger's

9    discipline?

10     A      Okay.  Yes.

11     Q      Do you agree with that?

12     A      Yes.

13     Q      So if Kroger treated one employee

14   different from another employee, then potentially

15   the union would be able to use that against Kroger,

16   right?

17     A      Yes.

18             MR. SPERRY:  Object to the form.

19   BY MR. BARRON:

20     Q      Let's talk about the step two meeting.

21   You've kind of mentioned it a little bit.  I want

22   to go into more detail about that.

23             (Defendant's Exhibit 14 marked.)

24   BY MR. BARRON:

25     Q      Okay.  Mr. London, the court reporter's

1  handed you what's been marked as Exhibit 14 to your

2  deposition.  I'll represent to you these are notes

3  from various step two and step three meetings.  I'm

4  assuming you've never seen these before.

5      A    I have not.

6      Q    Okay.  Did you take -- you didn't take any

7  notes?

8      A    I did not.

9      Q    Do you know if the other folks in

10 attendance were taking notes?

11     A    Yes.

12     Q    You physically observed that?

13     A    Yes.

14     Q    On Exhibit 14, at the top, it says that

15 the persons at the step two meeting were Larry

16 London, which is you, Maria Davenport, Lori Dodson,

17 Mike Mabrey and Jill Nystrom?

18     A    Correct.

19     Q    Does that sound right?

20     A    Yes.

21     Q    It says that the meeting took place on

22 March 6.  Does that sound right?

23     A    Correct.

24     Q    It says there were no recording.  Is that

25 true as far as you know?

Page 109

```
 1        A    As far as I know.

 2        Q    You didn't tape record anything, did you?

 3        A    No.

 4        Q    You haven't made any tape recordings

 5   relevant to this case, have you?

 6        A    No.

 7        Q    All right.  I'm going to walk through here

 8   and just ask you a couple of things, and you can

 9   just -- if you can just confirm whether the notes

10   are accurate --

11        A    Okay.

12        Q    -- that's really what I'm looking for

13   here.

14             On -- and I'm going to use the Bates

15   numbers.  If you look at the bottom right-hand

16   number, there's numbers.  Instead of saying page 2

17   of the exhibit, I'm just going to point you to

18   Bates numbers.  So if you look at Bates number

19   228 --

20        A    Yes.

21        Q    And it looks like there's an LL, which in

22   the notes, I believe, represents you.  I don't need

23   you to confirm that.  But it says, "Not the first

24   time.  Machine wouldn't let me ring up chicken."

25             A little later on, it says, "When happens,
```

Page 110

```
1    I leave a note."
2            Does that sound like something that you --
3        A    Yes.
4        Q    -- said?
5        A    Yes.
6        Q    Okay.  A little further down, there's an
7    MM, which I believe represents Mr. Mabrey, it says,
8    "Did you tell me that you knew it was a violation
9    of policy and shouldn't do it?"
10           And then LL, "Yes, I said that."
11           Is that something that you said?
12       A    Yes.
13       Q    On 229, looks like there's a discussion
14   about, "This time just put it in fridge.  Why?"
15           And then you answered, "Yes, Super Bowl
16   Sunday.  Busy.  Worked 74-hour week.  Show week.  I
17   was tired.  Didn't remember it until Mabrey asked
18   me about it."
19           Is that something that you said?
20       A    Yeah.
21       Q    A little further down, it says, from
22   Mr. Mabrey to you, "You said you leave sticker to
23   pay later.  You didn't leave any note.  You put
24   chicken in fridge in the morning."
25           Do you see that?
```

Page 111

```
 1        A     Yes.
 2        Q     All right.  Beginning on Bates number 230,
 3   there's notes from a step three meeting.  Do you
 4   see that?
 5        A     Yes.
 6        Q     And do you recall that meeting as well?
 7        A     I do.
 8        Q     And the date, it has May 8, 2014.  Is that
 9   accurate?
10        A     It sounds right.
11        Q     Okay.  And it has Larry London, you, Maria
12   Davenport, Jill Nystrom, Mike Mabrey and Brenda
13   Cape?
14        A     Yes.
15        Q     Same thing, I want to walk through the
16   notes and just ask you a couple of things.
17        A     Okay.  Now, for the record...
18        Q     Sure.
19        A     I had sent Mr. Lucia a letter.
20        Q     Right.
21        A     Somebody from human resource had called me
22   and told me they had received the letter and they
23   would like to set up a meeting to meet with me.
24              At no time did I realize that the meeting
25   they wanted to set up was actually going to be the
```

Page 112

1    third step in the -- as it turned out, that's what

2    it was.  But before I got there, I did not know

3    that.  I thought we were just having a meeting --

4         Q    About the letter?

5         A    -- about the letter.

6         Q    Okay.  All right.  Fair enough.  Did you

7    talk about the letter in the step three meeting?

8         A    When we got to the meeting, first thing I

9    asked them, when we sat down, I said, "Are you

10   aware that I had sent a letter to Mr. Lucia?"

11           And I believe Ms. Carr or Cape --

12        Q    Cape.

13        A    -- Ms. Cape said, "Yes, we're aware of

14   that."  And then she said, "But we're not here to

15   talk about that.  We're here to talk about the

16   incident that occurred on February the 6th."

17           And that's the first time I realized we

18   were not there about the letter.

19        Q    I'm going to go ahead and mark your letter

20   since we're talking about it.

21           (Defendant's Exhibit 15 marked.)

22   BY MR. BARRON:

23        Q    Mr. London, the court reporter's handed

24   you what's been marked as Exhibit 15 to your

25   deposition.

                                    Page 113

 1      A    Yes.

 2      Q    Is that the letter to Mr. Lucia that

 3  you're talking about?

 4      A    Yes.

 5           MR. BARRON:  I got a note from the

 6  videographer that we're almost out of time on this

 7  tape, so we're going to go ahead and take another

 8  break.

 9           THE WITNESS:  Okay.

10           THE VIDEOGRAPHER:  And we are off the

11  record.  The time is 11:19.  This is the end of

12  disk one.

13           (Off-the-record discussion.)

14           THE VIDEOGRAPHER:  And we are back on the

15  record.  The time is 11:22.  This is the beginning

16  of disk two.  You may continue.

17  BY MR. BARRON:

18      Q    Mr. London, I want to ask you about the

19  step three meeting.

20      A    Yes.

21      Q    If you could go back to Exhibit 14.

22      A    Yes.

23      Q    If you look on page 231, Bates number 231,

24  there was some discussion, I believe, by Mr. Mabrey

25  where he said, "Can understand forgetting about it,

                                        Page 114

1  but then picking up in the break room later in the

2  morning to put in the refrigerator should have

3  jogged your memory."

4           Do you see that?

5      A    Yes.

6      Q    All right.  I mean, isn't that true,

7  though?  I mean, your testimony is you forgot, but

8  then you specifically handled the chicken that

9  morning before you left, right?

10     A    Yes.

11     Q    You can certainly understand why Kroger

12 might look at that and say, you know, you should

13 have remembered at that point to pay for your

14 chicken?

15     A    And at that moment, that was my intent.

16 Then I went upstairs, Ms. Dodson was there, we

17 talked for 30 or 40 minutes, and I completely

18 forgot.  Because my intent was to come back

19 downstairs to get the chicken to pay for it on the

20 way out the door and take it home.

21     Q    Yeah.  But you didn't do that?

22     A    I did not do that, but that was my intent.

23     Q    You didn't write a note, you didn't pay

24 for it --

25     A    Right.

1      Q     -- you didn't tell anybody; you didn't do

2     any those things?

3      A     Correct.

4      Q     Even though you specifically went back and

5     handled the chicken that morning before you left?

6      A     Yes.

7      Q     On page 233, looks like you raised a

8     couple of other examples.  There's one about an old

9     lady stealing from Winn-Dixie?

10     A     Yes.

11     Q     What is that about?

12     A     I was just telling them a story when I was

13    a manager with Winn-Dixie, we had a customer that

14    came in and, you know, just bought her groceries on

15    a regular basis.

16          And what happened was, she had taken --

17    bought a large bag of dog food, and she put it up

18    underneath.  Actually, she had something -- an

19    employee actually put it there for her.

20          So when she came up front to pay for her

21    groceries, she paid for everything, was -- had left

22    the store, was out in the parking lot, and an

23    assistant manager comes running out the door.  He

24    had seen her go out the door, went over to the

25    cashier and said, Did she pay for the dog food

Page 116

1   underneath?  Said no.  She left the store without

2   paying for it.  So he goes out there, and he starts

3   screaming at her.  And she gets all upset, she

4   comes back in and pays for it.

5            That's not good enough.  He wants her

6   arrested.  He fires the cashier for not seeing the

7   dog food.  He has the little old lady arrested.  We

8   all have to go to court.  The judge had a hissy

9   fit, because, once again, it was on intent.  They

10  could not prove that she intended to steal that dog

11  food.  And he just went crazy on the Winn-Dixie

12  management people, because he said, yes,

13  technically, she left the store without paying for

14  it, and if you went by the absolute law, that was

15  theft.  But to convict somebody of something like

16  that, you need to show intent.  And since they

17  couldn't show intent, they threw it out.

18           And my understanding was it cost

19  Winn-Dixie back then a fortune in the following

20  lawsuits and stuff that were -- and that was the

21  point I was trying to make about the chicken, was

22  that that judge believed that intent did matter,

23  that you may have taken steps that did not coincide

24  with exactly how you think people should act or

25  react, but because this person had not hid anything

Page 117

1   or tried to conceal anything, you can't assume that

2   her intent was to steal.

3        Q    That was for purposes of a criminal

4   prosecution, correct?

5        A    Yes.

6        Q    Which is -- you're not here on a criminal

7   prosecution?

8        A    Correct.

9        Q    You were never prosecuted by Kroger,

10  correct?

11       A    Correct.

12       Q    And again, Kroger never -- Kroger went out

13  of its way to say, we're not even accusing you of

14  theft, correct?

15       A    Right.

16       Q    There's also a reference to a dairy

17  manager who bought $30 worth out groceries.  What's

18  that about?

19       A    Where is that at?

20       Q    It's on page 233, near the bottom.  Is it

21  talking about you or is this someone else?  It

22  says, "A few years ago, as dairy manager, bought

23  $30 worth of the groceries.  Machine would not take

24  the money."

25            MR. SPERRY:  It's the second to last

                                        Page 118

1    paragraph.

2              THE WITNESS:  Yeah, I see it.

3         A    No, that was about me.

4    BY MR. BARRON:

5         Q    Okay.

6         A    And what had happened was, I had purchased

7    everything -- or I had scanned everything, and then

8    at the time that I got ready to pay for it, after I

9    had scanned everything, it shut down.  And some of

10   the stuff was refrigerated and whatever.  And I

11   left a note and came back and paid for it.

12   BY MR. BARRON:

13        Q    Okay.

14        A    But I did leave the store with merchandise

15   that I had not paid for.

16        Q    But you left a note?

17        A    But I did leave a note.

18        Q    Was that at night or something?  Why --

19        A    Yeah, that was night.  Like I said, I was

20   the -- when I was the dairy manager, I was also

21   overnight.

22        Q    And then the next paragraph says, "About

23   six or seven times, this happened.  Something would

24   not scan.  Robot locked down.  Left note to pay

25   later."

                                   Page 119

 1              It says, "Felt this was acceptable because

 2      no one told me this was not okay."

 3          A      Correct.

 4          Q      All right.  There's a difference between

 5      no one told me this was not okay and someone

 6      specifically told me it was acceptable.

 7          A      Okay.  And I have told you that several

 8      people had told me it was okay.

 9          Q      Okay.  That's not what you said here.

10      Here it says, you felt it was acceptable because no

11      one told you it was not okay.  In other words,

12      there's a difference between, I thought I could do

13      it because no one told me I couldn't, versus

14      someone gave you specific permission to do it.

15          A      That is absolutely correct.  But my

16      testimony is that I was told it was okay, not only

17      by Lori Dodson, but Ms. Stacie Robinson, Cory Ivy,

18      Michelle Fresalone, they were all present at

19      different times when the conversation came up or

20      when I came back to make sure they saw the note, to

21      show them that I had come back and paid for it,

22      because that was my way of covering myself, because

23      I understood this was a big deal.

24          Q      Right.

25          A      So not only would I just come back and pay

                                              Page 120

1   for it, I would come back and say, hey, guys, I did

2   come back, here's the receipt, so there's no doubt

3   in their mind later that just because I left them a

4   note didn't mean I came back.  I had to prove to

5   them that I did.

6        Q    Right.  But no one ever -- I want to make

7   sure I'm clear that -- clear as to what they told

8   you.  They didn't tell you it was okay to -- let's

9   say a robot broke down, to leave a note and then

10  leave the store without paying for it.  You were

11  supposed to pay for it before you left when the

12  cashier got there, right?

13       A    Yes.

14       Q    Okay.  So under no scenario were you ever

15  given permission to leave the store without paying

16  for merchandise?

17       A    On that one occasion, I was leaving the

18  store because I had a meeting I had to be at at

19  another store, so I couldn't wait for the cashier

20  to be there.  That's why I left a note and said, I

21  will be back.

22       Q    Right.  Okay.  But you did not get

23  permission to do that?

24       A    I did not.

25       Q    Right.  You were never given permission

                                        Page 121

1   from anybody in store management to leave the store

2   without paying for merchandise?

3      A   Correct.

4      Q   Only to leave a note when you actually

5   consumed the merchandise?

6      A   Correct.

7      Q   And then later, you would pay for it when

8   a cashier arrived --

9      A   Correct.

10      Q   -- in the morning before you left the

11   store?

12      A   Correct.

13      Q   There's several points in here where you

14   talk about enjoying working for Ms. Dodson, you

15   feel bad for her.  Did you like Ms. Dodson?

16      A   I adored Ms. Dodson.

17      Q   Did you think she was a good manager?

18      A   I thought she was great.

19      Q   Why did you feel bad for -- did you

20   perceive that this incident involving you would

21   hurt Ms. Dodson?

22      A   I did.

23      Q   Why?

24      A   Because I was a part of her team.  I was

25   one of the leaders on her team.  As a matter of

Page 122

1    fact, when this first happened, and I did not know

2    what I know now, one of the last things I did

3    before I left Ms. Dodson's office on February the

4    6th was to apologize for putting her in that

5    position.

6         Q    What did she say?

7         A    I thought she was going to cry.  She

8    looked very upset about it.

9         Q    She was sad to see you go?

10        A    I think so.

11        Q    Okay.  Well, I mean, did she express

12   sadness that this had happened?

13        A    I mean, she -- Ms. Dodson, as a manager --

14   and like I said, the manager I had prior to her,

15   night and day different.  I mean, that was an

16   individual I couldn't stand.  Ms. Dodson was the

17   opposite.

18             Now, a lot of people in the store didn't

19   have the same feeling for Dodson I did, but it was

20   the way it was.  But she was a person who hated

21   confrontation.  She was not a person to get in your

22   face and scream at you or anything like that.

23             But if you ever got on her bad side, you

24   were done.  You were either on the Dodson team or

25   you weren't.  And if you weren't, you weren't going

Page 123

1    to be there very long, and that was pretty much

2    understood.  And a lot of people didn't want to be

3    on her team, and they weren't there very long.

4         Q    Okay.  You were on her team?

5         A    I was on her team.

6         Q    Okay.  You had a good relationship with

7    her?

8         A    I would say for the -- most of the time I

9    was there, I had a great relationship with her.

10        Q    Okay.  Friends?

11        A    I would say -- I thought so.

12        Q    Okay.  Would you, like, give her hugs,

13   those kind of things?

14        A    She was more the hugger than me.

15        Q    Okay.

16        A    But there was times when she gave me a

17   hug.

18        Q    Okay.

19        A    And then I would have to listen to all the

20   other employees criticize me for getting a hug.

21             But like I said, I was always impressed by

22   the fact that she was a working manager.  Whenever

23   she would tell us that we had to get something

24   done, she wouldn't just tell us that and leave; she

25   would be there to help us get it done.  And I

                                        Page 124

1    respected that.

2         Q    Did you feel like she respected you?

3         A    I did.

4         Q    All right.  Did she compliment you on the

5    work that you were doing?

6         A    All the time.

7         Q    Give me some examples.

8         A    When I was her dairy lead, when she --

9    when Ms. Vergara left and she took over, the first

10   thing she said to me is that she said she had heard

11   that I ran one of the best dairies in Zone M and

12   she didn't want me to change a thing.  Whatever I

13   was doing, keep doing, take care of it.

14            And she would walk back there -- and

15   usually, I would only be there for a couple of

16   hours in the morning while she was there because I

17   was working overnight, but she would walk by there

18   and she'd go, "This is beautiful.  I don't see how

19   you get it all done."  She goes, "I've had bigger

20   stores, and I've never seen a dairy look like

21   this."

22            And, of course, that was awesome because

23   the previous manager never had a good thing to say

24   to anybody about anything.

25        Q    She was very complimentary of your work?

Page 125

```
 1        A      Yes, she was.

 2        Q      Okay.  What about as grocery manager, was

 3   she complimentary of your job as grocery manager?

 4        A      Her thing, when I was the grocery manager,

 5   was that she told me that she counted on me more

 6   than she did any of her co-managers because I was

 7   the person who physically had to get the stuff

 8   done.  It wasn't more -- it wasn't as much managing

 9   as it was getting stuff done.  And she counted on

10   me to make sure stuff was done.

11             Kroger is real big on this key retailing

12   thing.  And we have key retailing checks.  And they

13   are -- they started off as aggravating and then

14   they just became ridiculous because they just kept

15   adding and adding and adding stuff to them.

16             One of her goals, and whether it was just

17   wanting to be the best or whether it was bonuses or

18   whatever was pending, she wanted to be one of the

19   best at key retailing as far as the grades that

20   they would give us when they would come around.

21             When I was in dairy, it was always

22   100 percent.  There was -- everything was always

23   done and done the way it was supposed to be done

24   according to Kroger policy.

25             When I became the grocery manager, that
```

Page 126

1    was one of the first things she told me, because

2    she had issues with the previous grocery manager.

3    She goes, "I'm counting on you to make sure that if

4    they walk in the door, we're not scrambling to try

5    to catch up.  We're ready."

6         Q    And just for the record, a key retailing

7    are things like out of stocks, things like that --

8         A    It's --

9         Q    -- conditions of the store?

10        A    It's a whole list of things.  I mean, it's

11   reports.  It's -- every day you have reports you

12   have to generate.  Your schedules have to be posted

13   in a certain way.  Your back stock reports have to

14   be done every day.

15             It's a lot of tedious stuff that when you

16   get busy, a lot of people say, well, it's more

17   important to put the milk on the shelf than it is

18   to do the report.

19             Well, I learned working for Kroger that

20   they like to say customer comes first, get your

21   damn reports done because you're going to show up

22   on report if it's not done.  And so that was just

23   one of the things I learned.

24             And Winn-Dixie was that way, so I had that

25   experience, take care of what your boss and your

                                   Page 127

1    boss's boss wants done, and then you worry about

2    the other stuff.  And that way you don't get

3    hollered at for it.

4         Q    Okay.  So it's fair to say as grocery

5    manager, you felt like Ms. Dodson was pleased with

6    the work that you were doing?

7         A    Yes.

8         Q    And you made her look good?

9         A    That was my plan, yes.

10        Q    Okay.  And basically as the grocery

11   manager, you were responsible for the night crew so

12   that in the morning, the store looked good, right?

13        A    The store had to look good, the dairy and

14   the frozen food, that was -- that's what

15   incorporated the grocery manager's position.

16        Q    I think you said that at the time of your

17   termination, you were still working on training

18   someone for the dairy?

19        A    Yes.

20        Q    And that she had -- Ms. Dodson had had

21   problems finding someone to take over that role?

22        A    Yes.

23        Q    She was counting on you to train that new

24   person, multiple new people?

25        A    Well, most of the time, it wasn't just the

                                        Page 128

```
 1    training.  It was my job, since I was the previous
 2    dairy manager, whenever there was a problem, I had
 3    to go catch them up.  And as it turned out, I would
 4    say at least five days a week, I spent several
 5    hours in the dairy, along with all the grocery
 6    duties, making sure the dairy was going to be right
 7    for the next morning when it opened.
 8              And that was just one of those extra
 9    things that you had to take on, that it was harder
10    on me, it required more time, and it drove my crew
11    crazy, because they wanted me with them because
12    even though I'm the grocery manager, I'm still
13    required to stock shelves and to take care of
14    aisles.  And if I wasn't taking care of an aisle,
15    that means somebody else had to pick that up.
16       Q    All right.  Let's turn to your letter to
17    Mr. Lucia --
18       A    Okay.
19       Q    -- which is marked as Exhibit 15.
20              Do you have that in front of you?
21       A    Yes.
22       Q    Do you know the date when you wrote that
23    letter?  Is it fair to say it was between the step
24    two and step three meetings?
25       A    Oh, yes, yes.
```

Page 129

1      Q    Okay.  Can you nail it down any further

2   than that?

3      A    Well, I mean, it's dated 3/19.

4      Q    Okay.  Where?  Oh, okay.  Good.  Thank

5   you.

6           I want to ask you about some of the things

7   you put in your letter.

8      A    Okay.

9      Q    Did you type this at home?

10     A    Yes.

11     Q    On a computer?

12     A    Yes.

13     Q    Were there any drafts of this letter?

14     A    There was probably several over a period

15  of time, yes.

16     Q    Okay.  So did you do it sort of like all

17  in one setting or did you draft it and then make

18  edits to it, anything like that?

19     A    Oh, I would -- I'm a horrible speller and

20  even worse at typing, so --

21     Q    Okay.

22     A    -- yes, I would do it and then read it and

23  say, okay, that's not what I meant to say, and then

24  I'd have to go back and do it again.

25     Q    Okay.  But, I mean, the version that's on

Page 130

```
 1   your computer is the final version?

 2        A    Yes.

 3        Q    Or do you have, like, multiple versions or

 4   drafts?

 5        A    No, no.  That was the -- that was the

 6   whole version, yes.

 7        Q    Okay.  And you sent it to Mr. Lucia?

 8        A    Yes.

 9        Q    And you sent it to Mr. Well and

10   Ms. Nystrom?

11        A    Yes.

12        Q    Who's Mr. Well?

13        A    He's a vice president.

14        Q    Did you send it to anybody else?

15        A    I don't think if I copied anybody else,

16   no.

17        Q    That's all that's copied on it.  I'm

18   just --

19        A    Okay.

20        Q    -- curious if you actually sent it to

21   anybody else.

22        A    No.  And, well, and at our meeting, the

23   third meeting, Ms. Davenport, the union rep, had

24   not -- I did not copy her, and she asked for a

25   copy.  And so I did provide one with her -- to her.
```

Page 131

1     Q    What was the purpose of sending this

2   letter?

3     A    I wanted Mr. Lucia to understand the

4   situation.  I didn't feel like the people at the

5   level that I was -- had been speaking to were going

6   to do anything that was going to benefit me, and so

7   I was hoping that I would get in touch with

8   somebody in the position that could do something

9   about it.

10        And even in the letter, I told Mr. Lucia

11  what I wanted was an apology from Kroger and

12  reinstatement.

13    Q    And I believe you testified that you heard

14  back from somebody about the letter?

15    A    Yes.

16    Q    Who did you hear back from?

17    A    I don't remember.  It was somebody from

18  human resources.

19    Q    Brenda Cape maybe?

20    A    No, it wasn't her.  It was a guy.

21    Q    Okay.  All right.  And what did he tell

22  you?

23    A    Well, we played phone tag for -- it had to

24  be a month, where he would leave a message and then

25  I'd call back, and we did that.  And so when I

Page 132

 1   finally talked to him, he said, Larry, he said, we

 2   got your letter here, they sent from it Mr. Lucia's

 3   office to us.  They want us to set up a meeting and

 4   sit down and talk to you and see whether or not we

 5   can work something out.

 6           And that's how he said it, "work something

 7   out."  So I said, okay, that sounds good.  Like I

 8   said, I had no idea it was just another version of

 9   the third grievance thing.  If I would have known

10   that, I don't know if I would have even taken the

11   meeting.

12       Q    Okay.  And that's what prompted the

13   meeting?

14       A    Yes.

15       Q    Okay.  Same thing, I'm going to give you

16   Bates numbers --

17       A    Okay.

18       Q    -- and then we'll use that method to go

19   through the letter.

20       A    Okay.

21       Q    On number 122 on the bottom right-hand

22   corner, a couple of pages in, paragraph that says

23   "I was fired on February 6."

24           Do you see that?

25       A    Yes.

Veritext Legal Solutions
800-336-4000

1      Q      2/6/2014?

2      A      Yes.

3      Q      A couple of sentences down, it says,

4    "There are several people who have far more

5    knowledge of what went on than your people may be

6    aware of.  Even if you knew who these people were,

7    I would have my doubts if they would be very

8    forthcoming with the truth at this time out of fear

9    of also losing their job."

10          Who were you talking about there?

11     A      I was talking about the co-managers that

12   were aware of the policy to allow me to make those

13   purchases overnight.

14     Q      You're talking about the note --

15     A      Yes.

16     Q      -- the policy of leaving a note?

17     A      Yeah, yeah.

18     Q      Okay.  That's all you're talking about,

19   right?

20     A      Yeah.

21     Q      And again, you didn't leave a note?

22     A      No.

23     Q      The next sentence says, "When we get to

24   court, I can assure that you that no one is going

25   to lie for me, and I really do not believe anyone's

Page 134

1    going to lie for Kroger and take a chance at

2    committing perjury."

3            What were you talking about there?

4        A    Just in general, that I believe in a

5    situation where if you're in court -- or when

6    you're talking to people, like we are right now,

7    where you're talking to people at store level and

8    stuff and you're interviewing people, I understand

9    if they feel they say something that would be

10   viewed as negative for Kroger, that Kroger would

11   respond in a negative way to them.

12           And therefore, I would think that somebody

13   talking to somebody off the record would be less

14   truthful than somebody who was under oath and in

15   jeopardy of some kind of punishment if they were

16   found not telling the truth under oath.

17       Q    So what would anybody need to lie about,

18   though?  I mean, you basically admitted that you

19   didn't pay for the chicken.  I'm just confused on

20   why you thought anybody would need to lie about

21   anything.

22       A    When we were talking -- when I was talking

23   about this, I was talking about all the other stuff

24   that had gone on with the overtime violations and

25   that kind of thing.

Page 135

1       Q     Okay.  We're going to get there.  On

2    page 123 onto 124, talks about "If six employees

3    are accused" -- and this is down at the bottom.

4       A     Yes.

5       Q     -- "of making the same kind of mistakes

6    and they are all suspended but every one of them

7    get to keep their job but another person does not,

8    is that discrimination?  What if I were to tell you

9    that all of those six employees who got their job

10   back were young, part-time people, and the other

11   employee was full-time, top paid and over 60, is

12   there a pattern here?"

13          Are you talking about anything specific

14   there or are you -- is this just a hypothetical?

15      A     There was -- well, there was -- it was --

16   it's hypothetical with substance, because I had

17   known of several people who had been suspended

18   pending or whatever, and it was a whole assortment

19   of different things that were, quote, violations of

20   company policy.  But by and large, even when

21   Ms. Dodson didn't want them back, the company

22   forced them back into the store.

23          And once again, as an employee who tried

24   to follow all the rules, and you see people

25   intentionally and deliberately -- I mean, there's

Page 136

1   that word again, intentional -- you see people

2   violating rules, whether they're mistakes or not,

3   and the company goes after them or tries to take

4   disciplinary action on them, and yet they're

5   allowed to come back, okay, if that's the way it

6   works, that's the way it works.  But it didn't work

7   that way for me.

8       Q    So you don't know the circumstances

9   surrounding those specific issues, do you?

10      A    Some of them I knew more than others

11  because I was involved more than others.  Like we

12  had a kid who was a cashier who was smoking an

13  e-cigarette.  And he was told he couldn't do that

14  on the floor.  And the next time he was saw doing

15  that on the floor, he was suspended pending.  And

16  he was allowed to come back to work for Kroger.

17      Q    Okay.  And how were you personally

18  involved with that?  Was that something where you

19  were on duty --

20      A    That was something where I was a witness

21  to it.

22      Q    Okay.

23      A    And when they went upstairs to do the --

24  they brought me as the witness, because I was the

25  grocery manager on duty at the time.

Page 137

1      Q     So in that situation, suspended pending,

2   again, is basically the first step of a discharge,

3   right?

4      A     Yes, yes.

5      Q     And that employee was effectively

6   discharged for that, and it was later overturned

7   and --

8      A     Yes.

9      Q     -- through the grievance process, I'm

10  assuming?

11     A     Yes.

12     Q     Okay.  And you don't have any personal

13  knowledge of what happened in the grievance

14  process?

15     A     I do not.

16     Q     Any others where you had any involvement

17  with?

18     A     No.

19     Q     All right.  On the next page, you talk

20  about -- or you question whether this could be age

21  discrimination.

22           Just to be clear, this lawsuit is not

23  about age discrimination?

24     A     It's not.  But at the time, I didn't

25  know -- I had no idea which direction this was

                                        Page 138

1    going.

2        Q    Understood.  And it talks about, "The

3    retail value of the mistake does not matter.  It

4    does not matter if your intentions were good or

5    evil.  I was told that it does not matter if you

6    are considered a great employee in the eyes of

7    management or if you are in the bottom 10 percent.

8    It has no bearing."

9            So again, you were told by Kroger that

10   whether you're a good employee, a bad employee, the

11   value of the retail product doesn't matter with

12   respect to the associate purchase policy, right?

13       A    That's how it worked out.

14       Q    Okay.

15       A    Now, like I said, my whole argument or

16   premise was, you watch people make mistakes over

17   and over again, and they keep their job.  And you

18   watch people do it in such a way where you feel

19   their intentions are to disrespect the company or

20   not to do what's best -- what's in the best

21   interest of the company.

22            And I felt that I had always done what was

23   in the best interests of the company.  And the

24   first time I make a mistake, I'm terminated.  Yeah,

25   I had a problem with that.

Page 139

1      Q     On 126, Bates number 126, there's a

2   reference to a Michael Noff for a -- something

3   about a case involving $3 million.

4      A     Yes.  And that was a -- that was -- that

5   was a lawsuit where there was a slip and fall in

6   the store, if I believe -- if I remember that

7   correctly.

8      Q     Right.  I'm familiar with that one.  You

9   didn't have any involvement with it, did you?

10     A     No.

11     Q     Okay.  This was just something you read

12  about or heard about?

13     A     Right.  And well, I mean, the way we heard

14  about it was, when the verdict came down and there

15  was a large verdict against Kroger, each store had

16  to share in the loss as far as bonuses and stuff

17  like that.

18           And so it became common knowledge that we

19  were all going to be punished to some degree on our

20  bottom line because, obviously, they had to make up

21  for the loss and stuff.

22           But the part that had bothered me so bad

23  was that -- and the way I understand it, and once

24  again I'm just -- it's what I read, was that the

25  punitive damages were based on the fact that Kroger

Page 140

1    wasn't honest and they got caught, and therefore,

2    what could have been X turned into X, Y and Z.

3         Q     You had no personal knowledge?

4         A     No personal knowledge.

5         Q     Didn't happen at your store?

6         A     No.

7         Q     On 1/27, there's a reference to cheating

8    on OSAT scores?

9         A     Yes.

10        Q     What's that about?

11        A     At our meeting, when they were giving me

12   the fourth degree about the ethics of somebody

13   telling you you could do something and whether you

14   could do it and all that, you should be more

15   ethical and that, whatever, I just found the whole

16   thing ironic because one of the things Kroger did

17   is they had all kind of things that they would send

18   out for customer service to try to make it better.

19   Their -- and a lot of their stuff was based on, you

20   know, reports and whatever, as I was telling you on

21   the key retailing part.

22             Well, the thing with the OSAT was, it was

23   about customer satisfaction.  And so when you would

24   come into the store, the customer -- the cashier is

25   supposed to hand every customer a thing to fill

Page 141

1    out.  And you fill it out, and they rate your store

2    and your service and all that kind of stuff.

3            Well, we had meeting after meeting on how

4    important this was.  And this was out of

5    Cincinnati.  And Atlanta was terrible, we're going

6    to get better, we're going to do this, we're going

7    to do that.

8            So all of a sudden, we got better.  And we

9    were doing great.  And it was discovered, and it

10   was going on in our store, too, and I know people

11   that told me about it, they were having employees

12   fill out those customer things and just pretend

13   they were a customer and fill it out and send it

14   in.  And, of course, they were great.

15           And when they got caught, it was one of

16   those things where you went, wow, all these

17   different managers -- and it wasn't all managers,

18   I'm sure some were -- involved in making their

19   numbers better than what they actually were.

20           And my whole point of that was, you're

21   sitting there questioning me about my ethics and

22   how I should behave, and yet all these store

23   managers got caught doing it, and to my knowledge,

24   nobody lost their job.  They were basically -- just

25   said, I can't believe you did that.  We're all

                                        Page 142

1   embarrassed.  We're all humiliated by it, because

2   Cincinnati found out about it.  And we're going to

3   do it differently now so you can't cheat anymore.

4         But that was just -- once again, were you

5   cheating to be better, were you cheating to

6   maximize your bonuses?  I don't know.  But it was

7   just one of those things that came to me, and it

8   was just aggravating because, once again, it was

9   like somebody was on a high horse on these two

10  issues, but this over here was okay.

11      Q    So you didn't personally fill out a

12  form -- a fraudulent form, did you?

13      A    I was not part of that, no.

14      Q    All right.  And do you know if your store

15  was part of that?

16      A    Yes, I do.

17      Q    How do you know that?

18      A    Because I know the -- a couple of the

19  employees who were actually -- that was part of

20  their job.  Here, take these cards, go in the break

21  room, fill these out, make sure you come up with

22  names that aren't redundant so they won't --

23      Q    How do you know that?  I mean, did they

24  tell you --

25      A    They told me.  They told me that's what

Page 143

```
 1    their job was.  I was laughing because they were
 2    saying, you know what I got to do today, you know,
 3    I got to sit down for 30 minutes and do this.
 4         Q    Who told you that?
 5         A    They were kids.  I don't remember their
 6    names.
 7         Q    When was this?
 8         A    This had to be, I would say, fall of 2013.
 9         Q    Who was the store manager at the time?
10         A    Lori Dodson.
11         Q    Okay.  Do you know if she gave
12    instructions for them to do that?
13         A    I have no idea, but -- I take that back.
14    I take that back.  I -- there was a conversation
15    between her and Rosana, who was the front end
16    manager, and they were discussing how much better
17    their OSAT score was.  And the comment was made,
18    Well, don't make them too good or somebody's going
19    to know something's up.
20              Because -- and that was just a
21    conversation I overheard.  They weren't talking to
22    me.  I was just upstairs on the computer at the
23    time that this conversation occurred.  And I just
24    kind of went, oh, really.
25         Q    You don't have any personal knowledge as
```

Page 144

1   to what steps Kroger took to respond to this --

2       A    No, no.

3       Q    -- in terms of disciplining managers?

4       A    I have no idea.

5       Q    It's possible managers were disciplined;

6   you just don't know?

7       A    To my knowledge, nobody lost their job.  I

8   don't know about --

9       Q    Right.

10      A    I mean, there could have been all kind of

11  stuff done, notes in files, whatever.  But no, to

12  me, the only thing I would know is if somebody had

13  been fired, obviously, even from scuttlebutt, you

14  would have found out that, well, did you hear what

15  happened.

16      Q    Okay.  Did you have any conversations with

17  Kroger after the step three?

18      A    No.

19      Q    Okay.  Did you have any conversations with

20  the union after the step three?

21      A    Ms. Davenport asked me to get her a copy

22  of the letter, and I said I would.

23           I had asked for, from Kroger, that if I

24  was terminated, I wanted my -- the accrued vacation

25  pay and stuff that I was owed.

Page 145

1          They came back to me and said, if you

2    agree to -- if you agree to resign, we will give

3    you that money.  If you don't, we're going to keep

4    it.

5          And once again, it was one of those things

6    where, from an ethical standpoint, it was what I

7    had earned.  It was due to me January the 1st of

8    that year.  And now they're telling me that if I

9    agree to say something that's not true in writing,

10   they will reward me by giving the money that was

11   owed to me.  I had a problem with that.

12         Ms. Davenport says, oh, don't worry about

13   it, Larry, the union will step forward and they

14   will make sure you get that.  And never heard

15   another word from them.

16   Q    Isn't it true that Kroger told you that

17   under their policy -- under its policy, employees

18   who are terminated for theft aren't entitled to get

19   their accrued vacation?

20   A    I wasn't terminated for theft.  I was

21   terminated for company policy violation.

22   Q    Fair enough.  You're right.  Terminated

23   for violation of policy.

24         But employees who are terminated in those

25   circumstances typically, under their policy, don't

                                        Page 146

```
 1    receive accrued vacation?

 2        A    I had never heard that.  I did not know

 3    that.

 4        Q    You don't know what Kroger's policy is

 5    with respect to which employees get accrued

 6    vacation and which ones don't?

 7        A    I mean, I know what was owed to me.  If I

 8    would have taken my vacation pay on January the

 9    1st --

10        Q    Right.

11        A    -- they weren't going to fire me on

12    February the 2nd and then say, you need to give

13    back our money.

14        Q    No doubt.

15        A    Okay.

16        Q    But an employee who is terminated, as

17    opposed to one who resigns, you don't know what

18    Kroger policy is with respect to --

19        A    Well, I mean, I was told that after the

20    fact.

21        Q    Sure.  Right.

22        A    But once again, I was offended by the fact

23    that a company who's sitting there talking about

24    ethics and honesty and how things should be done

25    are saying, we want you to say this, when it's not
```

Page 147

```
 1    true.  You're voluntarily -- you're going to

 2    voluntarily resign, and we will give you X.  That's

 3    the --

 4         Q    Your opinion is that --

 5         A    My opinion is that's unethical because of

 6    the fact that they were trying to coerce me to do

 7    something that was not honest.

 8         Q    Well, it was your choice.

 9         A    For the purpose of gain.

10         Q    First it was your choice.  No one forced

11    you to do anything --

12         A    Right.

13         Q    -- right?

14         A    Right.

15         Q    And you don't know if that was the typical

16    company practice, right?

17         A    Right.

18         Q    All right.  Any other discussions with the

19    union or Kroger after the third step that we

20    haven't talked about?

21         A    No, no.

22         Q    Did you have any discussion with the union

23    about arbitrating your grievance?

24         A    No.

25         Q    Why not?
```

Page 148

1      A    I thought it was done.  I thought after

2    three, there was nothing else that could be done.

3    And then when Ms. Davenport never -- and after she

4    said she was going to take care of the overtime pay

5    and stuff, she did not return my calls.

6           And I did send her a certified letter at

7    some point stating again what I wanted from her and

8    asked her what was going on, and she never returned

9    my call and never contacted me again.

10     Q    When did you hire your lawyer?

11          I don't want to know anything you talked

12   about.  I just want to know when you hired him.

13     A    No, I'm trying to think.  This year,

14   February -- what was it?

15     Q    2016?

16     A    Yeah.

17     Q    Okay.  I'll represent that the lawsuit was

18   filed in February of 2016.

19     A    Yes.

20     Q    Okay.  Did you hire the lawyer shortly

21   before that?

22     A    Yes.

23     Q    Okay.  Why did it take you so long between

24   '14 and '16?

25     A    Because I'm not as smart as I should be.

                                    Page 149

1    I originally did not realize that -- because

2    originally, when I sent the letter to Mr. Lucia, I

3    was looking at this from different points of view.

4            And I knew there was an EEOC thing that

5    you had to accomplish and go through and whatever.

6    And I missed the deadline on it.  I just -- I

7    didn't realize it was as short a period of time as

8    it was.

9            Having said that, and once again, why you

10   should never try to be a lawyer if you're not, I

11   had read several things about if you're going to

12   dispute a wage and hour claim, you had a three-year

13   window.  I didn't realize that a three-year window

14   was ticking from the time that the event occurred,

15   not you had three years to file.  And so when I

16   finally realized that, I was where it is now.

17      Q    Okay.  And I'm just curious, do you know

18   whether that three-year window is only if it's

19   willful and whether there's, in fact, a two-year

20   window as well?

21      A    I have no --

22      Q    Do you understand that distinction at all?

23      A    No, no.

24           MR. BARRON:  Okay.  All right.  I'm going

25   to suggest we take a break because I'm about to get

Page 150

```
 1    into the FLSA stuff.  It just seems like a good
 2    stopping point.
 3              MR. SPERRY:  Absolutely, perfect spot.
 4              THE VIDEOGRAPHER:  Stand by, please.  And
 5    we are off the record.  The time is 11:57.
 6              (Lunch from 11:57 a.m. to 12:55 p.m.)
 7              THE VIDEOGRAPHER:  And we are back on the
 8    record.  The time is approximately 12:55.  You may
 9    continue.
10    BY MR. BARRON:
11        Q    Mr. London, we're back on the record.  You
12    understand you're still under oath?
13        A    Yes.
14              (Defendant's Exhibit 16 marked.)
15    BY MR. BARRON:
16        Q    Mr. London, the court reporter has handed
17    you what's been marked as Exhibit 16 to the record
18    here today.  I'll represent to you that that's a
19    copy of the complaint that kicked off this lawsuit.
20    Have you seen that before?
21        A    Yes.
22        Q    Have you read it before?
23        A    Yes.
24        Q    All right.  And it was filed February 5th,
25    2016, correct?
```

Page 151

```
 1        A    Correct.
 2        Q    I want to direct your attention to page 4
 3   of Exhibit 16.  And in paragraph 9, it alleges
 4   there that you worked more than 40 hours per
 5   workweek and were not paid overtime wages; is that
 6   right?  Is that what your -- at least part of what
 7   your lawsuit is about?
 8        A    Yes, yes.
 9        Q    On page 5, I want to direct your attention
10   to paragraph 18.  It says, "Although plaintiff
11   worked approximately 70 hours in a workweek, Dodson
12   directed Plaintiff to not record all his hours and
13   paid Plaintiff for only eight hours overtime each
14   week."
15             Do you see that?
16        A    Yes.
17        Q    All right.  Are you talking about a single
18   workweek or what is your allegation there?
19        A    That was weekly.
20        Q    Okay.  So your testimony in this case is
21   that you worked 70 hours every single week?
22        A    Actually, it was more than that.  It was
23   closer to 75 hours each week.  I averaged about 11
24   hours per day seven days a week.
25        Q    Okay.  From what period -- from when to
```

Page 152

1    when?

2         A    When I became a grocery manager in -- that

3    would be November, I believe, of 2012 until

4    February of 2014.

5         Q    Okay.  Your testimony is seven days a

6    week, every week between 2012 and 2014 --

7         A    Yes.

8         Q    -- you worked?

9         A    Yes.

10        Q    Okay.  Are you accounting for the fact

11   that there were days where you didn't show up for

12   work at all?

13        A    I never missed a day of work.  There

14   was -- in the period of time that we're

15   discussing --

16        Q    Right.

17        A    -- calendar -- let's say calendar year

18   2013.

19        Q    Right.

20        A    I was not at work four days.

21        Q    The whole year?

22        A    The whole year.  I was on vacation and out

23   of town.  Even though I had vacation time, I was

24   still at work those weeks, as far as orders go,

25   things that I needed to take care of from a

                                        Page 153

1    paperwork standpoint.  And you can go back and look

2    at the records and it'll show that even on vacation

3    weeks, you would work your 40 hours or 30-something

4    hours, go on vacation, come back and pick it up

5    again, where you weren't taking time away from

6    the -- from that.

7         Q    So you're saying you were paid for your

8    vacation hours, but you didn't actually take that

9    time off --

10        A    True.

11        Q    -- just continued to work?

12        A    Yes, yes, yes.

13        Q    And --

14        A    Except for that one time.

15        Q    All right.  And that's permissible at

16   Kroger?

17        A    Oh, yes, yes.

18        Q    You're not the only one that did that?

19        A    No.

20        Q    In your paragraph 18 there of the

21   complaint, it says, "Dodson directed Plaintiff to

22   not record all his hours and paid Plaintiff for

23   only eight hours overtime each week."

24             I want to break that up.

25        A    Okay.

                                            Page 154

1      Q     When did Dodson direct you to not record

2   all of your hours?

3      A     What Ms. Dodson would say, the way this

4   took place, when I became her grocery manager, she

5   told me that it was not a five-day-a-week job.  I

6   knew that already.  She goes, "I expect you to work

7   and do whatever we need to do to get the job done."

8   She goes, "I'm allowed to use a certain amount of

9   overtime per store."

10          She goes, "And I expect my grocery manager

11   to get most of that because to me he's the most

12   important person."  She goes, "But I will tell you

13   how many hours you can put down each week."  And

14   she goes, "And I expect you to stay within those

15   guidelines."

16          The first couple of weeks I was grocery

17   manager, she told me that I could use eight hours.

18   I think I was -- the first week I was, like, 13.

19   The next week I was, like, 15.

20          She calls me into her office.  She goes,

21   "That's unacceptable.  You can't put down those

22   kind of hours.  If I say eight, that means I'm

23   letting other people use overtime within the store.

24   If we go over our number that we're allowed to put

25   down or use, I get in trouble."  And she goes,

Page 155

1    "That we can't do."

2           So my comment to her was, "If I need more

3    hours, do you have people available to help me?"

4           She goes, "No, I don't.  That's why you're

5    my grocery manager.  I expect you to do whatever it

6    takes to get the job done."

7           And this was a conversation that was known

8    throughout Kroger, as far as the store that I

9    worked in.  Previous grocery managers before I

10   became one had told me that.  When I was in dairy,

11   that was the -- that's what I was told, is that we

12   have to finish our job every day.

13          And the way the thing -- that Kroger

14   works, if you get a truck in, the way the

15   computer-assisted ordering and all that works, it

16   doesn't work if you don't finish your truck each

17   day.  Because the next day, there may be another

18   truck.  And it generates orders based on what you

19   got in and what came and what didn't.  So you have

20   to finish your truck so you can make out your

21   orders to make it work.  So that was a mandatory

22   thing, you had to finish.

23          And when I was the dairy manager, it was

24   constant where co-manager or someone would come

25   back there, they would look in the cooler, this

Page 156

1    would be, you know, 9 -- 7 or 8 in the morning.

2    Got three pallets of stuff left to do.  Do you have

3    anybody to help me?  No.  Well, don't leave till

4    it's done, but don't use any overtime.

5              Now, I don't know how you gel those two

6    things unless they're not telling you to work off

7    the clock, because they're telling you don't leave

8    until it's done, but don't use overtime.

9              And the situation I got into most of the

10   time, more often than not, it wasn't the overtime

11   after the 40, although that's important, of course,

12   but with Kroger, it's overtime after nine.

13        Q    Right.

14        A    And so even on a daily basis, I was using

15   overtime that wasn't being recorded because I was

16   there more than the nine hours.

17        Q    Okay.  So let me break this down some

18   more.

19        A    Okay.

20        Q    All right.  I want to -- I want to go

21   through every conversation that you had with

22   Ms. Dodson where you're claiming she told you to

23   work off the clock.

24              Based on what you just described to me

25   there, she never explicitly told you to work off

Page 157

 1    the clock?

 2        A    And nobody would.

 3        Q    Okay.  So can we agree that no one from

 4    Kroger ever explicitly told you to work off the

 5    clock?

 6        A    Explicitly?

 7        Q    Yeah.

 8        A    Yes.  Nobody ever --

 9        Q    No one ever said, Larry, if you can't --

10    if you can't get the job done, you're supposed to

11    keep working off the clock?  No one ever told you

12    that?

13        A    Nobody ever said that, no.

14        Q    Okay.  What you're -- you interpreted what

15    they told you as instructing you to work off the

16    clock?

17        A    Yes.

18        Q    Okay.  And what you were interpreting as

19    an instruction to work off the clock was the fact

20    that you were required to get the job done within a

21    certain amount of time without using overtime?

22        A    Yes.

23        Q    Okay.  Now, in fact, let's just take 2013

24    as an example.

25        A    Okay.

1        Q      You worked a lot of overtime in 2013?

2        A      I did.

3        Q      Okay.  Were you aware that you were one of

4    the highest -- you had the highest amount -- one of

5    the highest amounts of overtime in your district

6    for 2013?

7        A      That, what you just said --

8        Q      Yeah.

9        A      -- is why -- one of the reasons why we're

10   here today.  Because in January of 2014, Ms. Dodson

11   called me into her office, and she said, "I just

12   got an email from Daniel Thurman, retail operations

13   supervisor, attendant, whatever.  And in that

14   email, he said, Larry London has the second most

15   overtime in Zone M."  And says, "You need to do

16   something about that.  You need to fix that."

17            So she calls me into the office and tells

18   me that.  And I looked at her at the time when she

19   said that, and I said, "So what do you want me to

20   do about it?"  I said, "You know how many hours I'm

21   putting in."  That's what I said to her.

22            And she said, "Well," she goes, "This is

23   something that is going to come back to bite us if

24   we don't do something about it."

25            So the first thing I said to her, I said,

Page 159

1    "Well, one of the things you can do is get me a

2    dairy manager, because I'm spending a lot of my

3    hours in the dairy and not in my department,

4    although I'm responsible for dairy."

5          She goes, "Well, I'll get with Keith

6    Williams, who's the district manager, and see what

7    I can do."  I said, "Okay."

8          Another thing she was doing -- we are

9    budgeted -- our grocery department is -- as a

10   grocery manager, I'm given a budget.  You can use

11   230 hours as an example.

12      Q    Right.

13      A    Ms. Dodson had taken 40 hours from the day

14   I became grocery manager and had me schedule on my

15   schedule that she worked that person during the day

16   for her benefit.  Not the benefit of the store.

17   I'm not claiming that she was doing something mean

18   or evil.  But she needed -- she said she needed

19   that person to work for her during the day to get

20   stuff done that she didn't have anybody there to

21   take care of.

22          So I'm 40 hours short there, plus whatever

23   hours I'm spending in dairy.  So I told her, I

24   said, "Well, we need to do something about the fact

25   that you're using Bobby Hide, who was the employee,

Page 160

1    in the daytime."

2              "No, we can't do that.  I need him."

3              I said, "Then I don't know what you want

4    me to do.  Because you're telling me that you want

5    to cut back on the overtime that I'm being paid.

6    And at the same time, you're telling me that you

7    can't give me back the hours that are actually

8    dedicated to my department."

9              And I know for a fact talking to the other

10   grocery managers in the area, that the hours they

11   were budgeted was -- it was damn near impossible to

12   get everything done.  And here I'm working 40 hours

13   short of the full-time person and the hours that

14   I'm putting in dairy, which were probably in the

15   20s each week.

16       Q    But one of the ways, for example, you can

17   get the job done is to be more efficient, right?

18       A    If you had people that were more

19   efficient --

20       Q    Right.

21       A    -- maybe you could.  I don't want to pat

22   myself on the back.  I don't want to sit here and

23   brag.  I was very good at what I did as far as the

24   speed that I could work at.

25       Q    Okay.  But you also had another crew?

                                        Page 161

1      A      I did.  I had other crew.

2      Q      And it was your job to manage that crew?

3      A      Yes, it was.

4      Q      Right.  And it was your job to get the

5   work done, as you said, in the amount of time

6   given?

7      A      Absolutely.

8      Q      And if the work wasn't getting done within

9   the allotted amount of time, well, then, perhaps --

10  and I'm not saying this was the reason --

11     A      Right.

12     Q      But perhaps it was because you weren't

13  doing a very good job managing the crew?

14     A      The --

15            MR. SPERRY:  Objection.

16     A      The people that we had -- and, of course,

17  everybody has different crews.  I had two people

18  that were incredibly good.  They were fast.  I had

19  people on that team that were -- they were just

20  there.

21            There was no process that I was aware of

22  within Kroger where you could require an employee

23  to speed up, to work faster.

24            The union did not permit a -- what do they

25  call it -- a production-type discipline.  So if

Page 162

```
 1    I've got George on aisle two and he's doing 100

 2    cases an hour and Fred's doing 20 on aisle four, I

 3    can't go over and get on Fred.  I can tell him to

 4    speed up.  I can tell him -- I can insist that he

 5    work faster, but from a disciplinary standpoint,

 6    there wasn't a thing in the world I could do about

 7    it.

 8    BY MR. BARRON:

 9        Q    Did you ever have any conversations with

10    your store manager about disciplining night

11    stockers for not being productive enough?

12        A    There were some that if they weren't

13    full-time, we would just schedule them less.  But

14    during that course of time, I probably would have

15    went through 20 different employees that worked

16    part-time or whatever for whatever reason.

17             If you -- the problem nowadays, and this

18    is just in general, but if you get on to somebody

19    that's making $7 an hour and you tell them to hurry

20    up, usually 10 minutes later, they're going to be

21    walking out the door.  And that was just -- that

22    was just part of the -- what you're dealing with on

23    a regular basis.

24             And so you may actually get to the point

25    where you wouldn't say anything to an employee who
```

Page 163

```
 1    was bad for fear you'd have nobody.  And there were
 2    weeks where I would be down two people and there
 3    was nobody coming in the door to be hired.  And
 4    they would go to other districts and stuff and say,
 5    do you have anybody you can send us, whatever.  And
 6    by and large, we were on our own.  That's how it
 7    was working.
 8        Q    But isn't that the case with every night
 9    crew?  I worked --
10        A    Oh, I don't doubt that.
11        Q    -- night crew when I was in college.
12        A    I don't doubt that at all.
13        Q    Nothing's changed in 25 years.
14        A    I don't doubt that at all.
15        Q    Okay.  Did you work nights at Winn-Dixie?
16        A    Yes.
17        Q    Okay.
18        A    Well, no, no.  I worked daytime at
19    Winn-Dixie because I was market manager.
20        Q    Okay.
21        A    Yeah.
22        Q    I mean, you said that you talked to other
23    night crew managers.  In fact, isn't it true, sir,
24    that basically every night crew has those same
25    issues?
```

                                          Page 164

```
 1        A     Oh, I agree, yes.

 2        Q     Okay.  It's hard to find people that want

 3   to work at night?

 4        A     That's right.

 5        Q     It's hard to find people that want to work

 6   hard at night?

 7        A     Yes.

 8        Q     It's hard to find people who aren't sleepy

 9   when they do come to work --

10        A     Yes.

11        Q     -- at night, right?

12        A     Yes.

13        Q     And it's probably, I imagine, hard

14   disciplining people when you're both hourly

15   employees and both members of the union?  Is

16   that --

17        A     Well, I wasn't a member of the union.

18        Q     You weren't a member of the union.

19        A     Actually, I don't know if anybody on my

20   team was ever a member of the union.

21        Q     Okay.

22        A     But they had that -- but they had that

23   knowledge that if you confronted them, you could

24   have issues.

25        Q     Fair enough.  I mean, you knew that if you
```

Page 165

```
 1    tried to terminate them, that there was a

 2    recourse --

 3         A    Yes.

 4         Q    -- that they could --

 5         A    Yes.

 6         Q    -- fight about?

 7              And it's also not unique to you that you

 8    had a budget that you had to stay within in terms

 9    of the number of hours that you had?

10         A    No, no.  That was fine.

11         Q    If there was overtime to be worked, it

12    didn't necessarily have to be your overtime.  I

13    mean, you could have members of the crew stay late,

14    right?

15         A    I could have.  Here was the problem:  I

16    had not a single person on my crew who wanted

17    overtime.  Always drove me crazy, because these are

18    the same people that were always broke.  But if you

19    asked them -- when we were granted overtime, when

20    we could officially use overtime, and you'd ask

21    somebody to stay over for an hour or two or

22    whatever, they just wouldn't do it.

23              And by the union rule, if you're scheduled

24    to get off at 6, you can't make them stay past 6.

25    And they would walk right out that door.  And if
```

Page 166

1    you still had three hours' worth of work to do,

2    that was -- that would fall back on me.  And it

3    went back to the, "I expect you to stay until the

4    job is done."

5         Q    I mean, I've looked at the records.  Isn't

6    it true that, in fact, some people did stay from

7    time to time when they could?

8         A    From time to time, but it was only when it

9    was authorized overtime.  And one of the things

10   that happened in our store a lot is, they would be

11   very strict about the overtime.  And then we would

12   find out that somebody from corporate, from

13   Cincinnati or somebody important from Atlanta, was

14   coming to our store.  And then all overtime rules

15   would go out the window.  They would be, everybody

16   on deck, we need to get this done, we need to fix

17   this.

18        And the same thing would happen if

19   somebody came in unsuspecting and a surprise and

20   conditions were poor, then they would come back to

21   us and, y'all all need to come in as fast -- you

22   know, as soon as you can, whatever.  And there were

23   very few people who would ever actually come in to

24   work overtime.

25        Q    The same is true around the holidays; I

Page 167

 1    mean, I'm assuming you got extra time around the

 2    holidays and --

 3         A    Oh, yeah.

 4         Q    -- people working overtime around the

 5    holidays, right?

 6         A    Well, most holidays, overtime wasn't

 7    authorized unless there was something specific for

 8    it.  Once again, they were -- the company as a rule

 9    was just adamant about not using overtime unless

10    they absolutely had to.

11         Q    Fair enough, but --

12         A    And I understand it.

13         Q    Let me stop you there.  To me there's a

14    difference between overtime and just allocating

15    extra hours to the department.  Isn't it true that

16    around holidays, you got allocated extra hours to

17    the night crew?

18         A    If they were available.  In other words,

19    once again, if I'm at -- example, I'm at 250 on my

20    hours, and they say, oh, we need to up the budget

21    this week -- because the computer that generated

22    the budget also took all the stuff into

23    consideration.  So they'd say, you got an extra 20

24    hours this week.  I didn't have any employees to

25    work those 20 hours; it didn't matter.

Page 168

```
 1      Q     Well, whose fault was that?
 2      A     That's just -- generally speaking, that's
 3   life.  I mean, there was no employees hired -- able
 4   to be hired.  Kroger, in our store, I don't know of
 5   any time during the time I was grocery manager that
 6   they were full staff in every department.  They
 7   were always trying to hire.
 8            Their policy, not mine, but they wanted to
 9   bring everybody in at minimum wage.  I understand
10   why you would do that from a cost standpoint.
11            They also needed you to screen and pass
12   your drug test.  And we may get four or five people
13   a week that would apply.  If you had four apply,
14   three would fail the drug test.  So you've only got
15   one person that's available, and then they would
16   have limited hours of when they could work.
17            So that was just -- that was the overall
18   issue, but it wasn't just our store.  Once again,
19   you get to the meetings where you were with the
20   other managers and stuff, it was amazing some of
21   the things that people would come up with.
22      Q     Okay.  In paragraph 19, the complaint, it
23   says:  "In early February, Plaintiff complained to
24   Dodson about not getting paid overtime for all
25   hours worked.  Dodson responded by telling
```

Page 169

1    Plaintiff that he would have to put in as many

2    hours as necessary to get the job done, but that he

3    should not record the hours actually worked."

4        A    Once again --

5        Q    I want to know about that conversation.

6             MR. SPERRY:  Yeah, is that a question?

7             THE WITNESS:  Oh, okay.

8    BY MR. BARRON:

9        Q    Yeah.  I'd like you to tell me about that

10   conversation that's alleged there.

11       A    Okay.  Okay.  Same conversation we were

12   just talking about --

13       Q    Right.

14       A    -- where she had just received the email

15   from Daniel Thurman, so we've pretty much gone over

16   that conversation.

17            Once again, Lori Dodson -- nobody else has

18   ever said to me, work off the clock.  That did not

19   happen.  But after I told her -- what I said to her

20   when we were going over this, and she said that

21   we've got to do something to show Daniel Thurman

22   that we take what he said seriously and we're going

23   to do something about it.  Okay?

24            And the dairy thing came up, and then she

25   told me she wasn't going to give me my 40 hours

                                          Page 170

1    from the other person.  And I said to her at that

2    time -- and as we've talked about earlier, I liked

3    Lori Dodson.  I hated to disappoint Lori Dodson.  I

4    really did.  And probably the first time that we've

5    ever had a conversation where the tone wasn't

6    friendly, but I was aggravated, I was tired,

7    because, once again, I felt I was doing everything

8    in my power to get everything done and now they're

9    criticizing me for this also.

10            And once again, I'm the employee who's

11   willing to work seven days a week and do whatever

12   they ask me to do.  And once again, I'm getting

13   criticized for it.  I'm being threatened, as I took

14   it.  I'm considered the bad employee now by --

15   according to the email.

16            So I told her, I said, "Well, I guess what

17   I could do is I could just work what's on my

18   schedule.  And when it says go home, go home."

19            And she looks right at me and she goes,

20   "You know we can't do that.  You've got to get the

21   job done.  We've just got to figure out a better

22   way to get the job done."

23            And I said, "Well, I'm doing everything I

24   know how to do, and I don't know what else you

25   think I can do.  But once again, if you're telling

                                        Page 171

1   me to only work what's on the schedule, I'll do

2   that."

3           Because one of the problems that we had

4   there -- and once again, you can go back and look

5   at the records and see this, I averaged, I want to

6   say, nine and a half, 10 hours overtime.  Not one

7   of those hours was ever scheduled.  When I made out

8   my schedule, key retailing and -- I forgot what

9   they call it now, e-scheduling, you're not allowed

10  to schedule an hour of overtime on e-scheduling.

11  It doesn't permit it.

12          It doesn't matter if you're the only

13  employee in the entire department and they know

14  that ahead of time.  Their rules, you cannot

15  actually schedule overtime unless you get a written

16  email from somebody higher up than store level.

17          So even when we knew I was going to work

18  eight hours overtime on the clock, that could not

19  be recorded.

20     Q    Okay.  I want to talk about this meeting

21  with Dodson some more.

22     A    Okay.

23     Q    Where did that meeting take place?

24     A    In her office.

25     Q    How long was it?

1    A    Oh, it was 15, 20 minutes at the most.

2    Q    Was that in the morning?

3    A    Yes.

4    Q    Okay.  Did she threaten you?

5    A    She was frustrated.  I -- and once again,

6   because of our relationship and whatever, I felt

7   she was exasperated by the email from Daniel

8   Thurman because --

9    Q    Let me stop you there.  Did you see the

10  email from Thurman?

11   A    No, I did not.  I never saw --

12   Q    You don't know what the content was?

13   A    I do not.  I -- just what she told me.

14  And then --

15   Q    What did she tell you was in the email?

16   A    That I had the second most overtime in

17  Zone M, and that he wanted her to present him an

18  action plan of how she was going to eliminate that.

19   Q    Okay.  All right.  Do you remember how

20  much overtime you got in 2013?

21   A    Like I said, it probably -- I think it was

22  over 500 hours.

23   Q    Yeah.  Do you remember how much it was

24  dollars?

25   A    Oh, it was 20,000.

Page 173

```
 1        Q     Yeah.

 2        A     Something like that.

 3        Q     Your normal pay should have been around

 4   35?

 5        A     40.

 6        Q     Okay.  So you got about 50 percent higher

 7   pay in 2013 than you otherwise would have gotten if

 8   you just worked --

 9        A     Oh, yes, yes, absolutely.

10        Q     That's a lot of money?

11        A     Yes, it is.

12        Q     That money comes out of the store's

13   budget, right?

14        A     Yes.

15        Q     And it's -- you would agree that from a

16   business standpoint, it makes more sense to pay

17   somebody at straight time than to pay them at time

18   and a half?

19        A     I've always thought that.

20        Q     Okay.  So that's -- there's nothing out of

21   the ordinary about a business, especially a grocery

22   store on a low margin, wanting to pay straight time

23   pay instead of overtime pay, right?

24        A     Nothing wrong with that, no.

25        Q     Okay.  In fact, that was, again, part of
```

Page 174

1    what you're supposed to be managing on the night

2    crew, right?

3         A    Yes.

4         Q    If you could get the job done using only

5    straight time pay, you should do that --

6         A    Right.

7         Q    -- as opposed to working overtime?

8         A    Yes.

9         Q    And I understand emergencies happen,

10   people don't show up.  But on a normal given day,

11   given good business practices, that's how you

12   should manage the store, right?

13        A    Yes.

14        Q    So what -- what was being asked of

15   Ms. Dodson and what was being asked of you was

16   nothing out of the ordinary, right?

17        A    What was being asked -- well, for

18   starters, I never felt that the budget, even if all

19   the hours were available, were sufficient to get

20   the job done with all that they expected.  That I

21   didn't believe.  I knew I was going to do my best

22   to do that.  I knew I was good at that.  But -- in

23   other words, you're always teetering on the edge.

24   And once again, from a business standpoint, you

25   don't want to have fat hours.  You want to be lean,

Page 175

1    because that's how you're going to make your money,

2    so I understood that.

3            But the way -- the way I understood it,

4    one of the things that Kroger uses as a parameter

5    or the way that they figure the -- the hours you're

6    budgeted is not based on sales, it's based on

7    square footage of the size of the store.  So --

8        Q    Let me stop you there.  What basis do you

9    have for that?

10       A    Oh, they send out all kind of stuff on

11   that telling us all the time how -- this is how we

12   arrive at this and stuff like that.  We'd actually

13   go to meetings where they would show us charts and

14   stuff for how they rely --

15       Q    Have you ever done budgeting for a store?

16       A    No.

17       Q    Okay.  You've never had -- you've never

18   personally been responsible for doing the budget

19   for a store?

20       A    No.

21       Q    Have you ever even done a budget for a

22   grocery department?

23       A    Well, I mean, from an hour standpoint, not

24   from a dollars standpoint, yes.  And I actually

25   made out the schedule for my department every week.

Page 176

```
 1        Q      Okay.

 2        A      That was my job.

 3        Q      Other than making out the schedule for

 4   your department every week, have you been involved

 5   in the budgeting of the store?

 6        A      Just looking at the hours that they allow

 7   and then making the schedules and whatever.

 8        Q      Okay.  Go ahead.

 9        A      Okay.  But because they based it on square

10   footage and not sales, we have a very small store

11   from a square footage standpoint compared to the

12   larger Krogers.  And we do a tremendous amount of

13   business in that store.

14             So what would happen is, in a larger

15   store, you -- for example, you may have a store

16   where you could put 36 bottles of ketchup -- of

17   Heinz ketchup on the shelf.  In our store, you

18   could put 18.  Our volume was such that by the end

19   of the day, the 18 would be empty.

20             So we would come in and we would work our

21   butts off and get everything done.  And the store

22   would look good until about 2:00.  And then by the

23   time we came back that night, it was blown out.  It

24   was a disaster.

25             I mean, it was just -- it's one of those
```

Page 177

 1    unique things where you're thrilled that you have

 2    all those sales, but it's so hard to work in an

 3    area that's that small, and because of the way they

 4    do the budgeting -- because we had said that

 5    several times to them when we were at meetings

 6    where we're talking about budgets and stuff like

 7    that, if you're constantly having to use too much

 8    overtime, either it's -- as you're trying to -- I

 9    don't want to say imply, but as we're discussing

10    here, it's either a lack of management or maybe you

11    need to change your budgeting.

12          Because if you could have given me three

13    people at $7 an hour and take away my $20, my

14    overtime, and you would have come out ahead.  I

15    totally agree with that.  But they never wanted to

16    give me the three people.  I didn't even have the

17    people that I was budgeted for.  I don't know if I

18    was -- I don't know if more than once or twice ever

19    that I actually had the budgeted hours I was

20    allowed.

21      Q    If someone at Kroger testifies that the

22    budgeting of the store did take sales into

23    account --

24      A    Okay.

25      Q    -- do you have any reason to dispute that?

                                            Page 178

1     A     As long as it's part of it.

2     Q     Okay.

3     A     If it --

4     Q     You don't know that --

5     A     If they told me --

6     Q     You don't know that the only factor was

7   square footage, do you?

8     A     No.

9     Q     Okay.

10    A     But I do know that Ms. Dodson and others

11  smarter than me and higher up than me complained

12  about that on a regular basis.

13    Q     Okay.  I want to go back to the meeting

14  with Ms. Dodson.  She never told you that you were

15  going to be fired in that meeting, did she?

16    A     No.

17    Q     She never threatened you that you were

18  going to be fired, right?

19    A     No.

20    Q     She never said that you would be

21  disciplined in any way, right?

22    A     No.  She just said that we had to come up

23  with a plan to stop using the overtime, but that I

24  would not -- how did she put it?  But we still had

25  to get everything done.

Page 179

1          And when I told her, like I said, "So you

2     want me to work my schedule and go home," and she

3     looked at me and she goes, "Well, don't be silly.

4     We still got to make sure we get everything done."

5          Q     Okay.  Did you have discussions with

6     anybody else in management about the email from the

7     district about --

8          A     Yes.

9          Q     Okay.  Who else did you have discussions

10    with?

11         A     And I apologize for interrupting you.

12         Q     That's fine.

13         A     Andrew Browning, he was co-manager, and he

14    was the grocery -- he was over the grocery

15    department as the co-manager.

16         Q     Okay.  And just for the record, you had

17    multiple co-managers and then they split the

18    department?

19         A     Oh, they would move around.

20         Q     Okay.

21         A     And in my time at Kroger, there was

22    probably 25 co-managers.

23         Q     And typically, there was a co-manager that

24    had responsibility over the grocery department?

25         A     Right.

Page 180

1      Q     They would split the responsibilities,

2   like one co-manager would have produce in their

3   department --

4      A     Right.

5      Q     -- and one would have grocery or whatever?

6      A     Yes, yes.

7      Q     Okay.  Go ahead.

8      A     So he either got the same -- he was either

9   copied on the same email or he got a separate one

10   from Daniel Thurman.  And Mr. Browning, who I

11   considered a friend, not just a manager, but a

12   friend, he came up to me and -- how do I put this?

13          He's one of those managers who always felt

14   that his job was in jeopardy.  He always felt they

15   were going to fire him at any minute.  And it drove

16   me crazy because I never understood why he always

17   felt that way, because he did a good job, from what

18   I understood.

19          But he comes up to me, and he's concerned

20   that he's gotten this email from Daniel Thurman.

21   And Daniel Thurman had implied to him, from what

22   he's telling me, that he himself needs to get

23   involved in this, and he needs to make sure that we

24   address the situation with my overtime.

25              And because he was a friend, and because

Page 181

1    we had talked about the overtime and the working
2    off the clock and stuff before, because I had
3    talked with him about this, he goes, "So what are
4    you going to do?"

5         And I said, "What I really need to do is
6    just work my schedule.  And then when all hell
7    breaks loose because the store falls apart, then
8    they'll understand it."  But I said, "I don't want
9    to do that, but that's where my mindset is right
10   now."

11        Now, prior to this, the same gentleman,
12   Andrew Browning, had gone to a meeting, and I want
13   to say it was in the fall, maybe winter, of 2013.
14   Ms. Dodson was on vacation, so he was her
15   representative at this meeting.  At this meeting,
16   Felix Turner, who I believe was the zone manager --
17   I'm not sure at the time what his position, but he
18   was pretty high up the chain.

19        So this was supposed to be a meeting with
20   unit managers.  And Mr. Turner tells everybody at
21   this meeting that they have been evaluating
22   overtime, Atlanta division wide, and they had
23   determined that 95 percent of the overtime was
24   being worked by either managers or leads.  Not
25   other employees.

Page 182

```
 1              And he told them that the company felt
 2    that this was being done deliberate, this was being
 3    done for the purpose of making extra money, and
 4    that, in essence, it was a form of stealing from
 5    the company.  And that they were going to address
 6    this going forward and this -- they needed to go
 7    back to their stores and look at all their
 8    departments and stuff like that.
 9              And this was something that they were
10    going to work on in the coming year.  And of
11    course, like I said, they're talking to unit
12    managers about this.  Mr. Browning just happened to
13    be there.
14              So when he told me that, it really changed
15    my attitude because, once again, I thought by
16    always being there, by always doing whatever they
17    wanted me to do no matter whether it was limited or
18    it was extraordinary, I took pride in that.
19              I mean, even though I'm the grocery
20    manager, when I would take care of the dairy and
21    get everything fixed, and they would come in and
22    they would see it, I wasn't mad that I had to work
23    the extra hours.  I was thrilled that I was able to
24    get everything done so they were happy.  So they
25    were pleased.
```

Page 183

1      Q    Right.  But, I mean, you wanted the extra

2   money, right?

3      A    Oh, I had no problem with the extra money.

4      Q    Well, you not only had no problem with it,

5   I mean, you wanted the extra money, agreed?

6      A    I was one of those people that I would

7   have never turned down overtime if it was offered.

8      Q    Right.  There's people that are like

9   that --

10     A    Yes.

11     Q    -- and people that just don't want to work

12  the overtime?

13     A    They don't want to work the overtime.

14     Q    You were one of those folks that --

15     A    I was one of those people if they offered

16  it -- when they offered it at other stores --

17     Q    Right.

18     A    -- I went and did it.

19     Q    Okay.  And I don't know what the reason

20  for that was.  I'm assuming at least part of the

21  reason was that you needed the money?

22     A    Yes.

23     Q    Okay.  In your mind, that was a good

24  trade-off, your time --

25     A    Yes.

Page 184

1      Q     -- versus the money was a good trade-off?

2      A     Absolutely.

3      Q     So -- but as a manager, you have a

4    conflicting responsibility because you're also

5    supposed to manage the budget of the store, right?

6      A     Yes.

7      Q     And as you said earlier, it's always a

8    better trade-off to have a lower paid associate

9    work straight time instead of you as the higher

10   paid manager working the overtime?

11     A     Right.

12     Q     So you have a conflict, because if you

13   want to make more money yourself, you know, one way

14   to do that is to hog all the overtime for yourself.

15     A     Right.

16     Q     I'm not saying you did that --

17     A     Right.

18     Q     -- but that would be one way to do it?

19     A     That would be a way to do it.

20     Q     Right.

21     A     Yes.

22     Q     So you can understand, from an upper

23   management standpoint, when you see someone in a

24   position like yourself who's getting a large amount

25   of overtime, that it might raise the question of

                                          Page 185

1    the person's motives and the fact they're just

2    trying to pad their own pay --

3         A    Okay.

4         Q    -- right?

5              I mean, you can understand?  You at

6    least -- can you give me that?

7         A    Yes.

8         Q    Okay.  And it would also call into

9    question perhaps the efficiency of that person

10   because, again, you have a conflict now where if

11   you go a little bit slower and maybe are not as

12   aggressive in your management of your night crew,

13   that results in the work not getting done as

14   quickly, which again results in more pay for you in

15   overtime, correct?

16        A    Correct.

17        Q    Right.  So it's natural for management to

18   look at that and understand the friction there and

19   push the grocery manager to be more efficient and

20   to work less overtime themselves, and if necessary,

21   have someone under them work the overtime, correct?

22        A    Yes.  But here's where the situation

23   changes with Kroger.  When -- not just my

24   department, but all the departments within the

25   store that I am familiar with, okay, what Kroger

Page 186

1    would do -- and once again, Kroger's running a

2    business.  I understand that.  They don't have to

3    be concerned about employees.  They don't have to

4    be concerned about how things are going.  They are

5    nuts and bolts, dollars and cents.  I understand

6    that.

7              What would happen -- okay.  Let's say Sara

8    in the deli calls out, they need somebody to work.

9    So they go, well, who's on the schedule?  And you

10   got your deli manager and then you got two or three

11   other employees.  Okay.  So let's say they call

12   Bill in, who's an employee.  He makes basically

13   what -- the same thing Sara makes.  So he comes in,

14   he works, because they called him and he's a good

15   employee.  But she called out, can you come in and

16   help us out?  Sure.  So he comes in and he works.

17             Now, he was scheduled that week to work 24

18   hours, but because they called him in, he gets 32.

19   He thinks he's ahead of the game.  He's happy.

20   They called, I did the right thing, I came in.  The

21   next week they schedule him 16.  They cut out the

22   extra eight hours he just got because they don't

23   want him to get into the area where he could start

24   looking like full-time hours.  And this happened

25   over and over again.

Page 187

```
 1            Now, what happens with that is, the next
 2    time you call Bill, Bill don't answer the phone.
 3    So you call the next person, and the same thing
 4    happens.  And what would happen is, over a period
 5    of time, the only person that's going to answer
 6    that daggone phone is going to be your dairy
 7    manager or your lead or your grocery manager,
 8    because they have a responsibility to the
 9    department.
10            Now, they could refuse to answer the phone
11    and just not get the overtime or not want to come
12    in or whatever.  But then they know they're going
13    to walk into a pigsty the next day because
14    everything's -- nothing's going to be done and
15    they're going to be behind.  And that's why your
16    leads and your grocery people usually wound up with
17    the most of the overtime.
18            Because that was -- that was the way --
19    they treated people like that at our store, but I
20    don't know if that was company wide or whatever.
21        Q    Well, you don't have any knowledge beyond
22    your own department, do you?
23        A    Right, right, but it was the -- but, I
24    mean, the other departments, because I would talk
25    to their managers --
```

Page 188

1     Q    This is just what you heard?

2     A    Right.  Well, I mean, I talked to them

3   personally, so I heard that from them.  And they

4   would say, yeah, they called three people, nobody

5   would show up, so I had to come in.  And the same

6   thing happened with me.

7     Q    But you don't know the reason why those

8   people -- I mean, it could have been they were at a

9   ballgame.  They're busy that day.  It could be

10  even --

11    A    But, I mean, generally speaking, that's

12  what happened.  And with my team -- and like I

13  said, I had a pretty good crew, but once they left,

14  they hardly ever came in if they were called.

15    Q    Okay.  I want to go back to your

16  conversation with Mr. Browning.

17    A    Okay.

18    Q    You said you had a conversation with

19  Mr. Browning about the email as well?

20    A    Yes.

21    Q    Okay.  Anything else about that

22  conversation that you can recall?

23    A    Well, I mean, he told me about it, and

24  then he asked me, he goes, "Is there anything you

25  can do to help me out?"

Page 189

1          And I told him, I said, "So you already

2     have a good idea of how many hours I'm putting in."

3     And I said, are you going to -- and, of course, I

4     was being a smart aleck at the time.  I said, "Are

5     you going to finish the pallets and I'll leave on

6     time and that will -- we can back on some of that?"

7          And he said, "No."  He goes, "Of course

8     not.  I can't do that."  And --

9     Q    Well, let me stop you right there.  I

10    mean, it is true that co-managers would sometimes

11    help out in your department?  I mean, you're not

12    saying that co-managers never stocked anything for

13    your department, are you?

14    A    Very little, very little.  They rarely

15    actually stocked.

16    Q    Okay.

17    A    That was just -- most of them, they did

18    not.

19    Q    Okay.  What about daytime crew sometimes

20    would help replenish the shelves during the day?

21    You said there was a person --

22    A    I mean, they -- the person that they had

23    taken from me, he was there for that purpose, to

24    replenish and whatever.

25    Q    So in your example where the Heinz ketchup

Page 190

 1    was out by 2:00 --

 2        A    Right.

 3        Q    -- there was an employee --

 4        A    That was --

 5        Q    Hold on.  There was an employee scheduled

 6    during the day whose job it was to replenish the

 7    shelves, right?

 8        A    Yeah, yeah, as best they could.  And once

 9    again, going back to Lori Dodson, she had no

10    problem putting ketchup on the shelf if they needed

11    ketchup on the shelf; whereas, I had been around

12    other store managers that would never do that.

13        Q    Okay.  What else -- do you recall anything

14    else from Mr. Browning?

15        A    Well, during that conversation, because

16    like I said, I had become frustrated and

17    aggravated, when I told him that, and I said -- I

18    said, "I've really got a good mind to just start

19    working my 40 hours and just letting things

20    happen."  And I said to him at that point, I said,

21    "And you can tell Ms. Dodson that."

22             Because I said, "I've done everything

23    she's asked of me, and I believe I've done it with

24    the right intentions.  And if she's telling me now

25    that all of a sudden I'm only supposed to put down

                                          Page 191

1    40 hours," I said, "I don't see how that's going to

2    work."

3         Q    Okay.  In the conversation with

4    Mr. Browning or Ms. Dodson, did you ever say, I'm

5    working off the clock?

6         A    No.

7         Q    Okay.  Did you have a conversation with

8    anybody other than Ms. Dodson or Andrew Browning

9    about the email?

10        A    No.

11        Q    Did you have a conversation with anybody

12   in management, anybody, about the email regarding

13   2013 --

14        A    No.

15        Q    -- other than those two?

16        A    Those two.

17        Q    Okay.  And again, Mr. Browning never

18   threatened you with termination or discipline?

19        A    No.

20             (Defendant's Exhibit 17 marked.)

21   BY MR. BARRON:

22        Q    I'm handing you now what's been marked as

23   Exhibit 17 to your deposition.  And I'll represent

24   to you that these are what we call interrogatory

25   answers, which are questions that we --

                                        Page 192

```
 1        A     Yes.

 2        Q     -- gave to your lawyer.  He probably gave

 3    to you and --

 4        A     Yes.

 5        Q     -- and you answered them?

 6        A     Okay.

 7        Q     Have you ever seen this before?

 8        A     Yes.

 9        Q     I want to turn your attention to page 7,

10    and you were asked a question in interrogatory

11    number 5 about identifying the persons to whom you

12    gave notice, complained or otherwise informed

13    either in writing or orally of the fact that you

14    believed you were being unlawfully compensated or

15    denied overtime by Defendant.

16              Do you see that?

17        A     Yes.

18        Q     And then there's some answers there.  I

19    want to maybe try to shortcut this a little bit.

20    Did you ever tell anybody at Kroger in management

21    that you were working off the clock?

22        A     The only person that I had a specific

23    conversation with, that I said that to, was Andrew

24    Browning.  Because Mr. Browning had told me

25    previously that when he was a market manager for
```

Page 193

1    Kroger, that he, too, worked off the clock to get

2    everything done so that he could be the, quote,

3    best at what he was doing.  And that was one of the

4    reasons why he was promoted to a co-manager

5    position.

6           Therefore, I did not feel that saying

7    anything to him was going to put me in any kind of

8    jeopardy with somebody knowing something I didn't

9    want them to know.

10       Q    Okay.  So let me break that up a little

11   bit.  You understood that it was against Kroger

12   policy to work off the clock?

13       A    Yes.

14       Q    There's no question in your mind about

15   that?

16       A    Against corporate policy, yes.

17       Q    Right.  And we'll go through the -- all of

18   the different writings and policies where you were

19   told that.  But you knew that if you told, say,

20   Ms. Dodson that you were working off the clock, she

21   would instruct you not to do that?

22       A    If I told her point blank, yes.

23       Q    Okay.  You knew that by not putting all of

24   your time into Kroger's timekeeping system, you

25   were, in fact, committing fraud, right?

Page 194

```
 1              MR. SPERRY:  Object to the form.
 2    BY MR. BARRON:
 3        Q    Did you know that?
 4        A    No, I did not do that.
 5        Q    Did you know that you were violating
 6    Kroger policy at least?
 7        A    Yes.
 8        Q    And you did that anyway?
 9        A    Yes.
10        Q    In your mind?
11        A    Yes.
12        Q    Knowingly?
13        A    Yes.
14        Q    You signed off on your time sheet every
15    week, didn't you?
16        A    They didn't have us sign the time sheet.
17        Q    Well, you may not have signed it.  Did you
18    see your time and approve it every week?  Is there
19    a process for approving your time?
20        A    Not really.  It's just -- basically, the
21    only time it becomes a question is if there is a --
22    if you have a question.  In other words, if you
23    walked up and you checked your time and it said 47
24    hours, and you're fine with that, that was the end
25    of the thing.  If it said 42 hours and you worked
```

Page 195

1    47, then you would go question it.

2         Q    You had an opportunity to review your

3    time --

4         A    Yes.

5         Q    -- and dispute it if you wanted to?

6         A    Yes.

7         Q    If you thought, hey, I worked an extra

8    five hours of overtime and that's not reflected on

9    here, you had the ability to dispute that?

10        A    Yes.

11        Q    And you never did that?

12        A    Never did.

13        Q    Okay.  Let's go back to Browning.

14        A    Yes.

15        Q    Tell me exactly what you discussed with

16   Browning.

17        A    He had told me, like I said, that he --

18   when he was a market manager, there was not enough

19   hours in a day for him to get everything done that

20   they required, and he got tired of getting his butt

21   chewed out and being threatened with writeups or

22   whatever, and so he just made up his mind that he

23   wasn't going to leave each day until everything was

24   done the way it needed to be done.

25             And he said all of a sudden he went from

Page 196

1    being a market manager that was on the verge of

2    losing his job to being the star of the zone.  And

3    he said that's when he was convinced that that was

4    the way it should be -- that that's what they

5    wanted you to do, because he figured out a way to

6    get everything done even though the hours may be

7    limited.

8        Q    So he never told you that anybody at

9    Kroger specifically told him to work off the clock?

10       A    That is correct.

11       Q    Basically, he told you that he chose to do

12   that on his own?

13       A    True.

14       Q    Did he instruct you to work off the clock?

15       A    No.

16       Q    Did you tell him that you were working off

17   the clock?

18       A    I think it was assumed.  I don't -- he

19   never -- I never said --

20       Q    Hold on.

21       A    -- oh, by the way.

22            MR. BARRON:  Yeah.  Object; nonresponsive.

23   BY MR. BARRON:

24       Q    My question is a very simple one.

25       A    Okay.

Page 197

1     Q     It's yes or no.  Did you ever tell him

2  that you were working off the clock?

3     A     No.

4     Q     Okay.  Anything else about that

5  conversation that you can recall?

6     A     Well, once again, the conversation was --

7  the way the conversation started was, "I thought

8  you weren't coming in till 8."  And it was, like,

9  6.

10        And I said, "Well, I needed to get some

11  stuff done in dairy."

12        And he said something to the effect, he

13  goes, "But you haven't clocked in yet, have you?"

14        And I said, "No, I'll clock in later."

15        And then we just -- I mean, it was no --

16  there was no concern on his part, there was no,

17  well, let's go get you clocked in or anything like

18  that.  It was just a statement of fact.

19     Q     And in that same -- you're saying in that

20  same conversation you -- he talked about the meat

21  market?

22     A     Right, right.  He said, he goes, "I

23  understand what you're doing because I had to do

24  the same thing."

25        And then the whole conversation took

Page 198

1    place.

2         Q    Okay.  Any other conversations with

3    Mr. Browning regarding off-the-clock work?

4         A    No, not that I can remember.

5         Q    Okay.  Any other members of management

6    that you can recall?

7         A    Not of that type, no.

8         Q    All right.  Going back to your

9    interrogatory answers, on number 1, it says, "In

10   December of '07, you complained to Co-Manager Motts

11   after Motts asked you to work overtime without pay.

12   Motts responded to Plaintiff that if Plaintiff

13   worked off the clock, promotion would follow."

14        Tell me what you recall about that.

15        A    Okay.  That was when I had first started

16   with Kroger.  I had only been there two or three

17   weeks.  And they had taken me off the grocery crew

18   and moved me to frozen because there was an issue

19   with staffing in that department.  And Mr. Motts

20   was the person who had hired me originally.

21        And the freezer was an absolute disaster.

22   I'd go back there, you've got a frozen food manager

23   and then one other employee.  That was the baseline

24   for the hours in that department.  And I don't know

25   if you've ever been inside a grocery freezer --

Page 199

```
 1        Q     I have.

 2        A     -- but this freezer was probably 100-foot

 3    long, 50 feet wide, 25, 30 feet tall, huge freezer.

 4    There had to be 2,000 cases of frozen food stuff,

 5    not the deli bakery, just frozen, stacked to the

 6    ceiling all over the place.  Damages everywhere.  I

 7    mean, I couldn't believe the health department

 8    hadn't come in and closed them down, it was that

 9    bad.

10            And when I first went over there, they had

11    asked -- they had always had issues, from what I

12    understand, with the frozen food manager.  And he

13    was a union person, as in, if you said good morning

14    to him, he'd say, "Don't talk to me, I'll call the

15    union."

16            And he had gotten to the point where he'd

17    been able to -- management just left him alone

18    because he was just that person, that one person in

19    the store that always had issues with everything.

20            And that's why the freezer was allowed to

21    get in that condition, I assume, but he hadn't

22    fixed it and he was responsible.  So Mr. Motts --

23    they put me in the frozen.  And one day he comes

24    back there -- and this is -- I'd only been in

25    frozen for a week or two, and I just asked him, I
```

                                                    Page 200

1  said, "What the heck's going on with the back room?

2  I mean, that's ridiculous."

3         And he goes, "Well, why don't you show me

4  what you're made of and why don't you fix it."

5         And I said -- I said, "Well, it would be a

6  challenge," and I just kind of left it at that.

7         A week or so goes by.  He comes by, and he

8  goes, "I thought you were going to do something

9  about the freezer."

10         I hadn't done anything.  I was just

11  working my eight-hour shifts, putting out the

12  frozen that comes in, you know, every three days or

13  whatever.

14         And he says it a second time.  So I look

15  at him and I go, "Oh, I thought you were kidding.

16  I thought we were just, you know talking in

17  general."  I said, "You'd have to make me a 40-hour

18  employee to even have a chance at that."

19         Now, when I was originally hired, one of

20  the things I inquired about was, you know, how does

21  this status work.  And he told me point blank, at

22  that point in time, Kroger was not hiring anybody

23  full-time.  That the company had to come up with a

24  policy that they were going to be mostly part-time

25  employees with a few full-time management people,

                                          Page 201

1   and until they got their ratios correct in their

2   stores, nobody was going to full-time position.

3           Okay.  So that's -- I understood that when

4   I was hired.  So when Mr. Motts makes the remark

5   that I hadn't done anything, and I said about 40

6   hours, he looks at me, and he says, "Well, you're

7   working about 40 hours."  He goes, "I asked you to

8   do something, you've not done a thing about it, I'm

9   not sure you're going to make it through your

10  probationary period."

11          And my instinct was to say something

12  really nasty and just walk out, but I said, "No,

13  no, no, I'll play the game.  Okay.  What exactly do

14  you want me to do?"

15          And he goes, "You just need to come up

16  with a plan and start seeing what we can do."

17  Because, he goes, "Every time anybody comes in

18  here, they have a fit about that freezer.  It's a

19  disaster."

20          I said, "I understand."

21          So what I did was, the next week or two,

22  instead of working my 24, I'd come in a couple of

23  hours early, I'd go work in the freezer.  I'd stay

24  a couple of hours over, I'd work on the freezer.

25  And all this I'm putting down.

                                          Page 202

1          So a week goes by.  Instead of 24 hours,

2     I've got in, like, 35, all on the clock.

3          Here comes Mr. Motts, "What in the hell

4     are you doing?"

5          I said, "What are you talking about?"

6          "You were supposed to be scheduled 24

7     hours.  You put down 35."

8          "But you said that you wanted me to work

9     on the freezer."

10          "I didn't tell you you could put down any

11     extra hours."

12          Well, at that point, common sense tells me

13     what he was saying.  And he said -- and at that

14     point, he said to me, he says, "Look, I can't

15     promise you anything, but you take care of me and

16     I'll take care of you."

17          And I took that to mean, I fix the

18     freezer, he'll take care of me.  And it took me

19     probably two months of working four or five hours

20     here, three or four hours there.

21          And the part that always amazed me,

22     because, like I said, I've been in the grocery

23     business for years, people would see me at 9:00 in

24     the morning, hey, Larry, how ya doing, see you're

25     working on that freezer, never say a thing about my

Page 203

1    schedule.  Same thing at night.

2          If I'm in charge and I see somebody I

3    recognize and I don't know why they're there, first

4    thing I'd say to one of my people is, why are you

5    here.  You know, you're not scheduled to be here,

6    why.

7          Never happened.  And I got the freezer

8    fixed.  And all of a sudden, I went from 24 to 32

9    hours every week.  And then they came back,

10   Mr. Motts again, and said, "Would you mind working

11   a few hours in dairy?"

12         I said, "Not a problem."

13         So each time they added a job to me, they

14   would add hours.  So a person who wasn't supposed

15   to get full-time status, I got full-time status by

16   doing whatever they asked me to do.

17         But once I got full-time status, then they

18   just kept adding stuff.  So once I got the 40

19   hours, now I'm working 45 and 50 and still getting

20   paid for 40.

21       Q    Okay.  On part two, it says you had a

22   conversation with Cynthia --

23       A    Vergara.

24       Q    -- Vergara.

25       A    Okay.  She was the unit manager.

Page 204

1      Q     Okay.  Which is the same as a store

2    manager, as I understand?

3      A     Yes, yes, that's Kroger's thing, is unit

4    manager.

5            So I did not care for Ms. Vergara.  That's

6    just -- it's a personal thing.  Nobody got along

7    with this lady.  It was just -- she's one of those

8    persons that -- the opposite of Lori Dodson.

9            (Reporter clarification.)

10     A     She's one of those people where she was a

11   hard person to get along with.  And like I said,

12   she was the opposite of Lori Dodson.

13           So she had decided over a period of

14   time -- she had gone through three dairy managers

15   while I was still in the frozen.  So she comes to

16   me -- or she actually calls me at home.  And I had

17   no idea what kind of trouble I was in when I got a

18   phone call from her.

19           They wanted me to come in, and when I came

20   in, she goes, "I want to make you my dairy manager.

21   What do you think about that?"

22           I said no -- because I really didn't want

23   to work for her directly.  Overnight I never saw

24   her except maybe an hour or two here and there.  So

25   I said, "No, I really don't want to do that."

                                            Page 205

1              So a couple of weeks goes by, she calls me

2       back in again.  "Larry, I really need you to take

3       care of dairy."

4              I said, "Ms. Dodson [sic], you don't go to

5       top pay when you become a lead."

6              In other words, if you're on the scale of

7       50 cents for every six months or whatever, it

8       doesn't change.  You get your 40 cents, but that's

9       all you get.  You don't go to top pay.

10             And I said, "I'm making 60 cent for night

11      premium.  I make 40 cents for lead.  I'm not going

12      to take a position of lead, be responsible, and

13      take a pay cut.  Just not going to do it."

14             Okay.  Calls me the third time.  Now, this

15      lady doesn't ask anybody for anything, and for her

16      to call me three times, that was amazing.  And now

17      it's not really, will you do it, it's "You need to

18      quit being a you-know-what and step up and help out

19      the company and quit just thinking about yourself

20      and take this position."

21             And I just looked at her, and I said, "I

22      won't take the position unless I can work it

23      overnight."

24             She goes, "I don't care what you do as far

25      as your hours are concerned.  I just need the dairy

                                        Page 206

1    fixed."

2         Okay?

3    Q    Okay.

4    A    So I accepted the position.  I took it.  I

5    knew -- one of the things I did do that just made

6    her furious was that -- we were upstairs when we

7    were having this discussion.  And one of the things

8    I said to her, because I had known that there's

9    been three people lose their job who were the

10   previous dairy managers, I said, "If I get to the

11   place where I don't want to do this anymore, I can

12   step back and go back to the stock room."

13        "Absolutely."

14        So Ms. Hua, who was the administrative

15   assistant, also a union rep, I call her in there

16   and I go, "I just want this to be understood,

17   because this has been agreed upon."  And I thought

18   the lady was going to kill me on the spot when I

19   said that to her.  I said, "This is what we agreed.

20   I just don't want anything to come up."

21        So I went back to dairy and started

22   working on it.  It took me three or four weeks to

23   get everything in it straightened out, and then it

24   started working fine.  But I'm working 55, 60

25   hours, and under Vergara, you didn't put down a

                                        Page 207

 1    minute of overtime.

 2         Q    Okay.  Let me stop you there.  You

 3    described everything that happened in the meeting

 4    that you mentioned in your interrogatories?

 5    Because now you're getting into what happened after

 6    the meeting.  I want to make sure --

 7         A    Okay.

 8         Q    -- I've covered --

 9         A    In the meeting --

10         Q    In your interrogatories --

11         A    I'm trying to get to the meeting.  I

12    haven't got to the meeting yet.

13         Q    You haven't gotten to the meeting yet?

14         A    No.

15         Q    Okay.  All right.

16         A    Okay.  I'm trying to get you to the

17    meeting.

18         Q    All right.  That's what I really want to

19    talk about.

20         A    Okay, okay.  But -- so I ended up the

21    dairy lead.

22         Q    Yeah.

23         A    Okay.  And the dairy is working out great.

24    Every time the zone staff or anybody would come

25    into the store, they had problems in nearly every

                                        Page 208

1   department but dairy.  Dairy was the star.  And, of

2   course, I was quite proud of that.

3          And Ms. Vergara came back to my dairy

4   cooler one morning when I was still there, and it

5   was something I had never heard a unit manager or

6   anybody in that position say, she says -- she

7   complimented me.  It was the first compliment I'd

8   ever gotten from her.

9          And she said when she was the -- when she

10  decided she wanted to be somebody at Kroger, she

11  got the position of drug GM manager.  And she said,

12  "I made it my point that once I became a drug GM

13  manager, I was going to be the best.  And I didn't

14  care how many hours I had to work.  And I didn't

15  care how many rules I had to break.  I was going to

16  be the best, so they were going to notice me.  And

17  I was going to get promoted.  That was just my

18  mindset."

19         And I'm just sitting there going, wow,

20  really, somebody's admitting this to me in that

21  position.  And when she said that, I really had no

22  idea where she was going with the conversation.

23         But she said, "And it worked out great for

24  me."  And then she said, "But nowadays, you have to

25  be a lot more careful about how you do stuff."

Page 209

1          Once again, this is a unit manager

2    talking.  And I'm going, wow, that's about as

3    direct as I've ever had a unit manager talk about

4    anything that would be considered unethical or not

5    company policy or whatever.

6          Well, what happened was, two weeks later,

7    she calls me up to her office and says, "How would

8    you like to be my grocery manager?"

9          And I said, "No, ma'am."

10          And this wasn't going to be the

11    conversation that we had about getting to the dairy

12    where she kept asking and I finally said yes.

13    Because she was now on her third grocery manager

14    while I had been in dairy.  And I watched grocery

15    manager after grocery manager, they would come in

16    and work as hard as they could, and then they would

17    come up to me, like, at 5:30 or something, let me

18    know when it's 6:00, I need to clock out.  And they

19    would go up front and clock out and go right back

20    to work.  And that happened over and over and over

21    again.

22          And so when she asked me to be her grocery

23    manager, I knew I didn't want any part of that.

24    Because first grocery manager that I worked with at

25    night was a guy by the name of Jason O'Fallon, and

                                        Page 210

1    to me, he was one of the best managers I'd ever

2    been around.  I mean, he was one of those people

3    that just had all his ducks in a row, worked his

4    butt off, had a good crew, the whole bit.  And he

5    finally got to the point where he just couldn't

6    take it anymore and he just transferred out of the

7    store.

8           And then the next one had the same problem

9    and the next one had the same problem.

10      Q    Okay.  Have we gotten to the October

11   2010 --

12      A    Well, that was --

13      Q    That's the --

14      A    That's what happened in the dairy when we

15   had that discussion.

16      Q    All right.  You never complained to her

17   about not being paid for overtime?

18      A    No.

19      Q    Okay.  You never complained to Motts about

20   not being paid for overtime?

21      A    No.

22      Q    In part three, it says you complained of

23   off-the-clock hours worked and unpaid overtime to

24   the following co-managers, and then you listed a

25   number of people.

                                        Page 211

1      A     Okay.  The way I listed those, apparently

2    I missed -- I did not list those correctly under

3    that.  Because these are people that I thought if

4    they weren't aware, they should have been aware.

5    But I never complained to these people directly

6    because the only person that I ever really directly

7    complained about the hours was Lucia in the letter

8    and to Andrew Browning.  But I never complained

9    directly to Lori Dodson from that standpoint.

10     Q     Okay.  Same with Mr. Chate or

11   Mr. Hotchkins, Ms. Fresalone?

12     A     Right, right.  These are all managers at

13   different levels that different things happened

14   that because they happened, I thought they should

15   have known.

16           It was my whole premise of, if you're a

17   manager, you should know who's scheduled, when

18   they're scheduled, who's coming in later, that kind

19   of thing.

20           And these people never questioned me when

21   I would be there -- I would see these people at

22   7:00 at night.  They were the closing manager.

23   When they left, I would become the manager on duty.

24   The next morning, when they came back in at 7, I'd

25   still be there.  And yet they didn't say, oh, my

1    God, you're still here, how much overtime are you

2    getting?  The question never came up.

3         Q    Well, A, you don't know whether they knew

4    your schedule or not, right?

5         A    No, personally.  I mean, obviously, I

6    don't know what somebody --

7         Q    I mean, some of these people were trainees

8    that were coming through there on MD1, right?

9         A    Some were, yes.

10        Q    Right.  Some of them were co-managers that

11   didn't even have responsibility over the grocery

12   department, correct?

13        A    Correct.

14        Q    And they all would have presumably known

15   that it's Kroger policy for associates to record

16   their time, right?

17        A    Yes.

18        Q    And they also would have known that you're

19   getting a heck of a lot of overtime.  In fact, you

20   were number three in the whole zone, right?

21        A    Yes.

22        Q    Okay.  So your statement or your testimony

23   that they should have known that you were working

24   off the clock is really just speculation, isn't it?

25             MR. SPERRY:  Objection to the form.

Page 213

1        A     Once again, I could only speak for myself.

2   BY MR. BARRON:

3        Q     Right.

4        A     If -- I believe if I was in that position,

5   I would know who's coming in and what time they're

6   coming in, because I would know, oh, good, we're

7   behind, but I've got so and so coming in at 7, I've

8   got another person coming in at 8, we can -- you

9   know your -- if you've got a working plan, you know

10  what's coming forward.  And therefore, you would be

11  aware of what's going on.

12       Q     All right.

13       A     Now, I agree, some of these people that --

14  and I don't mean to be disrespectful, but some of

15  these people or some of the people that's not even

16  on the list that were hired as co-managers were

17  clueless.  They had never worked in the grocery

18  department.  You could have told them pretty much

19  anything, and they would have believed you.

20             But these people -- most of these people

21  were at one time or another a grocery manager as

22  far as the code -- responsibility goes.

23       Q     There's never -- there was never a point

24  where you explicitly told any of these people

25  listed in the interrogatory answers under section

Page 214

1    three that you were working off the clock?

2         A    No.

3         Q    There was never a point where they

4    confronted you and said, Are you punched in or Are

5    you punched out, and you told them, you know, No --

6    or Yes, I have punched out, and I'm still working?

7         A    Right.

8         Q    That never happened?

9         A    No.  Although with Robert Hotchkins, and

10   he was a co-manager that was responsible for

11   grocery, I guess it would be Christmas day of 2012,

12   I had been a grocery manager for about six weeks or

13   something like that, it was Christmas day, we had

14   had a hell of a week.  The store was a disaster.

15   Of course, Kroger was closed on Sunday, on

16   Christmas day.

17            I had keys to the store.  Ms. Dodson was

18   concerned that we had a lot of stuff to do.  Nobody

19   was supposed to come in or clock in until midnight

20   because they didn't want to pay the double or

21   triple time, whatever it was for the holiday.

22   And -- but she wanted us to make sure we were done

23   by 6 a.m. when we opened so we wouldn't have

24   pallets in the store from a safety standpoint.  And

25   she went over this with me several times.

                                        Page 215

```
 1              So I decided that I would come in on
 2   Christmas day, like, at 4, and I went ahead and
 3   unloaded the grocery truck and pulled everything
 4   out on the floor so when the crew got there at 12,
 5   we could just start right to work.  And
 6   Mr. Hotchkins came in doing a temperature check,
 7   and we talked.  We had a conversation.  Happy
 8   Christmas, blah, blah, blah, blah.  Never asked me
 9   while I was there if I was on the clock or anything
10   like that.
11              So from that standpoint, if anybody was
12   going to ever ask the question, that should have
13   been asked, and it never was.
14              Now, it's -- once again, I don't know, he
15   may have gone to somebody else the next day and
16   said, Do you know that he was there?  And they
17   said, We don't care.  I don't know.
18        Q    But you don't know that?
19        A    I have no idea.
20        Q    Okay.  We've talked about in section four
21   your letter to Mr. Lucia -- Lucia.
22        A    Yes.
23        Q    And it mentions in section five, in
24   May 2014, you met with Ms. Nystrom, but she refused
25   to discuss the unpaid overtime issue with you?
```

Page 216

1      A    Yes.

2      Q    Okay.  That's the step three meeting that

3  we talked about?

4      A    Yes.

5      Q    Any other discussions with management

6  about off-the-clock work or unpaid overtime that we

7  haven't talked about in this deposition today?

8      A    Not that I can think of, no.

9      Q    All right.  I want to walk through the

10  procedure for clocking in and out at Kroger.  Did

11  it change during your employment there or did it --

12  or was it the same?

13      A    No, it changed.  I believe originally we

14  actually had a time card.  Then it went to the

15  fingerprint identification thing.

16      Q    Okay.  Do you remember when it went to the

17  fingerprint?

18      A    I believe it had to be -- it had to be a

19  good three or four years in, because I was still in

20  dairy when we were clocking in and out on the card

21  because -- I just thought of something else I need

22  to put on the record for you.

23          Jack Graff, who is the frozen food

24  manager, he was, like I said, just not a happy

25  person, and he was livid when I got promoted to the

Page 217

1   dairy.  And he had seen me come in, and I had been

2   working in dairy for a couple of hours, and then I

3   went over and I clocked in.  And he saw me clock

4   in.  And he went and checked the time card and saw

5   that that's what I had done.

6        Q    This is another associate, not a manager?

7        A    Right.  Not a -- no, well, it's the frozen

8   lead.

9        Q    Okay.

10       A    Not management, but frozen lead.  And like

11  I said, since we didn't get along, he comes up to

12  me a little while later and he says, "I saw what

13  you did, and I'm going to get you fired for it."

14           And I said, "Jack, do whatever you got to

15  do."  Like I said, we didn't get along.

16           So he told me he was going to call

17  management.

18           Well, when I saw Ms. Vergara the next day

19  or the next morning, I told her about the incident

20  and what Jack had said.

21           And she goes, "You don't worry about a

22  thing.  If Jack comes up to me, the first thing

23  he's going to explain to me is why he was messing

24  with your time card, and that's going to end this

25  conversation."  And I never heard another word

Page 218

```
 1   about it.
 2        Q    Just to be clear, did you tell
 3   Ms. Vergara, I was working off the clock?
 4        A    I told her I had been working and I
 5   clocked in and Jack accused me of working off the
 6   clock.
 7        Q    Okay.  But you did not tell her that you
 8   were --
 9        A    I did not tell her I was working off the
10   clock and she said it was okay, no.
11        Q    Okay.  All right.  When -- did you refer
12   to the timekeeping system as a Kronos system?  Does
13   that sound familiar?
14        A    It does sound familiar.
15        Q    What did you call it?
16        A    Time clock.
17        Q    Time clock, okay.  Even though when it
18   went over to fingerprint, you still called it a
19   time clock?
20        A    Yeah.  I still called it -- still was the
21   place where you clocked in.
22        Q    Old habits die hard.
23        A    Yeah.
24        Q    When you got to the store, how did you
25   clock in?  What is the fingerprint system?
```

Page 219

1    A   Okay.  Well, the way it's supposed to work

2  is you come up to the thing and you put your finger

3  there and there's a reader on it, and it --

4  whenever it finally reads your number -- your

5  fingerprint, then it will tell you what -- it will

6  ask you -- it will prompt you, what do you want to

7  do, clock in, clock out for break, whatever.

8    Q   Okay.  And you would follow that

9  procedure?

10    A   Well, in my case, for whatever reason, my

11  fingerprint never worked.  So they had to give me a

12  special IUD number to actually clock in.  So I had

13  a code, like a PIN number.

14    Q   So you'd punch in a code instead of --

15    A   I'd punch in, like, 3-0-2-1 and then I

16  would clock in.

17    Q   Okay.  And same system for clocking out?

18    A   Yeah.

19    Q   You would just put your code in, instead

20  of hitting punch in, you said punch out?

21    A   Yes.

22    Q   And you were supposed to do that every day

23  when you got to work and every day when you left?

24    A   Yes.

25    Q   What if you forgot to punch in or out,

Page 220

1  what was the procedure?

2      A    What you were supposed to do, if you

3  forgot for the whole day, let's just say you had

4  one of those things -- it actually happened to me

5  once.  But there's a clipboard.  You write in when

6  you arrive, the date, you know, 2/16, got here at,

7  and then you write when you left.  And the

8  clipboard is left next to the time clock.

9            And then in the morning, the AA who was in

10  charge of the payroll would come in and she would

11  go down the list, and then she would manually enter

12  in whatever there was.  And if she had a question

13  about it, she would call you or whatever to see

14  what was the deal.

15      Q    Did management have to approve that?

16      A    Somebody had to approve it once it was

17  done, yes.

18      Q    I mean, an employee couldn't just make up

19  time and put it on the clipboard?

20      A    Well, you could do that, but then, once

21  again, because the person who has the schedule in

22  front of them on the computer could look at it and

23  see whether or not you were even scheduled --

24      Q    Right.

25      A    -- because from what I understand, while I

1   was there, but back in probably 2008, 2009, we

2   actually had a produce clerk who was coming in

3   early in the morning, clocking in and going back

4   home.  And I have no idea how long it went on, but

5   he'd come in and he'd get three or four hours a

6   day, and finally got caught.

7        Q    Okay.  But the idea was to be truthful?

8        A    Yes.

9        Q    And the idea was that somebody would

10  verify that the employee was being truthful?

11       A    Yes, yes.

12       Q    Did you ever have associates that worked

13  the night crew that forgot to punch in or out?

14       A    Yes.

15       Q    Okay.  And did you have to approve

16  anything or --

17       A    They would call me and ask me to -- in

18  other words, when they would write down on the

19  clipboard, Larry, you know I got here at 10, but I

20  forgot the clock in, and then I would put my

21  initials by it, and that was my way of telling

22  Ms. Hua if there was a problem, call me.

23       Q    Okay.  It was that you approved it --

24       A    Yes.

25       Q    -- but again, they weren't being

                                   Page 222

1    dishonest?

2        A    Right.

3        Q    It was something that happened?

4        A    It was a mistake.

5        Q    It was legitimate?

6        A    Yes.

7        Q    Did you ever provide instructions to the

8    night crew associates that worked underneath you

9    that they were supposed to record all their time?

10       A    I mean, basically, the only thing they

11   ever went through was the same thing that you --

12   the Kroger policy sheet.

13       Q    Okay.  Did you -- do you have knowledge or

14   did you have knowledge that associates that worked

15   on the night crew were working off the clock?

16       A    As far as I knew, nobody ever did.

17       Q    Okay.  So your -- and your testimony, the

18   only person, to your knowledge, that ever worked

19   off the clock at that store was you?

20       A    No, that is not my testimony.

21       Q    Okay.  Well, what do you have -- who else

22   do you have knowledge -- personal knowledge they

23   worked off the clock?

24       A    From what they told me?

25       Q    From any source.

Page 223

1        A     Okay.  There were several.  Like I said,

2    the three previous grocery managers all told me

3    that they were working off the clock.  They all had

4    complained to me about the reason they wanted to

5    leave the store is because of the amount of hours

6    they were being asked to work or being required to

7    work.

8              Like I said, I saw firsthand where they

9    would come to me and say, I've got to go clock out,

10   I'm going to clock in and then go back to work.

11   That was Jason O'Fallon, Jeff Braggett, Steve

12   Corely -- I believe that's his last name, I'm not

13   positive -- and Jason Hart.

14       Q     These are all grocery managers?

15       A     All grocery managers.

16       Q     And you don't know whether they ever

17   raised those issues with management?

18       A     I have no idea.  I mean, Jason O'Fallon

19   transferred out of the store.  Now, once again, I

20   don't know if he ever complained about that

21   specifically.  He transferred out of the store.

22             Jeff Braggett was the person that was

23   fired for the cigarette thing.  Steve Corely, I

24   believe he was one of those people that was a

25   grocery manager in -- on the -- in the co-manager

                                            Page 224

 1    program, so he was there to just be the grocery

 2    manager for a while.  So he actually moved back to

 3    the co-manager position as he moved up.

 4           And then Jason Hart, who was the last

 5    grocery manager, whose place I took, he was just

 6    adamant about that they kept trying to make him

 7    work hours he just wasn't going to work.  And

 8    that's why he -- he wasn't even -- he went and

 9    found a place to transfer out of the district

10    because he couldn't even find a place within the

11    district to leave.

12    Q    Anybody else that you have personal

13    knowledge of them working off the clock?

14    A    From a small standpoint, not a long

15    standpoint, market manager at the time was Paul

16    Osburn, which, once again, is one of those

17    Catch-22s, because he's also a union rep, he was

18    known for coming in and making out his orders and

19    stuff off the clock.

20           I had seen deli managers that did that,

21    where on their day off, they would still come in

22    and make out their orders because they didn't trust

23    anybody else to do it.

24    Q    How do you know they were working off the

25    clock?

1       A       Because they told me.

2       Q       Okay.

3       A       They said, "Well, I'm only going to be

4    here for a few minutes.  But, you know, I don't

5    want to get in trouble, but at the same time, I'm

6    not going to trust somebody else to do my orders."

7    And --

8       Q       And -- go ahead.

9       A       One of the things that happened to me when

10   I was the dairy lead is -- because of the key

11   retailing thing I had explained earlier and all the

12   reports and stuff that were generated, I'd take a

13   day off.  People are designated to take care of

14   those things when I'm not there, co-managers,

15   whatever.  They didn't do it, and then I wind up on

16   the report.  And so then I get screamed at, "You're

17   on this report.  I told you this has to get to be

18   done every day."

19           The only way I can guarantee I'm going to

20   get it done every day is that I'm here every day.

21   So even back then when I was the dairy lead, I may

22   only have an hour and a half of work that needed to

23   be done from reports and stuff, but I would still

24   come in on my day off, off the clock, and make sure

25   those reports were done so that I wouldn't be on

Page 226

```
 1   somebody's list.
 2            MR. BARRON:  All right.  He needs to
 3   change the tape.  So we're going to --
 4            THE WITNESS:  Okay.
 5            MR. BARRON:  -- take a break.
 6            THE VIDEOGRAPHER:  And we are off the
 7   record.  The time is 2:06.  This is the end of disk
 8   two.
 9            (Recess from 2:06 p.m. to 2:18 p.m.)
10            (Defendant's Exhibits 19 and 19 marked.)
11            THE VIDEOGRAPHER:  And we are back on the
12   record.  The time is 2:18.  This is the beginning
13   of disk three.  You may continue.
14   BY MR. BARRON:
15       Q    Mr. London, I'm handing you two more
16   exhibits here, Exhibits 18 and 19.  I'll represent
17   to you that these are out of the Kroger rule book.
18   Do those documents look familiar to you?
19       A    Yes.
20       Q    Okay.  The first one is Exhibit 18, and
21   it's entitled The 411 on the Kroger Scene, Time and
22   Attendance System.  I want to walk through a couple
23   of the rules here.
24            The third paragraph, first bullet,
25   actually, "All time worked must be recorded by your
```

1    assigned badge number."

2          Do you see that?

3      A    Yes.

4      Q    "No associate may perform work without

5    recording his or her time via the time clock."

6          Do you see that?

7      A    Yes.

8      Q    Okay.  You agree that was a rule at

9    Kroger, right?

10     A    It was a corporate rule, yes.

11     Q    Yeah.  And you were informed of that rule?

12     A    Yes.

13     Q    The next bullet, "Federal law requires

14   that all hourly associates be paid for all time

15   worked, so no associate is permitted to work off

16   the clock."

17         Do you see that?

18     A    Yes.

19     Q    All right.  Again, this is part of the

20   book that you received?

21     A    Yes.

22     Q    From the bottom, fourth paragraph up,

23   where it says, "All hourly associates will be paid

24   once a week.  Time sheets must be signed when pay

25   is received.  By signing you certify that the time

Page 228

 1   recorded on your time sheet is accurate."

 2          Do you see that?

 3      A    Yes.

 4      Q    And you received your paycheck every week

 5   and never objected that it was inaccurate, right?

 6      A    Correct.

 7      Q    During the entire time you worked at

 8   Kroger?

 9      A    I don't believe so, no.

10      Q    Well, let's go this way:  You never

11   objected to not being paid for time because you

12   worked off the clock?

13      A    Right.

14      Q    There may have been a situation where it

15   was 15 minutes off or something --

16      A    Right, right.  I mean -- and usually,

17   because I would check my time before it went into

18   payroll, if there was a question, then I would

19   address it before it was actually submitted to

20   payroll; therefore, there was never an issue on the

21   actual check.

22      Q    Okay.  You reviewed -- you actually

23   reviewed it every week to make sure it was right?

24      A    Right.

25      Q    And from time to time, you caught issues?

                                        Page 229

1      A     Yes.

2      Q     Okay.  And those were corrected?

3      A     Yes.

4      Q     Never a problem with Kroger refusing to

5   correct an issue that you felt they should correct?

6      A     There were a couple of incidents where --

7   and it was my fault that instigated the incident,

8   but I had come in early, was supposed to clock in

9   at 10, I had got there like at 6 or 6:30, got busy.

10  The crew came in, we got started, completely

11  forgot.

12          So it's 2 a.m. and I haven't clocked in.

13  So I followed the procedure as best I could at that

14  point because you cannot clock in past a certain

15  time.  If you're scheduled at 10, like, by 10:30,

16  you cannot clock in, even if you show up, without

17  being overwritten into the system.

18          So I went and I clocked in or attempted to

19  clock in at 2.  Of course, it rejected me.  Then I

20  signed the little sheet and I put down 10.

21          And then when I saw Ms. Hua, who handles

22  the payroll, the next morning, I said, "I really

23  meant to clock in at 10, but I didn't even think

24  about it till 2."

25          And she said, "Well, we can't do that."

Page 230

1    She goes, "The only thing that I know is that you

2    attempted to clock in at 2.  I don't know that you

3    actually were here at 10."

4             And it kind of angered me a little bit,

5    kind of got me upset.  And I said to her, I said,

6    "Well, if you don't believe I was here at 10, then

7    you can ask my crew."  Or, I said, "Better yet,

8    check the video."

9             And so she goes, "Well, I'll let

10   Ms. Dodson handle it."

11            Okay.  So the next day, Ms. Dodson calls

12   me into her office, and she says, "Kathy told me

13   there was a problem."

14            And I said, "Okay."  I didn't mean for it

15   to have to go to her, but it did.

16            And she said, "So what happened?"

17            So I told her.  And I told her exactly

18   that.  I said, "I meant to clock in at 10.  I had

19   gotten here like at 6, but by the time I

20   remembered, it was 2 a.m."

21            And she goes -- and once again, it's one

22   of those things where she's not saying it, but she

23   is.  She looks at me and she says, "We cannot have

24   Kathy Hua in here looking at video and you're

25   telling me you came in at 10 and you were here at 6

                                           Page 231

1    p.m."

2          And I -- the little light bulb went off,

3    because I had never even thought about the

4    possibility that somebody might see that I was

5    there earlier.  I was just concerned that she

6    thought that I was trying to lie about coming in at

7    10.  So Dodson took care of it.  There was nothing

8    else said about it.  Ms. Hua didn't say anything

9    about it.

10          And then, oh, it had to be a good six

11    months later, I had not clocked in the whole day.

12    I mean, I came in, I did my work, went home and

13    just -- the mind was gone, whatever.  I don't know

14    what I was thinking.

15          So at the end of the week, I've got in 38

16    hours instead of 60-something hours.  So I'm like,

17    okay, what do you do now.  So -- and I was going to

18    let it go.  I just wasn't going to get paid because

19    I didn't want to create that situation again.

20          But without even thinking about it, when

21    Ms. Hua says, "You only worked 38 hours?"

22          Because, you know, as we've discussed, I'm

23    normally getting paid at least 50 on most weeks,

24    and all of a sudden I show up with 38.  That's just

25    not me, right?

Page 232

1        So I said to her, I said, "No," I said, "I
2    must have missed a day or something."
3        So we go back and we look, and she sees
4    where I missed the day.
5        So once again, she goes to Ms. Dodson.
6    And I wasn't even thinking this way at the time.
7    I'm thinking, oh, God, I've got myself in trouble,
8    I've got Dodson in trouble, what am I going to do.
9        And Ms. Dodson told me, she goes, "If you
10   forget to clock in like that, then you just need to
11   stay away from the time clock."
12       Now, that's the only time she's ever said
13   something directly to me.  But she said, "You can't
14   go back and correct it because that creates
15   problems for everybody."
16       And I said, "Yeah, you're right, but I
17   shouldn't have forgotten in the first place."
18       But what she said to me after that was --
19   Ms. Hua was not thinking I was working off the
20   clock.  She thought that I was trying to get paid
21   for not working, and she thought that Lori Dodson
22   was approving of that.  And that was the concern
23   that both of them seemed to have had.  She thought
24   I was trying to, quote, steal from Kroger hours.
25       And Ms. Dodson, as she told me, she goes,

Page 233

1    "If Kathy starts investigating and discovers that

2    that's what's happened, we're all going to get

3    fired."

4           And I said, "Yes, ma'am.  It won't ever

5    happen again."

6       Q    Okay.  Did -- are you saying that

7    Ms. Dodson actually used the word "off the clock"

8    or --

9       A    She told -- I don't know if she used the

10   word "off clock," but she said, "If you forget to

11   clock in, don't try to correct it."

12      Q    Okay.  You don't know why she said that?

13      A    No.  I mean, I'm assuming what I just

14   talked about.  But once again, she did not say, If

15   you forget to clock in, you're not getting paid for

16   it and that's just too bad.

17          I mean, that -- to me, that was the result

18   of the conversation, but she never said that

19   directly.

20      Q    In fact, I mean, she told you to clock in,

21   right?  I mean, that was the purpose of, you should

22   be --

23      A    She said I should not be forgetting to

24   clock in.

25      Q    Right.  You should remember to clock in?

Page 234

1        A     Yes.

2        Q     Okay.   Exhibit 19 basically has the same

3    rules that are set forth in 18; do you agree with

4    that?

5        A     Yes.

6        Q     Okay.

7              (Defendant's Exhibit 20 marked.)

8    BY MR. BARRON:

9        Q     Have you seen Exhibit 20 before?

10       A     Yes.

11       Q     Was this a memo to everyone at your store?

12       A     Yes.

13       Q     You signed it on page 2 of Exhibit 20?

14       A     Yes.

15       Q     And this is about that clipboard that you

16   were talking about?

17       A     Yes.

18       Q     And basically the gist is that there's too

19   many people writing their time on the clipboards

20   instead of punching in and out?

21       A     Right.

22       Q     And there was maybe a concern about abuse

23   and --

24       A     Yes.

25       Q     -- negligence and those kinds of things?

                                        Page 235

1        A    Yes.

2        Q    If you look on page 2, the very last

3   paragraph, it says, "It's your responsibility to do

4   a last ring inquiry at the end of the week to make

5   sure your time is correct."

6             Do you know what that -- a last ring

7   inquiry is?

8        A    Yes.

9        Q    What is it?

10       A    That's where it will give you what's

11   totaled up on your -- that's actually going to be

12   reported to the payroll.

13       Q    So you can see, here's my time for the

14   week?

15       A    Yes.

16       Q    You're supposed to do that every week to

17   make sure it's correct?

18       A    Yes.

19       Q    It says, "Every effort is being made to

20   make sure that payroll is accurate, but if there's

21   an error, please notify Kathy by 7 a.m. on Sunday

22   to make sure you get paid the correct number of

23   hours."

24       A    Correct.

25       Q    Kathy was the AA?

Page 236

```
 1        A    Yes.

 2              (Defendant's Exhibit 21 marked.)

 3   BY MR. BARRON:

 4        Q    I'll hand you what's been marked as

 5   Exhibit 21 to your deposition.  Is that your

 6   signature?

 7        A    Yes, it is.

 8        Q    And it looks like this was signed in '07,

 9   about the time you were hired?

10        A    Yes.

11        Q    This is to all employees.  It says, "When

12   you finish your workweek, you have to verify your

13   time."

14              So again, telling you to make sure you're

15   being paid correctly, right?

16        A    Yes.

17        Q    It is your -- and "your" is in caps --

18   responsibility to check your time and make sure

19   that you have the right amount of hours, right?

20        A    Yes.

21        Q    And by the way, on this same document, it

22   talks about having magazines or newspapers in the

23   break room, about paying for them, saying that "If

24   anyone is caught with anything in the break room

25   that has not been paid for, it will lead to
```

Page 237

1    disciplinary action up to and including discharge."

2            Do you see that?

3       A    Yes.

4       Q    And so this is just another place where

5    the company was very strict about its rules with

6    respect to not paying for merchandise?

7       A    Well, and once again, the rule was -- and

8    Ms. Dodson was adamant about it, she would go

9    through our refrigerator two and three times a

10   week.  If anything was in that refrigerator that

11   did not have a receipt on it, not only would she

12   throw it away, she would go back and look at the

13   video cameras to see who put it in there, and then

14   talk to them about it.

15           Once again, and I know I'm beating a dead

16   horse here, but if I was trying to hide something

17   from the company, the last place I would have put

18   the chicken would have been in the refrigerator

19   because she was notorious about this.

20           To the point where I used to bring a

21   protein shake to work in a milk jug.  And she threw

22   it away a couple of times because I was bringing it

23   from home in a milk jug and it was a protein shake

24   that was premixed.

25           So I got so aggravated at her, because I

Page 238

```
 1   told her before, I said, you know, this is what it
 2   is.  So I went to Publix and I bought my milk there
 3   so there would be no question that it was a Kroger
 4   item.  And she about had a stroke.  She said, "What
 5   if Bruce Lucia comes in and opens up our
 6   refrigerator and there's Publix milk?"
 7           But it was just one of those things why --
 8   I was so aware, once again, if you were trying to
 9   deceive or do something dishonest, that would not
10   be the place where you would hide it.
11           (Defendant's Exhibit 22 marked.)
12   BY MR. BARRON:
13       Q    All right.  Mr. London, I've handed you
14   what's been marked as Exhibit 2 -- I'm sorry, 22 to
15   your deposition.  And I'll represent to you that
16   this is part of your earnings history --
17       A    Yes.
18       Q    -- your wage history at Kroger.  Do you
19   recognize that?
20       A    Yes.
21       Q    I want to direct your attention to the
22   very last page.  And do you remember what the last
23   day you worked was?
24       A    Well, the last day I was actually at
25   Kroger would have been February 6, 2014.
```

Page 239

1       Q      That's the day where you had the meeting

2   with the loss prevention?

3       A      Yes.

4       Q      Was that meeting after you had worked your

5   shift?

6       A      No.  But I had come in, I want to say,

7   7:30 on that Thursday.

8       Q      Okay.

9       A      Ms. Dodson was there.  We walked the store

10  like we always do.  Then we went upstairs and we

11  went over a couple of things.  Then I did all my

12  paperwork on the computer.  Then I went downstairs

13  and unloaded the truck.  And then about 10:00, she

14  called me upstairs, and that's when I met with her

15  and Mr. Mabrey.

16      Q      Okay.  Did you punch in that day?

17      A      I did not.

18      Q      Okay.  And that was the 6th?

19      A      Yes.

20      Q      Okay.  And the date that the chicken

21  incident happened on was the --

22      A      Saturday.

23      Q      Saturday, the 1st?

24      A      I believe so, yes.

25      Q      Okay.  Do you know what the workweeks are

                                            Page 240

1    at Kroger, from what date to what date?

2        A    I believe we start our new week on

3    Saturday.

4        Q    Okay.  So it runs Saturday to --

5        A    Saturday to Friday.

6        Q    -- to Friday, yeah.

7        A    And it's a little screwy because of the

8    overnight is different from the --

9        Q    Right.

10       A    -- the other people.

11       Q    So how does that work?  Do you -- does it

12   roll over -- do they put it on the day that it's

13   actually worked or do you -- does it roll to the

14   next day?

15       A    I believe it's the day that you work the

16   most hours on is where it's credited.

17       Q    Okay.

18       A    So if you start your shift at 10, by their

19   time, it's actually midnight.

20       Q    Okay.  So if you worked, say, 10 to 6 --

21       A    10 to 6, if I was scheduling an employee

22   to work 10 to 6 --

23       Q    Tuesday into Wednesday, it would count on

24   Wednesday?

25       A    Yes.

                                      Page 241

1     Q    Okay.  I want to direct your attention to

2   Exhibit 22, and on the very last page --

3     A    Yes.

4     Q    -- this is the very end of your employment

5   there at Kroger.

6     A    Yes.

7     Q    It looks like there's an entry on

8   February 8th -- which I believe would have been

9   your last paycheck; is that correct?  You said your

10   last --

11     A    Yes, yes, yes, yes, yes.

12     Q    Okay.  For one hour and -- one and

13   three-quarters hours of overtime.  Do you see that,

14   1.75?

15     A    Yes.

16     Q    And then the week before that,

17   February 1st, you had 33 and a half hours of

18   overtime.

19     A    Yes.

20     Q    Do you see that?

21     A    Yes.

22     Q    All right.  So your last week of

23   employment, do you know how many days you would

24   have actually worked that week?

25     A    Seven.

                                        Page 242

1      Q    Well, you didn't actually work a full
2   week, though, because --
3      A    Oh, okay.  The last -- okay.  I see what
4   you're saying.
5      Q    Yeah.
6      A    Well, I'm not sure then.
7      Q    Okay.  That's a -- and that's a fair
8   answer.
9      A    Okay.  Because she was -- because that
10  previous week, I had -- that's the first time I had
11  ever put down all my hours on the clock.  That's
12  why it shows up that way.  And --
13     Q    You're talking about the 33?
14     A    Yes.
15     Q    Okay.
16     A    And when she asked me how many hours I
17  had, and I told her, her comment to me -- this is
18  Lori Dodson, was that, "You're going to get us both
19  fired."
20          And I could tell that whatever our
21  relationship was before, it didn't seem the same.
22  She seemed -- where she used to be -- or prior to
23  that week and a half or so, I'd always consider her
24  my friend, not just my boss.  And now it seemed
25  stranged -- estranged, I should say.

Page 243

1          But -- so she had told me, you know, that

2    I was going to get us both fired, they were going

3    to have a fit about this, whatever.  And so I said,

4    "So I'm going to do the best I can, but that's all

5    I can do."

6          And the very reason that Thursday I had

7    not clocked in is because after all the stuff we

8    had been through the previous week with the snow

9    and all the things and all the hours, I still

10   wanted to make things right.

11         So that Friday morning, I was scheduled to

12   be at another store, like at 5 a.m., and so my

13   intent was, instead of starting another week with a

14   bunch of overtime after we just come off that, I

15   just wasn't going to clock in till I had to go to

16   the other store.

17     Q    Wait, wait.  Why were you going to another

18   store?

19     A    They had some kind of meeting or something

20   or -- I think they were getting ready -- they

21   were -- actually, they were getting ready for a

22   re-grand opening, or something like that, and so

23   there were several of us grocery managers across

24   the zone that had to go there and work and take

25   care of whatever they had to do to get done.

Page 244

1    Q    So that wouldn't have been charged against

2    your store; it would have been charged against the

3    other store, wouldn't it?

4    A    It would have been -- it was -- that would

5    have -- yeah, you're right, and that's what I was

6    trying to do is, if I would have kept working on

7    the clock, that would have been overtime charged to

8    our store.  And I was trying to get us back in some

9    kind of line by not -- because I still had a Friday

10   to work at theirs, in my store.

11   Q    All right.  Okay.  Just to be clear, the

12   week of February 1st, when you put down 33 and a

13   half hours of overtime --

14   A    Yes.

15   Q    -- you did not work any off-the-clock

16   hours that week, did you?

17   A    I had worked a couple earlier in the week

18   where it was the nine-hour thing.  In other words,

19   I had no idea this was going to happen and we were

20   going to have all these --

21   Q    You're talking about the snow apocalypse?

22   A    Right, right, right, right.  And so I was

23   trying to -- so on the Saturday, Sunday, even

24   Monday, when I would get to eight or nine hours, I

25   would clock out.  I wouldn't do the 10 or 11 on the

Page 245

1    clock.  Because, remember, you could work a 40-hour

2    week and still have overtime if you were working

3    more than nine hours in a single day.

4         Q    Okay.  So you're saying at some point

5    during that week, after the snow hit --

6         A    Before the snow hit.

7         Q    Before the snow hit, you decided to go

8    ahead and just start recording all your time?

9         A    Yes, yes, because --

10        Q    Why?

11        A    I was so frustrated with her being mad at

12   me because of the Daniel Thurman thing, that I had

13   come to the point where I was just going to make

14   them do something.  Make them either -- either

15   change the -- get me the dairy help, give me my

16   hours back, or do something, because I was at the

17   point where I just -- I could not see myself

18   working all these hours and them telling me, "Don't

19   put down any overtime."

20        Q    So you're -- let me make sure I'm clear.

21   Your testimony under oath is that you worked your

22   normal week that week, and you just suddenly

23   decided to put down your actual hours, as opposed

24   to there was a once-in-a-lifetime weather emergency

25   and everybody was up at the store, including

Page 246

1    yourself, and you actually worked that much

2    overtime?

3        A    What I'm saying is, prior to the snow

4    event --

5        Q    Right.

6        A    -- okay, we had had the conversation with

7    Dodson.  I was trying to limit my overtime, but at

8    the same time, I was trying to be fair to her.  And

9    one of the things that happened was, that

10   Wednesday, the day the apocalypse happened, I was

11   actually scheduled off.  That was always my

12   scheduled day off.  I never took it off, but it was

13   on the schedule that way.

14           And she called 3:30, 4:00 in the

15   afternoon, and she says, "I need you to get here at

16   soon as possible."

17           And I was -- like I said, I'm still upset

18   and angry with her, and I'm never like that.  So I

19   said, "You don't want me to come in.  That will be

20   overtime."

21           And she just basically said, she goes,

22   "Get her as soon as you can," and hung up on me.

23           And what I did was I walked -- of course,

24   it was three and a half miles -- but I worked to

25   work because there was no way I could get out of my

                                        Page 247

1    neighborhood.  And that was, you know, in the

2    afternoon still.  It wasn't even the disaster that

3    it turned into.  And for the next four days, it was

4    15, 16 hour days.

5           Now, even on the time sheet, there were

6    times where it was, like, probably 12 or 13 hours,

7    because if I was in the store and I go in the break

8    room and sit down or try to lay down or something

9    like that, I would clock out for that, because I

10   wasn't trying to -- once again, I wasn't trying to

11   rip Kroger off.

12          But at the same time, you didn't have the

13   ability to get in the car and drive back home,

14   because when I left the store, I'd have to walk

15   back, because it was, like, four days before I

16   could get my vehicle out.

17      Q    But you're not -- there's -- there was no

18   discussion with anybody in management that week

19   about the fact that you were working off the clock,

20   right?

21      A    No.

22      Q    I mean, you reported 33 hours of overtime?

23      A    Right, right.  Like I --

24      Q    I'm assuming they -- I mean, do you have

25   any reason to believe that management thought that

Page 248

1    you were working off the clock that week?

2         A    No, because like I said, it was just -- it

3    was -- I'm not sure where you're going with that.

4         Q    Well, your testimony, I think, a few

5    minutes ago was that you worked off the clock,

6    like, Saturday, Sunday at the beginning of that

7    week --

8         A    Prior to that, yes.

9         Q    Prior to the big snow event?

10        A    Yes.

11        Q    But that same workweek?

12        A    Right.

13        Q    Okay.  And then at some point later in the

14   week, you started recording all of your time?

15        A    Yes.

16        Q    And what I'm getting at is, there's --

17   there was no way for management to have known that

18   particular week whether you were working off the

19   clock or not, right?

20        A    No.  I mean, it was -- I was doing the

21   same thing I had always done, and therefore, the

22   management -- and when you say "management would

23   have known," Lori Dodson, if she wanted to know,

24   would have known, because she would have had to

25   look.  But no, I didn't say, I'm going to work off

Page 249

1    the clock.

2         Q    Right.  But if the management -- if a

3    manager were to look at your time records for that

4    week, they would see that you worked 33 and a half

5    hours of overtime.

6         A    Correct.

7         Q    That wouldn't suggest to them that you

8    were working off the clock; it would suggest that

9    you were working a heck of a lot of hours --

10        A    Oh, yes, yes.

11        Q    -- on the clock?

12        A    Yes, absolutely.

13        Q    Right?  I mean, that's -- that's just the

14   overtime.  I mean, that's --

15        A    Yes.

16        Q    -- 73 hours, roughly, of time.

17        A    Yes, yes.

18        Q    Typically, if you're looking for policy

19   violations of people working off the clock, you

20   wouldn't start with someone who's recording 73

21   hours --

22        A    Correct, true.

23        Q    -- right?

24        A    Right.

25        Q    I mean, if anything, you'd be looking at

                                        Page 250

```
 1   maybe, is that person --

 2        A    Did they really -- were they really there

 3   73 hours.

 4        Q    Exactly.

 5        A    Absolutely.

 6        Q    So there's no reason for management to

 7   know or should have known that particular week that

 8   you were working off the clock?

 9        A    Right.

10        Q    Okay.  The next week, the week after --

11        A    Right.

12        Q    The incident with the chicken happened, I

13   think you said, Saturday night --

14        A    Yes.

15        Q    -- which would be the first night of the

16   new week?

17        A    Right.

18        Q    And -- let's get out your punch history.

19   One of these has fallen apart.  Let me give you

20   that one.  It's just the staples --

21             (Defendant's Exhibit 23 marked.)

22   BY MR. BARRON:

23        Q    All right.  So Mr. London, I've -- we've

24   handed you what's been marked as Exhibit 23 to your

25   deposition, and I want to direct your attention to
```

                                        Page 251

```
 1    the last page.  And if you look at -- starting --

 2    there's a Sunday, February 1st.

 3         A    Yes.

 4         Q    See that?

 5         A    Yes.

 6         Q    I believe that's the start of that week.

 7    Do you have any reason to disagree with me?

 8              I believe that would have been Saturday

 9    night going into Sunday.

10         A    Yes.

11         Q    Does that make sense?

12         A    Yes.

13         Q    Okay.  And that would be the day the

14    chicken incident happened?

15         A    Correct.

16         Q    Saturday night going into Sunday?

17         A    Correct.

18         Q    All right.  So it looks like you worked

19    that night and then the 2nd, Monday, and then

20    Tuesday and then Wednesday.

21         A    Yes.

22         Q    Does that look right?

23         A    Yes.

24         Q    And it looks like you recorded for those

25    days on Sunday 10 and a quarter hours?
```

Page 252

```
 1        A     Correct.

 2        Q     And then Monday was nine and a half?

 3        A     Yes.

 4        Q     Tuesday was eight and a half?

 5        A     Yes.

 6        Q     And Wednesday was eight?

 7        A     Yes.

 8        Q     Does that look right?

 9        A     Yes.

10        Q     And if you look at what you were

11   scheduled, on Sunday, it was -- you were scheduled

12   eight, you worked 10 and a quarter, or you recorded

13   10 and a quarter?

14        A     Right.

15        Q     On Monday, you were scheduled eight, you

16   recorded nine and a half.  On Tuesday, you were

17   scheduled eight, you recorded eight and a half.  On

18   Wednesday, the 4th, you were scheduled four, and

19   you worked eight -- or recorded eight.

20        A     Yes.

21        Q     Does that sound correct?

22        A     Yes.

23        Q     Okay.  So every single day that week, you

24   worked more hours than you were scheduled?

25        A     Yes.
```

Page 253

1  Q Well, you -- again, you recorded --

2  A Right.

3  Q You punched in for more hours than you

4 were scheduled?

5  A Right.

6  Q So if someone were to look at the time

7 records, they would see that you were actually

8 receiving more pay than for what you were

9 scheduled?

10  A Right.

11  Q Okay.  And sitting here today, can you

12 testify one way or the other whether you worked any

13 off-the-clock time that particular week?

14  A Yes, I did.

15  Q Okay.  Do you recall exactly how much?

16  A No, no.  We were -- we were still behind,

17 so I believe we didn't even know when we were going

18 to get our deliveries and stuff, because there were

19 trucks that weren't being delivered to the store.

20   So, for example, that Sunday, I may have

21 came in as early as 6, but because there was no --

22  Q Well, I don't want you to speculate.  I

23 mean, do you remember working --

24  A I do not remember --

25  Q Okay.

1      A    -- the exact hours.  I do not.

2      Q    That's what I'm trying to get at.

3      A    Right.

4      Q    Sitting here today --

5      A    Yeah.

6      Q    -- on any of those days, the February the

7  1st through the February the 4th, can you say with

8  any certainty what time you came in and what --

9      A    No.

10      Q    -- time you left?

11      A    No.

12      Q    Can you say with any certainty how those

13  times compare with what you actually punched in and

14  out?

15      A    No, I mean --

16      Q    You'd just be guessing, right?

17      A    I'd be guessing.

18      Q    Right.

19      A    Yes, absolutely.

20      Q    So, you know, for example, if it says the

21  in was, you know, 9:20 p.m., and your out was

22  7:27 a.m., sitting here today, you couldn't say

23  whether that's accurate or not?

24      A    No.

25      Q    I mean, it's possible you actually got

Page 255

1    there at 9:20 p.m. and left at 7:27 a.m.?

2         A    It's possible.

3         Q    Okay.

4         A    Yes.

5         Q    And can you think of any evidence sitting

6    here today that would lead a management person at

7    Kroger to be able to look at these records and see

8    that you were working off the clock?

9         A    No.

10        Q    Because, again, they would see that you're

11   actually working longer than your scheduled

12   shifts --

13        A    Yes.

14        Q    -- each of those days?

15        A    Yes.  The only thing that would have made

16   a difference is if somebody had actually observed

17   the schedule and then saw that I was working

18   different from what the actual schedule was.

19        Q    Right.  But, I mean, you were actually

20   being paid -- you punched out later than your

21   actual schedule?

22        A    Oh, yes.

23        Q    So the only way someone would have caught

24   you that particular week is if they saw you working

25   at, say, 8:00 and you had punched out at 7:00, and

Page 256

1    they took it upon themselves to go look at the time

2    cards that particular day --

3        A    That is correct.

4        Q    -- and compare those two things?

5        A    That is correct.

6        Q    And to your knowledge, that never

7    happened?

8        A    To my knowledge, no.

9        Q    And there was -- was there any specific

10   occasion that you can remember that would have led

11   someone to do that?

12       A    Not that week, no.

13       Q    Okay.  Now I want to ask you a broader

14   question.  I want to just branch out beyond those

15   particular pay weeks.

16            How did you decide when to punch in and

17   out?  If you weren't using your actual start of

18   work and end of work --

19       A    Okay.

20       Q    -- as you were required to do --

21       A    Okay.

22       Q    -- what criteria did you use to decide

23   when you punched in or when you punched out?

24       A    Because what Lori Dodson told me, each

25   week, it would be different.  She would say, "This

                                            Page 257

1  week, try to keep your overtime that you put down

2  to eight."

3          The next week, it would be, "Try to keep

4  your overtime to four."  Depending on what was

5  going on in the store, depending on what corporate

6  was telling her.

7          So -- and as I told you earlier, when I

8  made out the schedule, it was for 40 hours.  When I

9  made out the schedule for 40 hours, it was six

10  days.  But I was always there seven.  So I would

11  just do the math.  I would say, okay, she said I

12  could put down 44 hours this week.  So I would just

13  do the math and say, okay, I'm working hours this

14  day, I can work eight hours or nine hours,

15  whatever.

16          But I would always try not to work more

17  than the nine on the clock because, once again,

18  then you have the screwy way you got to calculate

19  the overtime because it was a day thing instead of

20  the weekly thing.

21      Q    Okay.

22      A    So that was just me doing the math to get

23  to the number that she had told me that I could get

24  to.

25      Q    When did -- when would she tell you that

Page 258

1    number?

2         A     Usually on -- let's see.  I made out my

3    schedules for the following week on -- I want to

4    say Tuesday.  It had to be uploaded to the computer

5    at some point.

6         Q     The number she gave you, though, was for

7    the department, not for you personally, right?

8         A     No.  The overtime was me, personally.

9         Q     So she would tell you each week what

10   overtime you personally -- was?

11        A     Absolutely.

12        Q     -- were allowed to work?

13        A     Absolutely.

14        Q     Not for the department?

15        A     Not for the department.  It was for me.

16        Q     Because it's true that other people in the

17   department worked overtime?

18        A     Rarely, but once again, whenever that

19   was -- happened, and it would be, tell Dave he can

20   get six hours, tell -- but what she would do -- and

21   going back to what we were talking about earlier,

22   she would say, "If I've got to pay overtime, I'm

23   going to pay my manager overtime," because she

24   trusted me to do the best I could do; whereas,

25   there was others she felt like would not be worthy

Page 259

1    of the extra pay.

2         Q    So is it your testimony that she gave you

3    a quota each week for each specific person on the

4    night crew --

5         A    No, no.

6         Q    -- how much overtime they could work?

7         A    Because generally speaking, it was no

8    overtime but Larry, period.

9         Q    Well, there were -- I mean, I've looked at

10   the records.  I mean, for example, Mr. Geiser

11   worked overtime, right?

12        A    Yes.

13        Q    Is that Dave?

14        A    Yes.

15        Q    Do you know who I'm talking about?

16        A    Right.  He was my assistant.

17        Q    Okay.  So he worked overtime?

18        A    Not on a regular basis, but it was -- it

19   was always approved.  Remember, nobody worked

20   overtime at Kroger unless she told them ahead of

21   time it was okay.

22        Q    Well, okay, let's just say, you come in,

23   it's you and Dave and, I don't know, maybe a couple

24   of stockers there, and two people don't show up.

25        A    Right.

                                        Page 260

1      Q    Do you call Lori Dodson at midnight and

2    say, "Is it okay for me and Dave to work late?"

3      A    There were weeks when she would want that

4    phone call to be made.

5      Q    Okay.  Because overtime was getting out of

6    control at that time --

7      A    Yes, yes --

8      Q    -- right?

9      A    -- something like that.

10     Q    But on a normal occasion, if that

11   happened, you understood that your job was to get

12   everything done, and if that that --

13     A    Yes.

14     Q    -- meant trying to persuade, beg, whatever

15   you needed to do, to get the other members of that

16   crew to stay until -- and help you, right?

17     A    Okay.  That specific incident that you're

18   speaking of happened.

19     Q    Yeah.

20     A    I had been there two, three weeks, and

21   Ms. Dodson had told me, you know, this week you can

22   do eight hours, whatever.  And apparently there

23   was -- I'm not sure exactly what happened, but

24   anyhow, they had projected sales for the division,

25   and the sales were plummeting or whatever.  So they

Page 261

1  called all the stores, you need to slash your

2  budgets.  Now, this is when we're already in

3  schedule.

4          So, Mr. Malik, who was co-manager, he

5  comes to me -- and this is, you know, like a

6  Tuesday night, and it's 9:00, and he goes, "I just

7  got a memo from so and so.  They said no overtime,

8  absolutely positively no overtime."  And not only

9  did he tell me that, he went around and he told

10  each of my crew.

11          And as I already explained to you, my crew

12  didn't want to work overtime anyhow.  So he says,

13  "No exception, absolutely."

14          Now, this is -- I'm new at the grocery

15  manager thing.  So, yes, sir.

16          So our truck who's supposed to be there by

17  10 shows up at 2 a.m.  Okay.  This is a problem.

18  My whole crew walks out at 6:00.  They don't care

19  that there's five pallets still left in the truck

20  because he told them to leave and they weren't

21  worrying about it.

22          So at 7, he comes back in because he was

23  the closer and then the opener, and they did that a

24  lot.  And as soon as he sees me, the first thing he

25  says is, "I told you no overtime.  What are you

1   doing here?"  I told him what happened.

2          "I don't care.  Leave."

3          So I did, I clocked out, I went home.  A

4   couple of hours later, the phone rings.  I've been

5   asleep for maybe an hour.

6          It's Ms. Dodson.  "What in the heck are

7   you doing?  You can't leave.  You've got half a

8   truck here."

9          And it was just a coincidence that that

10  morning the zone staff came in, and they had a fit

11  about the truck not getting done and the grocery

12  manager had left and gone home.

13         And that's when we had our conversation,

14  Ms. Dodson and I, that the only person I was to

15  listen to was her.  Co-managers -- I was never

16  supposed to be disrespectful to them.  I was never

17  supposed to be obnoxious toward them or anything

18  like that.  But unless she told me different,

19  whatever she told me is what I was supposed to do.

20      Q    Okay.  Let me stop you there.  You're

21  using an extreme.  I want to talk about a regular

22  day-to-day event.

23      A    That's --

24      Q    I worked a night crew, sir.

25      A    Okay.

                                        Page 263

1      Q    I know that people don't show up for night

2   crews.

3      A    Oh, yes.

4      Q    You give me that?

5      A    Yes.

6      Q    Okay.  In fact, it probably happens more

7   often than not --

8      A    Right.

9      Q    -- right?

10          So again, let's imagine a scenario which I

11   know you experienced where one or even two people

12   didn't show up for whatever reason.  Right?  That

13   means that -- how many people did you normally have

14   on a truck night?

15      A    Well, you had double truck nights and you

16   had single truck nights, so --

17      Q    Let's say you're working double --

18      A    -- some nights you'd have four.  Double

19   truck nights you'd have six.

20      Q    Six people?

21      A    Yeah.

22      Q    What if you only end up having three that

23   night?

24      A    Never had it that bad, but --

25      Q    Okay.  Four.

Page 264

1     A     Okay.  If we lost a person.

2     Q     Or -- yeah.

3     A     Okay.  There were things that we were

4   supposed to do besides just stocking.  For example,

5   supposed to condition half the store, which is

6   where you go around and you front everything.

7     Q     Right.

8     A     And it takes a considerable amount of

9   time.  Okay.  If we're down a person, we're not

10  going to condition.  We're just going to get all

11  the stock off the store.  And whether the store

12  gets conditioned that day or not, that's

13  irrelevant.  The customer is still going to have

14  the merchandise that they want to buy and I can

15  still make out an order.

16    Q     So you prioritize --

17    A     Yes.

18    Q     -- right?

19          Get the stock up first, but if you have to

20  have people work overtime to get the stock up, you

21  were authorized to ask people to work --

22    A     Oh, no, no, no.  Once again --

23    Q     Your testimony is you were not?

24    A     We were never authorized.

25    Q     Even if -- even if, you know, people don't

Page 265

1    show up, the truck's late --

2        A    No.  They didn't care.

3        Q    Didn't care?

4        A    That was one of those things they did not

5    care about.

6        Q    And I'm not talking about the rare events

7    where --

8        A    No.

9        Q    -- you get a directive from corporate

10   or --

11       A    Right.

12       Q    -- the district manager that we have to

13   watch overtime.  I'm talking on a normal ordinary

14   week when something happens, people don't show up,

15   your testimony is you couldn't ask Dave or anybody

16   else that was working with you to work overtime?

17       A    Usually, there was somebody there by 7 in

18   the morning.  And so what I would do is I would

19   usually wait till a co-manager got there, and I'd

20   say, "You make the call."

21            But Dodson had always told me that if

22   there's a problem, she didn't care if it was 3:00

23   in the morning, that if there was something she

24   needed to know about, to call her because when

25   Kroger management would get on this thing about the

Page 266

 1    no overtime or whatever, and they would make a
 2    really big deal about it, and she was trying to be
 3    responsive to what they were telling her.
 4            If I called her at 2:00 in the morning --
 5    and I think that happened once or twice -- where
 6    something had happened, power went out, something
 7    like that, she in turn would then turn around and
 8    call the person who told her she can't use overtime
 9    as soon as she got off the phone with me, and then
10    tell them, okay, you're going to make the decision
11    because you told me under no circumstances -- so
12    that's how that went.
13      Q    So if we look at the payroll records,
14    every single time that a member of the night crew
15    was working overtime, your testimony is you called
16    Lori Dodson?
17      A    I'm saying I cannot think of two or three
18    times that somebody ever got overtime that was not
19    preapproved.
20      Q    And when you -- I want to understand what
21    you mean by "preapproved."
22      A    That -- before we started the shift.
23      Q    Right.  Preapproved like that night?
24      A    Right.  We already knew that somebody
25    could stay over and work, yes.  And let's also keep

                                        Page 267

1   in mind, generally speaking, before that

2   co-manager, whoever was the closing manager, left,

3   if somebody wasn't coming in, they had already

4   called.

5       Q    Because they left at 11?

6       A    Because they weren't -- yeah, they left at

7   11.  That's what they were supposed to do.

8       Q    Right.  So there was plenty of -- let's

9   back up.  That's a good point.  So there was plenty

10  of occasions where the co-manager was there when

11  the person called in --

12      A    Yes.

13      Q    -- because they typically got there at 10?

14      A    Yes.

15      Q    Okay.  So if one or two people called in

16  by 10, and the co-manager wasn't leaving till 11,

17  you would have the opportunity to talk to that

18  co-manager --

19      A    Yes.

20      Q    -- about, hey, is it okay if I use some

21  overtime tonight?

22      A    Right.

23      Q    And you would do that from time to time?

24      A    Well, like I said, I can't remember

25  offhand of any time -- if that co-manager approved

Page 268

1    it, they got that approval from Dodson.  Because

2    they also knew that -- once again -- and once

3    again, it was her store, her rules, let her make

4    the decision.

5         Q    Do you know for a fact that they called

6    Dodson?

7         A    Oh, they would usually tell me that.

8    Yeah, I just checked with Ms. Dodson, whatever.

9         Q    So there was -- there were occasions where

10   people didn't show up, whatever, you talked to the

11   co-manager before they -- before he or she left at

12   11 --

13        A    Yeah.

14        Q    -- and you had approval to work overtime?

15        A    Yes.

16        Q    For your crew to work overtime that night?

17        A    Yes, yes.

18        Q    That happened regularly, didn't it?

19        A    No, because we didn't use other people in

20   my -- on my crew, and I may be wrong on this, I

21   mean, it's been a long time, but outside of Dave,

22   Brian Roberts was probably the only other person I

23   ever know to get overtime on my crew.

24        Q    But that's just because those other

25   employees didn't want to work overtime?

Page 269

```
 1        A    Well, that's true, that's true.

 2        Q    Right?  It's not because you didn't ask

 3   them?

 4        A    Well, I mean, sometimes you would.  But

 5   then again, we go back to what we were talking

 6   about earlier, where Ms. Dodson knew my employees

 7   and she knew who was good at what they did and

 8   people who weren't.  And she'd just tell me flat

 9   out, "He's not working any overtime because he's

10   not worth his base pay, and I'm sure not going to

11   pay him time and a half."

12        Q    Okay.  In your complaint, you claim that

13   Ms. Dodson told you you could only work eight hours

14   overtime per week?

15        A    It was an average.

16        Q    Okay.  Because, in fact, I mean, if you

17   look at your time records, you're working --

18        A    Oh, it was all over the place.

19        Q    All over the place?

20        A    But it was an average.  That was an

21   average is what I meant to say on that.

22        Q    Back in 2013, I think you averaged

23   something like 13 hours a week?

24        A    It was 10.  I think it was 10.  I could be

25   wrong, but I think that's what it was.
```

Page 270

```
 1            But once again, the reason that it would
 2     vary is because when we were --
 3            MR. BARRON:  I think you got this
 4     yesterday.
 5       A     When we were having a normal week, it
 6     would be, you can work four, you can work eight,
 7     you can work six.  But then whenever we had the
 8     issues with zone staff or corporate or whatever, it
 9     could jump up to 20, 25 hours.
10            (Defendant's Exhibit 24 marked.)
11     BY MR. BARRON:
12       Q     Mr. London, I'm handing you what's been
13     marked as Exhibit 23 to your deposition -- 24, I'm
14     sorry, I missed one.  And I'll represent to you
15     that this is the data that was attached to the
16     email that we've been talking about.
17       A     Right.
18       Q     And if you look on page 2, it has a column
19     that says "weekly average," just was cut off.
20       A     Okay.
21       Q     And it has 13 hours for you.
22       A     Okay.
23       Q     And it looks like your overtime pay for
24     2013 was $19,381.  Do you see that?
25       A     Yes.
```

```
 1        Q    Does that sound about right?
 2        A    Sounds about right, yes.
 3        Q    Okay.  So again, you were averaging a lot
 4   higher than eight?
 5        A    I mean, it was -- like I said, I was doing
 6   the math based on an assumption of -- actually,
 7   what I did is I took what I had made at the end of
 8   the year and then tried to subtract out the base
 9   pay and divide it out that way.
10        Q    Did you typically leave at the same time
11   as Mr. Geiser or different times?
12        A    I was usually the last one out of the
13   building.
14        Q    Okay.  How long after he left did you
15   usually leave?
16        A    Depends on what time whoever was scheduled
17   came in came in.
18        Q    Are you talking about the opening manager?
19        A    Yes.
20        Q    And they typically got there about, what,
21   7?
22        A    That was when they were scheduled,
23   generally speaking.  And then it would depend on
24   what they had to do as far as first thing in the
25   morning, if they -- like, for example, if they had
```

Page 272

1   a field change, something they had to do, then I

2   would wait till they got through with that because

3   we would walk the store, and then I could go over

4   what happened during the night, what we got done,

5   what we didn't get done, you know, just general

6   grocery stuff, what came in, shippers, that kind of

7   thing.

8        Q    Okay.  So let's talk about your routine.

9   So when you got to the store in the evening, what

10   did you typically do?

11       A    Dairy.  The first thing I did was usually,

12   I would go to dairy, finish whatever had not been

13   stocked, fill up the milk, clean the dairy cooler,

14   organize and get it ready for the next truck.

15       Q    So during this time that you were grocery

16   manager, you -- there was someone that was supposed

17   to be doing the dairy trucks; is that fair?

18       A    There were -- there were employees hired

19   to work dairy.

20       Q    Right.  So you were not doing the dairy

21   truck, per se?

22       A    I was doing part of the dairy truck.

23       Q    Whatever the other person didn't do?

24       A    Pretty much, yes.

25       Q    Okay.  So is it fair to say that for the

Page 273

1    most part, you were just refilling the milk,

2    refilling, say, orange juice, fast moving items?

3        A     No, because depending on who we had back

4    there and the amount of training that they had and

5    their experience, I had people that they could

6    always get the yogurt done, but the rest of the

7    dairy wouldn't be done.  It was that kind of thing

8    where -- and this was a huge dairy as far as

9    volume.  It was probably doing 45, $50,000 a week.

10   That's a lot of yogurt.

11            And it was -- because our cooler was the

12   size it was, it was relatively small, and we also

13   moved an enormous amount of milk out of that store.

14   The one thing you could not have is to have two

15   trucks there at the same time because once you put

16   pallets side by side, you couldn't work in there

17   any more.  All your -- all your speed and stuff

18   would just go away because you were constantly

19   having to walk around stuff.

20            So my goal as -- when I was the dairy lead

21   was always to finish the truck and have everything

22   ready for the next truck.  And once I became the

23   grocery manager, that was even more important

24   because I couldn't leave -- I could leave sometimes

25   before the perishables truck got there, and

1    therefore, I had to have the cooler right because I

2    couldn't depend on employees to get it right.

3         Q    So your testimony is, when you got there

4    early, you were typically working on the dairy?

5         A    Yes.

6         Q    And then you had your grocery manager

7    responsibilities?

8         A    Yes.

9         Q    Which typically had to be done by a

10   certain time in the morning, right?

11        A    Yes.

12        Q    Because you couldn't have pallets out on

13   the sales floor?

14        A    Right.

15        Q    You couldn't have boxes out on the sales

16   floor?

17        A    Right.

18        Q    After what time, 7?

19        A    6.

20        Q    6?

21        A    When we opened, we wanted the -- for

22   customers to be able to come in safely.

23        Q    Okay.  So there really was no stocking

24   going on typically after 6?

25        A    No, usually after 6, it was ordering.

Page 275

1     Q    Okay.

2     A    Because by the time we got everything off

3  and everybody else left, then I would walk the

4  store and do my orders.

5     Q    Right.  Now, Kroger has a

6  computer-assisted ordering system.

7     A    Yes.

8     Q    So you didn't have to actually order the

9  whole store?

10    A    You have to walk the entire store.

11    Q    You have to walk the whole store and look

12 for holes and things that were missed by the

13 computer ordering?

14    A    Right, yes.

15    Q    Which is faster than actually ordering the

16 whole store?

17    A    Yes and no.  Because you also have to edit

18 everything to make sure that the computer's not

19 bringing in stuff you no longer need.

20    Q    And -- but you don't get a truck every

21 day, did you?

22    A    Yes.

23    Q    Every single day?

24    A    Every single day.

25    Q    Seven days a week?

Page 276

```
 1        A     Every single day.

 2        Q     Okay.

 3        A     And like I said, Sundays and Fridays we

 4   got double trucks.  Dairy, you got trucks five days

 5   a week on perishable.  And then on milk, you got

 6   milk delivery four days.

 7        Q     Well, did -- do you do the milk

 8   deliveries?

 9        A     Yes, I was -- if I was there, I was the

10   one who checked it in.  It usually came in

11   overnight.

12        Q     Right.

13        A     And then I would make sure that -- that

14   was one of the more time consuming physical things

15   you had to do, is that we wanted our milk to be

16   fresh; and therefore, rotation was absolute.

17              So when it was time for the next truck to

18   come in, you would only have, like, three or four

19   pallets left of milk.  And all that had to be hand

20   stacked off in front of the -- where the milk goes

21   onto the dairy case so that when the next truck got

22   there, it would go in behind that.  And it was just

23   one of those things you had to do.

24              And also in dairy, because it being

25   perishable, cleaning was something that had to be
```

Page 277

```
 1   done every week.  And that fell on me.  And that
 2   included pulling out all the racks, pulling out all
 3   the panels on the milk where all the milk goes and
 4   stuff like that.  And it was a nasty job.  It
 5   was --
 6        Q    Why -- let me stop you.  Why wouldn't that
 7   fall on the dairy manager, the dairy lead?
 8        A    Because that was me.
 9        Q    Well, you said there was somebody else
10   doing that job.
11        A    There was people -- there were people
12   there, but they were trying to learn -- we were
13   trying to get them to learn how to order and how to
14   stock.  And if you gave them too much stuff to do,
15   none of it would get done.
16        Q    So your testimony is you did -- you did
17   not do the ordering for the dairy?
18        A    I did almost all the ordering, because in
19   the beginning, you would have people start
20   ordering.  And then you would see within -- because
21   remember how many people we went through in the
22   beginning, it was three.  And that was probably
23   within a four-month period, maybe five month.  If
24   they screw up an order, don't order enough, within
25   a couple of days, we were in trouble.
```

Page 278

```
 1              And what would happen is, they're ordering
 2     200 piece trucks when they should be ordering 400
 3     piece trucks.  And by the time they would call me
 4     and tell me, I need to go fix dairy, it's an 800
 5     piece truck, and now -- once again, we didn't have
 6     the staff to do the 400 piece truck and we're
 7     trying -- we're behind and we're trying to catch up
 8     again.
 9        Q    Let's talk about the morning, so moving
10     off dairy.  You did not typically work dairy in the
11     morning, right?
12        A    Usually, I was done with dairy.  The dairy
13     person scheduled --
14        Q    Right.
15        A    -- would come in at 7.
16        Q    In the morning, okay.
17        A    Okay.  So I had everything done, and they
18     would just start on whatever the truck was that had
19     just come in.
20        Q    So the pallets are off the floor.  The
21     boxes are off the floor.  There's no stocking going
22     on.  You're --
23        A    Right.
24        Q    -- not working in the dairy.
25        A    Yes.
```

Page 279

1      Q     The opening manager is there

2    typically --

3      A     By 7 or so.

4      Q     -- by 7 or so.

5      A     Yes.

6      Q     So what did you do past 7?

7      A     Well, like I said, after we walked the

8    store and all that, usually by 8, I'd leave.

9      Q     Okay.

10     A     Yeah.  Now, there were times where we were

11   so short in dairy that on the two days that we did

12   not have perishable trucks, we actually would

13   schedule nobody in the dairy until that evening.  A

14   part-time person would come in.

15          And because of the volume we did, there

16   were a couple of -- what I would do is, I would

17   say -- I would say to a co-manager, I would say,

18   "Okay, we don't have anybody in dairy scheduled

19   today, but you need to make sure that the milk and

20   the eggs stay filled."

21          And I would come in, and the milk and the

22   eggs would be empty.  So it actually became a

23   routine where on those weeks where we had that

24   short of help, I would come in, off the clock

25   again, usually 11 -- and remember, I just left,

Page 280

1    went home, slept for a couple of hours, come back

2    just long enough to fill up the milk, fill up the

3    eggs and then leave.  Because depending on somebody

4    else to do it was just a sure fire way to see it

5    wasn't going to get done.

6         Q    So going back to your schedule, you

7    were -- on many days, you were scheduled till 8,

8    right?

9         A    I was never scheduled past 6, not that I

10   can remember.

11        Q    Okay.

12        A    My schedule -- in fact, it was -- and

13   there was two days I was scheduled to leave, like,

14   at 2.

15        Q    I saw some 12 to 8s on here.  Are you

16   saying you were never scheduled 12 to 8?

17        A    No.  They may have put that in the

18   computer because of the Saturday over to the Sunday

19   thing, but I was never scheduled 12 to 8.

20        Q    Okay.  What were you typically scheduled?

21        A    10 to 6.

22        Q    So you think the 10 to 6s were somehow

23   converted to 12 to 8s?

24        A    Yes, it had to be, because I was never --

25   I made out the schedule myself.

                                        Page 281

1       Q       Okay.

2       A       I remember because of e-scheduling, it had

3   to be uploaded.  I actually made out a hard

4   schedule, and then I left that in my box and

5   another person would come along and upload that to

6   the e-scheduling computer for whatever deal they

7   did.

8       Q       Did you ever leave before the opening

9   manager arrived?

10      A       A couple of times, but it always made me

11  nervous because I was the manager on duty when they

12  left, and I was always scared to death that if I

13  left before they got there and something went

14  wrong, I would be held responsible.  So even if I

15  clocked out at 6, I would still stay to make sure

16  that if something went wrong, I was there.

17              And I -- and a lot of times I was the only

18  person with keys.  I mean, if a perishable showed

19  up and the co-manager hadn't got there, I got the

20  keys to the back door and we couldn't have them

21  sitting there and not able to unload.

22      Q       Did anybody else on the night crew have

23  keys, Mr. Geiser, for example?

24      A       Mr. Geiser had keys, yes.

25      Q       So at least on the schedule, there appears

                                        Page 282

1    to be days where you were not scheduled to work all

2    night?

3         A    Correct.

4         Q    Right?

5         A    Correct.

6         Q    You were, like, half days or whatever you

7    want to call it?

8         A    Yes, yes.

9         Q    Is that what y'all called them?

10        A    Yeah.

11        Q    Okay.  And I'm assuming on those days,

12   Mr. Geiser also had keys?

13        A    Yes.

14        Q    So it wouldn't be necessary for you to

15   stay until the opening manager got there,

16   Mr. Geiser could stay till the opening manager got

17   there?

18        A    Mr. Geiser, his situation was such that he

19   almost always had to leave at 6 because he had

20   babysitting issues as far as the wife going to

21   work.  Therefore, he was never one to want to stay

22   over.  And that was another reason why, if he

23   worked overtime, it was usually on different days

24   when he didn't have to leave right at 6 because of

25   the childcare.

Page 283

1      Q     Like weekends or something?

2      A     Do what?

3      Q     Weekends or --

4      A     Yeah, something like that, yeah.  And

5   whenever he would work overtime, sometimes he would

6   do it without her permission, and she would talk to

7   him about it and talk to me about it.

8      Q     You never instructed Mr. Geiser to work

9   off the clock, did you?

10     A     No.

11     Q     To your knowledge, he never did work off

12  the clock, correct?

13     A     To my knowledge -- there were a couple of

14  times where he was supposed to finish up whatever

15  he was doing, and he would say something to me

16  like, oh, I came back later and talked to Dodson

17  and I finished that.  And I never asked him, I

18  said, "Did you clock in to finish that," you know.

19          But it worried me because even though I

20  was willing to do it, I would never ask somebody

21  else to do it, because even though I was willing to

22  do it, my choice, I always felt like that was

23  taking advantage of somebody, and I didn't want to

24  be in that position.

25     Q     Well, and if you got caught, you'd be

                                        Page 284

1   fired?

2       A    Well, that too.  That too.  There is that.

3            MR. BARRON:  All right.  Let's take a

4   break.  I think I'm pretty close to being done.

5            THE WITNESS:  Okay.

6            THE VIDEOGRAPHER:  And we're off the

7   record.  The time is 3:11.

8            (Recess from 3:11 p.m. to 3:17 p.m.)

9            THE VIDEOGRAPHER:  And we are back on the

10  record.  The time is 3:17.  You may continue.

11           MR. BARRON:  Pass the witness.

12           MR. SPERRY:  Say it again.

13           MR. BARRON:  Pass the witness.

14           MR. SPERRY:  I don't have any questions at

15  this point in time.  We would like to reserve the

16  right to read and sign.

17           THE VIDEOGRAPHER:  This concludes this

18  videotaped deposition.  The time is 3:17.  We're

19  off the record.

20           (Deposition concluded at 3:17 p.m.)

21           (Signature reserved.)

22

23

24

25

                                        Page 285

```
 1                    CERTIFICATE
 2       STATE OF GEORGIA:
         COUNTY OF FULTON:
 3
 4            I hereby certify that the foregoing
         transcript was taken down, as stated in the
 5       caption, and the colloquies, questions and answers
         were reduced to typewriting under my direction;
 6       that the transcript is a true and correct record of
         the evidence given upon said proceeding.
 7            I further certify that I am not a relative
         or employee or attorney of any party, nor am I
 8       financially interested in the outcome of this
         action.
 9            I have no relationship of interest in this
         matter which would disqualify me from maintaining
10       my obligation of impartiality in compliance with
         the Code of Professional Ethics.
11            I have no direct contract with any party
         in this action and my compensation is based solely
12       on the terms of my subcontractor agreement.
              Nothing in the arrangements made for this
13       proceeding impacts my absolute commitment to serve
         all parties as an impartial officer of the court.
14
15            This the 27th day of June, 2016.
16
17
18            Carolyn M. Carboni
19
20       CAROLYN M. CARBONI, RPR, RMR, CCR-B-878
21       VERITEXT LEGAL SOLUTIONS
22       Firm Registration No. 571
23       300 Throckmorton Street, Suite 1600
24       Fort Worth, Texas 76102
25       Phone:  817-336-3042
```

Page 286

1                 CHANGES AND SIGNATURE

               TO THE ORAL DEPOSITION OF

2                    LARRY LONDON

                   June 20, 2016

3

4        PAGE    LINE    CHANGE        REASON

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

                                          Page 287

```
 1           I, LARRY LONDON, have read the foregoing

 2      depositionand hereby affix my signature that same is

 3      true and correct, except as noted above.

 4

 5                              _____

                                LARRY LONDON

 6      STATE OF _____)

 7      COUNTY OF _____)

 8

 9           Before me, _____, on this

10      day personally appeared LARRY LONDON, known

11      to me (or proved to me under oath or through _____

12      (description of identity card or other document) to be

13      the person whose name is subscribed to the foregoing

14      instrument and acknowledged to me that they executed

15      the same for the purposes and consideration therein

16      expressed.

17           (Seal)  Given under my hand and seal of office

18      this _____ day of _____, _____.

19

20

21

22

23                              _____

24                              Notary Public in and for the

25                              State of _____
```

Page 288

Job No. 2327858          LARRY L. LONDON - 06/20/2016

**[0007 - 2900]**

| **0** |
|---|

**0007**   2:22
**0028**   2:20
**00353**   1:6
**07**   199:10 237:8

| **1** |
|---|

**1**   2:4,15 21:19,22
   55:3,14,18 56:3
   199:9
**1,000**   83:16,21
   103:21
**1-2**   3:17
**1.75**   242:14
**1/27**   141:7
**10**   2:21 5:20 29:11
   31:13 85:1,4,16
   139:7 163:20 172:6
   222:19 230:9,15,20
   230:23 231:3,6,18
   231:25 232:7
   241:18,20,21,22
   245:25 252:25
   253:12,13 262:17
   268:13,16 270:24
   270:24 281:21,22
**10/29/07**   3:18
**100**   79:9 126:22
   163:1 200:2
**107-100**   2:18
**108**   3:6
**10:00**   240:13
**10:28**   76:17,18
**10:30**   230:15
**10:42**   76:18,20
**11**   2:23 27:22 88:8
   88:10,10,23 152:23
   245:25 268:5,7,16
   269:12 280:25
**112-113**   2:17
**113**   3:8
**116-118**   2:25
**11:19**   114:11
**11:22**   114:15

**11:57**   151:5,6
**12**   2:25 31:23 92:23
   93:1 216:4 248:6
   281:15,16,19,23
**122**   133:21
**1221**   5:13
**123**   136:2
**124**   136:2
**1245**   1:16 5:7
**126**   140:1,1
**12:55**   151:6,8
**12th**   24:7
**13**   3:3 15:9 94:15,18
   155:18 248:6
   270:23 271:21
**14**   3:5 66:20 108:23
   109:1,14 114:21
   149:24
**14th**   88:15
**15**   3:7 33:6,18 66:20
   113:21,24 129:19
   155:19 173:1
   229:15 248:4
**151**   3:9
**16**   3:9 149:24
   151:14,17 152:3
   187:21 248:4
**1600**   286:23
**17**   3:10 21:7 192:20
   192:23
**18**   3:12 152:10
   154:20 177:18,19
   227:16,20 235:3
**18,000**   31:19
**19**   3:14 169:22
   227:10,10,16 235:2
**19,381**   271:24
**192**   3:11
**194**   3:15
**1953**   10:20
**1973**   17:18
**1991**   17:18
**1999**   26:11,18
**1:16**   1:6

**1st**   60:16 63:25
   85:23 146:7 147:9
   240:23 242:17
   245:12 252:2 255:7

| **2** |
|---|

**2**   2:5 40:10,13 42:3
   110:16 230:12,19
   230:24 231:2,20
   235:13 236:2
   239:14 262:17
   271:18 281:14
**2,000**   200:4
**2/14/14**   2:23
**2/16**   221:6
**2/6/2014**   134:1
**2/7**   86:11
**20**   1:13 3:16 163:2
   163:15 168:23,25
   173:1 178:13 235:7
   235:9,13 271:9
   287:2
**20,000**   173:25
**200**   279:2
**2000**   11:4,7 17:17
   17:17 26:11,18
**2001**   16:14
**2002**   11:7
**2004**   2:6,9 17:1
   23:19,22 40:23 41:5
**2005**   17:1 23:19
**2006**   16:14
**2007**   15:25 26:10,13
   40:7,16 41:7 55:21
**2008**   222:1
**2009**   31:12 222:1
**2010**   49:18 211:11
**2012**   41:21 153:3,6
   215:11
**2013**   3:22 144:8
   153:18 158:23
   159:1,6 173:20
   174:7 182:13
   192:13 270:22
   271:24

**2014**   28:12,15 30:12
   30:23 55:12 56:5
   58:23 85:23 88:15
   112:8 153:4,6
   159:10 216:24
   239:25
**2015**   30:6,12
**2016**   1:13 6:4
   149:15,18 151:25
   286:15 287:2
**20s**   161:15
**20th**   6:4
**21**   2:4 3:18 10:6,15
   237:2,5
**216-221**   3:20
**22**   2:7 3:20 239:11
   239:14 242:2
**223**   5:7
**227**   3:13,15
**227-253**   3:6
**228**   110:19
**229**   111:13
**22s**   225:17
**23**   3:21 251:21,24
   271:13
**230**   112:2 160:11
**231**   114:23,23
**233**   116:7 118:20
**235**   3:17
**237**   3:19
**239**   3:20
**24**   3:22 20:2 25:19
   55:22 187:17
   202:22 203:1,6
   204:8 271:10,13
**25**   16:24 22:20 23:2
   164:13 180:22
   200:3 271:9
**250**   168:19
**251**   3:21
**271**   3:22
**27th**   286:15
**29**   40:16
**2900**   5:13

Job No. 2327858                    LARRY L. LONDON - 06/20/2016

**[2920 - absolutely]**

**2920**  10:1 22:9
**2:00**  177:22 191:1
  267:4
**2:06**  227:7,9
**2:18**  227:9,12
**2:44**  60:16,22
**2nd**  63:25 147:12
  252:19

**3**

**3**  2:8 3:19 41:16,19
  42:3 140:3
**3-0-2-1**  220:15
**3.5**  21:9
**3/19**  130:3
**3/19/14**  3:7
**3/20/14**  3:3
**30**  115:17 118:17,23
  144:3 154:3 200:3
**300**  286:23
**30041**  10:2
**30303**  5:8
**30th**  40:8
**31**  60:7,8 74:25
**32**  187:18 204:8
**33**  242:17 243:13
  245:12 248:22
  250:4
**35**  174:4 203:2,7
**36**  177:16
**38**  232:15,21,24
**3:11**  285:7,8
**3:17**  285:8,10,18,20
**3:30**  247:14

**4**

**4**  2:11 24:10 44:8,11
  46:12 82:23 152:2
  216:2
**40**  2:7 31:19 32:6
  48:20 115:17 152:4
  154:3 157:11
  160:13,22 161:12
  170:25 174:5
  191:19 192:1
  201:17 202:5,7

204:18,20 206:8,11
  246:1 258:8,9
**400**  17:7 279:2,6
**41**  2:10
**41,000**  30:24
**411**  2:11 3:12
  227:21
**42**  195:25
**44**  2:12 258:12
**45**  20:12 70:10
  204:19 274:9
**47**  195:23 196:1
**473**  21:2,6,8 38:14
  47:25 55:9 60:5
**49**  2:13
**4:00**  247:14
**4th**  253:18 255:7

**5**

**5**  2:13 24:10 49:1,4
  103:11,12,12,13,14
  103:20,22 104:3,12
  152:9 193:11
  244:12
**50**  174:6 200:3
  204:19 206:7
  232:23
**50,000**  274:9
**500**  173:22
**54**  2:15
**55**  207:24
**571**  286:22
**59**  2:17,18
**5:30**  210:17
**5th**  151:24

**6**

**6**  2:14,15 4:3 54:12
  54:15,18 55:3,15,18
  56:3 57:4 109:22
  133:23 166:24,24
  198:9 215:23 230:9
  231:19,25 239:25
  241:20,21,22
  254:21 275:19,20
  275:24,25 281:9,21

**282**:15 283:19,24
**60**  31:14 48:19
  136:11 206:10
  207:24 232:16
**61**  31:14
**63**  10:18
**6:00**  210:18 262:18
**6:30**  57:4 230:9
**6s**  281:22
**6th**  63:23 93:7
  113:16 123:4
  240:18

**7**

**7**  2:16 59:2,7,15
  68:8 157:1 163:19
  178:13 193:9
  212:24 214:7
  236:21 262:22
  266:17 272:21
  275:18 279:15
  280:3,4,6
**7.35**  38:23
**7.40**  38:23
**70**  2:10 152:11,21
**71**  19:7
**73**  19:8 250:16,20
  251:3
**74**  111:16
**75**  152:23
**76102**  286:24
**77**  2:20
**77010**  5:14
**7:00**  212:22 256:25
**7:27**  255:22 256:1
**7:30**  240:7

**8**

**8**  2:18 59:4,7,25
  112:8 157:1 198:8
  214:8 280:8 281:7
  281:16,19
**80**  12:1
**800**  279:4
**817-336-3042**
  286:25

**832.214.3900**  5:15
**85**  2:22
**878**  1:19 286:20
**88**  2:24 12:4
**8:00**  256:25
**8s**  281:15,23
**8th**  242:8

**9**

**9**  2:19 77:24 78:3
  152:3 157:1
**92**  2:25
**94**  3:4 18:4
**95**  18:4 182:23
**98**  18:4
**9:00**  203:23 262:6
**9:20**  1:14 255:21
  256:1
**9:21**  6:3

**a**

**a.m.**  1:14 2:15,15
  6:3 55:3,3,14,15,18
  60:16,22 76:18,18
  151:6 215:23
  230:12 231:20
  236:21 244:12
  255:22 256:1
  262:17
**aa**  221:9 236:25
**ability**  8:24 196:9
  248:13
**able**  27:11,13 36:3,4
  39:25 45:7 108:15
  169:3 183:23
  200:17 256:7
  275:22 282:21
**absolute**  79:23
  80:17 117:14
  199:21 277:16
  286:13
**absolutely**  45:13
  51:19 67:25 120:15
  151:3 162:7 168:10
  174:9 185:2 207:13
  250:12 251:5

Page 2

**[absolutely - appointed]**

255:19 259:11,13
262:8,13
**absurd** 97:5 101:6
102:14,21
**abuse** 235:22
**acceptable** 120:1,6
120:10
**accepted** 207:4
**access** 24:19 25:17
**accomplish** 150:5
**account** 79:25
178:23
**accounting** 153:10
**accrued** 145:24
146:19 147:1,5
**accumulated** 30:25
31:20
**accurate** 110:10
112:9 229:1 236:20
255:23
**accused** 23:20 102:6
104:25 136:3 219:5
**accusing** 102:3,16
102:18 106:13
118:13
**acknowledged**
288:14
**act** 117:24
**acting** 36:7
**action** 1:5 46:13
55:7 91:14 137:4
173:18 238:1 286:8
286:11
**actions** 108:5
**acts** 35:13
**actual** 22:7 229:21
246:23 256:18,21
257:17
**adamant** 168:9
225:6 238:8
**add** 204:14
**added** 204:13
**adding** 126:15,15,15
204:18

**address** 9:25 10:5
181:24 183:5
229:19
**adequate** 30:14
**administer** 79:17
**administrative**
207:14
**admit** 66:22
**admitted** 64:8
135:18
**admitting** 209:20
**adored** 122:16
**advanced** 43:18
**advantage** 284:23
**advice** 2:21 84:20
85:9 86:21
**advisability** 86:25
**advised** 56:7 60:6
**affix** 288:2
**afternoon** 247:15
248:2
**age** 138:20,23
**aggravated** 171:6
191:17 238:25
**aggravating** 126:13
143:8
**aggressive** 186:12
**ago** 11:3 118:22
249:5
**agree** 7:13 56:12
65:17,19 79:5,7
81:24 97:16,21
103:15 104:21
105:8 108:11 146:2
146:2,9 158:3 165:1
174:15 178:15
214:13 228:8 235:3
**agreed** 184:5 207:17
207:19
**agreement** 90:21
92:16 286:12
**ahead** 6:9 82:20
90:11 113:19 114:7
172:14 177:8
178:14 181:7

187:19 216:2 226:8
246:8 260:20
**aisle** 129:14 163:1,2
**aisles** 129:14
**aleck** 190:4
**alive** 13:10
**allegation** 152:18
**allegations** 60:5
**alleged** 170:10
**alleges** 152:3
**allocated** 168:16
**allocating** 168:14
**allotted** 162:9
**allow** 92:3 106:7
134:12 177:6
**allowed** 20:19 27:12
32:10 51:17 67:19
73:2 77:13 137:5,16
155:8,24 172:9
178:20 200:20
259:12
**amazed** 203:21
**amazing** 169:20
206:16
**ambitious** 35:12,15
35:16
**amount** 34:12 155:8
158:21 159:4 162:5
162:9 177:12
185:24 224:5
237:19 265:8 274:4
274:13
**amounts** 79:4 159:5
**andrew** 180:13
182:12 192:8
193:23 212:8
**angered** 231:4
**angry** 28:19 247:18
**annoying** 91:7
**answer** 7:9,11,16,22
8:7,16 29:4 51:12
82:20 103:7 107:4
188:2,5,10 243:8
**answered** 111:15
193:5

**answers** 192:25
193:18 199:9
214:25 286:5
**anybody** 9:2 10:3
12:25 37:13,16
46:24 47:15 63:13
77:20 87:22 116:1
122:1 125:24
131:14,15,21
135:17,20 157:3
160:20 164:5
165:19 180:6 192:8
192:11,12 193:20
197:8 201:22
202:17 206:15
208:24 209:6
216:11 225:12,23
248:18 266:15
280:18 282:22
**anymore** 143:3
207:11 211:6
**anyone's** 134:25
**anytime** 20:1,17
**anyway** 195:8
**apart** 182:7 251:19
**apocalypse** 245:21
247:10
**apologize** 7:17
123:4 180:11
**apology** 102:2
132:11
**apparently** 212:1
261:22
**appearances** 5:1
**appeared** 23:4
288:10
**appears** 282:25
**application** 2:4 16:6
22:1,3,6,7 23:9
**applied** 27:17 34:24
36:25 37:6
**apply** 30:9 36:16
37:9 169:13,13
**appointed** 25:1

**[approval - barron]**

**approval** 269:1,14
**approve** 195:18
  221:15,16 222:15
**approved** 222:23
  260:19 268:25
**approving** 195:19
  233:22
**approximately** 6:3
  64:1 151:8 152:11
**arbitrating** 148:23
**arbitration** 93:19
  108:3
**area** 42:13 161:10
  178:3 187:23
**areas** 98:7,11
**argument** 105:3
  139:15
**argumentative**
  103:18
**arm** 68:25
**arrangements**
  286:12
**arrest** 26:1
**arrested** 23:15,17
  23:18 24:12,18,25
  117:6,7
**arrests** 25:24
**arrive** 176:12 221:6
**arrived** 122:8 282:9
**article** 5:20
**asked** 24:15 29:1
  33:17 52:20 68:10
  102:2 107:5 111:17
  113:9 131:24
  145:21,23 149:8
  166:19 175:14,15
  175:17 189:24
  191:23 193:10
  199:11 200:11,25
  202:7 204:16
  210:22 216:8,13
  224:6 243:16
  284:17
**asking** 105:4 210:12

**asks** 23:9
**asleep** 263:5
**assembly** 18:25
**assigned** 228:1
**assistant** 116:23
  207:15 260:16
**assisted** 156:15
  276:6
**associate** 2:13 42:5
  43:22 44:15 46:12
  46:20 47:16 49:5
  60:18 65:18 85:24
  102:7 105:1 139:12
  185:8 218:6 228:4
  228:15
**associated** 71:8
**associates** 45:7,15
  46:2 213:15 222:12
  223:8,14 228:14,23
**assortment** 136:18
**assume** 8:16 16:20
  40:5 54:23,25 68:22
  85:6 118:1 200:21
**assumed** 60:17
  197:18
**assuming** 33:16
  63:10 109:4 138:10
  168:1 184:20
  234:13 248:24
  283:11
**assumption** 87:13
  272:6
**assure** 134:24
**atlanta** 1:2,17 5:8
  14:4,6,8 15:11 31:9
  31:21 142:5 167:13
  182:22
**attached** 271:15
**attempted** 61:9 64:3
  68:2,4 230:18 231:2
**attendance** 3:13,14
  109:10 227:22
**attendant** 159:13
**attention** 44:24 45:4
  59:25 75:5,7 152:2

152:9 193:9 239:21
  242:1 251:25
**attitude** 84:3 96:22
  98:13,18 183:15
**attorney** 25:10
  286:7
**attorneys** 101:15,20
  101:22
**authority** 73:21
  74:12,13 96:4,15
**authorized** 167:9
  168:7 265:21,24
**automatic** 89:20
**available** 31:16
  51:21 156:3 168:18
  169:15 175:19
**average** 270:15,20
  270:21 271:19
**averaged** 152:23
  172:5 270:22
**averaging** 272:3
**avoid** 43:6
**aware** 42:23 46:19
  75:2 82:8 84:24
  113:10,13 134:6,12
  159:3 162:21 212:4
  212:4 214:11 239:8
**awesome** 125:22

**b**

**b** 1:19 5:20 286:20
**babysitting** 283:20
**back** 14:25 22:23
  23:8 29:11 34:14,23
  35:8 36:15 52:23
  57:7,8 60:12 65:21
  71:4 76:19,22 83:10
  88:7 97:16 99:14
  102:4 104:2 114:14
  114:21 115:18
  116:4 117:4,19
  119:11 120:20,21
  120:25 121:1,2,4,21
  125:14 127:13
  130:24 132:14,16

132:25 136:10,21
  136:22 137:5,16
  144:13,14 146:1
  147:13 151:7,11
  154:1,4 156:25
  159:23 161:5,7,22
  167:2,3,20 172:4
  177:23 179:13
  183:7 189:15 190:6
  191:9 196:13 199:8
  199:22 200:24
  201:1 204:9 206:2
  207:12,12,21 209:3
  210:19 212:24
  222:1,3 224:10
  225:2 226:21
  227:11 233:3,14
  238:12 245:8
  246:16 248:13,15
  259:21 262:22
  268:9 270:5,22
  274:3 281:1,6
  282:20 284:16
  285:9
**backwards** 15:22
**bad** 15:6 122:15,19
  123:23 139:10
  140:22 164:1
  171:14 200:9
  234:16 264:24
**badge** 228:1
**bag** 116:17
**bail** 25:21,22,22
**bakery** 200:5
**ballgame** 189:9
**band** 45:22
**bankruptcy** 26:7
**bar** 33:4,6 79:9
**bargaining** 90:21
  92:15
**barron** 4:3 5:10 6:9
  6:12,12,20,22 21:20
  40:11 41:17 44:9
  47:3 49:2 54:13
  59:3,5 69:11,14,15

**[barron - budgeted]**

76:13,21 78:1 83:23
85:2 88:9 92:24
94:16 98:5 103:4
104:1 106:22 107:7
108:19,24 113:22
114:5,17 119:4,12
150:24 151:10,15
163:8 170:8 192:21
195:2 197:22,23
214:2 227:2,5,14
235:8 237:3 239:12
251:22 271:3,11
285:3,11,13
**base** 270:10 272:8
**based** 140:25 141:19
156:18 157:24
176:6,6 177:9 272:6
286:11
**baseline** 199:23
**basically** 18:10
37:22 55:2 74:22,23
95:19 100:16 102:1
128:10 135:18
138:2 142:24
164:24 187:12
195:20 197:11
223:10 235:2,18
247:21
**basis** 27:10 35:9
38:25 39:9 116:15
157:14 163:23
176:8 179:12
260:18
**bates** 2:6,9,17,18,20
2:22,25 3:5,15,17
3:19,20 110:14,18
110:18 112:2
114:23 133:16
140:1
**bathroom** 8:4
**bearing** 139:8
**beating** 238:15
**beautiful** 125:18
**beg** 261:14

**beginning** 6:5 95:18
112:2 114:15
227:12 249:6
278:19,22
**behalf** 5:2,9 89:21
95:25
**behave** 142:22
**belief** 95:20
**believe** 13:21 21:1
23:23 26:11 39:24
44:22 47:19 58:23
59:23 62:12 72:20
77:4 89:2,18 93:3
94:7 99:18 110:22
111:7 113:11
114:24 132:13
134:25 135:4 140:6
142:25 153:3
175:21 182:16
191:23 200:7 214:4
217:13,18 224:12
224:24 229:9 231:6
240:24 241:2,15
242:8 248:25 252:6
252:8 254:17
**believed** 77:5 89:16
96:6 117:22 193:14
214:19
**believing** 89:15
**belong** 24:22
**benefit** 84:8 132:6
160:16,16
**best** 7:15 8:15 64:25
101:12 125:11
126:17,19 139:20
139:20,23 175:21
191:8 194:3 209:13
209:16 211:1
230:13 244:4
259:24
**better** 67:1 141:18
142:6,8,19 143:5
144:16 171:21
185:8 231:7

**beyond** 188:21
257:14
**bi** 57:22
**big** 14:22 101:20
120:23 126:11
249:9 267:2
**bigger** 125:19
**bill** 187:12 188:2,2
**bit** 97:14 108:21
186:11 193:19
194:11 211:4 231:4
**bite** 159:23
**blah** 90:5,5,5,5
101:9,9,9 216:8,8,8
216:8
**blank** 194:22 201:21
**blind** 65:8
**blood** 43:4
**blown** 177:23
**board** 5:21
**bobby** 160:25
**bolts** 187:5
**bonuses** 126:17
140:16 143:6
**book** 227:17 228:20
**booklet** 49:7
**born** 10:19 65:13
**boss** 96:6,6,7,11,18
96:20 97:25 127:25
128:1 243:24
**boss's** 128:1
**bosses** 97:9
**bothered** 72:3 98:12
140:22
**bottles** 177:16
**bottom** 110:15
118:20 133:21
136:3 139:7 140:20
228:22
**bought** 116:14,17
118:17,22 239:2
**bowl** 111:15
**box** 60:7,8 282:4
**boxes** 85:17 275:15
279:21

**brag** 161:23
**braggett** 47:19
224:11,22
**branch** 31:25 32:6,7
257:14
**branches** 32:2
**break** 8:2,3 44:5,23
53:1 62:6,17 63:1,1
76:14 96:16,19
97:13 98:3 114:8
115:1 143:20
150:25 154:24
157:17 194:10
209:15 220:7 227:5
237:23,24 248:7
285:4
**breaks** 98:4 182:7
**brenda** 112:12
132:19
**brian** 269:22
**briefly** 101:23
**bring** 9:16 84:1
169:9 238:20
**bringing** 238:22
276:19
**broader** 257:13
**broke** 24:14 121:9
166:18
**brothers** 13:6,9,19
**brought** 51:4 64:11
71:21 74:1 75:5,6
75:14 137:24
**browning** 180:13
181:10 182:12
183:12 189:16,19
191:14 192:4,8,17
193:24,24 196:13
196:16 199:3 212:8
**bruce** 239:5
**budget** 160:10 166:8
168:20,22 174:13
175:18 176:18,21
185:5
**budgeted** 160:9
161:11 176:6

Page 5

**[budgeted - chicken]**

178:17,19
**budgeting** 176:15
177:5 178:4,11,22
**budgets** 178:6 262:2
**building** 272:13
**bulb** 232:2
**bullet** 45:5 46:2
227:24 228:13
**bullets** 45:1,14
**bunch** 101:18
244:14
**buried** 14:15,16
**business** 18:21
22:23 23:8 28:22
36:4 90:4 174:16,21
175:11,24 177:13
187:2 203:23
**busy** 111:16 127:16
189:9 230:9
**butt** 196:20 211:4
**butts** 177:21
**buy** 52:13 53:1 58:9
265:14
**buying** 52:4

**c**

**c** 6:1
**calculate** 258:18
**calendar** 153:17,17
**call** 19:1 60:4 77:9
90:2 91:20 102:15
132:25 149:9
162:25 172:9 186:8
187:11 188:2,3
192:24 200:14
205:18 206:16
207:15 218:16
219:15 221:13
222:17,22 261:1,4
266:20,24 267:8
279:3 283:7
**called** 16:18 18:16
31:25 42:23 75:15
88:25 89:8 102:21
102:22 104:25

112:21 159:11
187:14,15,18,20
189:4,14 219:18,20
240:14 247:14
262:1 267:4,15
268:4,11,15 269:5
283:9
**calls** 84:20 149:5
155:20 159:17
187:8 205:16 206:1
206:14 210:7
231:11
**cameras** 65:4
105:25 238:13
**cancer** 14:13,21
**candy** 46:25 79:9
**canned** 51:25
**cape** 112:13 113:11
113:12,13 132:19
**caps** 237:17
**captain** 31:25
**caption** 286:5
**car** 248:13
**carboni** 1:19 286:20
**card** 26:17 64:21
217:14,20 218:4,24
288:12
**cards** 143:20 257:2
**care** 53:8 80:15
81:21 125:13
127:25 129:13,14
149:4 153:25
160:21 183:20
203:15,16,18 205:5
206:3,24 209:14,15
216:17 226:13
232:7 244:25
262:18 263:2 266:2
266:3,5,22
**careful** 72:17,19
209:25
**careless** 82:18
**carolyn** 1:19 286:20
**carr** 113:11

**carrier** 32:8
**carriers** 32:7,12
**case** 6:22 25:4 80:19
110:5 140:3 152:20
164:8 220:10
277:21
**cases** 80:25 88:6
163:2 200:4
**cashier** 51:20 53:7
53:20 55:24 57:4,12
67:10 75:25 103:7
103:21 104:3,11,15
104:20 116:25
117:6 121:12,19
122:8 137:12
141:24
**cashier's** 103:20
**cashiers** 66:12
104:18
**casual** 81:16
**catch** 26:15 52:5
83:12,14 127:5
129:3 225:17 279:7
**caught** 79:16 80:2
80:18,20 141:1
142:15,23 222:6
229:25 237:24
256:23 284:25
**causes** 27:13 83:1
**ccr** 1:19 286:20
**ceiling** 200:6
**cent** 206:10
**center** 1:15 5:5
**cents** 48:19,20 187:5
206:7,8,11
**certain** 23:3 93:16
127:13 155:8
158:21 230:14
275:10
**certainly** 115:11
**certainty** 255:8,12
**certificate** 286:1
**certifications** 15:17
**certified** 149:6

**certify** 228:25 286:4
286:7
**chain** 182:18
**chains** 28:25
**challenge** 201:6
**chance** 135:1 201:18
**change** 55:20 96:4
100:7 125:12
178:11 206:8
217:11 227:3
246:15 273:1 287:4
**changed** 73:2 100:8
164:13 183:14
217:13
**changes** 186:23
287:1
**changing** 70:3
**charge** 96:7 103:7
204:2 221:10
**charged** 245:1,2,7
**charges** 25:11
**charts** 176:13
**chate** 212:10
**cheat** 143:3
**cheating** 141:7
143:5,5
**check** 37:12 71:11
84:4 216:6 229:17
229:21 231:8
237:18
**checked** 85:18
195:23 218:4 269:8
277:10
**checker** 19:2
**checks** 126:12
**chewed** 196:21
**chicken** 54:7 58:21
60:15 61:6,10,17
62:6,11,14,20,25
63:2,3,4,9,13,14
64:4,8,20 67:5
69:19,23 75:2 78:20
84:15 85:25 95:12
99:5,17 105:24
106:3 110:24

Veritext Legal Solutions
800-336-4000

**[chicken - compensation]**

111:24 115:8,14,19
116:5 117:21
135:19 238:18
240:20 251:12
252:14
**child** 15:8 23:20
24:16 25:12
**childcare** 283:25
**children** 11:22 13:2
13:4
**choice** 14:9 72:21
91:3,11 148:8,10
284:22
**choose** 36:16 94:22
108:8
**chose** 14:8 31:17
91:25 92:6,7,10,18
197:11
**christmas** 215:11,13
215:16 216:2,8
**cigarette** 137:13
224:23
**cigarettes** 47:21
**cincinnati** 142:5
143:2 167:13
**circumstances** 46:3
79:2 137:8 146:25
267:11
**city** 32:3
**civil** 1:5
**claim** 33:22 34:5
150:12 270:12
**claiming** 157:22
160:17
**claims** 32:22 34:16
**clarification** 205:9
**clark** 2:24 88:17
**clean** 83:7,9 273:13
**cleaning** 277:25
**clear** 34:24 42:2
95:22 121:7,7
138:22 219:2
245:11 246:20
**clerk** 222:2

**clients** 16:22 22:24
**clipboard** 221:5,8
221:19 222:19
235:15
**clipboards** 235:19
**clock** 98:3,4,12
157:7,23 158:1,5,11
158:16,19 170:18
172:18 182:2 192:5
193:21 194:1,12,20
197:9,14,17 198:2
198:14 199:3,13
203:2 210:18,19
211:23 213:24
215:1,19 216:9
217:6 218:3 219:3,6
219:10,16,17,19,25
220:7,7,12,16 221:8
222:20 223:15,19
223:23 224:3,9,10
225:13,19,25
226:24 228:5,16
229:12 230:8,14,16
230:19,23 231:2,18
233:10,11,20 234:7
234:10,11,15,20,24
234:25 243:11
244:15 245:7,15,25
246:1 248:9,19
249:1,5,19 250:1,8
250:11,19 251:8
254:13 256:8
258:17 280:24
284:9,12,18
**clocked** 198:13,17
218:3 219:5,21
230:12,18 232:11
244:7 263:3 282:15
**clocking** 217:10,20
220:17 222:3
**close** 56:3 285:4
**closed** 55:9,12,14,18
83:12 200:8 215:15
**closer** 152:23
262:23

**closing** 55:3 212:22
268:2
**clueless** 214:17
**coat** 63:2
**coca** 46:25
**code** 214:22 220:13
220:14,19 286:10
**coerce** 148:6
**coincide** 117:23
**coincidence** 263:9
**cola** 46:25
**cold** 60:15 61:10
**collective** 90:20
92:15
**college** 15:13 164:11
**colloquies** 286:5
**column** 271:18
**come** 14:6 42:14
53:16 57:5,7,13,25
65:21 71:1,10 72:16
81:22 91:12 95:13
115:18 120:21,25
121:1,2 126:20
137:5,16 141:24
143:21 154:4
156:24 159:23
165:9 167:20,21,23
169:21 177:20
178:14 179:22
183:21 187:15
188:11 189:5 200:8
201:23 202:15,22
205:19 207:20
208:24 210:15,17
215:19 216:1 218:1
220:2 221:10 222:5
224:9 225:21
226:24 230:8 240:6
244:14 246:13
247:19 260:22
275:22 277:18
279:15,19 280:14
280:21,24 281:1
282:5

**comes** 116:23 117:4
127:20 174:12
181:19 187:13,16
200:23 201:7,12
202:17 203:3
205:15 218:11,22
239:5 262:5,22
**coming** 57:7 164:3
167:14 183:10
198:8 212:18 213:8
214:5,6,7,8,10
222:2 225:18 232:6
268:3
**comment** 96:3
144:17 156:2
243:17
**commitment** 286:13
**committing** 135:2
194:25
**common** 97:24
140:18 203:12
**comp** 32:23 34:4,16
**company** 11:18
16:15 17:22 18:1,16
26:20 56:8 72:1,19
73:1 83:2,16 89:11
95:25 96:25 97:11
98:1,8 99:2 100:20
136:20,21 137:3
139:19,21,23
146:21 147:23
148:16 168:8 183:1
183:5 188:20
201:23 206:19
210:5 238:5,17
**company's** 97:4
**compare** 255:13
257:4
**compared** 61:4
177:11
**compensated**
193:14
**compensation**
286:11

**[complained - correct]**

**complained** 169:23
179:11 193:12
199:10 211:16,19
211:22 212:5,7,8
224:4,20
**complaint** 3:9
151:19 154:21
169:22 270:12
**complaints** 34:18
**complete** 52:10
67:24
**completely** 115:17
230:10
**compliance** 286:10
**complicated** 8:11
**compliment** 125:4
209:7
**complimentary**
125:25 126:3
**complimented**
209:7
**computer** 23:21
24:14,16,17,20,22
25:13,17 51:23 52:8
52:9 53:3,15 58:11
60:12,13 64:24 67:8
69:4,5 106:1,4,6
130:11 131:1
144:22 156:15
168:21 221:22
240:12 259:4 276:6
276:13 281:18
282:6
**computer's** 276:18
**computers** 51:21
53:6
**conceal** 118:1
**concern** 2:16 198:16
233:22 235:22
**concerned** 181:19
187:3,4 206:25
215:18 232:5
**concerning** 88:13
**concluded** 285:20

**concludes** 285:17
**condition** 200:21
265:5,10
**conditioned** 265:12
**conditions** 127:9
167:20
**confirm** 110:9,23
**confirmed** 61:4
**conflict** 185:12
186:10
**conflicting** 185:4
**confrontation**
123:21
**confronted** 63:17,20
165:23 215:4
**confused** 135:19
**consider** 97:11
243:23
**considerable** 265:8
**consideration**
168:23 288:15
**considered** 33:3
80:21 84:12 93:22
139:6 171:14
181:11 210:4
**consistent** 18:13
80:23
**conspiracy** 106:16
**constant** 156:24
**constantly** 178:7
274:18
**constitute** 89:24
**constitution** 31:9,22
**constructive** 2:21
84:20 85:9 86:21
**consume** 42:12 46:4
52:23 53:4 56:10
84:13 97:2
**consumed** 60:18
61:5 62:8 64:8 82:9
84:16 122:5
**consumes** 55:5
**consuming** 43:9
47:10 73:15 80:20
81:1 85:25 104:20

277:14
**consumption** 42:10
**contact** 89:6
**contacted** 31:14
149:9
**content** 173:12
**contest** 92:7,10
108:8
**continue** 76:20
114:16 151:9
227:13 285:10
**continued** 3:1
154:11
**contract** 90:21
286:11
**control** 2:19 78:8,11
261:6
**convenience** 36:18
36:19
**conversation** 100:11
100:16 120:19
144:14,21,23 156:7
157:21 170:5,10,11
170:16 171:5
189:16,18,22
191:15 192:3,7,11
193:23 198:5,6,7,20
198:25 204:22
209:22 210:11
216:7 218:25
234:18 247:6
263:13
**conversations**
145:16,19 163:9
199:2
**converted** 281:23
**convict** 117:15
**convicted** 23:10
**convinced** 48:16
197:3
**cooler** 83:8,11
156:25 209:4
273:13 274:11
275:1

**copied** 131:15,17
181:9
**copy** 40:4 41:22
49:4 131:24,25
145:21 151:19
**corely** 224:12,23
**corner** 133:22
**corporate** 167:12
194:16 228:10
258:5 266:9 271:8
**corporation** 1:7
**correct** 12:13 23:12
35:2,5 38:25 39:6,7
42:3,4 43:6,13,16
43:19,23 44:1,7
45:18 49:15 52:3
54:16 55:8,16 56:19
58:19,24 60:20
61:11,18,22 62:7,13
62:16 66:19 67:6,9
67:12,15,23 68:6
69:21 73:19 74:10
74:15 76:23 77:3,7
77:23 78:7,21 79:11
79:14,19,23 82:3,7
82:16 84:14,17
85:21 89:19 91:24
92:1,9,19 93:14,20
93:25 94:2,10 97:20
105:11 106:24
109:18,23 116:3
118:4,8,10,11,14
120:3,15 122:3,6,9
122:12 151:25
152:1 186:15,16,21
197:10 202:1
213:12,13 229:6
230:5,5 233:14
234:11 236:5,17,22
236:24 242:9 250:6
250:22 252:15,17
253:1,21 257:3,5
283:3,5 284:12
286:6 288:3

**[corrected - day]**

**corrected** 230:2
**correction** 31:5
**correctly** 39:25 46:9
  140:7 212:2 237:15
**cory** 53:11 120:17
**cost** 56:3 83:15,21
  117:18 169:10
**counsel** 5:1,23 6:7
  6:14 25:1 101:4
**count** 103:9 241:23
**counted** 126:5,9
**counting** 127:3
  128:23
**county** 26:3 286:2
  288:7
**couple** 34:2 44:25
  48:9 81:9,10 101:15
  101:22 110:8
  112:16 116:8
  125:15 133:22
  134:3 143:18
  155:16 202:22,24
  206:1 218:2 227:22
  230:6 238:22
  240:11 245:17
  260:23 263:4
  278:25 280:16
  281:1 282:10
  284:13
**course** 31:10 34:8
  59:13 98:10 125:22
  142:14 157:11
  162:16 163:14
  183:11 190:3,7
  209:2 215:15
  230:19 247:23
**court** 1:1 5:21,23
  6:15 7:17 8:20 25:4
  25:4 41:18 44:10
  49:3 59:6 69:11
  78:2 92:25 108:25
  113:23 117:8
  134:24 135:5
  151:16 286:13

**cover** 30:16
**covered** 208:8
**covering** 120:22
**cozen** 5:11
**crazy** 98:9 117:11
  129:11 166:17
  181:16
**create** 232:19
**creates** 233:14
**credit** 26:17
**credited** 241:16
**crew** 38:4,6 44:5
  47:14,15 53:14
  54:22 55:20 128:11
  129:10 161:25
  162:1,2,13 164:9,11
  164:23,24 166:13
  166:16 168:17
  175:2 186:12
  189:13 190:19
  199:17 211:4 216:4
  222:13 223:8,15
  230:10 231:7 260:4
  261:16 262:10,11
  262:18 263:24
  267:14 269:16,20
  269:23 282:22
**crews** 162:17 264:2
**crime** 23:10
**criminal** 27:14
  118:3,6
**criteria** 257:22
**criticize** 124:20
**criticized** 171:13
**criticizing** 171:9
**crossed** 97:25
**cry** 123:7
**cumming** 10:1 21:7
  24:3
**curious** 131:20
  150:17
**current** 9:25
**currently** 10:21
  29:15

**custody** 14:8
**customary** 92:3
**customer** 116:13
  127:20 141:18,23
  141:24,25 142:12
  142:13 265:13
**customers** 275:22
**cut** 34:3 161:5
  187:21 206:13
  271:19
**cv** 1:6
**cynthia** 204:22

**d**

**d** 5:3 6:1 12:9
**daggone** 188:6
**daily** 98:20 157:14
**dairies** 125:11
**dairy** 48:14,20
  49:21 50:7,12,15
  51:1,2,4 118:16,22
  119:20 125:8,20
  126:21 128:13,18
  129:2,5,6 156:10,23
  160:2,3,4,23 161:14
  170:24 183:20
  188:6 198:11
  204:11 205:14,20
  206:3,25 207:10,21
  208:21,23 209:1,1,3
  210:11,14 211:14
  217:20 218:1,2
  226:10,21 246:15
  273:11,12,13,17,19
  273:20,22 274:7,8
  274:20 275:4 277:4
  277:21,24 278:7,7
  278:17 279:4,10,10
  279:12,12,24
  280:11,13,18
**damages** 3:9 140:25
  200:6
**damn** 127:21 161:11
**daniel** 159:12
  170:15,21 173:7

  181:10,20,21
  246:12
**data** 271:15
**date** 6:4 23:19 24:4
  25:9 40:6 41:1
  54:24 93:6 112:8
  129:22 221:6
  240:20 241:1,1
**dated** 12:25 40:16
  41:21 88:15 130:3
**dates** 81:14 93:5
**dave** 259:19 260:13
  260:23 261:2
  266:15 269:21
**davenport** 88:25
  90:3 91:20 93:12
  94:24 95:22 101:3
  109:16 112:12
  131:23 145:21
  146:12 149:3
**david** 5:10 6:12,22
**day** 14:16 24:13
  28:2 35:7,23 36:14
  57:6 58:20 60:7,8
  61:19,21 68:15,18
  68:19 74:25 81:20
  86:18 87:2,12
  103:11 107:9
  123:15 127:11,14
  152:24 153:13
  155:5 156:12,17,17
  160:13,15,19
  175:10 177:19
  188:13 189:9
  190:20 191:6
  196:19,23 200:23
  215:11,13,16 216:2
  216:15 218:18
  220:22,23 221:3
  222:6 225:21
  226:13,18,20,20,24
  231:11 232:11
  233:2,4 239:23,24
  240:1,16 241:12,14
  241:15 246:3

Veritext Legal Solutions
800-336-4000

**[day - discipline]**

247:10,12 252:13
253:23 257:2
258:14,19 263:22
263:22 265:12
276:21,23,24 277:1
286:15 288:10,18
**days** 64:1,3 87:18
129:4 152:24 153:5
153:11,20 171:11
201:12 242:23
248:3,4,15 252:25
255:6 256:14
258:10 276:25
277:4,6 278:25
280:11 281:7,13
283:1,6,11,23
**daytime** 48:22 161:1
164:18 190:19
**dead** 238:15
**deadline** 150:6
**deal** 39:25 56:21
120:23 221:14
267:2 282:6
**dealing** 163:22
**dealt** 90:16
**death** 282:12
**debt** 26:17,22
**deceive** 65:11 239:9
**december** 199:10
**decent** 96:1
**decide** 22:22 257:16
257:22
**decided** 56:2 101:23
205:13 209:10
216:1 246:7,23
**deciding** 80:1
**decision** 95:20
267:10 269:4
**deck** 167:16
**dedicated** 161:8
**defend** 108:5
**defendant** 1:8 2:3
5:9 6:13 193:15
**defendant's** 21:19
40:10 41:16 44:8

49:1 54:12 59:2,4
77:24 85:1 88:8
92:23 94:15 108:23
113:21 151:14
192:20 227:10
235:7 237:2 239:11
251:21 271:10
**degree** 140:19
141:12
**deli** 47:10 52:5
60:14 80:20 187:8
187:10 200:5
225:20
**deliberate** 183:2
**deliberately** 136:25
**delivered** 32:5
254:19
**deliveries** 254:18
277:8
**delivery** 277:6
**denied** 193:15
**denney** 5:18
**denny** 12:9
**denying** 64:17
**department** 27:18
34:3 38:13 52:5
83:6,6 160:3,9
161:8 168:15 169:6
172:13 176:22,25
177:4 180:15,18,24
181:3 186:24 188:9
188:22 190:11,13
199:19,24 200:7
209:1 213:12
214:18 259:7,14,15
259:17
**departments** 183:8
186:24 188:24
**depend** 272:23
275:2
**depending** 258:4,5
274:3 281:3
**depends** 272:16
**deposed** 6:17 7:2
33:5

**deposition** 1:11 6:5
7:7 9:3,10 21:22
33:4 40:13 41:19
44:11 54:15 59:8
78:4 93:2 94:18
109:2 113:25
192:23 217:7 237:5
239:15 251:25
271:13 285:18,20
287:1
**depositionand**
288:2
**depression** 28:19
**described** 88:1,11
100:11 157:24
208:3
**describes** 86:2
**description** 2:2 3:2
288:12
**designated** 32:9
42:13 98:7 226:13
**designed** 48:21
**detail** 3:21 95:8,9
108:22
**details** 27:8 61:4
86:10
**determination** 87:9
**determine** 29:8 97:7
**determined** 182:23
**diagnosed** 14:23
**dialysis** 27:3
**die** 15:4 219:22
**died** 14:7,13,16
**difference** 52:7
82:17 99:3 104:19
104:24 120:4,12
168:14 256:16
**different** 17:4,21
28:24 62:1 68:16
72:13,16 81:23,25
84:3,6,10 99:5
100:14 101:25
104:22 105:2
108:14 120:19
123:15 136:19

142:17 150:3
162:17 163:15
194:18 212:13,13
241:8 256:18
257:25 263:18
272:11 283:23
**differentiate** 79:8
107:13
**differently** 143:3
**difficult** 79:17
105:16 107:14
**diminished** 22:24
**dinner** 85:25 86:1
**direct** 44:24 45:4
47:12 59:24 152:2,9
155:1 210:3 239:21
242:1 251:25
286:11
**directed** 152:12
154:21
**direction** 87:15
138:25 286:5
**directive** 54:20
97:18 266:9
**directly** 39:25 46:22
205:23 212:5,6,9
233:13 234:19
**disability** 29:19,20
29:23
**disagree** 252:7
**disappoint** 171:3
**disaster** 177:24
199:21 202:19
215:14 248:2
**discern** 105:17
**discharge** 46:14
138:2 238:1
**discharged** 138:6
**disciplinary** 46:13
55:6 91:14 137:4
163:5 238:1
**discipline** 78:23
80:1 85:12 92:7
108:9 162:25
192:18

Page 10

[disciplined - effect]

**disciplined** 46:19
82:11 107:23 145:5
179:21
**disciplining** 145:3
163:10 165:14
**disclosure** 5:22
**discourage** 101:10
**discovered** 142:9
**discovers** 234:1
**discrimination**
32:23 33:23 136:8
138:21,23
**discuss** 216:25
**discussed** 72:13
82:24 87:14 196:15
232:22
**discussing** 144:16
153:15 178:9
**discussion** 53:10,11
56:17 72:22 73:22
74:8,11 99:19
111:13 114:13,24
148:22 207:7
211:15 248:18
**discussions** 86:21
148:18 180:5,9
217:5
**dishonest** 223:1
239:9
**disk** 114:12,16
227:7,13
**dispute** 49:9 61:1,7
150:12 178:25
196:5,9
**disqualify** 286:9
**disregard** 85:18
**disrespect** 139:19
**disrespectful** 214:14
263:16
**distinction** 150:22
**distinguish** 102:24
**district** 1:1,1 25:10
159:5 160:6 180:7
225:9,11 266:12

**districts** 164:4
**divide** 272:9
**division** 1:2 182:22
261:24
**dixie** 12:11,13,15,17
17:15 19:7 22:17
27:20 31:8 32:4
34:1,15 37:23,24
38:8 42:21 116:9,13
117:11,19 127:24
164:15,19
**doctors** 15:1
**document** 2:14 3:14
3:17 78:4 85:3
237:21 288:12
**documents** 9:9,16
41:12 59:8 76:4
227:18
**dodson** 50:11 52:12
53:9 56:17 64:25
66:15 67:13,19
70:16 71:21 72:6,12
72:23 73:4,21 74:9
74:12,19 75:5,7,14
77:2,6,9,21 80:6
81:9 86:13 89:23
96:3 109:16 115:16
120:17 122:14,15
122:16,21 123:13
123:16,19,24 128:5
128:20 136:21
144:10 152:11
154:21 155:1,3
157:22 159:10
160:13 169:24,25
170:17 171:3,3
172:21 175:15
179:10,14 182:14
191:9,21 192:4,8
194:20 205:8,12
206:4 212:9 215:17
231:10,11 232:7
233:5,8,9,21,25
234:7 238:8 240:9
243:18 247:7

249:23 257:24
261:1,21 263:6,14
266:21 267:16
269:1,6,8 270:6,13
284:16
**dodson's** 65:20 70:8
75:14 123:3
**dog** 116:17,25 117:7
117:10
**doing** 7:23 17:8,13
18:9,11 22:22 28:6
50:7 51:25 70:25
71:9,24 77:12 81:23
90:4 101:21 103:22
125:5,13,13 128:6
137:14 142:9,23
160:8,17 162:13
163:1,2 171:7,23
176:18 183:16
194:3 198:23 203:4
203:24 204:16
216:6 249:20
258:22 263:1,7
272:5 273:17,20,22
274:9 278:10
284:15
**dollar** 79:4
**dollars** 31:15 173:24
176:24 187:5
**door** 19:23 37:10
58:3,3,5 115:20
116:23,24 127:4
163:21 164:3
166:25 282:20
**doors** 71:3,4
**doris** 12:7
**double** 215:20
264:15,17,18 277:4
**doubt** 121:2 147:14
164:10,12,14
**doubts** 134:7
**downstairs** 115:19
240:12
**draft** 68:10,15
130:17

**drafts** 130:13 131:4
**drag** 90:8
**drink** 43:9
**drive** 10:1 248:13
**drives** 98:9
**dropped** 25:11
**drove** 18:25 129:10
166:17 181:15
**drug** 12:18 169:12
169:14 209:11,12
**ducks** 211:3
**due** 146:7
**duly** 6:17
**dumb** 35:6
**duties** 129:6
**duty** 137:19,25
212:23 282:11

**e**

**e** 6:1,1 11:14 12:9
137:13 172:9,10
282:2,6
**earlier** 26:11 78:14
93:15 171:2 185:7
226:11 232:5
245:17 258:7
259:21 270:6
**early** 28:23 29:12
57:12 58:5 169:23
202:23 222:3 230:8
254:21 275:4
**earn** 2:12
**earned** 146:7
**earnings** 239:16
**easier** 11:1 15:21
**easily** 107:12
**eat** 44:5
**eating** 80:7
**edge** 175:23
**edit** 276:17
**edits** 130:18
**education** 15:13
**eeoc** 150:4
**effect** 198:12

[effective - explained]

| | | | |
|---|---|---|---|
| **effective** 2:6,9 56:3 | 201:18 221:18 | **established** 85:18 | **exception** 105:21 |
| **effectively** 138:5 | 222:10 241:21 | **estimate** 81:4 | 262:13 |
| **efficiency** 186:9 | 286:7 | **estimating** 31:13 | **excessive** 93:9 97:24 |
| **efficient** 161:17,19 | **employee's** 86:13 | **estranged** 243:25 | **excuse** 11:18 66:25 |
| 186:19 | 97:4 | **ethical** 97:8 141:15 | 69:8 |
| **effort** 236:19 | **employees** 3:17,18 | 146:6 | **executed** 288:14 |
| **eggs** 280:20,22 | 18:5 42:18 43:25 | **ethics** 141:12 142:21 | **exempt** 38:24 39:5 |
| 281:3 | 46:19 47:14 57:21 | 147:24 286:10 | **exhausted** 66:22 |
| **eight** 12:3 83:15 | 75:20 79:3 81:1,15 | **evaluating** 182:21 | **exhibit** 2:2,4,5,8,11 |
| 152:13 154:23 | 81:23,25 88:6 92:3 | **evening** 81:18 273:9 | 2:13,14,16,18,19,21 |
| 155:17,22 172:18 | 107:23 124:20 | 280:13 | 2:23,25 3:2,3,5,7,9 |
| 187:22 201:11 | 136:2,9 142:11 | **event** 150:14 247:4 | 3:10,12,14,16,18,20 |
| 245:24 253:4,6,12 | 143:19 146:17,24 | 249:9 263:22 | 3:21,22 21:19,22 |
| 253:15,17,17,19,19 | 147:5 163:15 | **events** 266:6 | 40:10,13 41:16,19 |
| 258:2,14 261:22 | 165:15 168:24 | **eventually** 100:1,3 | 42:3 44:8,11 46:12 |
| 270:13 271:6 272:4 | 169:3 182:25 187:3 | **everybody** 13:21 | 49:1,4 54:12,15,18 |
| **either** 103:24 | 187:11 201:25 | 65:14 162:17 | 59:2,4,7,15,25 68:8 |
| 123:24 178:8,10 | 237:11 269:25 | 167:15 169:9 | 77:24 78:3 85:1,4 |
| 181:8,8 182:24 | 270:6 273:18 275:2 | 182:20 233:15 | 85:16 88:8,10,10,23 |
| 193:13 246:14,14 | **employment** 2:4 | 246:25 276:3 | 92:23 93:1 94:15,18 |
| **eligible** 39:2,6 | 11:15 15:21 18:14 | **everything's** 52:3 | 108:23 109:1,14 |
| **eliminate** 173:18 | 22:14 28:10 31:7 | 188:14 | 110:17 113:21,24 |
| **email** 159:12,14 | 37:14 88:13 217:11 | **evidence** 64:12 | 114:21 129:19 |
| 170:14 171:15 | 242:4,23 | 106:8 256:5 286:6 | 151:14,17 152:3 |
| 172:16 173:7,10,15 | **empty** 177:19 | **evil** 139:5 160:18 | 192:20,23 227:20 |
| 180:6 181:9,20 | 280:22 | **exact** 255:1 | 235:2,7,9,13 237:2 |
| 189:19 192:9,12 | **ended** 100:5 208:20 | **exactly** 117:24 | 237:5 239:11,14 |
| 271:16 | **enforce** 43:21 80:24 | 196:15 202:13 | 242:2 251:21,24 |
| **embarrassed** 143:1 | 92:18 | 231:17 251:4 | 271:10,13 |
| **emergencies** 175:9 | **enforced** 98:9 | 254:15 261:23 | **exhibits** 2:1 3:1 |
| **emergency** 246:24 | **enforcing** 98:14 | **examination** 4:1,2 | 227:10,16,16 |
| **employed** 35:3 | **enjoying** 122:14 | 6:19 | **exit** 21:7 |
| **employee** 2:14 | **enormous** 274:13 | **examined** 6:17 | **expect** 155:6,10,14 |
| 31:10 40:4 43:8,11 | **enter** 29:5,7 221:11 | **example** 44:4 75:4 | 156:5 167:3 |
| 64:21 71:22 79:15 | **entire** 39:4 50:25 | 82:22 98:2 158:24 | **expected** 175:20 |
| 80:6 82:9 83:5,19 | 100:16 172:13 | 160:11 161:16 | **experience** 29:2,5 |
| 84:7,12 89:18 96:17 | 229:7 276:10 | 168:19 177:15 | 37:22 79:21 127:25 |
| 97:7 98:17 108:13 | **entitled** 2:14 146:18 | 190:25 254:20 | 274:5 |
| 108:14 116:19 | 227:21 | 255:20 260:10 | **experienced** 264:11 |
| 136:11,23 138:5 | **entry** 29:1,6 242:7 | 265:4 272:25 | **expert** 90:24 |
| 139:6,10,10 147:16 | **error** 236:21 | 282:23 | **explain** 64:25 87:22 |
| 160:25 162:22 | **especially** 174:21 | **examples** 116:8 | 218:23 |
| 163:25 171:10,14 | **esquire** 5:3,10 | 125:7 | **explained** 95:8 |
| 172:13 187:12,15 | **essence** 183:4 | **exasperated** 173:7 | 226:11 262:11 |
| 191:3,5 199:23 | | | |

**[explicitly - fix]**

**explicitly**  157:25
158:4,6 214:24
**express**  123:11
**expressed**  288:16
**extra**  129:8 168:1,15
168:16,23 183:3,23
184:1,3,5 187:22
196:7 203:11 260:1
**extraordinary**
183:18
**extreme**  263:21
**eyes**  139:6

**f**

**face**  123:22
**fact**  38:14 61:21
66:3 79:7 82:4
89:21 104:13 123:1
124:22 140:25
147:20,22 148:6
150:19 153:10
158:19,23 160:24
161:9 164:23 167:6
174:25 186:1
193:13 194:25
198:18 213:19
234:20 248:19
264:6 269:5 270:16
281:12
**factor**  179:6
**fail**  106:5 107:3
169:14
**failed**  58:11 66:6
67:20 73:17 85:24
95:13 106:4
**fair**  37:11,15 39:4
42:17,20 50:4 52:25
90:18 102:23 113:6
128:4 129:23
146:22 165:25
168:11 243:7 247:8
273:17,25
**fall**  140:5 144:8
167:2 182:13 278:7

**fallen**  251:19
**falls**  182:7
**familiar**  22:2 85:8
86:24 107:18 140:8
186:25 219:13,14
227:18
**family**  12:22 13:14
**fan**  39:22 101:20
**far**  21:1,8 28:21
29:13 82:5 109:25
110:1 126:19 134:4
140:16 153:24
156:8 161:23
206:24 214:22
223:16 272:24
274:8 283:20
**fast**  8:12 162:18
167:21 274:2
**faster**  162:23 163:5
276:15
**fat**  175:25
**fault**  97:4 169:1
230:7
**favor**  89:11
**fear**  134:8 164:1
**february**  24:7 30:12
30:23 55:12 58:23
60:16 85:23 88:15
113:16 123:3
133:23 147:12
149:14,18 151:24
153:4 169:23
239:25 242:8,17
245:12 252:2 255:6
255:7
**federal**  228:13
**feel**  36:3 78:19 93:8
122:15,19 125:2
132:4 135:9 139:18
194:6
**feeling**  96:22 123:19
**feet**  200:3,3
**felix**  182:16
**fell**  278:1

**felt**  78:22 82:14
95:16 120:1,10
128:5 139:22 171:7
173:6 175:18
181:13,14,17 183:1
230:5 259:25
284:22
**field**  273:1
**fight**  33:5,9 166:6
**figure**  107:15
171:21 176:5
**figured**  197:5
**file**  1:5 83:22 89:19
91:2,3 107:23
150:15
**filed**  6:25 26:7,10
32:19 33:22 34:5,18
107:22 149:18
151:24
**files**  145:11
**fill**  22:4 34:9 141:25
142:1,12,13 143:11
143:21 273:13
281:2,2
**filled**  280:20
**final**  131:1
**finally**  48:16 133:1
150:16 210:12
211:5 220:4 222:6
**financially**  286:8
**find**  165:2,5,8
167:12 225:10
**finding**  128:21
**fine**  36:6 52:19 54:1
90:15 166:10
180:12 195:24
207:24
**finger**  220:2
**fingerprint**  217:15
217:17 219:18,25
220:5,11
**finish**  7:11,15 37:2
43:24 62:11 69:9
156:12,16,20,22
190:5 237:12

273:12 274:21
284:14,18
**finished**  14:4 284:17
**fire**  96:8,8 104:11
147:11 181:15
281:4
**fired**  46:24 47:9,19
47:20 72:18 80:14
80:18,22 103:20,23
103:23 104:3
133:23 145:13
179:15,18 218:13
224:23 234:3
243:19 244:2 285:1
**fires**  117:6
**firm**  5:4 286:22
**first**  6:17 11:24 13:2
28:18 55:21 64:20
69:9 74:3,8 89:24
90:8 93:21 96:5
100:15 104:12
105:12 110:23
113:8,17 123:1
125:9 127:1,20
138:2 139:24
148:10 155:16,18
159:25 171:4
199:15 200:10
204:3 209:7 210:24
218:22 227:20,24
233:17 243:10
251:15 262:24
265:19 272:24
273:11
**firsthand**  224:8
**fit**  117:9 202:18
244:3 263:10
**fitness**  20:1,17
**five**  87:17 129:4
155:5 169:12 196:8
203:19 216:23
262:19 277:4
278:23
**fix**  159:16 167:16
201:4 203:17 279:4

Veritext Legal Solutions
800-336-4000

**[fixed - give]**

**fixed** 183:21 200:22
  204:8 207:1
**fixtures** 18:23
**flat** 270:8
**floor** 80:7 83:8,9
  105:25 137:14,15
  216:4 275:13,16
  279:20,21
**florida** 13:21,22
**flsa** 151:1
**focus** 58:20
**folks** 109:9 184:14
**follow** 57:23 67:22
  97:19 136:24
  199:13 220:8
**followed** 68:5 93:18
  230:13
**following** 63:22 73:1
  90:14 97:1 117:19
  211:24 259:3
**follows** 6:18
**food** 43:9 46:25
  52:23 56:10 73:15
  104:20 116:17,25
  117:7,11 128:14
  199:22 200:4,12
  217:23
**foot** 200:2
**footage** 61:3 176:7
  177:10,11 179:7
**forced** 50:22 136:22
  148:10
**foregoing** 286:4
  288:1,13
**forever** 90:8
**forget** 233:10
  234:10,15
**forgetting** 114:25
  234:23
**forgot** 65:21 69:23
  79:15,16 83:10
  106:19 115:7,18
  172:8 220:25 221:3
  222:13,20 230:11

**forgotten** 233:17
**forklift** 18:25
**form** 2:25 47:2
  82:19 85:8,12 93:3
  97:23 103:3,17
  106:21 107:1
  108:18 143:12,12
  183:4 195:1 213:25
**forsyth** 26:4,5
**fort** 286:24
**forth** 90:22 235:3
**forthcoming** 134:8
**fortune** 117:19
**forward** 25:5,6
  35:21 89:6 100:24
  101:17 106:7
  146:13 183:6
  214:10
**found** 24:16 63:11
  83:15 87:11 135:16
  141:15 143:2
  145:14 225:9
**four** 55:4 57:19
  60:15 61:10 64:1,3
  81:6 85:25 153:20
  163:2 169:12,13
  203:19,20 207:22
  216:20 217:19
  222:5 248:3,15
  253:18 258:4
  264:18,25 271:6
  277:6,18 278:23
**fourth** 141:12
  228:22
**fraud** 194:25
**fraudulent** 143:12
**fred** 163:3
**fred's** 163:2
**free** 80:20
**freezer** 199:21,25
  200:2,3,20 201:9
  202:18,23,24 203:9
  203:18,25 204:7
**freezes** 52:10

**fresalone** 53:13
  120:18 212:11
**fresh** 277:16
**friction** 186:18
**friday** 66:21 241:5,6
  244:11 245:9
**fridays** 277:3
**fridge** 111:14,24
**friend** 181:11,12,25
  243:24
**friendly** 171:6
**friends** 124:10
**front** 37:10 64:19,24
  65:1,14 105:25
  116:20 129:20
  144:15 210:19
  221:22 265:6
  277:20
**frozen** 128:14
  199:18,22 200:4,5
  200:12,23,25
  201:12 205:15
  217:23 218:7,10
**frustrated** 173:5
  191:16 246:11
**full** 9:19 39:9,11
  45:6 136:11 161:13
  163:13 169:6
  187:24 201:23,25
  202:2 204:15,15,17
  243:1
**fully** 86:10
**fulton** 286:2
**fun** 35:14
**fund** 31:15
**funds** 24:25
**furious** 207:6
**furniture** 11:18
**further** 111:6,21
  130:1 286:7
**future** 28:21

| g |
|---|

**g** 6:1

**gain** 84:7 148:9
**game** 107:8 187:19
  202:13
**garnished** 26:14,16
**gather** 33:12
**geiser** 260:10
  272:11 282:23,24
  283:12,16,18 284:8
**gel** 157:5
**general** 101:16
  135:4 163:18
  201:17 273:5
**generally** 27:7,10
  42:15 85:8 169:2
  189:11 260:7 268:1
  272:23
**generate** 127:12
**generated** 60:11
  168:21 226:12
**generates** 156:18
**gentleman** 182:11
**george** 163:1
**georgia** 1:1,17 5:8
  5:21 10:1 17:7
  286:2
**getting** 23:5 29:4
  34:3 72:18 84:19
  86:17 124:20 126:9
  162:8 169:24
  171:12 185:24
  186:13 196:20
  204:19 208:5
  210:11 213:2,19
  232:23 234:15
  244:20,21 249:16
  261:5 263:11
**gist** 235:18
**give** 102:4 124:12
  125:7 126:20
  133:15 146:2
  147:12 148:2 161:7
  170:25 178:16
  186:6 220:11
  236:10 246:15
  251:19 264:4

**[given - grocery]**

| | | | |
|---|---|---|---|
| **given** 54:21,21 55:1 | 273:12 274:18 | 175:21 176:1 | 209:8 211:10 |
| 89:1,2 91:22 92:7 | 277:22 279:4 | 179:15,18 181:15 | 231:19 |
| 121:15,25 160:10 | **goal** 274:20 | 182:4 183:5,6,10 | **grades** 126:19 |
| 162:6 175:10,11 | **goals** 126:16 | 187:4 188:5,6,12,14 | **graduated** 15:11 |
| 178:12 286:6 | **god** 213:1 233:7 | 188:15 190:3,5 | **graff** 217:23 |
| 288:17 | **goes** 52:25 71:16 | 191:9 192:1 194:7 | **grand** 244:22 |
| **giving** 33:3 98:1 | 91:8,8,10,15 95:3 | 196:23 199:8 201:1 | **granted** 166:19 |
| 141:11 146:10 | 102:15 117:2 | 201:8,24 202:2,9 | **great** 7:23 95:8,9 |
| **gm** 12:18 209:11,12 | 125:19 127:3 137:3 | 206:11,13 207:18 | 106:17 122:18 |
| **go** 6:9 7:6 8:3 11:1 | 155:6,8,10,12,14,20 | 209:13,15,16,17,19 | 124:9 139:6 142:9 |
| 14:3 19:7,22,25 | 155:25 156:4 | 209:22 210:2,10 | 142:14 208:23 |
| 20:6,13 22:23 23:7 | 159:22 160:5 | 214:11 216:12 | 209:23 |
| 24:12 25:9 29:11 | 171:19 180:3 182:3 | 218:13,16,23,24 | **grievance** 2:25 |
| 34:23 35:20,24 36:1 | 189:24 190:7 | 222:3 224:10 225:7 | 59:21 89:7,19,25 |
| 36:15 37:11 40:1 | 198:13,22 201:3,7,8 | 226:3,6,19 227:3 | 90:2,18 91:2,4 |
| 45:14 60:12 68:7 | 202:7,15,17 203:1 | 232:17,18 233:8 | 92:11 93:3,6,7,19 |
| 73:4 80:13 82:20 | 205:20 206:1,24 | 234:2 236:11 | 100:14,25 107:22 |
| 87:15 90:1,10,11,11 | 214:22 218:21 | 243:18 244:2,2,4,15 | 107:24 133:9 138:9 |
| 91:19 96:14 98:19 | 231:1,9,21 233:5,9 | 244:17 245:19,20 | 138:13 148:23 |
| 100:17,24 101:4,17 | 233:25 247:21 | 246:13 249:3,25 | **groceries** 116:14,21 |
| 106:7 108:22 | 262:6 277:20 278:3 | 252:9,16 254:17 | 118:17,23 |
| 113:19 114:7,21 | **going** 7:5,8,8,9 8:16 | 258:5 259:21,23 | **grocery** 13:17 22:23 |
| 116:24 117:8 123:9 | 25:3,6 26:15 35:8 | 265:10,10,13 | 23:8 28:22,25 29:2 |
| 125:18 129:3 | 37:3 43:8 44:5 | 267:10 270:10 | 36:4 38:11 43:2,6 |
| 130:24 133:18 | 48:23 49:12 51:14 | 275:24 279:21 | 43:18,20 47:18,20 |
| 143:20 150:5 | 52:1,2 53:21,22 | 281:5,6 283:20 | 48:2,5,7,10,10 |
| 153:24 154:1,4 | 54:2,4,9 65:8 66:11 | **gold's** 17:4 24:1,2 | 49:25 50:6,10,14 |
| 155:24 157:20 | 66:15 72:10,18,24 | **golf** 19:17 | 51:1 61:5 65:6 67:1 |
| 163:3 164:4 167:15 | 76:14 83:7 87:15 | **good** 6:21 98:17 | 79:13 83:13 126:2,3 |
| 171:18,18 172:4 | 89:6 90:9,10 101:1 | 117:5 122:17 124:6 | 126:4,25 127:2 |
| 176:13 177:8 | 101:4,4,7,8,11 | 125:23 128:8,12,13 | 128:4,10,15 129:5 |
| 179:13 180:2 181:7 | 106:3 107:3,15 | 130:4 133:7 139:4 | 129:12 137:25 |
| 183:6 186:11 187:9 | 110:7,14,17 112:25 | 139:10 144:18 | 153:2 155:4,10,16 |
| 189:15 194:17 | 113:19 114:7 123:7 | 151:1 161:23 | 156:5,9 160:9,10,14 |
| 196:1,13 198:17 | 123:25 127:21 | 162:13,18 175:11 | 161:10 169:5 |
| 199:22 201:15 | 129:6 132:5,6 | 175:22 177:22 | 174:21 176:22 |
| 202:23 206:4,9 | 133:15 134:24 | 181:17 184:23 | 180:14,14,24 181:5 |
| 207:12,16 210:19 | 135:1 136:1 139:1 | 185:1 187:14 | 183:19 186:19 |
| 210:19 221:11 | 140:19 142:5,6,6,10 | 189:13 190:2 | 188:7,16 199:17,25 |
| 224:9,10 226:8 | 143:2 144:18 146:3 | 191:18 200:13 | 203:22 210:8,13,14 |
| 229:10 231:15 | 147:11 148:1 149:4 | 211:4 214:6 217:19 | 210:15,22,24 |
| 232:18 233:3,14 | 149:8 150:11,24 | 232:10 268:9 270:7 | 213:11 214:17,21 |
| 238:8,12 244:15,24 | 159:23 163:20 | **goods** 52:1 | 215:11,12 216:3 |
| 246:7 248:7 257:1 | 170:20,22,25 | **gotten** 174:7 181:20 | 224:2,14,15,25 |
| 265:6 270:5 273:3 | 172:17 173:18 | 200:16 208:13 | 225:1,5 244:23 |

[grocery - horrible]

262:14 263:11
273:6,15 274:23
275:6
**grow** 13:24
**guarantee** 226:19
**guaranteed** 52:3
**guess** 11:1 33:2,3
34:4 171:16 215:11
**guessing** 23:18
31:13 255:16,17
**guidelines** 155:15
**guy** 132:20 210:25
**guys** 77:13 121:1
**gym** 16:10 17:2,4
19:17,19,22,25 23:3
23:25 24:1,2 35:9
**gyms** 17:4

**h**

**habits** 219:22
**half** 25:8 36:21
49:17 172:6 174:18
226:22 242:17
243:23 245:13
247:24 250:4 253:2
253:4,16,17 263:7
265:5 270:11 283:6
**hand** 80:19 99:15
110:15 133:21
141:25 237:4
277:19 288:17
**handed** 21:21 41:18
44:10 49:4 54:14
59:7 78:2 92:25
94:17 109:1 113:23
151:16 239:13
251:24
**handing** 40:12
192:22 227:15
271:12
**handle** 50:20 231:10
**handled** 115:8 116:5
**handles** 230:21
**handwritten** 3:3,5

**hang** 31:4
**happen** 36:10 57:18
57:22 90:9 141:5
167:18 170:19
175:9 177:14 187:7
188:4 191:20 234:5
245:19 279:1
**happened** 14:12
24:11,13,24 36:12
50:19 52:11 53:18
57:19 58:6 62:23
63:9,17,19,25 64:11
67:2,2 71:14 75:8
81:5,8,17 84:5
87:17 90:8 95:4,8
116:16 119:6,23
123:1,12 138:13
145:15 167:10
183:12 187:24
189:6,12 204:7
208:3,5 210:6,20
211:14 212:13,14
215:8 221:4 223:3
226:9 231:16 234:2
240:21 247:9,10
251:12 252:14
257:7 259:19
261:11,18,23 263:1
267:5,6 269:18
273:4
**happening** 36:11
**happens** 36:13
52:13 104:9 105:14
105:15 110:25
188:1,4 264:6
266:14
**happy** 8:3 183:24
187:19 216:7
217:24
**harassment** 33:23
**hard** 79:21 101:10
165:2,5,6,8,13
178:2 205:11
210:16 219:22
282:3

**harder** 129:9
**harris** 1:15 5:6
**hart** 224:13 225:4
**hate** 66:21
**hated** 123:20 171:3
**he'll** 203:18
**head** 7:25 105:9
**health** 26:20,24
200:7
**hear** 47:7,8,9 75:19
95:4,4 101:2 132:16
145:14
**heard** 42:5 83:18
96:5 125:10 132:13
140:12,13 146:14
147:2 189:1,3 209:5
218:25
**hearing** 89:7,25
100:14 101:1,14
**hearsay** 46:22 47:4
75:10
**heart** 106:10
**heck** 213:19 250:9
263:6
**heck's** 201:1
**heinz** 177:17 190:25
**held** 282:14
**hell** 96:9 182:6
203:3 215:14
**help** 8:15 69:11
124:25 156:3 157:3
187:16 189:25
190:11,20 206:18
246:15 261:16
280:24
**hey** 121:1 196:7
203:24 268:20
**hid** 117:25
**hide** 160:25 238:16
239:10
**high** 14:3,4,5 15:10
18:15 19:6 143:9
182:18
**higher** 172:16 174:6
179:11 185:9 272:4

**highest** 159:4,4,5
**hire** 96:8 149:10,20
169:7
**hired** 38:14,17,24
39:8 40:3 41:11
49:13 51:3 78:5
149:12 164:3 169:3
169:4 199:20
201:19 202:4
214:16 237:9
273:18
**hiring** 37:17,19
201:22
**hissy** 117:8
**history** 3:21 22:14
27:14 49:12 239:16
239:18 251:18
**hit** 246:5,6,7
**hitting** 220:20
**hobbies** 19:16 21:16
**hog** 185:14
**hold** 25:7 191:5
197:20
**holes** 276:12
**holiday** 215:21
**holidays** 167:25
168:2,5,6,16
**hollered** 128:3
**home** 16:9 63:7
88:20 115:20 130:9
171:18,18 180:2
205:16 222:4
232:12 238:23
248:13 263:3,12
281:1
**honest** 69:17 82:15
82:18 83:19 141:1
148:7
**honestly** 8:25
105:19
**honesty** 147:24
**hopefully** 7:10
**hoping** 132:7
**horrible** 130:19

Page 16

**[horse - interrogatories]**

**horse** 143:9 238:16
**hotchkins** 81:12
212:11 215:9 216:6
**hour** 19:23 22:20
29:12 55:22 70:10
76:14 111:16
150:12 163:2,19
166:21 172:10
176:23 178:13
201:11,17 205:24
226:22 242:12
245:18 246:1 248:4
263:5
**hourly** 38:21,24
165:14 228:14,23
**hours** 20:4 25:19
66:20 83:15 125:16
129:5 152:4,11,12
152:13,21,23,24
154:3,4,8,22,23
155:2,13,17,22
156:3 157:16
159:20 160:3,11,13
160:22,23 161:7,10
161:12,13 166:9
167:1 168:15,16,20
168:24,25 169:16
169:25 170:2,3,25
172:6,7,18 173:22
175:19,25 176:5
177:6 178:19
183:23 187:18,22
187:24 190:2
191:19 192:1
195:24,25 196:8,19
197:6 199:24 202:6
202:7,23,24 203:1,7
203:11,19,20 204:9
204:11,14,19
206:25 207:25
209:14 211:23
212:7 218:2 222:5
224:5 225:7 232:16
232:16,21 233:24
236:23 237:19

241:16 242:13,17
243:11,16 244:9
245:13,16,24 246:3
246:16,18,23 248:6
248:22 250:5,9,16
250:21 251:3
252:25 253:24
254:3 255:1 258:8,9
258:12,13,14,14
259:20 261:22
263:4 270:13,23
271:9,21 281:1
**house** 10:7
**houston** 5:14
**hr** 88:17
**hua** 207:14 222:22
230:21 231:24
232:8,21 233:19
**hug** 124:17,20
**huge** 200:3 274:8
**hugger** 124:14
**hugs** 124:12
**huh** 7:24,24 51:10
**human** 112:21
132:18
**humiliated** 143:1
**hung** 247:22
**hurry** 163:19
**hurt** 122:21
**hypothetical** 136:14
136:16

**i**

**ibl** 16:4
**idea** 84:22 92:5
133:8 138:25
144:13 145:4 190:2
205:17 209:22
216:19 222:4,7,9
224:18 245:19
**identification**
217:15
**identifies** 64:23
**identify** 6:7

**identifying** 193:11
**identity** 288:12
**idiot** 103:9
**imagine** 105:14,15
165:13 264:10
**immediately** 16:1
33:8 36:2 63:21
**impacts** 286:13
**impartial** 95:19
286:13
**impartiality** 286:10
**implicate** 72:25
**implied** 181:21
**imply** 178:9
**importance** 78:11
**important** 3:16 7:22
43:2,11 78:15 82:25
127:17 142:4
155:12 157:11
167:13 274:23
**impossible** 161:11
**impressed** 124:21
**inaccurate** 229:5
**incident** 54:7 63:17
63:19 82:24 86:2
113:16 122:20
218:19 230:7
240:21 251:12
252:14 261:17
**incidents** 230:6
**included** 278:2
**including** 46:14
238:1 246:25
**income** 29:8 30:11
30:18
**incorporated** 16:16
128:15
**incorrect** 62:22
**incredibly** 162:18
**index** 2:1 3:1 4:1
**individual** 123:16
**industry** 13:17
**information** 3:16
**informed** 86:10
193:12 228:11

**initials** 16:20 222:21
**injured** 33:25 34:9
**injury** 34:12
**inquired** 201:20
**inquiry** 236:4,7
**inserts** 32:4
**inside** 199:25
**insist** 163:4
**instigated** 230:7
**instinct** 202:11
**instruct** 194:21
197:14
**instructed** 284:8
**instructing** 158:15
**instruction** 158:19
**instructions** 144:12
223:7
**instrument** 288:14
**insurance** 23:7
26:20
**intend** 105:20
**intended** 103:1
117:10
**intent** 65:11,15
78:19 80:1 83:2,20
83:20 95:9 105:6,18
105:24 106:9
115:15,18,22 117:9
117:16,17,22 118:2
244:13
**intention** 69:22
**intentional** 137:1
**intentionally** 136:25
**intentions** 139:4,19
191:24
**interest** 139:21
286:9
**interested** 286:8
**interesting** 15:3
**interests** 139:23
**interfere** 8:24
**interpreted** 158:14
**interpreting** 158:18
**interrogatories** 3:11
208:4,10

**[interrogatory - know]**

**interrogatory**
192:24 193:10
199:9 214:25
**interrupting**  180:11
**interviewing**  135:8
**inventory**  2:19 43:1
63:11 78:8,11 83:21
**investigating**  234:1
**investigation**  87:8
**investigations**  70:20
**investigator**  60:1
**involved**  70:20
137:11,18 142:18
177:4 181:23
**involvement**  138:16
140:9
**involving**  58:20 81:1
122:20 140:3
**ironic**  141:16
**irrelevant**  265:13
**issue**  35:25 75:2
79:22 84:16 99:15
169:18 199:18
216:25 229:20
230:5
**issued**  78:23
**issues**  26:20,24
27:13 35:11 71:3
81:20 127:2 137:9
143:10 164:25
165:24 200:11,19
224:17 229:25
271:8 283:20
**issuing**  85:12
**it'll**  154:2
**item**  46:4,25 57:3
68:1,2,4 80:20
239:4
**items**  51:24 55:5
79:4 81:1 274:2
**iud**  220:12
**ivy**  53:11 120:17

**j**

**jack**  217:23 218:14
218:20,22 219:5
**jacksonville**  13:25
14:1 15:11
**jail**  25:18
**january**  146:7 147:8
159:10
**jason**  210:25 224:11
224:13,18 225:4
**jeff**  47:19 224:11,22
**jeopardy**  135:15
181:14 194:8
**jill**  94:23 109:17
112:12
**job**  19:12 27:18 32:8
32:10 33:25 34:9
37:11,15 38:8 39:24
43:21 44:3 48:21,23
49:20,22 50:7,13,21
83:22 102:4 126:3
129:1 134:9 136:7,9
139:17 142:24
143:20 144:1 145:7
155:5,7 156:6,12
158:10,20 161:17
162:2,4,13 167:4
170:2 171:21,22
175:4,20 177:2
181:14,17 191:6
197:2 204:13 207:9
261:11 278:4,10
**jobs**  32:14
**jogged**  115:3
**john**  47:9
**johnny**  98:16,18,19
**johnny's**  98:17
**jose**  58:9
**journal**  31:9,22
**judge**  117:8,22
**jug**  238:21,23
**juice**  274:2
**jump**  271:9

**june**  1:13 6:4 286:15
287:2

**k**

**kathy**  231:12,24
234:1 236:21,25
**keep**  26:1 42:10
125:13 136:7
139:17 146:3
158:11 258:1,3
267:25
**keith**  160:5
**kept**  29:4 72:4,6
83:22 102:21
126:14 204:21
210:12 225:6 245:6
**ketchup**  177:16,17
190:25 191:10,11
**key**  126:11,12,19
127:6 141:21 172:8
226:10
**keys**  215:17 282:18
282:20,23,24
283:12
**kick**  7:18
**kicked**  151:19
**kid**  137:12
**kidding**  201:15
**kidney**  26:25 27:1,9
29:23 35:11,25 36:5
36:6
**kidneys**  27:9
**kids**  144:5
**kill**  207:18
**kind**  18:21 27:13
33:7 34:10 35:14
37:25 38:1,13 47:11
71:5 72:2 81:21
108:21 124:13
135:15,25 136:5
141:17 142:2
144:24 145:10
155:22 176:10
194:7 201:6 205:17
212:18 231:4,5

244:19 245:9 273:6
274:7
**kinds**  235:25
**knew**  51:19 53:11
66:11 111:8 134:6
137:10 150:4 155:6
165:25 172:17
175:21,22 194:19
194:23 207:5
210:23 213:3
223:16 267:24
269:2 270:6,7
**know**  8:3,10,14 9:4
11:19 15:5 19:4
21:10 25:15 27:7
36:14 37:2,3,8
42:14 43:14 54:2
55:17 59:20 60:2,8
63:9,21 65:4,8 67:1
71:23 72:1,4,10,24
73:5 74:24,24,25
75:4,24 76:1 80:10
80:19 82:5 86:6
87:4 92:2 96:17
99:1 101:14 104:2,6
104:13,18 106:15
106:18,19 107:11
107:21 109:9,25
110:1 113:2 115:12
116:14 123:1,2
129:22 133:10
137:8 138:25
141:20 142:10
143:6,14,17,18,23
144:2,2,11,19 145:6
145:8,12 147:2,4,7
147:17 148:15
149:11,12 150:17
157:1,5 159:20
161:3,9 165:19
167:22 169:4 170:5
171:20,24,24
172:13 173:12
178:17,18 179:4,6
179:10 184:19

Veritext Legal Solutions
800-336-4000

**[know - left]**

185:13 188:12,20
189:7 194:9 195:3,5
199:24 201:12,16
201:20 204:3,5
206:18 210:18
212:17 213:3,6
214:5,6,9,9 215:5
216:14,16,17,18
221:6 222:19
224:16,20 225:24
226:4 231:1,2
232:13,22 234:9,12
236:6 238:15 239:1
240:25 242:23
244:1 248:1 249:23
251:7 254:17
255:20,21 260:15
260:23 261:21
262:5 264:1,11
265:25 266:24
269:5,23 273:5
284:18

**knowing**  103:11
105:9 194:8

**knowingly**  195:12

**knowledge**  12:20,23
46:24 47:5,12 75:7
75:17,18 77:16
79:24 83:25 104:5
134:5 138:13
140:18 141:3,4
142:23 144:25
145:7 165:23
188:21 223:13,14
223:18,22,22
225:13 257:6,8
284:11,13

**known**  42:18 88:5
107:2 133:9 136:17
156:7 207:8 212:15
213:14,18,23
225:18 249:17,23
249:24 251:7
288:10

**knows**  103:8

**kroger**  1:7 2:11,13
2:18 3:12 6:13,22
6:25 11:20 12:19,23
12:25 13:12,15
15:21,24 16:2 17:9
19:13,15,20,24 22:1
27:17 28:1,7,11,12
30:19 31:1,3 34:16
34:24,25 35:4,22
36:15,16 37:3 39:5
39:15 40:3,17,21,24
41:12,21 42:18
43:17 44:14 45:20
46:18 47:17 49:5,13
55:21 65:12 68:1
69:5 70:18 75:1
77:17,22 78:16,23
79:3,20,25 80:21
82:23 83:21 84:20
87:7 88:7,18 89:18
90:18 91:12 92:3
93:18 96:4,16,19
97:1 98:2 101:24
102:3,5,7,23 104:11
105:1,9,17 107:14
108:5,13,15 115:11
118:9,12,12 126:11
126:24 127:19
132:11 135:1,10,10
137:16 139:9
140:15,25 141:16
145:1,17,23 146:16
147:18 148:19
154:16 156:8,13
157:12 158:4
162:22 169:4 176:4
178:21 180:21
186:23,25 193:20
194:1,11 195:6
197:9 199:16
201:22 209:10
213:15 215:15
217:10 223:12
227:17,21 228:9

229:8 230:4 233:24
239:3,18,25 241:1
242:5 248:11 256:7
260:20 266:25
276:5

**kroger's**  41:22 42:5
45:11 46:16 65:17
65:19 79:8 85:12
92:15 101:8 108:8
147:4 187:1 194:24
205:3

**krogers**  177:12

**kronos**  219:12

---

**l**

**l**  1:12 5:10 6:16

**label**  52:2

**lack**  178:10

**lady**  116:9 117:7
205:7 206:15
207:18

**landscaping**  17:22
17:25

**large**  116:17 136:20
140:15 164:6
185:24

**larger**  177:12,14

**larry**  1:3,12 6:5,11
6:16 9:20 22:9 61:5
64:23 69:8 106:2
107:4 109:15
112:11 133:1
146:13 158:9
159:14 203:24
206:2 222:19 260:8
287:2 288:1,5,10

**lasts**  36:12,13

**late**  35:23 66:12
166:13 261:2 266:1

**laughing**  144:1

**law**  5:4 117:14
228:13

**lawson**  9:20

**lawsuit**  6:25 9:14
32:25 98:24 138:22

140:5 149:17
151:19 152:7

**lawsuits**  32:19
117:20

**lawyer**  7:4 9:3,5
33:14,15 149:10,20
150:10 193:2

**lawyers**  101:9

**lay**  248:8

**lb**  16:18

**lbl**  16:19 22:14

**lead**  46:13 48:14,20
49:21 51:5 125:8
188:7 206:5,11,12
208:21 218:8,10
226:10,21 237:25
256:6 274:20 278:7

**leaders**  122:25

**leads**  51:2 182:24
188:16

**lean**  175:25

**learn**  278:12,13

**learned**  127:19,23

**leave**  8:7 53:5,17
57:1,10 58:1,2 66:4
67:7 81:25 83:20
111:1,22,23 119:14
119:17 121:9,10,15
122:1,4 124:24
132:24 134:21
157:3,7 190:5
196:23 224:5
225:11 262:20
263:2,7 272:10,15
274:24,24 280:8
281:3,13 282:8
283:19,24

**leaving**  17:19
121:17 134:16
268:16

**led**  257:10

**left**  19:7 62:21,25
63:3,4,12 65:22
68:20 76:25 82:9,22
83:11 84:8 87:12

Page 19

**[left - lyondellbasell]**

115:9 116:5,21
117:1,13 119:11,16
119:24 121:3,11,20
122:10 123:3 125:9
157:2 189:13
200:17 201:6
212:23 220:23
221:7,8 248:14
255:10 256:1
262:19 263:12
268:2,5,6 269:11
272:14 276:3
277:19 280:25
282:4,12,13
**legal**  100:22 101:4
286:21
**legitimate**  223:5
**letter**  2:16,23 3:7,18
88:10,22 89:9 94:18
99:19 101:13,23,25
112:19,22 113:4,5,7
113:10,18,19 114:2
129:16,23 130:7,13
132:2,10,14 133:2
133:19 145:22
149:6 150:2 212:7
216:21
**letting**  155:23
191:19
**level**  28:25 29:1,6
90:2 132:5 135:7
172:16
**levels**  212:13
**levitz**  11:18
**lie**  134:25 135:1,17
135:20 232:6
**lied**  105:13
**life**  43:4 96:9 169:3
**lifetime**  246:24
**light**  232:2
**lighting**  18:16,18,22
**liked**  28:22 171:2
**limit**  247:7
**limited**  169:16
183:17 197:7

**line**  19:1 75:1 79:21
97:25 140:20 245:9
287:4
**list**  127:10 212:2
214:16 221:11
227:1
**listed**  211:24 212:1
214:25
**listen**  96:18 124:19
263:15
**lithonia**  18:16,18,19
**litigation**  101:18
**little**  19:17 25:6
97:14 108:21
110:25 111:6,21
117:7 186:11
190:14,14 193:19
194:10 218:12
230:20 231:4 232:2
241:7
**live**  10:3 13:19 21:1
21:8
**lived**  10:5
**lives**  13:21
**livid**  217:25
**living**  32:4 96:9
**llc**  5:4
**local**  15:1
**location**  36:20,22
**locked**  58:3 61:15
71:4,4 119:24
**london**  1:3,12 2:17
2:23 3:4,8 6:6,11,16
6:21 9:20 21:21
22:9 40:12 49:3
54:14 59:6 61:5
64:23 76:22 78:2
85:4,23 92:25
108:25 109:16
112:11 113:23
114:18 151:11,16
159:14 227:15
239:13 251:23
271:12 287:2 288:1
288:5,10

**long**  8:10 10:5 11:3
11:5 12:2 16:12
17:25 20:11 31:21
32:11 36:6 49:16,22
63:16 65:3 70:9
124:1,3 149:23
172:25 179:1 200:3
222:4 225:14
269:21 272:14
281:2
**longer**  83:7 96:21
256:11 276:19
**look**  22:1,8,13 60:12
71:3 85:3 91:10
110:15,18 114:23
115:12 125:20
128:8,13 154:1
156:25 172:4
177:22 183:7
186:18 201:14
203:14 221:22
227:18 233:3 236:2
238:12 249:25
250:3 252:1,22
253:8,10 254:6
256:7 257:1 267:13
270:17 271:18
276:11
**looked**  63:10 65:5
102:15 123:8
128:12 159:18
167:5 180:3 206:21
260:9
**looking**  22:11 25:12
27:18 28:20 65:6
72:25 75:13 110:12
150:3 177:6 187:24
231:24 250:18,25
**looks**  22:19 40:16
78:4 86:12 93:6
97:6 110:21 111:13
116:7 171:19 202:6
231:23 237:8 242:7
252:18,24 271:23

**loose**  182:7
**lori**  65:20 86:12
109:16 120:17
144:10 170:17
171:3,3 191:9 205:8
205:12 212:9
233:21 243:18
249:23 257:24
261:1 267:16
**lose**  48:24 83:2
207:9
**losing**  134:9 197:2
**loss**  43:1 59:17
70:19,23 71:6,9
75:5,15 77:9 140:16
140:21 240:2
**lost**  48:22 83:21
103:13 142:24
145:7 265:1
**lot**  69:12 77:9
116:22 123:18
124:2 127:15,16
141:19 159:1 160:2
167:10 174:10
209:25 213:19
215:18 250:9
262:24 272:3
274:10 282:17
**low**  174:22
**lowe's**  11:17
**lower**  185:8
**lucia**  3:7 101:24
112:19 113:10
114:2 129:17 131:7
132:3,10 150:2
212:7 216:21,21
239:5
**lucia's**  133:2
**lump**  31:16
**lunch**  19:23 20:9
38:13 151:6
**lung**  14:21
**lyondellbasell**  5:12

**[m - mean]**

| m | | | |
|---|---|---|---|
| **m** 1:19 125:11 159:15 173:17 286:20 | 201:25 217:5 218:10,17 221:15 224:17 248:18,25 249:17,22,22 250:2 251:6 256:6 266:25 | 275:6 278:7 280:1 280:17 282:9,11,19 283:15,16 | 239:11,14 251:21 251:24 271:10,13 |
| **ma'am** 210:9 234:4 | **manager** 12:18 | **manager's** 50:10 128:15 | **market** 27:21,23 83:14 164:19 |
| **mabrey** 60:2 63:18 63:20 64:7 66:25 68:13 70:6,11 71:6 71:12,13 72:23 73:20 74:16 77:1 82:14 84:19 86:18 87:24 89:1,22 90:4 91:5 93:21 94:24 95:20 96:2 97:21 102:15 109:17 111:7,17,22 112:12 114:24 240:15 | 27:21 29:2 37:17,18 37:19 43:18,21 47:18,20 48:3,6,7 48:11 49:25 50:6,14 50:15 51:1,1 56:18 58:6 61:5 65:6 67:1 80:5,20 81:11,13 83:12,13,14 116:13 116:23 118:17,22 119:20 122:17 123:13,14 124:22 125:23 126:2,3,4,25 127:2 128:5,11 129:2,12 137:25 144:9,16 153:2 155:4,10,17 156:5 156:23,24 160:2,6 160:10,14 163:10 164:19 169:5 180:13,15,23 181:2 181:11 182:16 183:20 185:3,10 186:19 187:10 188:7,7 193:25 194:4 196:18 197:1 199:10,22 200:12 204:25 205:2,4,20 209:5,11,13 210:1,3 210:8,13,15,15,23 210:24 212:17,22 212:23 214:21 215:10,12 217:24 218:6 224:25,25 225:2,3,5,15 250:3 259:23 262:4,15 263:12 266:12,19 268:2,2,10,16,18,25 269:11 272:18 273:16 274:23 | **managers** 48:10 53:10 71:8 81:7 126:6 134:11 142:17,17,23 145:3 145:5 156:9 161:10 164:23 169:20 180:17,22 181:13 182:20,24 183:12 188:25 190:10,12 191:12 205:14 207:10 211:1,24 212:12 213:10 214:16 224:2,14,15 225:20 226:14 244:23 263:15 | 193:25 196:18 197:1 198:21 225:15 |
| **mabrey's** 62:24 | | **managing** 126:8 162:13 175:1 | **marriage** 11:2,22,24 11:25 13:2 |
| **machine** 52:22 66:4 95:10,13 106:20 107:3 110:24 118:23 | | **mandatory** 156:21 | **married** 9:7 10:21 10:22 11:5 12:2 |
| **machines** 52:17 | | **manner** 91:13 | **mary** 75:25 |
| **mad** 73:4 183:22 246:11 | | **manual** 40:4 | **math** 29:10 258:11 258:13,22 272:6 |
| **magazines** 237:22 | | **manually** 221:11 | **matter** 29:5 30:3 89:10 101:17 |
| **mail** 87:18 | | **manufacturer** 18:22 | 117:22 122:25 |
| **maintaining** 286:9 | | **march** 2:6,9 93:7 109:22 | 139:3,4,5,11 168:25 172:12 183:17 |
| **maintenance** 18:10 | | **margin** 174:22 | 286:9 |
| **making** 22:19 23:2 129:6 136:5 142:18 163:19 177:3,7 183:3 206:10 225:18 | | **maria** 88:25 93:12 109:16 112:11 | **maximize** 143:6 |
| **malik** 262:4 | | **mark** 5:3 6:10 113:19 | **mckinney** 5:13 |
| **manage** 162:2 175:12 185:5 | | **marked** 21:19,22 40:10,13 41:16,19 44:8,11 49:1 54:12 54:15 59:2,4,7 77:24 78:3 85:1,4 88:8 92:23 93:1 94:15,17 108:23 109:1 113:21,24 129:19 151:14,17 192:20,22 227:10 235:7 237:2,4 | **md1** 213:8 |
| **management** 40:1 43:14 53:18 60:6 117:12 122:1 139:7 178:10 180:6 185:23 186:12,17 192:12 193:20 199:5 200:17 | | | **mean** 11:17 14:20 24:11 32:22 35:16 37:23,24 47:8 58:7 68:3 84:2 87:3 91:3 92:13 99:9 105:5,13 107:21 115:6,7 121:4 123:11,13,15 127:10 130:3,25 135:18 136:25 140:13 143:23 145:10 147:7,19 160:17 164:22 165:25 166:13 167:5 168:1 169:3 176:23 177:25 183:19 184:1,5 186:5 188:24 189:2 189:8,11,23 190:10 190:11,22 198:15 200:7 201:2 203:17 211:2 213:5,7 214:14 221:18 |

**[mean - name]**

223:10 224:18
229:16 231:14
232:12 234:13,17
234:20,21 248:22
248:24 249:20
250:13,14,25
254:23 255:15,25
256:19 260:9,10
267:21 269:21
270:4,16 272:5
282:18
**means** 129:15
155:22 264:13
**meant** 87:6,11,23
88:3,5 130:23
230:23 231:18
261:14 270:21
**meat** 27:18,23 34:3
38:13,13 52:5 79:10
83:6,6,8,20 84:8,13
198:20
**mechanics** 75:1
**medical** 26:22
**medications** 8:23
**meet** 12:12,15
112:23
**meeting** 70:5,6
71:13,20 73:3,24
74:1,4,6,8 75:22
76:5 77:1,5 84:2,19
87:23 90:9,12 93:21
93:24 94:8,23 95:1
96:1,2 100:10
102:13,13 108:20
109:15,21 112:3,6
112:23,24 113:3,7,8
114:19 121:18
131:22,23 133:3,11
133:13 141:11
142:3,3 172:20,23
179:13,15 182:12
182:15,15,19,21
208:3,6,9,11,12,13
208:17 217:2 240:1
240:4 244:19

**meetings** 59:22
87:13 89:16 94:5
109:3 129:24
169:19 176:13
178:5
**member** 13:14
39:17 89:4 165:17
165:18,20 267:14
**members** 12:22
54:22 165:15
166:13 199:5
261:15
**memo** 235:11 262:7
**memory** 40:20
115:3
**mention** 69:16
**mentioned** 74:25
75:21 80:25 82:13
93:15 108:21 208:4
**mentions** 216:23
**merchandise** 42:9
42:11 45:16 46:4
82:2,6,9 99:8
119:14 121:16
122:2,5 238:6
265:14
**message** 132:24
**messing** 218:23
**met** 64:7 70:11
86:18 216:24
240:14
**method** 133:18
**michael** 60:1 140:2
**michelle** 53:13
120:18
**middle** 20:7
**midnight** 215:19
241:19 261:1
**mike** 109:17 112:12
**miles** 21:9 36:21
247:24
**military** 15:15
**milk** 127:17 238:21
238:23 239:2,6
273:13 274:1,13

277:5,6,7,15,19,20
278:3,3 280:19,21
281:2
**million** 140:3
**mind** 77:5 82:17
100:7,8 106:10
107:14,15 121:3
184:23 191:18
194:14 195:10
196:22 204:10
232:13 268:1
**mindset** 182:9
209:18
**mine** 95:21 169:8
**minimum** 38:22
169:9
**minute** 33:6 181:15
208:1
**minutes** 20:12 33:19
70:10 115:17 144:3
163:20 173:1 226:4
229:15 249:5
**missed** 35:23 150:6
153:13 212:2 233:2
233:4 271:14
276:12
**mistake** 69:17 82:15
82:18,18 83:3,19
93:8 102:25 105:19
139:3,24 223:4
**mistakes** 136:5
137:2 139:16
**mitigated** 78:23
**mm** 111:7
**molden** 5:4
**moment** 115:15
**monday** 245:24
252:19 253:2,15
**money** 48:22,24
83:2 103:8 106:5
118:24 146:3,10
147:13 174:10,12
176:1 183:3 184:2,3
184:5,21 185:1,13

**month** 24:6 132:24
278:23,23
**months** 33:10 50:21
101:1 203:19 206:7
232:11
**morning** 6:21 53:6
53:20 57:12 62:19
69:23 83:14 111:24
115:2,9 116:5
122:10 125:16
128:12 129:7 157:1
173:2 200:13
203:24 209:4
212:24 218:19
221:9 222:3 230:22
244:11 263:10
266:18,23 267:4
272:25 275:10
279:9,11,16
**motives** 186:1
**motts** 37:19,21
199:10,11,12,19
200:22 202:4 203:3
204:10 211:19
**move** 14:8 25:5
180:19
**moved** 14:10 25:6
199:18 225:2,3
274:13
**moving** 274:2 279:9
**mowing** 18:9
**multiple** 128:24
131:3 180:17

---

**n**

**n** 6:1 12:9,9
**nail** 130:1
**naive** 89:14
**name** 6:21 9:19,21
11:9,11 12:6,8 22:8
37:19 47:19 60:2
75:24 76:1 85:14
210:25 224:12
288:13

**[name's - object]**

**name's**  75:25
**names**  9:23 81:15
  143:22 144:6
**nancy**  11:10
**narrative**  60:1
  85:22
**nasty**  202:12 278:4
**natural**  186:17
**nature**  47:13 79:13
**near**  118:20 161:11
**nearly**  208:25
**necessarily**  96:20
  99:11 166:12
**necessary**  170:2
  186:20 283:14
**need**  7:23 8:2,4,6
  27:7 31:4 53:18
  72:17 80:10 82:25
  91:18,20 95:23
  110:22 117:16
  135:17,20 147:12
  155:7 156:2 159:15
  159:16 160:24
  161:2 167:16,16,21
  168:20 178:11
  182:5 187:8 202:15
  206:2,17,25 210:18
  217:21 233:10
  247:15 262:1
  276:19 279:4
  280:19
**needed**  23:5,6 32:11
  32:12 53:4,5,16
  56:8 67:11,14 72:15
  153:25 160:18,18
  169:11 183:6
  184:21 191:10
  196:24 198:10
  226:22 261:15
  266:24
**needs**  181:22,23
  227:2
**negative**  135:10,11
**negligence**  83:3
  235:25

**negotiations**  100:20
**neighborhood**  248:1
**nervous**  282:11
**never**  11:21 28:9
  33:22,25 35:23
  36:14 63:3,7,12
  64:3,5,5,5 71:6 72:8
  72:9 77:12,20 89:13
  90:17 95:10 98:3,9
  102:5 104:14 109:4
  118:9,12 121:25
  125:20,23 146:14
  147:2 149:3,8,9
  150:10 153:13
  157:25 173:11
  175:18 176:17,17
  178:15 179:14,17
  179:20 181:16
  184:7 190:12
  191:12 192:17
  196:11,12 197:8,19
  197:19 203:25
  204:7 205:23 209:5
  211:16,19 212:5,8
  212:20 213:2
  214:17,23,23 215:3
  215:8 216:8,13
  218:25 220:11
  229:5,10,20 230:4
  232:3 234:18
  247:12,18 257:6
  263:15,16 264:24
  265:24 281:9,16,19
  281:24 283:21
  284:8,11,17,20
**new**  50:14,15
  128:23,24 241:2
  251:16 262:14
**newspapers**  237:22
**night**  20:6 38:19
  44:4 47:14,15 48:18
  49:13 50:3 51:7
  52:15 54:22 55:10
  55:20 67:19 70:20
  70:24 71:2 81:18,21

83:13 119:18,19
  123:15 128:11
  163:10 164:8,11,23
  164:24 165:3,6,11
  168:17 175:1
  177:23 186:12
  204:1 206:10
  210:25 212:22
  222:13 223:8,15
  251:13,15 252:9,16
  252:19 260:4 262:6
  263:24 264:1,14,23
  267:14,23 269:16
  273:4 282:22 283:2
**nights**  164:15
  264:15,16,18,19
**nighttime**  51:20
**nine**  157:12,16
  172:6 245:18,24
  246:3 253:2,16
  258:14,17
**nobody's**  101:7
**nodding**  7:25
**noff**  140:2
**non**  38:24 39:5
**nonresponsive**
  53:22 197:22
**normal**  34:8 101:21
  174:3 175:10
  246:22 261:10
  266:13 271:5
**normally**  232:23
  264:13
**northern**  1:1
**notary**  288:24
**note**  3:3 53:5,17,17
  56:23,25 57:9,10,24
  58:1,2,4 63:12 66:4
  67:7 73:11 83:22
  111:1,23 114:5
  115:23 119:11,16
  119:17,24 120:20
  121:4,9,20 122:4
  134:14,16,21

**noted**  288:3
**notes**  3:5 77:14 94:4
  109:2,7,10 110:9,22
  112:3,16 145:11
**nothing's**  164:13
  188:14
**notice**  54:16 87:18
  193:12 209:16
**notify**  236:21
**notorious**  238:19
**november**  40:7
  153:3
**nowadays**  163:17
  209:24
**number**  22:24 31:15
  32:9 41:12 52:11
  85:17 89:2 106:1
  110:16,18 112:2
  114:23 133:21
  140:1 155:24 166:9
  193:11 199:9
  211:25 213:20
  220:4,12,13 228:1
  236:22 258:23
  259:1,6
**numbers**  110:15,16
  110:18 133:16
  142:19
**nuts**  187:5
**nystrom**  94:24 95:3
  97:6 109:17 112:12
  131:10 216:24

| o |
|---|

**o**  6:1
**o'connor**  5:11
**o'fallon**  210:25
  224:11,18
**oath**  8:19,20 76:23
  135:14,16 151:12
  246:21 288:11
**object**  47:2 53:21
  82:19 97:23 103:3
  103:17 106:21
  107:1 108:18 195:1

[object - once]

197:22

**objected**  58:18
    229:5,11
**objection**  162:15
    213:25
**obligation**  97:9
    286:10
**obnoxious**  263:17
**observed**  60:14,17
    109:12 256:16
**observer**  95:19
**obviously**  15:6 43:6
    56:8 77:8,11 95:11
    107:22 140:20
    145:13 213:5
**occasion**  121:17
    257:10 261:10
**occasions**  70:15,22
    72:13 80:4 268:10
    269:9
**occupation**  11:16
    12:10
**occur**  27:12
**occurred**  50:24
    89:16 113:16
    144:23 150:14
**october**  40:8,8,16
    211:10
**odd**  96:13
**ode**  1:6
**offended**  147:22
**offered**  184:7,15,16
**offhand**  268:25
**office**  24:14,18 57:1
    65:5 70:8 71:15
    72:21 123:3 133:3
    155:20 159:11,17
    172:24 210:7
    231:12 288:17
**officer**  286:13
**officially**  166:20
**oh**  22:10 33:10 41:2
    53:23,25 89:8
    129:25 130:4,19
    144:24 146:12

154:17 164:10
165:1 168:3,20
170:7 173:1,25
174:9 176:10
180:19 184:3
197:21 201:15
212:25 214:6
232:10 233:7 243:3
250:10 256:22
264:3 265:22 269:7
270:18 284:16
**okay**  6:24 8:7,17
10:11,13 11:5,19,24
12:2,10 13:22 14:6
14:21 15:10,20 16:4
16:8,20 17:6,8,13
17:16 18:21 20:23
21:12,18 22:4,10,19
23:1,9 25:2 26:18
27:20 29:21 30:18
31:11 33:17 34:7
35:19 36:8,15 37:4
37:11 41:4,11,15,25
44:20 46:9,23 47:4
47:22 48:5,8,12
49:24 50:17,19
51:14,19 52:19 53:3
53:21,23,25 54:5,6
54:8,24 55:2 56:7
56:12 57:2,7,10
58:2,7,12,14,17,22
59:6,20,24 60:4,14
61:3,9 63:4,12,24
64:1,7 65:16,24
67:25 68:9,13,20
69:10 71:12 72:7
73:20 74:3,5 75:11
75:16 76:2,13 77:4
77:8 79:1,7,24
80:25 81:7,14 82:21
83:24 84:23,25
85:11,13 86:8,20
87:3 89:3 90:13,17
90:20 91:18,22 92:2
92:17 94:11,14 96:5

96:23 97:15,17,21
99:14,14,22,24
100:7,9 102:9,12
103:7,10,19 104:14
104:17,19,24 105:8
105:22 106:14,25
107:6,21 108:10,25
109:6 110:11 111:6
112:11,17 113:6
114:9 119:5,13
120:2,5,7,8,9,11,16
121:8,14,22 123:11
124:4,6,10,12,15,18
126:2 128:4,10
129:18 130:1,4,4,8
130:16,21,23,25
131:7,19 132:21
133:7,12,15,17,20
134:18 136:1 137:5
137:17,22 138:12
139:14 140:11
143:10 144:11
145:16,19 147:15
149:17,20,23
150:17,24 152:20
152:25 153:5,10
154:25 157:17,19
158:3,14,18,23,25
159:3 160:7 161:25
164:15,17,20 165:2
165:21 169:22
170:7,11,11,23
172:20,22 173:4,19
174:6,20,25 176:17
177:1,8,9 178:24
179:2,9,13 180:5,9
180:16,20 181:7
184:19,23 186:3,8
186:25 187:7,11
189:15,17,21
190:16,19 191:13
192:3,7,17 193:6
194:10,23 196:13
197:25 198:4 199:2
199:5,15 202:3,13

204:21,25 205:1
206:14 207:2,3
208:2,7,15,16,20,20
208:23 211:10,19
212:1,10 213:22
216:20 217:2,16
218:9 219:7,10,11
219:17 220:1,8,17
222:7,15,23 223:13
223:17,21 224:1
226:2 227:4,20
228:8 229:22 230:2
231:11,14 232:17
234:6,12 235:2,6
240:8,16,18,20,25
241:4,17,20 242:1
242:12 243:3,3,7,9
243:15 245:11
246:4 247:6 249:13
251:10 252:13
253:23 254:11,15
254:25 256:3
257:13,19,21
258:11,13,21
260:17,21,22 261:2
261:5,17 262:17
263:20,25 264:6,25
265:1,3,9 267:10
268:15,20 270:12
270:16 271:20,22
272:3,14 273:8,25
275:23 276:1 277:2
279:16,17 280:9,18
281:11,20 282:1
283:11 285:5
**okayed**  66:1,2
**old**  10:17 30:2 116:8
117:7 219:22
**older**  23:5
**oldest**  14:7,10
**once**  23:18 31:13
36:11 52:13 55:1
83:17 89:16 95:9
98:13 99:1 104:9
117:9 136:23

Veritext Legal Solutions
800-336-4000

[once - part]

140:23 143:4,8
146:5 147:22 150:9
168:8,19 169:18
170:4,17 171:7,10
171:12,25 172:4
173:5 175:24
178:18 183:15
187:1 189:13 191:8
198:6 204:17,18
209:12 210:1 214:1
216:14 221:5,16,20
224:19 225:16
228:24 231:21
233:5 234:14 238:7
238:15 239:8
246:24 248:10
258:17 259:18
265:22 267:5 269:2
269:2 271:1 274:15
274:22 279:5

**ones**  71:10 147:6
**oops**  106:19
**open**  20:2 46:3
52:18 55:5 65:14
71:2 80:11
**opened**  53:19 129:7
215:23 275:21
**opener**  262:23
**opening**  67:10
244:22 272:18
280:1 282:8 283:15
283:16
**openings**  37:8
**opens**  239:5
**operate**  66:6 67:20
73:17
**operated**  67:8
**operations**  159:12
**opinion**  99:9 100:13
105:5,5 148:4,5
**opportunity**  91:22
92:4 94:8 106:17
196:2 268:17
**opposed**  7:24 36:16
98:1 147:17 175:7

246:23
**opposite**  123:17
205:8,12
**option**  52:19
**options**  52:16
**oral**  287:1
**orally**  193:13
**orange**  274:2
**order**  265:15 276:8
278:13,24,24
**ordering**  156:15
275:25 276:6,13,15
278:17,18,20 279:1
279:2
**orders**  153:24
156:18,21 225:18
225:22 226:6 276:4
**ordinary**  174:21
175:16 266:13
**organize**  273:14
**originally**  13:23
14:22 87:5 150:1,2
199:20 201:19
217:13
**osat**  141:8,22 144:17
**osburn**  86:6 225:16
**outcome**  286:8
**outside**  98:17,19
269:21
**overall**  169:17
**overheard**  144:21
**overnight**  27:19,25
38:4,5 48:18 52:12
53:3 58:4,6 119:21
125:17 134:13
205:23 206:23
241:8 277:11
**overtime**  3:22 34:19
39:2,6 135:24 149:4
152:5,13 154:23
155:9,23 157:4,8,10
157:12,15 158:21
159:1,5,15 161:5
166:11,12,17,19,20
167:9,11,14,24

168:4,6,9,14 169:24
172:6,10,15,18
173:16,20 174:23
175:7 178:8,14
179:23 181:24
182:1,22,23 184:7
184:12,13 185:10
185:14,25 186:15
186:20,21 188:11
188:17 193:15
196:8 199:11 208:1
211:17,20,23 213:1
213:19 216:25
217:6 242:13,18
244:14 245:7,13
246:2,19 247:2,7,20
248:22 250:5,14
258:1,4,19 259:8,10
259:17,22,23 260:6
260:8,11,17,20
261:5 262:7,8,12,25
265:20 266:13,16
267:1,8,15,18
268:21 269:14,16
269:23,25 270:9,14
271:23 283:23
284:5

**overturned**  138:6
**overwritten**  230:17
**owed**  145:25 146:11
147:7
**owes**  58:15 91:12
**owning**  10:11

**p**

**p**  6:1 11:14
**p.m.**  55:18 151:6
227:9,9 232:1
255:21 256:1 285:8
285:8,20
**pack**  60:15 61:6,10
80:11
**pad**  186:2
**page**  2:2 3:2 4:2
22:13 44:14,15

59:25 110:16
114:23 116:7
118:20 136:2
138:19 152:2,9
193:9 235:13 236:2
239:22 242:2 252:1
271:18 287:4

**pages**  133:22
**paid**  25:22 43:15
44:6 46:5 53:19
56:10 57:8 62:3
65:23 68:1 80:2
82:5 95:11 96:24
116:21 119:11,15
120:21 136:11
152:5,13 154:7,22
161:5 169:24 185:8
185:10 204:20
211:17,20 228:14
228:23 229:11
232:18,23 233:20
234:15 236:22
237:15,25 256:20
**pallets**  157:2 190:5
215:24 262:19
274:16 275:12
277:19 279:20
**panels**  278:3
**paper**  32:2,4 91:16
**paperwork**  34:10
154:1 240:12
**paragraph**  119:1,22
133:22 152:3,10
154:20 169:22
227:24 228:22
236:3
**paragraphs**  44:25
**parameter**  176:4
**parents**  14:7,12
**parking**  116:22
**part**  27:11 31:9,19
39:9,10 43:21 44:3
97:4 122:24 136:10
140:22 141:21
143:13,15,19 152:6

**[part - piece]**

163:16,22 174:25
179:1 184:20
198:16 201:24
203:21 204:21
210:23 211:22
228:19 239:16
273:22 274:1
280:14
**particular**  26:13
37:5,13 249:18
251:7 254:13
256:24 257:2,15
**parties**  286:13
**party**  20:23 40:1
286:7,11
**pass**  27:11,13
169:11 285:11,13
**pat**  161:21
**pattern**  136:12
**paul**  86:5 225:15
**pay**  3:20 23:3 29:3,6
53:5 57:2,5,13
61:17 64:4,19 65:21
67:4,11,14 68:2,4
73:15 79:16,17 80:9
80:10,13 97:2
102:24,25 104:21
105:24 106:3,5,19
111:23 115:13,19
115:23 116:20,25
119:8,24 120:25
121:11 122:7
135:19 145:25
147:8 149:4 174:3,7
174:16,17,22,23,23
175:5 186:2,14
199:11 206:5,9,13
215:20 228:24
254:8 257:15
259:22,23 260:1
270:10,11 271:23
272:9
**paycheck**  229:4
242:9

**paying**  64:9 69:22
73:13 82:1,10 117:2
117:13 121:10,15
122:2 237:23 238:6
**payment**  31:17 45:6
85:24
**payroll**  9:14 221:10
229:18,20 230:22
236:12,20 267:13
**pays**  117:4
**peachtree**  1:15 5:5,7
**penalty**  8:21
**pending**  86:25,25
87:6,20,23 88:6
126:18 136:18
137:15 138:1
**pension**  31:15
**people**  15:4 25:16
28:24,25,25 33:17
53:12,13,13 65:7
70:24 71:1,7 75:12
83:18 84:3 98:11,20
105:17,19 117:12
117:24 120:8
123:18 124:2
127:16 128:24
132:4 134:4,5,6
135:6,7,8 136:10,17
136:24 137:1
139:16,18 142:10
155:23 156:3
161:18 162:16,17
162:19 164:2 165:2
165:5,8,14 166:18
167:6,23 168:4
169:12,21 175:10
178:13,16,17 184:6
184:8,11,15 188:16
188:19 189:4,8
201:25 203:23
204:4 205:10 207:9
211:2,25 212:3,5,20
212:21 213:7
214:13,15,15,20,20
214:24 224:24

226:13 235:19
241:10 250:19
259:16 260:24
264:1,11,13,20
265:20,21,25
266:14 268:15
269:10,19 270:8
274:5 278:11,11,19
278:21
**pepsi**  61:23
**perceive**  122:20
**percent**  126:22
139:7 174:6 182:23
**percentage**  23:3
**perfect**  82:22 151:3
**perform**  228:4
**period**  22:25 25:18
28:19 50:21 55:17
56:2 130:14 150:7
152:25 153:14
188:4 202:10
205:13 260:8
278:23
**perishable**  277:5,25
280:12 282:18
**perishables**  274:25
**perjury**  8:21 135:2
**permissible**  154:15
**permission**  73:8,10
96:24 98:1 120:14
121:15,23,25 284:6
**permit**  162:24
172:11
**permitted**  77:17,22
228:15
**person**  19:2,3 24:15
47:13 50:14,20,22
50:23 51:4 55:5
58:15 75:22 80:22
89:5 96:7 117:25
123:20,21 126:7
128:24 136:7
155:12 160:15,19
161:13 166:16
169:15 171:1 186:9

188:3,5 190:21,22
193:22 199:20
200:13,18,18
204:14 205:11
212:6 214:8 217:25
221:21 223:18
224:22 251:1 256:6
260:3 263:14 265:1
265:9 267:8 268:11
269:22 273:23
279:13 280:14
282:5,18 288:13
**person's**  186:1
**personal**  16:3,8
17:11,14 20:16,19
20:21,23 22:20 28:4
28:6 46:23 75:16,18
77:16 79:24 83:24
84:7 88:2 101:19
104:5 106:1 138:12
141:3,4 144:25
205:6 223:22
225:12
**personally**  53:2
137:17 143:11
176:18 189:3 213:5
259:7,8,10 288:10
**persons**  109:15
193:11 205:8
**persuade**  261:14
**phone**  132:23 188:2
188:6,10 205:18
261:4 263:4 267:9
286:25
**phrase**  87:3
**physical**  277:14
**physically**  109:12
126:7
**pick**  32:12 129:15
154:4
**picked**  50:20 63:2
**picking**  115:1
**piece**  60:15 61:10
79:9 85:25 279:2,3
279:5,6

Page 26

**[pigsty - produces]**

pigsty  188:13
pin  220:13
pizza  58:9
place  58:13 70:7
  89:13 95:3 101:16
  109:21 155:4
  172:23 199:1 200:6
  207:11 219:21
  225:5,9,10 233:17
  238:4,17 239:10
  270:18,19
placed  62:14
plaintiff  1:4 5:2
  6:11 152:10,12,13
  154:21,22 169:23
  170:1 199:12,12
plaintiff's  3:10
plan  28:8 128:9
  173:18 179:23
  202:16 214:9
play  107:8 202:13
played  19:17 132:23
plaza  5:5
please  6:7,15 151:4
  236:21
pleased  128:5
  183:25
plenty  268:8,9
plummeting  261:25
plus  160:22
pocket  103:15,22
point  16:23 25:10
  26:15 39:11,19,20
  55:20 56:16 57:6,15
  64:10 65:22,25 73:5
  87:14 94:7 97:22
  102:14,20 103:16
  103:19 106:2 107:8
  110:17 115:13
  117:21 142:20
  149:7 151:2 163:24
  191:20 194:22
  200:16 201:21,22
  203:12,14 209:12
  211:5 214:23 215:3

230:14 238:20
  246:4,13,17 249:13
  259:5 268:9 285:15
points  44:25 122:13
  150:3
policies  51:15,19
  194:18
policy  2:13 42:6
  43:22 44:15 46:13
  46:16,21 47:16 49:6
  54:20 65:18,20,21
  72:2,4 73:1,2 74:13
  77:17,21 78:15 79:8
  79:18 96:25 97:12
  98:1,2,8,8,14,15
  99:2,2 102:8,18,19
  105:1 111:9 126:24
  134:12,16 136:20
  139:12 146:17,17
  146:21,23,25 147:4
  147:18 169:8
  194:12,16 195:6
  201:24 210:5
  213:15 223:12
  250:18
polite  95:6
poor  167:20
pornography  23:21
  24:17 25:12
portion  31:4
position  29:1 38:16
  43:18,20 48:15,16
  48:17 49:16,24
  50:10,23 123:5
  128:15 132:8
  182:17 185:24
  194:5 202:2 206:12
  206:20,22 207:4
  209:6,11,21 214:4
  225:3 284:24
positions  50:4
positive  11:4 224:13
positively  262:8
possibility  29:23
  52:6 232:4

possible  60:6 90:16
  145:5 247:16
  255:25 256:2
post  34:23
posted  44:23 127:12
potentially  108:14
power  96:4 171:8
  267:6
practice  45:19 57:17
  58:18 148:16
practices  175:11
preapproved  267:19
  267:21,23
premise  139:16
  212:16
premises  42:12
premium  48:19
  206:11
premixed  238:24
preparation  9:2,10
present  5:16,24 6:7
  30:19 81:7 95:21
  120:18 173:17
presented  52:16
president  101:24
  131:13
presumably  213:14
pretend  142:12
pretty  19:19 35:9
  124:1 170:15
  182:18 189:13
  214:18 273:24
  285:4
prevention  59:18
  70:19,23 71:6,10
  75:6,15 77:9 240:2
previous  11:24 84:2
  125:23 127:2 129:1
  156:9 207:10 224:2
  243:10 244:8
previously  193:25
pride  183:18
prior  16:1 42:9
  85:25 123:14
  182:11 243:22

247:3 249:8,9
prioritize  265:16
probably  7:4,17
  18:4 55:1 130:14
  161:14 163:14
  165:13 171:4
  173:21 180:22
  193:2 200:2 203:19
  222:1 248:6 264:6
  269:22 274:9
  278:22
probationary
  202:10
problem  26:25 27:5
  29:24 34:14 35:25
  36:9 51:23 53:15
  56:20 63:13 72:19
  98:21 129:2 139:25
  146:11 163:17
  166:15 184:3,4
  191:10 204:12
  211:8,9 222:22
  230:4 231:13
  262:17 266:22
problems  27:1 36:2
  128:21 172:3
  208:25 233:15
procedure  67:22,24
  90:22 91:19 93:19
  217:10 220:9 221:1
  230:13
proceed  35:20
  100:21
proceeded  96:14
proceeding  5:24
  286:6,13
process  25:3 52:21
  87:8,9 90:18 100:18
  138:9,14 162:21
  195:19
processed  30:2
produce  181:2
  222:2
produces  27:9

**[product - recall]**

**product** 42:12 43:12
  45:22 46:4 53:4
  60:19 104:21
  139:11
**production** 162:25
**productive** 163:11
**professional** 74:17
  286:10
**profitable** 18:12
**program** 35:13
  225:1
**project** 71:9
**projected** 261:24
**promise** 203:15
**promoted** 50:11,11
  194:4 209:17
  217:25
**promotion** 199:13
**prompt** 220:6
**prompted** 99:18
  133:12
**properly** 66:8 67:8
  67:20 71:4 73:18
**prosecuted** 118:9
**prosecution** 118:4,7
**protein** 238:21,23
**proud** 209:2
**prove** 117:10 121:4
**proved** 288:11
**provide** 131:25
  223:7
**provided** 59:20
  68:20
**providing** 41:21
**public** 288:24
**publix** 239:2,6
**pulled** 216:3
**pulling** 278:2,2
**punch** 3:21 220:14
  220:15,20,20,25
  222:13 240:16
  251:18 257:16
**punched** 215:4,5,6
  254:3 255:13
  256:20,25 257:23

257:23
**punching** 235:20
**punished** 140:19
**punishment** 135:15
**punitive** 140:25
**purchase** 2:13 42:6
  42:9 43:22 44:15
  45:6,8 46:13,20
  47:16 49:5 51:15
  52:9 61:9 65:18,19
  65:20 85:24 102:7
  105:1 106:7 139:12
**purchased** 119:6
**purchases** 51:22
  55:4 56:9 134:13
**purchasing** 52:21
  55:6
**purpose** 132:1 148:9
  183:3 190:23
  234:21
**purposes** 118:3
  288:15
**pursuant** 5:20
**push** 186:19
**pushed** 83:8
**put** 50:23 52:23
  83:10 91:5 103:14
  103:21,22 111:14
  111:23 115:2
  116:17,19 127:17
  130:7 155:13,21,24
  170:1 177:16,18
  179:24 181:12
  191:25 194:7
  200:23 203:7,10
  207:25 217:22
  220:2,19 221:19
  222:20 230:20
  238:13,17 241:12
  243:11 245:12
  246:19,23 258:1,12
  274:15 281:17
**putting** 123:4
  159:21 161:14
  190:2 191:10

194:23 201:11
202:25

**q**

**quarter** 252:25
  253:12,13
**quarters** 242:13
**question** 7:11 8:6,14
  35:6 37:2 43:24
  51:9,11 64:15 69:9
  106:9 107:5 138:20
  170:6 185:25 186:9
  193:10 194:14
  195:21,22 196:1
  197:24 213:2
  216:12 221:12
  229:18 239:3
  257:14
**questioned** 212:20
**questioning** 106:10
  142:21
**questions** 7:9 8:9
  33:17 192:25
  285:14 286:5
**quickly** 186:14
**quit** 19:10,11
  206:18,19
**quite** 31:2 95:6
  209:2
**quota** 260:3
**quote** 69:17 136:19
  194:2 233:24

**r**

**r** 2:24 6:1 11:14
**racks** 278:2
**raise** 48:19 185:25
**raised** 116:7 224:17
**ran** 125:11
**rare** 266:6
**rarely** 190:14
  259:18
**rate** 38:21 142:1
**ratios** 202:1
**react** 117:25

**reaction** 93:8
**read** 46:9 62:24
  130:22 140:11,24
  150:11 151:22
  285:16 288:1
**reader** 220:3
**reading** 52:8
**reads** 220:4
**ready** 119:8 127:5
  244:20,21 273:14
  274:22
**real** 126:11
**realize** 100:8 112:24
  150:1,7,13
**realized** 113:17
  150:16
**really** 14:17 48:15
  72:3 85:7 101:19
  110:12 134:25
  144:24 171:4 182:5
  183:14 191:18
  195:20 202:12
  205:22,25 206:2,17
  208:18 209:20,21
  212:6 213:24
  230:22 251:2,2
  267:2 275:23
**reason** 8:2,10 17:19
  23:7 26:13 49:9
  71:16 79:12,20
  100:24 162:10
  163:16 178:25
  184:19,21 189:7
  220:10 224:4 244:6
  248:25 251:6 252:7
  264:12 271:1
  283:22 287:4
**reasons** 8:13 159:9
  194:4
**rebecca** 88:17
**recall** 15:23 32:14
  37:20 39:8,15 71:12
  81:14 84:21 85:7
  86:17 112:6 189:22
  191:13 198:5 199:6

**[recall - responsible]**

199:14 254:15
**receipt** 40:17 42:10
43:12 45:8,15 46:6
57:9,15 76:10 80:8
121:2 238:11
**receive** 30:7 40:4
147:1
**received** 60:5 88:20
88:24 112:22
170:14 228:20,25
229:4
**receiving** 19:3 29:15
30:4 40:21 254:8
**recess** 76:18 227:9
285:8
**recognize** 204:3
239:19
**recommend** 90:14
**record** 2:21 6:3,8
56:17 76:17,20,22
84:20 85:9 86:21
91:13 110:2 112:17
114:11,13,15 127:6
135:13 151:5,8,11
151:17 152:12
154:22 155:1 170:3
180:16 213:15
217:22 223:9 227:7
227:12 285:7,10,19
286:6
**recorded** 157:15
172:19 227:25
229:1 252:24
253:12,16,17,19
254:1
**recording** 71:23
109:24 228:5 246:8
249:14 250:20
**recordings** 110:4
**records** 2:18 3:20,22
9:14 26:1 154:2
167:5 172:5 250:3
254:7 256:7 260:10
267:13 270:17

**recourse** 166:2
**reduced** 286:5
**redundant** 143:22
**refer** 219:11
**reference** 118:16
140:2 141:7
**referring** 66:3
**refilling** 274:1,2
**reflected** 196:8
**refresh** 40:20
**refrigerated** 119:10
**refrigeration** 83:11
**refrigerator** 62:15
62:20 63:3,5 115:2
238:9,10,18 239:6
**refuse** 188:10
**refused** 216:24
**refusing** 230:4
**regarding** 34:19
63:13 192:12 199:3
**regards** 60:5
**register** 45:8,15
46:6 103:8
**registration** 286:22
**regular** 19:20 27:10
35:9 116:15 163:23
179:12 260:18
263:21
**regularly** 269:18
**regulations** 2:5,8
5:21 40:18,22 41:23
44:14 85:19
**reinstatement**
132:12
**rejected** 230:19
**relationship** 124:6,9
173:6 243:21 286:9
**relative** 286:7
**relatively** 274:12
**relevant** 110:5
**rely** 176:14
**remaining** 62:14
**remark** 202:4
**remember** 24:4 26:3
38:21 39:13 40:6,21

41:11 54:24 63:16
71:16 76:12 86:20
94:25 111:17
132:17 140:6 144:5
173:19,23 199:4
217:16 234:25
239:22 246:1
254:23,24 257:10
260:19 268:24
278:21 280:25
281:10 282:2
**remembered** 64:6
64:10 115:13
231:20
**rented** 10:15
**renting** 10:12,13
**reopen** 56:3
**rep** 131:23 207:15
225:17
**repair** 24:15
**rephrase** 33:2 95:17
**replenish** 190:20,24
191:6
**report** 59:18 60:11
62:25 74:25 75:13
127:18,22 226:16
226:17
**reported** 236:12
248:22
**reporter** 5:23 6:15
7:17 44:10 49:3
59:6 69:12,13 78:2
92:25 151:16 205:9
**reporter's** 41:18
108:25 113:23
**reporting** 5:22
**reports** 127:11,11
127:13,21 141:20
226:12,23,25
**represent** 6:8,22
21:25 40:15,25
41:20 44:13 49:6
85:11 89:6 93:2
95:23,24 109:2
149:17 151:18

192:23 227:16
239:15 271:14
**representative**
182:15
**represented** 70:17
**representing** 6:10
6:12
**represents** 110:22
111:7
**require** 27:3 162:22
**required** 92:21
129:10,13 158:20
196:20 224:6
257:20
**requires** 105:6
228:13
**reserve** 285:15
**reserved** 285:21
**resign** 91:11,23 92:4
92:6 146:2 148:2
**resigns** 147:17
**resolved** 89:10,17
101:17
**resource** 112:21
**resources** 132:18
**respect** 43:24,25
44:15 139:12 147:5
147:18 238:6
**respected** 125:1,2
**respectful** 74:16
**respond** 88:22
135:11 145:1
**responded** 169:25
199:12
**response** 88:23
**responses** 3:10
**responsibilities**
181:1 275:7
**responsibility** 48:24
96:17 180:24 185:4
188:8 213:11
214:22 236:3
237:18
**responsible** 128:11
160:4 176:18

**[responsible - sales]**

200:22 206:12
215:10 282:14
**responsive** 267:3
**rest** 52:14 274:6
**restored** 89:12
**result** 102:19 234:17
**results** 186:13,14
**retail** 139:3,11
159:12
**retailing** 126:11,12
126:19 127:6
141:21 172:8
226:11
**retain** 45:15
**retirement** 28:23
29:18,20
**return** 149:5
**returned** 149:8
**reverse** 11:2
**review** 9:9,12 60:17
196:2
**reviewed** 61:3 76:4
229:22,23
**reviewing** 60:7
**reward** 146:10
**ridiculous** 101:6
126:14 201:2
**right** 7:20,21 8:1,21
10:24 11:15 13:10
15:3 19:23 29:25
33:8 36:4 40:24
43:5,12,18 45:22,25
46:14 47:1 48:12,25
49:3,8,12,14 54:9
54:10,14 55:9,14,23
55:25 56:13,15
58:10,17,18,25
59:15,17,24 60:24
61:7,21 62:10,23
63:4,12,14 64:9,12
64:14,16,17,22
65:18 66:14,16,23
67:4,21 68:6 69:7
69:20 73:17 74:24
75:19,21 76:13,25

77:10,22 78:13,20
78:24 80:15,16
83:25 84:8,13,18
85:14 86:20 87:22
90:22,24 91:4,10
92:5,10,11,13,18,22
93:13 94:3,9,11,19
97:8,9,13,22 98:6
98:22,25 99:5,11,14
100:12 102:8,10
103:2,14 104:8,12
104:16 105:1,4,6,10
105:14,20 106:12
107:16,23 108:1,2
108:16 109:19,22
110:7,15 112:2,10
112:20 113:6 115:6
115:9,25 118:15
120:4,24 121:6,12
121:22,25 125:4
128:12 129:6,16
132:21 133:21
134:19 135:6 138:3
138:19 139:12
140:8,13 143:14
145:9 146:22
147:10,21 148:12
148:13,14,16,17,18
150:24 151:24
152:6,17 153:16,19
154:15 157:13,20
160:12 161:17,20
162:4,11 165:4,11
166:14,25 168:5
170:13 171:19
173:19 174:13,23
175:2,6,12,16
179:18,21 180:25
181:4 182:9 184:1,2
184:8,17 185:5,11
185:15,17,20 186:4
186:17 187:20
188:23,23 189:2
190:9 191:2,7,24
194:17,25 198:22

198:22 199:8
208:15,18 210:19
211:16 212:12,12
213:4,8,10,16,20
214:3,12 215:7
216:5 217:9 218:7
219:11 221:24
223:2 227:2 228:9
228:19 229:5,13,16
229:16,23,24
232:25 233:16
234:21,25 235:21
237:15,19,19
239:13 241:9
242:22 244:10
245:5,11,22,22,22
245:22 247:5
248:20,23,23
249:12,19 250:2,13
250:23,24 251:9,11
251:17,23 252:18
252:22 253:8,14
254:2,5,10 255:3,16
255:18 256:19
259:7 260:11,16,25
261:8,16 264:8,9,12
265:7,18 266:11
267:23,24 268:8,22
270:2 271:17 272:1
272:2 273:20 275:1
275:2,10,14,17
276:5,14 277:12
279:11,14,23 281:8
283:4,24 285:3,16
**rights** 101:5
**ring** 56:21 69:19
110:24 236:4,6
**rings** 263:4
**rip** 248:11
**rmr** 1:19 286:20
**robert** 81:12 215:9
**roberts** 269:22
**robinson** 53:12
81:11 120:17

**robot** 55:4 119:24
121:9
**role** 128:21
**roll** 241:12,13
**room** 44:23 62:6,17
63:1,1 115:1 143:21
201:1 207:12
237:23,24 248:8
**rosana** 144:15
**rotation** 277:16
**roughly** 49:18
250:16
**route** 21:10
**routine** 21:13 273:8
280:23
**row** 211:3
**rpr** 1:19 286:20
**rubber** 45:22
**rule** 56:12,13 57:23
85:19 96:4,16,19
166:23 168:8
227:17 228:8,10,11
238:7
**rules** 2:5,8 5:20 7:5
40:17,21 41:3,13,22
42:14,18,21 44:14
45:12 136:24 137:2
167:14 172:14
209:15 227:23
235:3 238:5 269:3
**running** 116:23
187:1
**runs** 241:4

**s**

**s** 6:1 11:14
**sad** 123:9
**sadness** 123:12
**safely** 275:22
**safety** 71:3 215:24
**sake** 105:3
**sales** 83:9 176:6
177:10 178:2,22
261:24,25 275:13
275:15

Page 30

[sample - seven]

sample  80:21
sara  187:7,13
sat  63:2 71:15 74:20
  83:15 113:9
satisfaction  141:23
saturday  63:19
  66:21 240:22,23
  241:3,4,5 245:23
  249:6 251:13 252:8
  252:16 281:18
saving  31:2
savings  30:13,14,22
saw  47:13 75:13,14
  81:1 120:20 137:14
  173:11 205:23
  218:3,4,12,18 224:8
  230:21 256:17,24
  281:15
saying  22:5,6 67:7
  72:4 102:21 103:5
  110:16 144:2
  147:25 154:7
  162:10 185:16
  190:12 194:6
  198:19 203:13
  231:22 234:6
  237:23 243:4 246:4
  247:3 267:17
  281:16
says  40:23 45:5,15
  46:2,12 52:7 55:2
  60:4,14 86:5,13
  87:19,21 91:11,18
  91:20 93:7 97:6
  106:2 109:14,21,24
  110:23,25 111:7,21
  118:22 119:22
  120:1,10 133:22
  134:3,23 146:12
  152:10 154:21
  159:15 169:23
  171:18 199:9
  201:14 202:6
  203:14 204:21
  209:6 210:7 211:22

218:12 228:23
  231:12,23 232:21
  236:3,19 237:11
  247:15 255:20
  262:12,25 271:19
scale  29:3 206:6
scan  51:21,23 52:8
  61:12,14 62:1 64:20
  67:8,20 73:17 77:14
  106:1 119:24
scanned  51:25 119:7
  119:9
scanning  63:14
scans  56:9
scared  282:12
scenario  121:14
  264:10
scene  2:11 3:12
  227:21
schedule  160:14,15
  163:13 171:18
  172:1,8,10,15
  176:25 177:3 180:2
  182:6 187:9,21
  204:1 213:4 221:21
  247:13 256:17,18
  256:21 258:8,9
  262:3 280:13 281:6
  281:12,25 282:4,25
scheduled  101:2
  166:23 172:7
  187:17 191:5 203:6
  204:5 212:17,18
  221:23 230:15
  244:11 247:11,12
  253:11,11,15,17,18
  253:24 254:4,9
  256:11 272:16,22
  279:13 280:18
  281:7,9,13,16,19,20
  283:1
schedules  127:12
  177:7 259:3
scheduling  172:9,10
  241:21 282:2,6

school  14:3,4,5
  15:10 18:15 19:6
score  144:17
scores  141:8
scrambling  127:4
scream  123:22
screamed  226:16
screaming  117:3
screen  169:11
screw  278:24
screwed  73:9
screwy  241:7 258:18
scuttlebutt  145:13
se  95:23 273:21
seal  288:17,17
second  22:13 52:18
  73:24 74:1,6 90:2,9
  90:11 100:10
  118:25 159:14
  173:16 201:14
section  32:5 214:25
  216:20,23
security  29:12,14,16
  29:19 30:5,20 70:23
see  15:4 21:22 22:5
  22:10,11,17 32:8
  33:7 40:18 41:23
  44:16 45:1,9,17
  46:7 53:18 59:8
  60:13 65:7 68:1
  78:6 85:20 86:13,14
  93:10 98:11,16
  100:24 101:5
  103:16 111:25
  112:4 115:4 119:2
  123:9 125:18 133:4
  133:24 136:24
  137:1 152:15 160:6
  172:5 173:9 183:22
  185:23 192:1
  193:16 195:18
  203:23,24 204:2
  212:21 221:13,23
  228:2,6,17 229:2
  232:4 236:13 238:2

238:13 242:13,20
  243:3 246:17 250:4
  252:4 254:7 256:7
  256:10 259:2
  271:24 278:20
  281:4
seeing  70:16 117:6
  202:16
seen  44:18,20 59:10
  59:13,17 80:4 85:5
  106:11 109:4
  116:24 125:20
  151:20 193:7 218:1
  225:20 235:9
sees  233:3 262:24
send  89:10 131:14
  141:17 142:13
  149:6 164:5 176:10
sending  132:1
senior  77:21
sense  29:11 65:10
  77:9 97:24 174:16
  203:12 252:11
sent  112:19 113:10
  131:7,9,20 133:2
  150:2
sentence  46:11
  134:23
sentences  45:5
  134:3
separate  181:9
separation  30:19
  34:25 35:4
serious  79:13
seriously  170:22
serve  286:13
service  29:7 141:18
  142:2
set  25:9 28:20 91:9
  106:18 112:23,25
  133:3 235:3
sets  90:21
setting  130:17
seven  119:23 152:24
  153:5 171:11

**[seven - speaking]**

242:25 258:10
276:25
**shake**  238:21,23
**share**  140:16
**she'd**  125:18 270:8
**sheet**  40:16 41:21
195:14,16 223:12
229:1 230:20 248:5
**sheets**  228:24
**shelf**  127:17 177:17
191:10,11
**shelves**  129:13
190:20 191:7
**shift**  20:7,14 38:4,19
50:3 52:24 53:3
82:1,10 240:5
241:18 267:22
**shifts**  38:1 201:11
256:12
**shippers**  273:6
**shipping**  19:3
**shop**  36:24 37:5
86:5,8
**shoplifting**  65:7
**short**  103:11,12,12
103:20 104:3,12,20
150:7 160:22
161:13 280:11,24
**shortcut**  193:19
**shortly**  149:20
**show**  32:11 76:11
91:14 111:16
117:16,17 120:21
127:21 153:11
154:2 170:21
175:10 176:13
189:5 201:3 230:16
232:24 260:24
264:1,12 266:1,14
269:10
**showed**  64:12 76:9
282:18
**shows**  105:23,24
243:12 262:17

**shrink**  2:19 42:23
42:25 43:1,2 78:8
78:11 79:13,22
82:25 103:12
**shut**  52:14,18 53:3
60:12,13 119:9
**shuts**  52:8,22
**shutting**  53:15
**sic**  16:4 206:4
**side**  106:23 123:23
274:16,16
**sign**  37:10 40:16
41:20 91:16 195:16
285:16
**signature**  41:25
42:2 54:18 237:6
285:21 286:19
287:1 288:2
**signed**  41:7 54:16
78:5 85:6 86:12,14
93:3,12 101:13
195:14,17 228:24
230:20 235:13
237:8
**significant**  34:11
**signing**  228:25
**silly**  180:3
**similar**  44:22
**simple**  197:24
**single**  152:17,21
166:16 246:3
253:23 264:16
267:14 276:23,24
277:1
**sir**  164:23 262:15
263:24
**sister**  14:7,10
**sisters**  13:6,9,20
**sit**  133:4 144:3
161:22 248:8
**sitting**  101:20
142:21 147:23
209:19 254:11
255:4,22 256:5
282:21

**situation**  53:8 82:8
83:25 84:6,11,15
89:17,23 95:7
106:18 132:4 135:5
138:1 157:9 181:24
186:22 229:14
232:19 283:18
**situations**  79:2,25
81:24
**six**  36:11 87:18
100:25 119:23
136:2,9 206:7
215:12 232:10
258:9 259:20
264:19,20 271:7
**size**  176:7 274:12
**slash**  262:1
**sleepy**  165:8
**slept**  281:1
**slide**  58:4
**slip**  140:5
**slower**  186:11
**small**  79:4 177:10
178:3 225:14
274:12
**smart**  149:25 190:4
**smarter**  179:11
**smoke**  98:8
**smoker**  98:10
**smokers**  14:20
**smoking**  98:11,17
98:19,25 99:4,5,10
99:12 137:12
**smooth**  7:7
**snow**  66:17 244:8
245:21 246:5,6,7
247:3 249:9
**social**  29:12,14,15
29:18 30:4,20
**soda**  61:24 62:3,5
79:9
**soft**  43:9
**solely**  286:11
**solid**  96:11

**solutions**  286:21
**somebody**  33:11,12
34:6 50:11 53:7
75:6,13 112:21
117:15 129:15
132:8,14,17 135:12
135:13,14 141:12
143:9 145:12
163:18 166:21
167:12,13,19
172:16 174:17
187:8 194:8 204:2
209:10 213:6
216:15 221:16
222:9 226:6 232:4
256:16 266:17
267:18,24 268:3
278:9 281:3 284:20
284:23
**somebody's**  144:18
209:20 227:1
**something's**  144:19
**soon**  64:11 71:18
90:16 167:22
247:16,22 262:24
267:9
**sorry**  22:13 239:14
271:14
**sort**  21:12 46:25
56:23 61:24 130:16
**sound**  28:13 58:25
60:24 72:10 109:19
109:22 111:2
219:13,14 253:21
272:1
**sounds**  21:10 112:10
133:7 272:2
**source**  223:25
**sources**  30:18
**speak**  9:2 73:4 76:2
214:1
**speaking**  27:10
132:5 169:2 189:11
260:7 261:18 268:1
272:23

**[spear - store]**

spear  11:12
special  220:12
specific  120:14
  136:13 137:9 168:7
  193:22 257:9 260:3
  261:17
specifically  47:15
  115:8 116:4 120:6
  197:9 224:21
speculate  254:22
speculation  213:24
speed  161:24 162:23
  163:4 274:17
spell  11:13
spelled  101:25
speller  130:19
spend  2:12
spending  160:2,23
spent  129:4
sperry  5:3 6:10,10
  47:2 69:8 76:15
  82:19 97:23 103:3
  103:17 106:21
  107:1,4 108:18
  118:25 151:3
  162:15 170:6 195:1
  213:25 285:12,14
split  180:17 181:1
spoke  29:22 72:9
spoken  42:15
spot  151:3 207:18
spots  65:9
square  176:7 177:9
  177:11 179:7
stable  23:6
stacie  53:12 81:11
  120:17
stacked  200:5
  277:20
staff  20:22 169:6
  208:24 263:10
  271:8 279:6
staffing  199:19
stand  123:16 151:4

standard  89:9
standing  64:24
standpoint  146:6
  154:1 163:5 169:10
  174:16 175:24
  176:23,24 177:11
  185:23 212:9
  215:24 216:11
  225:14,15
staples  251:20
star  197:2 209:1
start  17:21 26:13
  29:11 30:4 36:1
  40:6 103:10 187:23
  191:18 202:16
  216:5 241:2,18
  246:8 250:20 252:6
  257:17 278:19
  279:18
started  15:23 20:14
  28:7 35:8,13 55:19
  55:21 72:22 126:13
  198:7 199:15
  207:21,24 230:10
  249:14 267:22
starters  175:18
starting  244:13
  252:1
starts  103:8 117:2
  234:1
state  286:2 288:6,25
stated  286:4
statement  5:22 68:7
  68:10 82:13 86:13
  86:14 93:7 198:18
  213:22
statements  33:13
states  1:1
stating  149:7
status  87:10 201:21
  204:15,15,17
stay  155:14 166:8,13
  166:21,24 167:3,6
  202:23 233:11
  261:16 267:25

280:20 282:15
  283:15,16,21
stayed  56:4
steal  65:12 78:19
  95:10 97:18 103:1
  105:13,18,20
  106:17 117:10
  118:2 233:24
stealing  46:24 47:9
  47:21 70:25 99:5,7
  99:7,11 116:9 183:4
step  50:22 59:22
  90:10 93:22,24 94:1
  94:7,9,19,23 99:20
  100:5 108:20 109:3
  109:3,15 112:3
  113:1,7 114:19
  129:23,24 138:2
  145:17,20 146:13
  148:19 206:18
  207:12 217:2
steps  59:21 93:16
  100:22 117:23
  145:1
steve  224:11,23
steward  86:5,8
  88:25
stick  72:15
sticker  111:22
stock  127:13 129:13
  207:12 265:11,19
  265:20 278:14
stocked  190:12,15
  273:13
stocker  38:10,11,18
  48:13 49:13
stockers  163:11
  260:24
stocking  38:4,5,12
  265:4 275:23
  279:21
stocks  127:7
stone  36:7
stones  27:10

stop  17:8 18:11
  22:22 102:5 168:13
  173:9 176:8 179:23
  190:9 208:2 263:20
  278:6
stopping  151:2
store  2:5,8 21:4
  28:25 36:22,24 37:5
  37:14 38:14 43:2
  51:4 53:19 55:3,9
  55:17,22 56:18 60:5
  60:6 65:3,22 67:19
  70:16 71:2 74:14
  79:13 80:5 81:2,19
  81:22 82:1,4,9
  116:22 117:1,13
  119:14 121:10,15
  121:18,19 122:1,1
  122:11 123:18
  127:9 128:12,13
  135:7 136:22 140:6
  140:15 141:5,24
  142:1,10,22 143:14
  144:9 155:9,23
  156:8 160:16
  163:10 167:10,14
  169:4,18 172:16
  174:22 175:12
  176:7,15,19 177:5
  177:10,13,15,15,17
  177:21 178:22
  182:7 185:5 186:25
  188:19 191:12
  200:19 205:1
  208:25 211:7
  215:14,17,24
  219:24 223:19
  224:5,19,21 235:11
  240:9 244:12,16,18
  245:2,3,8,10 246:25
  248:7,14 254:19
  258:5 265:5,11,11
  269:3 273:3,9
  274:13 276:4,9,10
  276:11,16 280:8

Veritext Legal Solutions
800-336-4000

**[store's - talking]**

store's  174:12
stores  43:6 125:20
  183:7 184:16 202:2
  262:1
storm  66:18
story  70:3 106:24
  116:12
straight  174:17,22
  175:5 185:9
straightened  207:23
strange  72:10
stranged  243:25
street  5:7 286:23
strict  21:12 167:11
  238:5
stroke  239:4
stuff  15:1 32:13
  34:4 35:13 51:15
  57:21 65:9 71:11
  117:20 119:10
  126:7,9,10,15
  127:15 128:2 135:8
  135:23 140:16,21
  141:19 142:2
  145:11,25 149:5
  151:1 157:2 160:20
  164:4 168:22
  169:20 176:10,12
  176:14 178:6 182:2
  183:8 198:11 200:4
  204:18 209:25
  215:18 225:19
  226:12,23 244:7
  254:18 273:6
  274:17,19 276:19
  278:4,14
subcontractor
  286:12
subject  55:6
submitted  5:23
  229:19
subscribed  288:13
subsequent  84:2
substance  136:16

substantiate  45:7
subtract  272:8
successful  16:23
sudden  98:16 142:8
  191:25 196:25
  204:8 232:24
suddenly  246:22
sued  33:11
sufficient  175:19
suggest  150:25
  250:7,8
suing  34:5
suite  1:16 5:7,13
  286:23
sum  31:17
sunday  32:4 111:16
  215:15 236:21
  245:23 249:6 252:2
  252:9,16,25 253:11
  254:20 281:18
sundays  277:3
super  111:15
supervisor  97:17
  159:13
supplement  32:9
supposed  32:10 50:9
  50:16 99:4 121:11
  126:23 141:25
  158:10 175:1
  182:19 185:5
  191:25 203:6
  204:14 215:19
  220:1,22 221:2
  223:9 230:8 236:16
  262:16 263:16,17
  263:19 265:4,5
  268:7 273:16
  284:14
sure  7:4,6,19 31:6
  44:3 51:12,18 53:19
  70:24 76:15 83:1
  112:18 120:20
  121:7 126:10 127:3
  129:6 142:18
  143:21 146:14

147:21 180:4
181:23 182:17
187:16 202:9 208:6
215:22 226:24
229:23 236:5,17,20
236:22 237:14,18
243:6 246:20 249:3
261:23 270:10
276:18 277:13
280:19 281:4
282:15
surprise  167:19
surrounding  137:9
surveillance  76:7
suspended  86:24,25
  87:5,7,20 88:6
  136:6,17 137:15
  138:1
suspension  87:23
suspicious  107:12
  107:12
swear  6:15
sworn  6:17
system  3:13 194:24
  219:12,12,25
  220:17 227:22
  230:17 276:6

**t**

table  7:18 8:6 62:25
tag  132:23
take  8:20 28:23
  31:16 48:17,17,23
  50:8 53:8 65:15
  70:6 80:15 81:21
  85:3 94:4 98:3
  100:23 108:2 109:6
  109:6 114:7 115:20
  118:23 125:13
  127:25 128:21
  129:9,13 135:1
  137:3 143:20
  144:13,14 149:4,23
  150:25 153:25
  154:8 158:23

160:21 170:22
172:23 178:13,22
183:20 203:15,16
203:18 206:2,12,13
206:20,22 211:6
226:12,13 227:5
244:24 285:3
taken  60:18 91:15
  95:2 101:16 116:16
  117:23 133:10
  147:8 160:13
  190:23 199:17
  286:4
takes  35:14 79:21
  156:6 265:8
talk  7:16 8:12 28:10
  37:13 70:5 74:3
  84:18 101:4,8,8
  108:20 113:7,15,15
  122:14 133:4
  138:19 172:20
  188:24 200:14
  208:19 210:3
  238:14 263:21
  268:17 273:8 279:9
  284:6,7
talked  9:4 28:24
  37:15,20 90:3 96:21
  99:24 100:1,3
  101:15,22 115:17
  133:1 148:20
  149:11 164:22
  171:2 182:1,3 189:2
  198:20 216:7,20
  217:3,7 234:14
  269:10 284:16
talking  7:12,19 31:7
  73:10 77:1 86:3
  98:24 99:1 113:20
  114:3 118:21
  134:10,11,14,18
  135:3,6,7,13,22,22
  135:23 136:13
  144:21 147:23
  152:17 161:9

Page 34

[talking - thought]

170:12 178:6
183:11 201:16
203:5 210:2 235:16
243:13 245:21
259:21 260:15
266:6,13 270:5
271:16 272:18
**talks**  78:10 136:2
139:2 237:22
**tall**  200:3
**tape**  45:20 110:2,4
114:7 227:3
**taxes**  29:14
**team**  72:14,15
122:24,25 123:24
124:3,4,5 162:19
165:20 189:12
**tech**  24:15
**technically**  117:13
**tedious**  127:15
**teetering**  175:23
**tell**  38:2 49:10 53:16
62:23 67:10,13
71:13 72:11 73:20
81:20 96:10,14,15
97:10,25 111:8
116:1 121:8 124:23
124:24 132:21
136:8 143:24
155:12 163:3,4,19
170:9 173:15
191:21 193:20
196:15 197:16
198:1 199:14
203:10 219:2,7,9
220:5 243:20
258:25 259:9,19,20
262:9 267:10 269:7
270:8 279:4
**telling**  57:8 70:17
75:12 105:18
116:12 135:16
141:13,20 146:8
157:6,7 161:4,6
169:25 171:25

176:11 181:22
191:24 222:21
231:25 237:14
246:18 258:6 267:3
**tells**  96:18 159:17
182:20 203:12
**temperature**  216:6
**tend**  8:12
**term**  86:24
**terminate**  166:1
**terminated**  19:10,12
28:12,18 46:20
47:15 79:3 82:23
87:19 104:10
139:24 145:24
146:18,20,21,22,24
147:16
**termination**  51:3
87:1,23 128:17
192:18
**terms**  21:13 145:3
166:8 286:12
**terrible**  142:5
**terry**  5:17
**test**  169:12,14
**testified**  32:25 78:14
91:1 132:13
**testifies**  178:21
**testify**  8:24 254:12
**testimony**  33:20
56:16,22 58:17
61:14 67:18 69:25
78:18 91:2 115:7
120:16 152:20
153:5 213:22
223:17,20 246:21
249:4 260:2 265:23
266:15 267:15
275:3 278:16
**texas**  5:14 286:24
**thank**  6:14 22:11
130:4
**theft**  43:5 60:6 79:4
79:22 80:21 84:12
105:5 117:15

118:14 146:18,20
**theirs**  245:10
**theory**  106:16
**thief**  65:13 102:3,6
102:16,17,19,22,22
104:25 105:12
**thing**  8:5 25:7 33:6
33:7 34:10 38:1,13
47:11 50:24 52:10
53:14 64:20 65:10
71:5,23,25 72:2
81:21 95:2,14 97:7
97:9 101:2,6 112:15
113:8 125:10,12,23
126:4,12 133:9,15
135:25 141:16,22
141:25 145:12
150:4 156:13,22
159:25 160:8 163:6
167:18 170:24
187:13,20 188:3
189:6 195:25
198:24 202:8
203:25 204:1,4
205:3,6 212:19
217:15 218:22,22
220:2 223:10,11
224:23 226:11
231:1 245:18
246:12 249:21
256:15 258:19,20
262:15,24 266:25
272:24 273:7,11
274:7,14 281:19
**things**  28:3 32:5
41:13 56:21 67:16
67:17 72:3,11,12,16
81:17,18,23 82:24
89:15 91:6,9 95:14
99:6 101:25 104:22
105:2 110:8 112:16
116:2 123:2 124:13
127:1,7,7,10,23
129:9 130:6 136:19
141:16,17 142:12

142:16 143:7 146:5
147:24 150:11
153:25 157:6 160:1
167:9 169:21 176:4
178:1 187:4 191:19
201:20 207:5,7
212:13 221:4 226:9
226:14 231:22
235:25 239:7
240:11 244:9,10
247:9 257:4 265:3
266:4 276:12
277:14,23
**think**  12:1 15:9
35:23 44:21 57:19
61:23 78:14,18 91:1
100:17 101:12
117:24 122:17
123:10 128:16
131:15 135:12
149:13 155:18
171:25 173:21
197:18 205:21
217:8 230:23
244:20 249:4
251:13 256:5 267:5
267:17 270:22,24
270:25 271:3
281:22 285:4
**thinking**  206:19
232:14,20 233:6,7
233:19
**thinks**  187:19
**third**  20:23 40:1
45:5 99:20 100:5,13
100:25 102:13
113:1 131:23 133:9
148:19 206:14
210:13 227:24
**thought**  64:5 72:22
72:24 73:6,7 77:10
87:5 88:2,4 96:1,12
97:5 102:1 113:3
120:12 122:18
123:7 124:11

Veritext Legal Solutions
800-336-4000

**[thought - told]**

135:20 149:1,1
174:19 183:15
196:7 198:7 201:8
201:15,16 207:17
212:3,14 217:21
232:3,6 233:20,21
233:23 248:25
**threaten** 173:4
**threatened** 171:13
179:17 192:18
196:21
**three** 13:9 18:2
34:13 36:13,21
49:17 50:4,21 51:2
70:14 81:6 94:1,9
94:20 109:3 112:3
113:7 114:19
129:24 145:17,20
149:2 150:12,13,15
150:18 157:2 167:1
169:14 178:12,16
187:10 189:4
199:16 201:12
203:20 205:14
206:16 207:9,22
211:22 213:20
215:1 217:2,19
222:5 224:2 227:13
238:9 242:13
247:24 261:20
264:22 267:17
277:18 278:22
**threw** 117:17
238:21
**thrilled** 178:1
183:23
**throckmorton**
286:23
**throw** 238:12
**thurman** 159:12
170:15,21 173:8,10
181:10,20,21
246:12
**thursday** 63:20,22
66:21 240:7 244:6

**ticking** 150:14
**till** 7:11 83:11 157:3
198:8 230:24
244:15 266:19
268:16 273:2 281:7
283:16
**time** 3:13,14 6:3
14:14,22 15:4,9
16:17 19:15,18,18
22:25 25:18 26:10
26:15 28:3 29:7
30:1,25 31:2,9,16
34:12,13 35:11,12
37:15 38:23 39:4,9
39:9,10,11 43:17
45:6 46:1,18 47:17
47:22 48:13,14
50:25 51:2,6 55:17
65:1 72:12 73:3,20
75:1 76:14,17,20
77:19 78:5 81:11,12
81:12,13 88:24
89:11,14 90:9 91:7
98:10 99:7,11
100:19 104:12
105:12,14,15
110:24 111:14
112:24 113:17
114:6,11,15 119:8
124:8 125:6 128:16
128:25 129:10
130:15 134:8
136:10,11 137:14
137:25 138:24
139:24 144:9,23
150:7,14 151:5,8
153:14,23 154:5,9
154:14 157:10
158:21 159:18
161:6,13 162:5,9
163:13,14,16 167:7
167:7,8,8 168:1
169:5,5 171:2,4
172:14 174:17,17
174:22 175:5

176:11 177:23
180:21 182:17
184:24 185:9
187:24 188:2,5
190:4,6 194:24
195:14,16,18,19,21
195:23 196:3
201:14,22,23,24,25
202:2,17 204:13,15
204:15,17 205:14
206:14 208:24
213:16 214:5,21
215:21 217:14
218:4,24 219:16,17
219:19 221:8,19
223:9 225:15 226:5
227:7,12,21,25
228:5,5,14,24,25
229:1,7,11,17,25,25
230:15 231:19
233:6,11,12 235:19
236:5,13 237:9,13
237:18 241:19
243:10 246:8 247:8
248:5,12 249:14
250:3,16 254:6,13
255:8,10 257:1
260:21 261:6 265:9
267:14 268:23,23
268:25 269:21
270:11,17 272:10
272:16 273:15
274:15 275:10,18
276:2 277:14,17
279:3 280:14 285:7
285:10,15,18
**timekeeping** 194:24
219:12
**timely** 91:12
**times** 10:24 42:11
44:20 52:11 57:20
70:13 81:4,9,10
102:14 119:23
120:19 124:16
178:5 206:16

215:25 238:9,22
248:6 255:13
267:18 272:11
280:10 282:10,17
284:14
**tired** 17:20 111:17
171:6 196:20
**today** 7:7 8:25 9:10
9:16 47:9 69:25
78:18 82:14 144:2
151:18 159:10
217:7 254:11 255:4
255:22 256:6
280:19
**today's** 6:4
**told** 27:15 30:1
31:14 32:17 38:3
48:17 53:2,14 56:22
66:25 68:25 72:7
77:12,20 90:7 96:13
96:22 97:17 101:3
112:22 120:2,5,6,7
120:8,11,13,16
121:7 126:5 127:1
132:10 137:13
139:5,9 142:11
143:25,25 144:4
146:16 147:19
155:5,17 156:10,11
157:22,25 158:4,11
158:15 160:23
170:19,25 171:16
173:13 179:5,14
180:1 183:1,14
189:23 190:1
191:17 193:24
194:19,19,22
196:17 197:8,9,11
201:21 214:18,24
215:5 218:16,19
219:4 223:24 224:2
226:1,17 231:12,17
231:17 233:9,25
234:9,20 239:1
243:17 244:1

Veritext Legal Solutions
800-336-4000

**[told - unethical]**

257:24 258:7,23
260:20 261:21
262:9,20,25 263:1
263:18,19 266:21
267:8,11 270:13
**tone**  171:5
**tonight**  268:21
**tony**  5:18
**top**  45:1 109:14
136:11 206:5,9
**totaled**  236:11
**totally**  178:15
**touch**  132:7
**tower**  1:15 5:6,12
**town**  153:23
**trade**  184:24 185:1
185:8
**train**  17:2 50:13
128:23
**trainees**  213:7
**trainer**  16:3,8 20:23
22:20
**trainers**  20:21
**training**  15:17 17:11
17:14 20:16,19 28:4
28:6 50:15 128:17
129:1 274:4
**transaction**  58:10
61:4 76:11
**transcript**  69:13,14
286:4,6
**transfer**  225:9
**transferred**  211:6
224:19,21
**treated**  108:13
188:19
**tremendous**  177:12
**trial**  25:10
**tried**  101:10 118:1
136:23 166:1 272:8
**tries**  137:3
**triple**  215:21
**trouble**  72:8 73:7
155:25 205:17
226:5 233:7,8

278:25
**truck**  156:14,16,18
156:20 216:3
240:13 262:16,19
263:8,11 264:14,15
264:16,19 273:14
273:21,22 274:21
274:22,25 276:20
277:17,21 279:5,6
279:18
**truck's**  266:1
**trucks**  32:6 254:19
273:17 274:15
277:4,4 279:2,3
280:12
**true**  19:21 23:13,14
35:1 45:19 56:11
84:9 89:15 102:10
102:11 109:25
115:6 146:9,16
148:1 154:10
164:23 167:6,25
168:15 190:10
197:13 250:22
259:16 270:1,1
286:6 288:3
**trust**  65:23 225:22
226:6
**trusted**  259:24
**truth**  72:11 105:18
134:8 135:16
**truthful**  135:14
222:7,10
**try**  7:15,18 8:15
65:12 72:24 105:17
107:15 127:4
141:18 150:10
193:19 234:11
248:8 258:1,3,16
**trying**  12:1 33:12
35:14,24 53:1
117:21 148:6
149:13 169:7 178:8
186:2 208:11,16
225:6 232:6 233:20

233:24 238:16
239:8 245:6,8,23
247:7,8 248:10,10
255:2 261:14 267:2
278:12,13 279:7,7
**tuesday**  241:23
252:20 253:4,16
259:4 262:6
**turn**  98:10 129:16
193:9 267:7,7
**turned**  31:14 89:15
113:1 129:3 141:2
184:7 248:3
**turner**  182:16,20
**twice**  10:25 49:7
178:18 267:5
**twisted**  68:25
**two**  11:6 13:9 36:12
44:25 45:5,14 49:17
49:23 50:1 52:17
56:1 70:14 93:24
94:8,23 99:5 101:1
104:22 105:2
108:20 109:3,15
114:16 129:24
143:9 150:19 157:5
162:17 163:1 164:2
166:21 187:10
192:15,16 199:16
200:25 202:21
203:19 204:21
205:24 210:6 227:8
227:15 238:9 257:4
260:24 261:20
264:11 267:17
268:15 274:14
280:11 281:13
**type**  69:3 74:13
79:18 89:7 130:9
162:25 199:7
**typed**  59:14
**typewriting**  286:5
**typical**  57:17 148:15
**typically**  104:11
146:25 180:23

250:18 268:13
272:10,20 273:10
275:4,9,24 279:10
280:2 281:20
**typing**  130:20

---

**u**

**u**  51:21,23 56:9
61:12,14 62:1 64:20
67:8,20 73:17 77:14
**uh**  7:24,24
**ultimately**  108:2
**umpire**  95:20
**unacceptable**
155:21
**underneath**  116:18
117:1 223:8
**understand**  6:24 8:9
8:11,14,15,19 19:19
45:11 56:15 76:23
79:1 83:16 84:5
90:20 99:3 103:5
106:23 107:22
114:25 115:11
132:3 135:8 140:23
150:22 151:12
168:12 169:9 175:9
182:8 185:22 186:5
186:18 187:2,5
198:23 200:12
202:20 205:2
221:25 267:20
**understanding**
117:18
**understood**  8:17
42:16 46:16 75:9
78:15 89:21 93:16
120:23 124:2 139:2
176:2,3 181:16,18
194:11 202:3
202:23 207:16 261:11
**unemployment**  30:7
**unethical**  97:11
148:5 210:4

Page 37

**[union - wanted]**

| | | | |
|---|---|---|---|
| **union** 39:15,17 86:8 | 273:11 275:25 | **viewed** 135:10 | **walking** 80:5 105:24 |
| 88:25 89:4 95:25 | 277:10 279:12 | **violate** 65:20 | 163:21 |
| 100:21 107:19 | 280:8,25 283:23 | **violated** 65:17,19,23 | **walks** 262:18 |
| 108:6,15 131:23 | | 85:23 96:25 102:7 | **want** 9:4 11:4 15:20 |

**v**

union 39:15,17 86:8 88:25 89:4 95:25 100:21 107:19 108:6,15 131:23 145:20 146:13 148:19,22 162:24 165:15,17,18,20 166:23 200:13,15 207:15 225:17
unions 39:22
unique 166:7 178:1
unit 182:20 183:11 204:25 205:3 209:5 210:1,3
united 1:1
unlawfully 193:14
unload 282:21
unloaded 216:3 240:13
unpaid 211:23 216:25 217:6
unsuspecting 167:19
upload 282:5
uploaded 259:4 282:3
upper 185:22
upset 117:3 123:8 231:5 247:17
upstairs 115:16 137:23 144:22 207:6 240:10,14
use 8:11 46:3 85:12 108:15 110:14 133:18 155:8,17,23 155:25 157:4,8 160:10 166:20 178:7 257:22 267:8 268:20 269:19
uses 176:4
usually 15:3,21 71:2 125:15 163:20 188:16 229:16 259:2 266:17,19 269:7 272:12,15

273:11 275:25 277:10 279:12 280:8,25 283:23

**v**

vacation 145:24 146:19 147:1,6,8 153:22,23 154:2,4,8 182:14
value 139:3,11
varies 51:24
various 109:3
vary 271:2
vehicle 248:16
verbally 7:23
verdict 140:14,15
vergara 125:9 204:23,24 205:5 207:25 209:3 218:18 219:3
verge 197:1
verify 222:10 237:12
veritext 286:21
version 41:5 49:5 130:25 131:1,6 133:8
versions 131:3
versus 105:19 120:13 185:1
vice 131:13
video 60:16 61:3 64:12 65:6 76:7,8,9 103:22 105:23 106:8 231:8,24 238:13
videographer 5:17 6:2,14 76:16,19 114:6,10,14 151:4,7 227:6,11 285:6,9,17
videotaped 1:11 6:5 285:18
view 79:21 88:2 107:11 150:3

viewed 135:10
violate 65:20
violated 65:17,19,23 85:23 96:25 102:7
violating 47:16 102:18 104:25 137:2 195:5
violation 46:12 111:8 146:21,23
violations 46:20 135:24 136:19 250:19
visit 70:24
voided 60:15,19 76:10
volume 177:18 274:9 280:15
voluntarily 148:1,2
vs 1:5

**w**

wage 38:22 150:12 169:9 239:18
wages 26:14,16 34:19 152:5
wait 7:10 52:23 121:19 244:17,17 266:19 273:2
waiting 25:4 72:6 87:20
waive 101:14
waived 94:9,11
waiving 94:19 99:19
walk 15:20 80:6 81:2,19,22 110:7 112:15 125:14,17 127:4 166:25 188:13 202:12 217:9 227:22 248:14 273:3 274:19 276:3,10,11
walked 106:6 195:23 240:9 247:23 280:7

walking 80:5 105:24 163:21
walks 262:18
want 9:4 11:4 15:20 16:14 17:17 23:19 24:7,10 25:8 27:25 28:10 31:12,18 34:13,23 36:1 40:7 43:6 44:24 45:4 48:15 52:22 59:24 68:7 70:5 72:20 74:3 80:24 81:10 83:4 87:17 90:7,15 95:4 101:18,19 108:21 112:15 114:18 121:6 124:2 125:12 130:6 133:3 136:21 147:25 149:11,12 152:2,9 154:24 157:20,20 159:19 161:3,4,21 161:22 165:2,5 170:5 172:5,20 175:25,25 178:9 179:13 180:2 182:8 182:12 184:11,13 185:13 187:23 188:11 189:15 193:9,19 194:9 202:14 205:20,22 205:25 207:11,16 207:20 208:6,18 210:23 215:20 217:9 220:6 226:5 227:22 232:19 239:21 240:6 242:1 247:19 251:25 254:22 257:13,14 259:3 261:3 262:12 263:21 265:14 267:20 269:25 283:7,21 284:23
wanted 17:20,21,21 27:19 28:2,21 37:25 38:1,3 58:9 81:20

Veritext Legal Solutions
800-336-4000

**[wanted - work]**

97:1 101:16,17
102:1,2 106:15
112:25 126:18
129:11 132:3,11
145:24 149:7
166:16 169:8
173:17 178:15
183:17 184:1,5
196:5 197:5 203:8
205:19 209:10
215:22 224:4
244:10 249:23
275:21 277:15
**wanting**   23:7 35:20
126:17 174:22
**wants**   117:5 128:1
**waste**   100:19,25
**watch**   139:16,18
266:13
**watched**   210:14
**water**   8:4
**way**   7:8,12 15:1
26:15 50:9,15,17
56:4,4 67:3,25 75:9
80:9 84:11 89:21
91:5,9,9 102:21
103:11 105:9
115:20 118:13
120:22 123:20
126:23 127:13,24
128:2 135:11 137:5
137:6,7 139:18
140:13,23 155:3
156:13,14 171:22
176:3,3,5 178:3
179:21 181:17
185:13,18,19
188:18 196:24
197:4,5,21 198:7
212:1 220:1 222:21
226:19 229:10
233:6 237:21
243:12 247:13,25
249:17 254:12
256:23 258:18

272:9 281:4
**ways**   161:16
**we've**   76:13 80:17
170:15,21 171:2,4
171:21 216:20
232:22 251:23
271:16
**weather**   246:24
**wednesday**   66:20
241:23,24 247:10
252:20 253:6,18
**week**   66:17,18
111:16,16 129:4
152:14,21,23,24
153:6,6 154:23
155:5,13,18,19
161:15 168:21,24
169:13 171:11
176:25 177:4
187:17,21 195:15
195:18 200:25
201:7 202:21 203:1
204:9 215:14
228:24 229:4,23
232:15 236:4,14,16
238:10 241:2
242:16,22,24 243:2
243:10,23 244:8,13
245:12,16,17 246:2
246:5,22,22 248:18
249:1,7,14,18 250:4
251:7,10,10,16
252:6 253:23
254:13 256:24
257:12,25 258:1,3
258:12 259:3,9
260:3 261:21
266:14 270:14,23
271:5 274:9 276:25
277:5 278:1
**weekends**   284:1,3
**weekly**   57:22,22
152:19 258:20
271:19

**weeks**   34:13 36:11
36:13 83:4 101:1
153:24 154:3
155:16 164:2
199:17 206:1
207:22 210:6
215:12 232:23
257:15 261:3,20
280:23
**weight**   52:5,7
**went**   15:10 18:15
19:17,19 25:3 28:18
37:11 50:25 51:2
52:12 62:1 71:20,22
71:25 87:8 95:1,9
95:14 97:3 115:16
116:4,24 117:11,14
118:12 134:5
137:23 142:16
144:24 163:15
167:3 184:18
196:25 200:10
204:8 207:21
215:25 216:2
217:14,16 218:3,4
219:18 222:4
223:11 225:8
229:17 230:18
232:2,12 239:2
240:10,11,12 262:9
263:3 267:6,12
278:21 281:1
282:13,16
**wetz**   5:17
**whatsoever**   65:11
**whim**   37:9
**wide**   182:22 188:20
200:3
**wife**   283:20
**willful**   150:19
**williams**   160:6
**willing**   171:11
284:20,21
**winchester**   10:1
22:9

**wind**   72:18 226:15
**window**   150:13,13
150:18,20 167:15
**winn**   12:11,13,15,17
17:15 19:7 22:17
27:20 31:8 34:1,15
37:23,24 38:8 42:21
116:9,13 117:11,19
127:24 164:15,19
**winter**   182:13
**wiped**   26:21
**wish**   108:3
**witness**   6:15 69:10
71:22 74:22 82:21
83:17 107:6 114:9
119:2 137:20,24
170:7 227:4 285:5
285:11,13
**witnesses**   33:12
**word**   8:11 72:9,25
137:1 146:15
218:25 234:7,10
**words**   51:25 55:19
57:18 68:23 100:22
120:11 168:18
175:23 195:22
206:6 222:18
245:18
**work**   2:15 7:8 12:19
13:12,17 16:1 18:15
21:14 23:21 24:15
27:19,25 29:11
31:21 34:11,25
35:24 36:4,6 37:6
38:1,3 49:16,22
50:9,16,17 52:2
81:18 87:16 96:19
96:20 106:20 125:5
125:25 128:6 133:5
133:6 137:6,16
153:12,13,20,24
154:3,11 155:6
156:16,21 157:6,23
157:25 158:4,15,19
160:19 161:24

Page 39

**[work - years]**

162:5,8,23 163:5
164:15 165:3,5,9
167:1,24 168:25
169:16 170:18
171:11,17 172:1,17
177:20 178:2 180:2
182:6 183:10,22
184:11,13 185:9
186:13,20,21 187:8
187:17 192:2
194:12 197:9,14
199:3,11 201:21
202:23,24 203:8
205:23 206:22
209:14 210:16,20
216:5 217:6 220:1
220:23 224:6,7,10
225:7,7 226:22
228:4,15 232:12
238:21 241:11,15
241:22 243:1
244:24 245:10,15
246:1 247:25
249:25 257:18,18
258:14,16 259:12
260:6 261:2 262:12
265:20,21 266:16
267:25 269:14,16
269:25 270:13
271:6,6,7 273:19
274:16 279:10
283:1,21 284:5,8,11
**worked**   11:17,19
12:11,12,22 13:14
17:9,15 18:25 19:4
19:15,20 21:13
27:20 28:9,15 31:1
31:8,8 34:1 35:22
38:5 39:5 43:17
46:18 47:17,22
48:18 50:3 51:6
83:13 92:12 95:11
111:16 139:13
152:4,11,21 153:8
156:9 159:1 160:15

163:15 164:9,18
166:11 169:25
170:3 174:8 182:24
194:1 195:25 196:7
199:13 209:23
210:24 211:3,23
214:17 220:11
222:12 223:8,14,18
223:23 227:25
228:15 229:7,12
232:21 239:23
240:4 241:13,20
242:24 245:17
246:21 247:1,24
249:5 250:4 252:18
253:12,19,24
254:12 259:17
260:11,17,19
263:24 283:23
**workers**   32:22
34:16
**working**   15:23
23:25 28:7 35:8,16
35:18 40:24 44:4
48:13 52:12 55:19
87:7 99:10,13
122:14 124:22
125:17 127:19
128:17 158:11
161:12 164:7 168:4
175:7 182:1 185:10
191:19 192:5
193:21 194:20
197:16 198:2
201:11 202:7,22
203:19,25 204:10
204:19 207:22,24
207:24 208:23
213:23 214:9 215:1
215:6 218:2 219:3,4
219:5,9 223:15
224:3 225:13,24
233:19,21 245:6
246:2,18 248:19
249:1,18 250:8,9,19

251:8 254:23 256:8
256:11,17,24
258:13 264:17
266:16 267:15
270:9,17 275:4
279:24
**workman's**   34:2,4
**workplace**   23:24
**works**   137:6,6
156:14,15 187:14
187:16
**workweek**   152:5,11
152:18 237:12
249:11
**workweeks**   240:25
**world**   107:2 163:6
**worn**   66:22
**worried**   284:19
**worry**   89:9 128:1
146:12 218:21
**worrying**   262:21
**worse**   130:20
**worst**   65:13
**worth**   118:17,23
167:1 270:10
286:24
**worthy**   259:25
**wound**   188:16
**wow**   13:10 14:19
142:16 209:19
210:2
**write**   53:17 56:22
88:22 98:19 101:23
115:23 221:5,7
222:18
**writeup**   84:23
**writeups**   196:21
**writing**   56:7 94:12
146:9 193:13
235:19
**writings**   194:18
**written**   5:22 42:15
96:23 104:6 172:15
**wrong**   70:25 72:5
77:10,13 95:15 97:3

97:8 102:1 174:24
269:20 270:25
282:14,16
**wrote**   94:19 129:22

| x |
| --- |

**x**   31:15 141:2,2
148:2

| y |
| --- |

**y**   12:9 141:2
**y'all**   72:20 167:21
283:9
**ya**   203:24
**yards**   18:9
**yeah**   14:24 15:5,10
17:17 18:10 19:25
22:8,10 27:9 33:16
33:16,18 37:4 51:12
54:6,11 57:11 65:22
69:11 111:20
115:21 119:2,19
134:17,17,20
139:24 149:16
158:7 159:8 164:21
168:3 170:6,9
173:23 174:1 189:4
191:8,8 197:22
208:22 219:20,23
220:18 228:11
233:16 241:6 243:5
245:5 255:5 261:19
264:21 265:2 268:6
269:8,13 280:10
283:10 284:4,4
**year**   10:19 24:9 25:8
28:22 39:14 56:1
57:20 81:6 146:8
149:13 150:12,13
150:18,19 153:17
153:21,22 183:10
272:8
**years**   10:6,15 11:6
12:3 18:2 27:22
31:8,23 35:22 49:17
49:23 50:1 118:22

Veritext Legal Solutions
800-336-4000

LARRY L. LONDON - 06/20/2016

**[years - zone]**

|   |
|---|
|   150:15 164:13 |
|   203:23 217:19 |
| **yesterday**   271:4 |
| **yogurt**   274:6,10 |
| **young**   136:10 |
| **z** |
| **z**   141:2 |
| **zone**   125:11 159:15 |
|   173:17 182:16 |
|   197:2 208:24 |
|   213:20 244:24 |
|   263:10 271:8 |

Page 41

Veritext Legal Solutions
800-336-4000